**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

FILED
RICHARD W. NAGEL
CLERK OF COURT

NOV 26 2024 3: 46 P

U.S. DISTRICT COURT
SOUTHERN DISTRICT
OF OHIO COLUMBUS

| | | |
|---|---|---|
| **KIMBERLY COCROFT** | : | CASE NO: |
| 345 S. HIGH STREET, SUITE 4E | | |
| COLUMBUS, OH 43215 | : | 2:24 CV 4208 |
| | | |
| **Plaintiff,** | : | JUDGE |
| | | |
| v. | : | |
| | | JUDGE SARGUS |
| **FRANKLIN COUNTY OHIO** | : | |
| **C/O PROSECUTING ATTORNEY** | | |
| 373 SOUTH HIGH STREET | : | MAGISTRATE JUDGE JOLSON |
| COLUMBUS, OH 43215 | | |
| | | |
| **RICHARD A. FRYE** | : | |
| 1669 ROXBURY ROAD | | |
| UPPER ARLINGTON, OH 43212 | : | **COMPLAINT** |
| | | |
| **COLLEEN O'DONNELL** | : | **TRIAL BY JURY DEMANDED** |
| 1160 GLENN AVENUE | | |
| COLUMBUS, OH 43212-3230 | : | |
| | | |
| **KIMBERLY J. BROWN** | : | |
| 345 S. HIGH STREET, SUITE 5E | | |
| COLUMBUS, OH 43215 | : | |
| | | |
| **STEPHEN L. MCINTOSH** | : | |
| 345 S. HIGH STREET, SUITE 4B | | |
| COLUMBUS, OH 43215 | : | |
| | | |
| **MICHAEL J. HOLBROOK** | : | |
| 345 S. HIGH STREET, SUITE 5B | | |
| COLUMBUS, OH 43215 | : | |
| | | |
| **JULIE M. LYNCH** | : | |
| 345 S. HIGH STREET, SUITE 7E | | |
| COLUMBUS, OH 43215 | : | |
| | | |
| **MARK SERROTT** | : | |
| 345 S. HIGH STREET, SUITE 6E | | |
| COLUMBUS, OH 43215 | : | |

1

**JEFFREY M. BROWN**          :
345 S. HIGH STREET, SUITE 4A
COLUMBUS, OH  43215       :

**CHRISTOPHER M. BROWN**    :
345 S. HIGH STREET, SUITE 3F
COLUMBUS, OH  43215       :

**DAVID YOUNG**            :
345 S. HIGH STREET, SUITE 7A
COLUMBUS, OH  43215       :

**KAREN HELD PHIPPS**      :
345 S. HIGH STREET, SUITE 7F
Columbus, OH  43215        :

**DANIEL R. HAWKINS**      :
345 S. HIGH STREET, SUITE 6B
COLUMBUS, OH  43215       :

**CARL. A. AVENI**          :
345 S. HIGH STREET, SUITE 6A
COLUMBUS, OH  43215       :

**SHERYL K. MUNSON**       :
345 S. HIGH STREET, SUITE 7B
COLUMBUS, OH  43215       :

**JENNIFER GOODMAN**      :
3820 CASWELL NW RD.
JOHNSTOWN, OH  43031     :

**SUSAN E. BEDSOLE**       :
425 SANDMAR CT.
PATASKALA, OH  43062      :

**CAMEO DAVIS**            :
345 S. HIGH STREET, 2ND FLOOR
COLUMBUS, OH  43215       :

**STACY WORTHINGTON**     :
345 S. HIGH STREET, 2ND FLOOR
COLUMBUS, OH  43215       :

**JEANINE HUMMER** :
373 S. HIGH STREET, 14TH FLOOR
COLUMBUS, OH 43215 :

**THERESA DEAN** :
373 S. HIGH STREET, 14TH FLOOR
COLUMBUS, OH 43215 :

          **Defendants.**

## Preliminary Statement

Plaintiff, Judge Kimberly Cocroft ("Plaintiff" or "Judge Cocroft"), *pro se* brings this against Defendant Franklin County for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-1 *et seq.*, as amended (hereinafter referred to as "Title VII"), and the Civil Rights Act of 1991, 42 U.S.C. 1981a, as amended; the Civil Rights Act of 1871; the Civil Rights Act of 1866, 42 U.S.C. 1981, 42 U.S.C. 1983 and the Ohio Civil Rights Act, Ohio Revised Code Chapter 4112.01 *et seq.* to vindicate federal and state protected rights against unlawful employment practices on the basis of race and gender, and retaliation and against individual Defendants Richard Frye, Colleen O' Donnell, Kimberly J. Brown, Stephen L. McIntosh, Michael Holbrook, Julie M. Lynch, Mark Serrott, Jeffrey M. Brown, Christopher M. Brown, David Young, Karen Held Phipps, Daniel R. Hawkins, Carl A. Aveni, Sheryl K. Munson, Jennifer Goodman, Susan E. Bedsole, Cameo Davis, Stacy Worthington, Jeanine Hummer, and Theresa Dean, in their personal capacities for their violations of equal protection, procedural and substantive due process guarantees of the Fourteenth Amendment and in their official capacities for prospective injunctive relief. The allegations and claims involve timely offenses and also continuing violations which serve to toll the applicable statutes of limitation.

**Introduction**

1.  At all relevant times, Plaintiff Judge Kimberly Cocroft was a judge for the Franklin County Court of Common Pleas, General Division ("FCCP-Gen").

2.  Judge Cocroft has served as a judge for the Franklin County Court of Common Pleas, General Division ("FCCP-Gen"), since April 6, 2009, and has been overwhelmingly re-elected to that position by the voters of Franklin County in elections held in 2010, 2016, and 2022.

3.  Judge Cocroft is a lifelong resident of Columbus, Ohio having graduated from Bishop Hartley High School in 1991 and The Ohio State University in 1995, 1997 and 2000.

4.  Defendants Frye, O'Donnell, K. Brown, McIntosh, Holbrook Lynch, Serrott, J. Brown, C. Brown, Young, Held Phipps, Hawkins, Aveni, and Munson are individuals who acted as agents for FCCP-Gen through their election as a judge and condoned, ignored, ratified, and/or engaged in discriminatory, retaliatory, and hostile conduct and a pattern of corrupt activity in their capacity as managers of FCCP-Gen protocols, policies, and procedures, including procedures to address bad faith complaints filed by employees.

5.  Defendant Goodman was promoted to the position of Court Administrator for FCCP-Gen in or around 2015.

6.  Defendant Bedsole was hired as Deputy Court Administrator for FCCP-Gen and served in that capacity from in or around 2016 through October 4, 2024.

7.  Defendant Davis is the Director of Human Resources for FCCP-Gen.

8.  Defendant Worthington is the Director of Court Support Services for FCCP-Gen.

9.  Defendant Hummer is First Assistant Prosecuting Attorney and Chief Counsel, Civil Division in the Office of Franklin County Prosecuting Attorney Gary Tyack.

10.     Defendant Dean is Deputy Director Labor and Employment, Civil Division, in the Office of Franklin County Prosecuting Attorney Gary Tyack.

11.     At all relevant times, Hummer and Dean served as counsel for FCCP-Gen Judges in their official capacity, which includes Plaintiff.

### Jurisdiction and Venue

12.     This suit is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., providing for relief from discrimination in employment on the basis of race and gender. The Ohio Revised Code §4112.02 *et seq*., prohibits discrimination in employment on the basis of race and sex.

13.     This Court has general federal question jurisdiction pursuant to 28 U.S.C.A. §§ 1331, 1343 and 1367.

14.     Venue is proper in the Southern District of Ohio under 28 U.S.C. §1391(b) because Judge Cocroft is a resident within the Southern District of Ohio, Defendant Franklin County is located within the Southern District of Ohio and the claims arose within the Southern District of Ohio.

### Administrative Process

15.     Judge Cocroft filed an administrative charge with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about May 23, 2024, which charge was docketed as 532-2024-03163.

16.     Judge Cocroft requested a "Right to Sue" letter on September 17, 2024 and the EEOC issued a "Right to Sue" notice, through the United States Department of Justice, to Judge Cocroft on or about October 2, 2024.

## Factual Background

### A. An Election And The Immediate Consequences

17.     In July 2021, Judge Cocroft was unanimously elected to serve as Administrative Judge of FCCP-Gen, beginning January 1, 2022. She was the first woman and first African American woman to serve in that role in the history of FCCP-Gen.

18.     The authority and responsibilities of an administrative judge are outlined in Rule of Superintendence 4.01, promulgated by the Supreme Court of Ohio.

19.     Sup. R. 4.01 states in part, "An administrative judge of a court or a division of a court *shall* do all of the following: Be responsible for and exercise control over the administration, docket, and calendar of the court or division; Be responsible to the Chief Justice of the Supreme Court in the discharge of the administrative judge's duties, for the observance of the Rules of Superintendence for the Courts of Ohio (* * *); Administer personnel policies established by the court of division; (* * *); Perform any other duties in furtherance of the responsibilities of the administrative judge." (Exhibit 1) (Emphasis added.)

20.     As Administrative Judge for FCCP-Gen, Judge Cocroft was also the supervisor for Goodman, in her capacity as Court Administrator. (Exhibit 2, Table of Organization)

21.     The election for Administrative Judge takes place the July preceding the year of service so that, if a new Administrative Judge is elected, the outgoing Administrative Judge, Court Administrator and Deputy Court Administrator can provide the incoming Administrative Judge with information about outstanding issues and training on Administrative Judge responsibilities.

22.     In 2021, McIntosh was the outgoing Administrative Judge.

23.     Beginning shortly after her election in July 2021, Judge Cocroft attempted to schedule a meeting with McIntosh, Goodman, and Bedsole on several occasions, to no avail.

24.     On November 4, 2021, Judge Cocroft sent an email to McIntosh's assistant, "A.S.", requesting a meeting with McIntosh "to discuss responsibilities that I will take on next year as Administrative Judge." (Exhibit 3)

25.     A.S. responded that she had asked McIntosh for a few dates and would "forward them when I have them." (Exhibit 3)

26.     On November 5, 2021, Bedsole sent a calendar invitation to Judge Cocroft titled, "AJ Transition" to schedule a meeting that would occur on November 10, 2021.

27.     Because Judge Cocroft had received no information regarding her duties as Administrative judge, and in an effort to learn more about the organization of FCCP-Gen and the responsibilities of its administrators, Judge Cocroft requested a copy of the FCCP-Gen Table of Organization and position descriptions for FCCP-Gen Directors and Probation Managers.

28.     Judge Cocroft received this information on November 8, 2021. It was the only information provided up to that point. (Exhibit 4)

29.     Judge Cocroft was scheduled to begin her service as Administrative Judge for FCCP-Gen on  January 3, 2022.

30.     The November 10, 2021 meeting took place in the FCCP-Gen Judges' Conference Room.

31.     Before providing Judge Cocroft with information that should have been provided in July 2021, McIntosh began the meeting by stating, "Before I start, I want to tell you that Jen (Goodman) and Susan (Bedsole) are going to be your best friends."

32.     Though Judge Cocroft thought this was a strange way to introduce a meeting about her responsibilities as Administrative Judge, she said nothing.

33.     Thereafter, McIntosh provided her with a few pieces of paper with information that included: a.) a laminated sheet with names and telephone numbers of persons to call in case of a

weather emergency; b.) a sheet regarding the management of auto title requests; and c.) a sheet regarding the management of requests for prospective jurors.

34. McIntosh then explained that there were several matters he would continue to manage even beyond his time of service as Administrative Judge, though any administrative matters should have been passed on to Judge Cocroft.

35. Beyond these sheets of paper, there was very limited information that Judge Cocroft received about her duties as Administrative Judge. To Judge Cocroft's knowledge, no other Administrative Judge failed to receive training and information about outstanding issues.

36. As a part of their job responsibilities, Goodman and Bedsole were required to inform the Ohio Supreme Court, other officeholders (e.g. Ohio Attorney General, Franklin County Prosecuting Attorney), and county agencies of the change in Administrative Judge. Neither Goodman nor Bedsole sent notifications to all FCCP-Gen partners regarding Judge Cocroft's election as Administrative Judge.

37. Internal FCCP-Gen documents that should have included Judge Cocroft's name as the new Administrative Judge for 2022 were not created initially.

38. Many documents that Judge Cocroft signed in the first two months of her service still included the name of outgoing Administrative Judge McIntosh.

39. Historically, the picture of the Administrative Judge is hung in the lobby of the courthouse no later than the first day of the year in which the new term begins.

40. Judge Cocroft's picture as Administrative Judge was not placed in the courthouse lobby until January 7, 2022.

41. In December 2021, and prior to the start of Judge Cocroft's term as Administrative Judge, McIntosh's secretary delivered dozens of auto title applications that had been pending since 2020

and 2021. Shortly thereafter, Judge Cocroft and her staff received numerous calls on a daily basis from auto title applicants regarding why their documents had not been reviewed and when they could expect a final decision.

42.     McIntosh did not inform Judge Cocroft that he had not reviewed dozens of auto titles submitted in 2020 and 2021 during the meeting on November 10, 2021.

### B. Be More Like Them

43.     On or around December 7 or 8, 2021, J. Brown and Serrott came to Judge Cocroft's office to inquire about why an employee on Judge Cocroft's staff was terminated.

44.     In Judge Cocroft's fifteen years of service as Judge, she is not aware of any circumstance in which a Caucasian judge was questioned by other judges about a personnel decision regarding their staff.

45.     J. Brown and Serrott began the conversation by stating that they came to find out why Judge Cocroft's employee quit because they had heard she quit.

46.     Judge Cocroft told J. Brown and Serrott that she owed them no explanation about her personnel decisions, just as Serrott had not been required to explain to her why his entire staff quit and joined the staff of a recently elected judge (Held Phipps).

47.     J. Brown and Serrott then told Judge Cocroft that, as Administrative Judge, she needed to be more approachable because "people" had said that she was not approachable or easy to get along with. J. Brown and Serrott then stated that they heard Judge Cocroft was unfriendly, did not talk to people, and was aggressive.

48.     Judge Cocroft responded that she had never heard those descriptions from anyone.

49. Thereafter, J. Brown gave Judge Cocroft a list of Black women whom she should be more like. Specifically, he said, "You ever heard of Joyce Beatty? Janet Jackson? Yvette McGee Brown? Laurel Beatty Blunt? Toshia Safford? You need to be more like them."

50. Serrott said nothing and did not disagree with J. Brown's statement and "list".

51. Judge Cocroft told J. Brown and Serrott that they did not have the right or her permission, in their paternalism and privilege, to come to her office, question her character and then give her a list of Black women whom she should be more like.

52. Judge Cocroft told them they would not accept her coming to their offices with a list of Caucasian men they should be more like and that, since they did not understand what it was or how it felt to be a Black person, let alone a Black woman, their comments were offensive.

53. Serrott then told Judge Cocroft that he would not want to be Black in America.

54. After J. Brown and Serrott left Judge Cocroft's office, she went to the office of McIntosh, who was still Administrative Judge, to tell him what happened. She was also scheduled to meet with him about administrative judge duties.

55. J. Brown is the suitemate of McIntosh and shares office space with him.

56. When Judge Cocroft arrived in McIntosh's office, she almost instantly began to cry and told McIntosh what J. Brown and Serrott said to her.

57. McIntosh responded that he worked with J. Brown at a local law firm prior to being elected to the bench and "that's just how he is."

58. McIntosh did not state that he would counsel Brown or Serrott about the inappropriate nature of their commentary to Judge Cocroft.

59. As of the filing of this complaint, Judge Cocroft has never been advised by McIntosh that he counseled with either J. Brown or Serrott and neither has ever apologized for their statements

about what kind of Black woman Judge Cocroft should be or for asking her to explain her personnel decisions.

### C.  A New Year With the Same Old Hostility

60.     Judge Cocroft began her term as Administrative Judge on January 3, 2022.

61.     One of her first initiatives was to meet with Court Reporters regarding a work protocol adopted unanimously by the judges in December 2021.

62.     The protocol was developed and approved after J. Brown, Serrott, Phipps, Hawkins, Aveni, and Munson pushed for the creation of a subcommittee to investigate complaints by Court Reporters against Bedsole, as well as a shortage of Reporters during a FCCP-Gen Judges meeting in or around September 2021.

63.     In discussing the employment roles of Goodman, Bedsole, Davis, and Worthington regarding the management of complaints by staff assigned to FCCP-Gen Judges and efforts to hire new Court Reporters, Hawkins wrote in an email dated September 1, 2021, "To be blunt, I believe there are a number of us judges who feel that our belief in the importance and necessity of using a live court reporter is not shared by those on the second floor who work for us ( * * *) I am dismayed [with] how things operate here given the higher stakes of the cases we deal with (* * *)." (Exhibit 5) (Emphasis added.)

64.     At the time of this September 2021 FCCP-Gen Judges' meeting, Judge Cocroft was Chair of the Personnel Committee but none of the judges who wanted an investigation discussed this matter with her prior to the meeting.

65.     As J. Brown requested the formation of a subcommittee during the meeting to investigate claims against Bedsole, Goodman sent a message to Judge Cocroft that said, "I'm aware of some proposed actions but no one is communicated outwardly. All is behind the scenes and secretive.

Phipps/Hawkins/JBrown proposing something. So others have said. Again no one ever picked up the phone to talk. That what frustrates me. It's apparently a big conspiracy…I can't help if folks won't talk to me. A lot of misinformation. I guess they are not happy with us. Would be nice to be able to be made aware and not blind sided. An attack for sure. Blind side attack. Hard not to feel attacked. To have so many come at us the way they did <u>with no opportunity to even be made aware of what we are accused of is disheartening. And sad.</u>" (Emphasis added.)

66.     But instead of the creation of a subcommittee, Judge Cocroft, in her role as Chair of the Personnel Committee, was directed by McIntosh, in his capacity as Administrative Judge, to investigate the claims and to make recommendations.

67.     Judge Cocroft's investigation took two months to complete and the recommendations were adopted unanimously by FCCP-Gen Judges.

68.     Prior to Judge Cocroft's meeting with Court Reporters, no previous Administrative Judge had ever met with them as a group.

69.     The meeting was led by the Reporters assigned to J. Brown and Serrott. The Reporter who is now assigned to Aveni also helped to lead the discussion.

70.     When the meeting started, the Reporters assigned to J. Brown, Serrott, and Aveni began to question Judge Cocroft about when the Protocol was adopted, who approved it, why it was approved, and whether it could be changed.

71.     The Reporters for J. Brown, Serrott, Hawkins, Munson, and Aveni then said their judges told them that they were not aware of what was in the Protocol and that Judge Cocroft had created it without their input.

72.     Judge Cocroft explained the process that led to the creation of the protocol.

73. Further, Judge Cocroft told the Reporters that she completed the investigation, presented findings, and made recommendations that were adopted unanimously by FCCP-Gen Judges, including those who requested the investigation in the first place.

74. Judge Cocroft told the Reporters that, unless FCCP-Gen Judges voted to amend it, the Protocol would remain unchanged.

75. During the January 2021 meeting, Judge Cocroft observed the Reporters for J. Brown, Serrott, and Aveni rolling their eyes at her, making audible sighs and other noises, interrupting Judge Cocroft while she was speaking and signaling to one another when she said something with which they did not agree. None of the other Reporters said anything about this behavior during the meeting.

76. After the meeting, two of the unassigned Reporters, as well as the Reporters for C. Brown and Held Phipps apologized for how the Reporters addressed and treated Judge Cocroft.

77. The Chief Reporter for 2022 was assigned to and supervised by J. Brown.

78. After the January meeting with Reporters, J. Brown asked to meet with Judge Cocroft and Bedsole regarding the Court Reporter Protocol.

79. The meeting was held in the Judges' Conference Room on the second floor of the FCCP-Gen building.

80. During the meeting, J. Brown, who voted in favor of the Protocol, began to complain about it. As the issues were discussed, J. Brown said to Judge Cocroft (in the presence of Bedsole), "Well if I ever decided to fuck you over, I'd let you know before I did it."

81. Judge Cocroft told J. Brown that he would never have the opportunity to do that either professionally or personally. Bedsole said nothing.

82.     The conversation continued and J. Brown made a reference to women wearing skirts and doing work.

83.     Judge Cocroft told J. Brown that his comments throughout the meeting were inappropriate and insensitive. Bedsole said nothing. Both Bedsole and J. Brown are Caucasian.

### D. Public Humiliation

84.     On June 6, 2022, a Data Board meeting was held. The Data Board is comprised of various county justice partners, including the Franklin County Clerk of Courts, the Chair of FCCP-Gen's Technology Committee (K. Brown), the Franklin County Auditor, and others.

85.     After the meeting, K. Brown contacted Bedsole to ask if there was any issue with Judge Cocroft, as Administrative Judge, and how the Court manages documents filed with the Franklin County Clerk of Courts. Bedsole told her there was no problem.

86.     K. Brown then relayed to Bedsole that the Clerk of Courts stated at the June 6, 2022 meeting that the "Common Pleas Administrative Judge" made the decision to facilitate a cybersecurity risk by allowing use of generic accounts for purposes of electronic filing and that the Clerk would be disabling those accounts unless and until she received an Order from the Court allowing the practice to continue.

87.     Judge Cocroft never ordered the creation of, nor does FCCP-Gen have the power to create, generic accounts for purposes of electronic filing.

88.     That work is assigned to the Franklin County Clerk of Courts, and it was the Clerk's staff that both implemented the process and then eliminated it with no notice to FCCP-Gen.

90.     The collateral consequences of the Clerk's decision were that filings from the Franklin County Public Defender's Office were being rejected, FCCP-Gen was not made aware of this decision and practice by the Clerk, and Judge Cocroft was blamed for the issue in a public meeting.

91. K. Brown never reached out to Judge Cocroft directly to ask about these allegations or to share with her what was said at the public meeting.

92. On June 7, 2022, Judge Cocroft wrote a detailed letter to the Clerk, explaining the decisions that her staff made (Exhibit 6 ).

93. Judge Cocroft copied every stakeholder who attended the meeting when the Clerk made the unfounded allegations against her.

94. As of the filing of this complaint, Judge Cocroft has never heard from the Clerk about this issue after the letter was sent and no public retraction has ever been made.

**D.    Judge Cocroft's Hires Ethnically Diverse Staff**

95. Judge Cocroft hired "S.C." as Bailiff in September 2021. S.C. is a Black woman.

96. There was one other candidate who was interested in the position with Judge Cocroft and she was a Caucasian Probation Officer.

97. The Caucasian Probation Officer was interested in going to law school and becoming a judge. During her interview with Judge Cocroft, she said that she wanted to work with her because she thought she would be able to help her with her decision-making process.

98. Conversely, during S.C.'s interview, she stated she wanted to work with Judge Cocroft because she was interested in helping her  better manage her work and because she believed her experience as an Administrative Probation Officer gave her a unique skill set that would translate well to the bailiff position.

99. Davis, in her employment capacity as Director of Human Resources, participated in both interviews.

100. At the conclusion of both, Judge Cocroft asked Davis whom she thought was the better candidate. Davis said that the Caucasian candidate was better. She also mentioned that the Director

of Court Support Services, Worthington, was friends with the Caucasian candidate and also liked her better.

101. Davis and Worthington work together on a daily basis.

102. Judge Cocroft told Davis that she was not interested in hiring a candidate who would view the bailiff position as a steppingstone to the practice of law and, ultimately, the bench.

103. Judge Cocroft told Davis that she needed someone who was fully committed to the position. Judge Cocroft also believed that S.C.'s skill set and experience was stronger than that of the Caucasian candidate. As such, Judge Cocroft told Davis that she would be selecting S.C. for the position.

104. Because S.C. was an Administrative Probation Officer at the time of her hiring, Judge Cocroft allowed her, with Goodman's, Bedsole's and Davis's knowledge and agreement, to "wrap up" her work in the FCCP-Gen Probation Department.

105. The reason that Judge Cocroft needed S.C. to start so quickly was because her prior bailiff, about whom J. Brown and Serrott attempted to question Judge Cocroft in December 2021, had left Judge Cocroft's criminal docket in complete disarray.

106. Davis was aware of all the issues created by the former bailiff, as Davis had drafted her Performance Improvement Plan/Training Plan at Judge Cocroft's request. (Exhibit 7)

107. For the first few weeks of her employment with Judge Cocroft, S.C. would work mornings until the criminal docket was completed and then work in the FCCP-Gen Probation Department in the afternoon.

108. S.C.'s work in the Probation Department necessitated her use of the Ohio Community Supervision System (OCSS).

109. Goodman, Bedsole, and Davis were aware of the fact that S.C. was accessing the OCSS.

110.    At some point in the early part of S.C.'s employment with Judge Cocroft, Bedsole contacted Judge Cocroft to tell her that "Administration" was checking employee use of certain systems, and it was noted that S.C. was accessing the OCSS.

111.    Judge Cocroft never received a complaint questioning the use of technology by her two prior bailiffs, who were Caucasian.

112.    Judge Cocroft had never received a complaint from anyone regarding S.C.'s alleged improper or unauthorized use of FCCP-Gen technology.

113.    Judge Cocroft again explained to Bedsole that S.C. left her employment with FCCP-Gen Probation without any notice in order to assist with getting her criminal docket back in shape after the prior bailiff's termination. To that end, S.C. was using the OCSS to wind up her probation work.

114.    At some point after that conversation, and without notice to Judge Cocroft, Bedsole, Goodman, Davis, or someone at their direction eliminated S.C.'s ability to access the OCSS.

115.    No one notified Judge Cocroft prior to terminating S.C.'s access to the OCSS.

116.    S.C.'s acceptance of the position with Judge Cocroft was predicated on Judge Cocroft's agreement with S.C. and her prior supervisor to allow S.C. to wrap up her work, including use of the OCSS, until a replacement was hired.

117.    Davis, Goodman, and Bedsole were aware of this agreement and understanding.

118..    Upon information and belief, Davis, Goodman, and Bedsole have made accommodations for Caucasian staff of FCCP-Gen Judges regarding use of leave time and other privileges of employment without question.

119.    Worthington, who is Director of Court Support Services, is responsible for training personal staff of FCCP-Gen Judges.

120.    Prior to Judge Cocroft hiring S.C., Worthington provided comprehensive training to all Judge Cocroft's personal staff.

121.    From 2009 through September 2021, all of Judge Cocroft's personal staff were Caucasian.

122.    Judge Cocroft's current Bailiff, S.C., received limited training from Worthington.

123.    Judge Cocroft overheard and witnessed the limited training and also overheard Worthington speaking to S.C. in a hostile and abrasive manner.

124.    In one instance, when Judge Cocroft overheard Worthington speaking to S.C. in an elevated and abrupt tone, she walked out of her office and into S.C.'s adjacent office to ask if everything was alright.

125.    Judge Cocroft never heard Worthington speak to her Caucasian staff in an abrupt and hostile manner.

126.    Judge Cocroft witnessed Worthington training the bailiff and other staff of the judge with whom Cocroft shares office space for over a month.

127.    The majority of S.C.'s training was provided by a Court Support Specialist. However, the Specialist was not able to answer all of S.C.'s questions. So, Judge Cocroft was required to provide training.

128.    Judge Cocroft was never required to provide training to her Caucasian personal staff.

129.    Judge Cocroft is required to provide monthly statistics reports to the Supreme Court of Ohio so that it has information on the number of cases pending on Judge Cocroft's docket.

130.    It is the responsibility of the bailiff of every FCCP-Gen Judge to prepare the monthly reports.

131.    Worthington did not train S.C. on how to prepare monthly statistics reports until November 2021, which was two months after S.C. began employment with Judge Cocroft.

132. Monthly statistics reports are required to be submitted to the Supreme Court of Ohio at the end of every month.

133. On May 16, 2022 and May 17, 2022, a Caucasian female Probation Officer demanded that Judge Cocroft explain to her why she issued an arrest warrant for a defendant on her docket and assigned to the Probation Officer for supervision. (Exhibit 8)

134. The Probation Officer wrote:

> I made note after the 5/5/22 date that this hearing was scheduled for 5/20. I was not made aware that the disposition date had changed. The Clerk's Office has the incorrect address for the defendant as well so he would not have received notice. Is there any way the capias can be set aside and a new date scheduled since we were not made aware of the court date change?

135. After Judge Cocroft replied and asked what the Officer meant by "We were not made aware ( * * *)" since the defendant's counsel appeared for the originally scheduled hearing, the Probation Officer stated, "Neither Mr. Kidwell or I was made aware of the date change. (* * *) I was not made aware of the change. (* * *) Again, probation was not made aware of this change. (* * *) I was not made aware that he did not appear for the 5/6 hearing. If I had been made aware, I could have communicated this directly to Mr. Kidwell."

136. Judge Cocroft sent an email and advised the Probation Officer that two other Probation Officers had covered the hearing that the defendant failed to attend and were obligated to provide that information to her. Judge Cocroft also informed the Officer that the defendant himself had requested the date change. Finally, Judge Cocroft advised the Officer that her tone was off-putting and seemed to suggest that Judge Cocroft intentionally did not provide her with information. So, Judge Cocroft requested a meeting with the Officer, and the Chief Probation Officer.

137. During the meeting, the Officer apologized for her behavior and said that she would be more thoughtful in her communications.

138. To Judge Cocroft's knowledge, the Officer has never communicated with a Caucasian-FCCP-Gen Judge in the way she communicated with Judge Cocroft.

139. On July 5, 2022, Judge Cocroft's new Staff Attorney, "D.H.", began her employment. D.H. is a Black woman.

140. Judge Cocroft advised Goodman, Bedsole and Davis more than a month before D.H.'s start date that she would be joining Judge Cocroft's staff so that preparations could be made regarding her technology and any other needs.

141. Judge Cocroft provided this notice because Goodman, Bedsole and/or Davis inquired repeatedly about information related to D.H.'s employment. Each had actual notice of D.H.'s start date.

142. Judge Cocroft was not in the office on D.H.'s first day of employment due to a previously scheduled commitment.

143. On D.H.'s first day, Goodman, Bedsole, or Davis sent an IT person who had no familiarity with the FCCP-Gen technology to assist D.H. with set-up.

144. For her first day of employment, D.H. had no access to email, voicemail, her calendar, Judge Cocroft's calendar, the electronic filing system, or any other technology needed to do her job.

145. D.H. advised Judge Cocroft of her challenges at the end of her first day.

146. Judge Cocroft apologized to D.H. for the lack of preparedness for her first day and attempted to ensure her that things would be corrected quickly.

147. Judge Cocroft was embarrassed and surprised by the lack of preparation associated with D.H.'s first day because there had never been an issue when Judge Cocroft's prior Staff Attorneys, who were all Caucasian, began employment.

148.    Judge Cocroft was concerned that D.H. may want to leave her employment based on the lack of organization associated with the beginning of her employment. Judge Cocroft expressed that concern to S.C and once again sent a communication to D.H. to assure her that things would get better.

149.    On July 6, 2022, at approximately 10:19am, Judge Cocroft sent an email to Goodman and Bedsole to inquire about D.H.'s issues and to request an update on when all the problems would be fixed. (Exhibit 9)

150.    Judge Cocroft did not receive a response from anyone until approximately 3:30pm on July 6, 2022 when Bedsole replied with partial answers and no update on when the problems would be fixed. (Exhibit 9)

151.    At approximately 4:30pm, Goodman came to Judge Cocroft's office to meet with her and to ask what was going on with D.H., even though the July 6, 2024 email was sent to her.

152.    The door to Judge Cocroft's chambers remained open during her meeting with Goodman.

153.    Judge Cocroft expressed her embarrassment, disappointment and frustration that D.H. had no access to any of the technology she needed to do her job.

154.    Judge Cocroft told Goodman that this circumstance was a continuation of the lack of institutional support that she and her staff received, as S.C. went through the same experience during her onboarding as a bailiff in September 2021.

155.    Judge Cocroft told Goodman that she worked hard to ensure that everyone received the support they needed to do their jobs, and that she would appreciate the same consideration and support for herself and her staff.

156.    Judge Cocroft told Goodman that the issues needed to be corrected by the next business day. Judge Cocroft made this statement outside of her office and across from S.C.'s office who heard the conversation.

157.    Even after this conversation between Judge Cocroft and Goodman, it took a few weeks for D.H.'s technology to be fully functional.

158.    D.H. did not receive a printer for her office (standard for all FCCP-Gen Judges' staff) until December 2022 and it was not fully operational until February 2023.

159.    None of Judge Cocroft's prior Caucasian Staff Attorneys had ever begun employment without being provided with a printer for their office.

160.    Judge Cocroft hired "T.M." as her Assistant in October 2022. T.M. is a Black woman with more than 30 years of experience working in various capacities in Franklin County, including its justice system.

161.    As one of her job responsibilities, Worthington is responsible for training the assistants of FCCP-Gen Judges.

162.    T.M. received limited training from Worthington and/or her staff.

163.    There was never an issue with training for Judge Cocroft's prior assistants, who were Caucasian.

164.    When Judge Cocroft hired T.M., and similar to her other recently hired Black staff, T.M. did not have full access to and use of the Court Forms technology which T.M. needed to prepare Judgment Entries, a central component of Judge Cocroft's work. Judge Cocroft had to request that T.M. be provided with full access to Court Forms technology.

165.     Neither Goodman, Bedsole, Davis, or Worthington ever told T.M. that she could bring in her laptop and have applications installed, in the event that she needed to do work while at home. T.M. did not learn of this until a chance conversation with Judge Cocroft in early 2024.

166.     To Judge Cocroft's knowledge, every Assistant is made aware that applications can be installed on laptops to allow the ability to work from home.

167.     Beginning July 26, 2022 and at various points thereafter, Davis began asking Judge Cocroft's Black staff (S.C., D.H., and T.M.) to provide additional copies of approved leave slips signed by Judge Cocroft.

168.     Davis told Judge Cocroft's staff that they did not have record of the leave slips and needed to confirm that the time was approved by Judge Cocroft.

169.     Judge Cocroft's Caucasian staff had never been asked to verify that they had submitted leave slips that were approved and signed by Judge Cocroft.

170.     In May 2022, J. Brown, Serrott, Frye, and several other FCCP-Gen Judges complained about the inability of their personal staff to get coverage when they took leave from the office.

171.     In investigating this concern in her capacity as Administrative Judge, Judge Cocroft directed Goodman, Bedsole, and Davis to review the use of leave time by FCCP-Gen Judges personal and assigned staff.

172.     Through that inquiry, Judge Cocroft learned that FCCP-Gen had provided more than a year's worth of coverage for employees who either had no leave time available or never submitted a leave slip. (Exhibit 10)

173.     Additionally, Judge Cocroft learned that the employees who chronically violated this policy were Caucasian and were never required to provide Davis with proof of submitted leave slips or available leave time.

**E. An Avalanche of Hostilities**

174.    At the first FCCP-Gen Judges' Meeting of her service as Administrative Judge in January 2022, Judge Cocroft shared with all judges that she wanted to implement several initiatives during her tenure: a.) the adoption of a local rule that outlined the role and responsibilities of the Administrative Judge (prior to 2022, there was no FCCP-Gen Local Rule that explained this position); b.) the implementation of an online payment portal for the payment of court, costs, fines, restitution and other money sanctions; c.) the translation of all criminal and probation forms into Spanish, Nepali and Somali; d.) the creation of an Access to Justice committee to address gaps in the delivery of services to various populations; e.) the implementation of a Diversity, Equity and Inclusion Director position for FCCP Gen; and f.) a review of Judge Cocroft's guiding principles to R.A.I.S.E. (Respect, Accountability, Intentionality, Success, Excellence) The Bar.

175.    During the meeting, no FCCP-Gen Judge expressed any objection to Judge Cocroft's initiatives. But that lack of objection would dissipate over the course of ensuing months.

177.    On July 11, 2022, Judge Cocroft received an email from Aveni, a Caucasian male FCCP-Gen Judge, complaining about the fact that he did not receive the number of jurors he requested for a criminal trial. (Exhibit 11).

178.    As the Administrative Judge for 2022, it was Judge Cocroft's responsibility to make assignment of juror panels for both criminal and civil matters.

179.    In this instance, it was not the case that Aveni did not receive a panel; rather, he received two fewer prospective jurors than he requested.

180.    On this particular day, there were four (4) requests for jury panels - three for criminal cases and one for a civil case - and all requests were filled.

181.    Judge Cocroft explained to Aveni that her efforts were to fulfill all four requests so that no FCCP-Gen Judge who requested a panel would have to wait to start trial.

182.    Judge Cocroft further explained that, prior to the day of trial, Aveni could have advised her of any extenuating concerns that would have prioritized his request or he could have summoned a special panel that would have been for his case only.

183.    Aveni then attempted to lecture Judge Cocroft about the assignment of jurors for civil cases and said, "One of the civil cases going today is before a Visiting Judge. I am surprised they are pulling 21 jurors under the circumstances and given that measure of priority against the exigencies of this matter. Having been on the receiving end of that dynamic many times during my time in private practice on civil cases, I knew how that issue traditionally broke out, when a VJ was involved."

184.    The only way that Aveni would have known the number of jurors assigned in a civil matter is by getting the information from a Jury Manager, who is only supposed to provide that information to the Administrative Judge.

185.    To Judge Cocroft's knowledge, no Jury Manager had ever provided a FCCP-Gen Judge with the number of prospective jurors assigned to a case by the Administrative Judge.

186.    Thereafter, Judge Cocroft told Aveni that the judge for the civil matter requested 24 jurors and that every judge had gotten fewer than requested. Judge Cocroft explained the nuances of juror assignment are based on the number of persons who answer summons and that her responsibility was to every judge who requested a panel.

187.    Judge Cocroft learned later that the matter before Aveni could not even proceed to trial because there was an unresolved evidentiary issue.

188.    To Judge Cocroft's knowledge and as of the filing of this complaint, Aveni has never sent an email questioning the juror assignment decision of any Administrative Judge since Judge Cocroft's service in that position ended in November 2022.

189.    After the conversation with Aveni, Judge Cocroft received an email from Serrott's Staff Attorney.  (Exhibit 12). Serrott's Staff Attorney is a Caucasian woman.

190.    The email included all the specific language that Judge Cocroft had just advised Aveni would be necessary in order to indicate that a matter should be a higher priority in the assignment of jurors.

191.    Based on this identical language, Judge Cocroft believed that Aveni and Serrott had discussed Aveni's complaint.

192.    Consequently, Judge Cocroft went to Serrott's office and told him that she had received the email from his Staff Attorney and, based on the language in the email, it appeared Serrott had a conversation with Aveni about Judge Cocroft and her decision. Serrott confirmed that Judge Cocroft's belief was correct.

193.    Judge Cocroft also told Serrott it was clear, based on the tone of his Staff Attorney's email, Aveni had not given Serrott the entire story.

194.    To that end, Judge Cocroft read the series of communications between Aveni and her to Serrott who was surprised by the details that had been left out. Specifically, Serrott said that Aveni led him to believe that he had not received a jury panel at all. Judge Cocroft clarified for Serrott that Aveni received a panel but with two fewer prospective jurors than requested.

195.    To Judge Cocroft's knowledge, there is no Caucasian or male Administrative Judge who has had to justify their decision-making process regarding the assignment of jurors.

196.    In Summer 2022, Judge Cocroft implemented a plan to translate all of the Court's criminal forms into Spanish, Nepali, and Somali as a recognition of the diverse communities the Court serves.

197.    The Language Access Coordinator at the time, "C.K.", led this effort and the FCCP-Gen Judges, Goodman, Bedsole, Davis, and Worthington were aware of this initiative, as Judge Cocroft announced it at the first Judges' Meeting of the year in January 2022.

198.    While the forms which would have been used by all FCCP-Gen Judges and probation staff were being finalized, C.K. sent Judge Cocroft a communication, informing her that Munson, a Caucasian woman, asked C.K. to translate criminal forms into Spanish but _only_ for use in her courtroom. (Exhibit 13)

199.    C.K. was concerned about ignoring Munson's request but understood that Judge Cocroft had requested that she lead the process for translating all forms for _all_ FCCP-Gen Judges.

200.    After being advised of this request, Judge Cocroft sent Munson an email and reminded her of the courtwide effort to translate all forms and informed her that the process was almost complete. (Exhibit 14).

201.    Judge Cocroft shared with Munson that, while C.K. was a high-level professional, FCCP-Gen was required to use the Supreme Court of Ohio's Language Services Program to translate forms and that those rules must be followed.

202.    Munson continued to send communications to Judge Cocroft that were argumentative in tone, stating that, based on her many years of experience as a Public Defender, she understood what needed to be done and that the lack of translated forms was a significant concern to her both as a former Public Defender and as a judge. (Exhibit 14)

203.    Prior to her effort and initiative to translate all criminal forms during her tenure as Administrative Judge in 2022, there had never been any effort by any FCCP-Gen Administrative Judge, FCCP-Gen Judge, or attorney in the Public Defender's Office or elsewhere who conferred with the Court about translating forms.

204.    Judge Cocroft told  Munson that, based on her commitment to making FCCP-Gen more accessible to our diverse communities, Judge Cocroft would be happy to assign her to the Court's Access to Justice standing committee. Judge Cocroft sent the offer email on or about Augst 29, 2022. (Exhibit 14)

205.    Judge Cocroft carbon copied Goodman and Bedsole on her emails with Munson and each was aware of Judge Cocroft's offer to Munson regarding service on the Access to Justice Committee.

206.    As of the filing of this complaint, Munson has never responded to that offer. However, when committee assignments were made for 2023, Goodman and/or Bedsole proposed to McIntosh, in his capacity as Administrative Judge, that Munson serve as Co-Chair of the Access to Justice Committee, while making Judge Cocroft a standard member of the committee she created.

207.    Although the translation process was completed in 2022, Goodman did not release the forms for use until mid-2023.

208.    Judge Cocroft later learned through speaking with interpreters, who appeared in court to assist in certain hearings, that many of them were not even aware that the forms existed and were not given access to them.

209.    In July 2022, Judge Cocroft developed an idea to institute criminal settlement weeks to help address the backlog of cases created by the COVID-19 pandemic. She contacted the Franklin

County Prosecuting Attorney, Franklin County Public Defender, and private defense counsel about this initiative in an effort to develop a working group, and all were on board to discuss the idea.

210. In Judge Cocroft's first meeting with the representatives of the Franklin County Prosecuting Attorney on July 27, 2022, the First Assistant for Criminal Cases, "J.G.", was visibly disinterested. Eventually, she said, "Have you talked with the other judges about this? I don't think they know about this." J.G. is a Caucasian woman and the former law partner of J. Brown.

211. Judge Cocroft explained that she wanted to gauge the interest of FCCP-Gen justice partners and formulate an idea before taking it to the Court. Judge Cocroft also explained that Sup. R. 4.01, which outlines the authority of the Administrative Judge, permitted her to have a conversation, at the very least.

212. After the meeting, a senior member of the Franklin County Prosecuting Attorney's Office who participated in the meeting came to Judge Cocroft's office to apologize for J.G.'s behavior.

213. This senior member said that during the meeting, which was held via Zoom, they noticed that J.G. was rolling her eyes, not paying attention and was disrespectful in every comment she made to Judge Cocroft. The senior member said they did not know why J.G. was behaving that way, but they were embarrassed and wanted to apologize.

214. The senior member then advised Judge Cocroft that she should work with another senior member of the Franklin County Prosecuting Attorney's Office moving forward.

215. To Judge Cocroft's knowledge, J.G. has never interacted with a Caucasian FCCP-Gen Judge in a hostile or dismissive way.

216. Eventually, the working committee developed several options for the implementation of criminal settlement weeks. (Exhibit 15)

217.    The Supreme Court of Ohio asked all courts to come up with ideas for reducing the number of overage cases.

218.    As of the date of the filing of this complaint, the pilot program for criminal settlement weeks has never been approved or implemented by FCCP-Gen Judges.

219.    In July 2022 at an Access to Justice Committee meeting, Judge Cocroft led a discussion about the position of DEI Director that she introduced initially at the January 2022 FCCP-Gen Judges' Meeting.

220.    Specifically, Judge Cocroft shared that she wanted to explore the idea of elevating the Services, Equity and Inclusions (SEI) Manager position to a DEI Director position for FCCP-Gen.

221.    During the meeting, McIntosh said that he believed it was a good idea to have a DEI Director position and to consider elevating the SEI Manager position. Other FCCP-Gen Judges who were members of the Access to Justice Committee in 2022 agreed.

222.    After the meeting, Goodman and Bedsole told Judge Cocroft they were annoyed that she did not share her thought about the SEI Manger/DEI Director positions with them, and she told them that she did not share her thought with anyone.

223.    Judge Cocroft also explained that Sup R. 4.01 gives the Administrative Judge the authority to manage the administration, docket and calendar of the court, and to administer personnel policies.

224.    Judge Cocroft also reminded Goodman and Bedsole that, during the meeting, McIntosh said Judge Cocroft's proposal was a necessary and good idea, particularly given the fact that FCCP-Gen would not have to find budget money to support a completely new position.

225. On or around September 8, 2022, Aveni notified Judge Cocroft that he had committed FCCP-Gen to participate in an expungement clinic that was occurring on Saturday, September 10, 2022. (Exhibit 16)

226. Participation in the expungement clinic required FCCP-Gen to submit an order to the Clerk of Courts, allowing all filing fees to be waived.

227. The only person who is permitted to prepare such an order is the FCCP-Gen Administrative Judge.

228. Aveni did not talk with Judge Cocroft about this initiative or what would be necessary to ensure participation and protect the operational integrity of FCCP-Gen before making the commitment to participate.

229. Because Judge Cocroft did not want to be blamed for failing to do what was necessary to ensure participation in the expungement clinic, she prepared and filed the Order one day before the event was scheduled.

230. Beyond committing FCCP-Gen to participate in the event, Aveni also invited certain judges (Serrott, C. Brown and Holbrook) to attend the event.

231. Judge Cocroft told Aveni that she would appreciate receiving a copy of the flyer so that she could give all FCCP-Gen Judges the opportunity to participate and so that the Court could avoid the appearance of selective invitations. (Exhibit 17)

232. In September 2022, Bedsole requested a meeting with Judge Cocroft to discuss various issues associated with her service as Administrative Judge.

233. During this meeting, Judge Cocroft asked Bedsole for an update regarding the DEI Director position, since the budget presentation was scheduled for October 2022.

234.    Bedsole said, "I knew you were going to ask about that. Cameo (Davis) just said to me last week, 'You know Judge Cocroft is going to ask about this soon.'"

235.    Bedsole then shared with Judge Cocroft that Goodman told Bedsole, Davis, Worthington and another FCCP-Gen Director to stop working on the budget submission for a DEI Director position.

236.    Bedsole told Judge Cocroft that Goodman had discussed the necessity of the position with the other FCCP Gen Directors and some of them did not think it was necessary.

237.    Bedsole also told Judge Cocroft that Goodman's idea was to move the position so that it would be a direct report to the HR Director (Davis). Judge Cocroft told Bedsole that plan was unacceptable because DEI is different from HR.

238.    Judge Cocroft told Bedsole that she was disappointed that the FCCP-Gen Directors decided to have a conversation about this among themselves, but no one thought enough of Judge Cocroft, as Administrative Judge, to bring the issue to her, until she happened to mention it in a meeting on wholly unrelated topics.

239.    Judge Cocroft told Bedsole that she would convene a meeting with the FCCP-Gen administrative team to discuss this development.

240.    Between the time of the initial conversation with Bedsole and Judge Cocroft's attempt to set up a meeting regarding this issue, Judge Cocroft's uncle died unexpectedly on Monday, September 26, 2022.

241.    Judge Cocroft's father asked her to assist with transport of her uncle's body from his home and other matters associated with his final service and winding up his affairs.

32

242.    On the day that Judge Cocroft's uncle died, Goodman was out of the office, so she informed Bedsole that she needed to leave due to the circumstance. Bedsole shared the information about the death of Judge Cocroft's uncle with Goodman.

243.    On Friday, September 30, Judge Cocroft planned to leave the office during the lunch period when the Court was closed so that she could purchase her uncle's burial clothes.

244.    As Judge Cocroft was preparing to leave, Goodman and Bedsole came to her office and asked her bailiff, S.C., if she was available to talk.

245.    Judge Cocroft could hear S.C. telling Goodman and Bedsole that Judge Cocroft was about to leave to buy burial clothes for her uncle. Goodman then replied, "This won't take long."

246.    Judge Cocroft asked S.C. to send Goodman and Bedsole into her office.

247.    When Goodman came in, she started by saying Bedsole told her what was relayed to Judge Cocroft about work being halted on the DEI Director position.

248.    Goodman then stated that the work had not actually stopped but that she was attempting to come up with alternatives and that the position would be in the budget.

249.    Judge Cocroft thanked Goodman and Bedsole for stopping by but told Goodman that she did not have the emotional bandwidth to have the conversation with them that day because she was going to buy burial clothes for her uncle, which S.C. had stated to them.

250.    Judge Cocroft told Goodman that she planned to meet with the administrative team about the issue because she had some concerns based on what Bedsole shared.

251.    Goodman continued to try to explain her position to Judge Cocroft who told her that she needed to leave so that she could handle family business and get back by 1:30pm when the Court reopened after lunch.

252.    Goodman continued to talk and Judge Cocroft finally told her that she needed to leave.