253. Goodman never offered condolences or expressed concern to Judge Cocroft about the death of her uncle.

254. On October 4, 2022, Judge Cocroft addressed Goodman, Bedsole, Davis, Worthington, one additional FCCP-Gen Director , and the Chief Probation Officer regarding the DEI Director issue.

255. Judge Cocroft said that she was disappointed in the administrative team's decision to have conversations without involving her, to cease work on the initiative, to take an internal poll about who thought the position was even necessary and to lead Judge Cocroft to believe that the work was going forward when it was not.

256. Judge Cocroft told Goodman that, as her direct report based on the Court's table of organization, it was Goodman's responsibility to come to Judge Cocroft first with any issues and that was her expectation moving forward.

257. Judge Cocroft told everyone in attendance that she did not want to answer questions during the meeting because she wanted to maintain a calm demeanor, as she was still trying to finalize her uncle's funeral and was already very emotional.

258. However, because there had been references to the quality of work from the SEI Manager and her ability to potentially be responsible for the work of a DEI Director, Judge Cocroft told the administrative team that she would hold a meeting with them and the SEI Manager to address any concerns.

259. Thereafter, Judge Cocroft scheduled a meeting with Goodman, Bedsole, Davis, the Chief Probation Officer, and the SEI Manager for October 13, 2022. Based on the potential elimination of the SEI Manager position, that person planned to apply for any DEI Director position with FCCP-Gen.

260.    Judge Cocroft clearly expressed to the SEI Manager that, while she believed the Manager was best suited for the position, it would be posted publicly, she would have to apply and, if she was not selected, then she would no longer be employed by FCCP-Gen. The SEI Manager understood and was excited about the possibility.

261.    The purpose of the October 13, 2022 meeting was to give the SEI Manager an opportunity to discuss any initiatives she had implemented and whether she was achieving goals identified by Goodman and Bedsole, as they had both indicated  that the SEI Manager was not doing what she was asked to do. The SEI Manager is a Black woman.

262.    During the meeting, the SEI Manager highlighted those things she was permitted to do. When Judge Cocroft asked Goodman why the SEI Manager was not able to do what she was hired by FCCP-Gen Judges to do, Goodman said that she had to figure out if "I can trust her." Judge Cocroft told Goodman that her perspective sounded strange for a group of professionals, especially given the fact that the SEI Manager had been hired for the position in 2017 or 2018 and the meeting was occurring in 2022.

263.    The Chief Probation Officer participated in the meeting via Zoom and his wife could hear what was being said. Later, the Chief Probation Officer told Judge Cocroft that both the Chief and his wife thought that Goodman's and Bedsole's remarks had racist undertones toward Judge Cocroft and the SEI Manager.

264.    On August 16, 2022, Judge Cocroft received an email from Frye, regarding whether enough prospective jurors were being summoned. (Exhibit 18) Frye, a Caucasian man, served as Presiding Judge in 2022. The Presiding Judge is elected by all General Division Judges.

265.    During the week of August 16, 2022, only 56 people responded to summons; however, the low rate was based, in part, on several districts and universities returning to school during that week.

266.    Judge Cocroft shared this and other information with Frye and also informed him that she and her staff had been subjected to a barrage of cynical remarks and innuendos from other judges, staff and lawyers because she assigned a jury panel to her courtroom in order to conclude a two-year old murder case for which the defendant was not waiving his constitutional right to speedy trial.

267.    Judge Cocroft told Frye that she was contemplating assigning the panel to another judge to avoid the remarks to which she and her staff were subjected.

268.    Frye responded, "[Don't let the critics or cynics, get you sidetracked. AJ is a huge responsibility <u>and you're doing it well but the position does bring with it gossip</u>. And you made the right choice to push ahead with your trial before a murderer walked." (Exhibit 18)

269.    On September 16, 2022, Judge Cocroft received a letter dated September 15, 2022 from J.G., First Assistant Prosecuting Attorney for Criminal Matters, regarding a request to summon more jurors. J.G. is the same person who questioned Judge Cocroft about the idea of criminal settlement weeks to address the backlog of criminal cases created by the COVID-19 pandemic. (Exhibit 19)

270.    In her September 15, 2022 letter, J.G. wrote, "I know that you, as Administrative Judge, <u>are aware of the backlog of criminal cases</u>. We are anxious to bring them to resolution but require the realistic expectation of trial in order to resolve the vast majority of them." (Emphasis added.)

271.    On September 16, 2022, Judge Cocroft sent a response letter to J.G., explaining that in the nine months during which Judge Cocroft served as Administrative Judge, there were two weeks

for which an insufficient number of prospective jurors responded and that, in many instances, the State's inability to provide timely discovery was the bigger cause of delay. (Exhibit 20)

272.    As of the filing of this complaint, J.G. has never responded to Judge Cocroft's letter of response or discussed it with her.

273.    Beyond Frye and J.G., Judge Cocroft received several other emails from judges complaining about the lack of prospective jurors. The complaints were from Caucasian judges who were not even in trial on a consistent basis. Those judges also questioned Judge Cocroft about how she assigned jurors to judges and complained among themselves about her assignment process. In response, Judge Cocroft sent an email to all FCCP-Gen Judges on August 16, 2022, addressing their concerns and advising of potential solutions to address prospective juror concerns. (Exhibit 21)

274.    Beyond his service as Presiding Judge in 2022, Frye also served as Co-Chair of the FCCP-Gen Finance Committee.

275.    In October 2022, Frye wanted to discuss the FCCP-Gen budget submission with Judge Cocroft in her capacity as Administrative Judge. Lynch who served as Chair of Finance, was unavailable to give the budget presentation.

276.    During Judge Cocroft's meeting with Frye, he told her that he didn't understand why FCCP-Gen needed a DEI Director and that a proposed Public Relations position was a "stupid idea".

277.    Judge Cocroft told Frye that the Public Relations position was Goodman's idea, not Judge Cocroft's, and explained the importance of the DEI Director from her perspective.

278.    Frye continued to disagree with the necessity of the DEI position only and, in support of his position, he noted that the FCCP-Gen had previously elected two Black male judges and Judge Cocroft. as Administrative Judge.

279.    Judge Cocroft attempted to explain why electing Judge Cocroft or the Black judges as Administrative Judge was not necessarily a reflection of a commitment to DEI but, instead, was a demonstration of the people who were willing to take on the responsibilities of the position.

280.    Frye then told Judge Cocroft that, instead of creating a DEI position, FCCP-Gen needed to increase the juror fee so that the Court could get more poor and Black people to serve as jurors.

281.    Stunned by his statement, Judge Cocroft told Frye that the juror fee was not the reason that Black people were not serving and that being poor and Black were not synonymous.

282.    Frye never challenged the Public Relations position once Judge Cocroft told him that the idea came from Goodman.

283.    Judge Cocroft told Frye that the Court would proceed with its attempt to create a DEI Director position, as discussed in the January 2022 Judges' meeting.

284.    In October 2022, every FCCP-Gen Judge received a letter from a former employee titled, "Why I Quit". The letter highlighted mistreatment of and abusive behavior toward staff by Goodman, Bedsole, and, upon information and belief, Davis. (Exhibit 22)

285.    Several of the FCCP-Gen judges came to Judge Cocroft regarding the letter and wanted to discuss the issues raised.

286.    Judge Cocroft approached all FCCP-Gen Judges to schedule a meeting. Frye, neither in his official capacity as Presiding Judge nor as a FCCP-Gen Judge, wanted to discuss the letter that alleged mistreatment and abusive behavior by three FCCP-Gen administrators.

287.    Because not all judges wanted to be involved in the discussion, Judge Cocroft could not convene an official Judges' Meeting to discuss a matter that was a personnel issue.

288.    Because the "Why I Quit" letter named Goodman and Bedsole specifically, Judge Cocroft gave each of them a copy of the complaint letter, consistent with the FCCP-Gen historical practice of advising of a complaint and providing a copy of the same to the employee against whom allegations are made. Judge Cocroft also told Goodman and Bedsole that some of the FCCP-Gen Judges wanted to discuss it.

289.    As Administrative Judge, Judge Cocroft had an obligation under FCCP-Gen policies and procedures to inform Goodman and Bedsole of allegations made, even by former employees. Judge Cocroft told Goodman and Bedsole she would keep them advised of developments or requests from the FCCP-Gen Judges who chose to discuss the matter.

290.    The meeting was attended by Judge Cocroft, J. Brown, Serrott, Hawkins, Aveni, Held Phipps, Munson, McIntosh, and one other FCCP-Gen Judge.

291.    During the meeting, Judge Cocroft explained her concerns about the letter (the employee did not self-identify, though every judge in attendance believed they knew the employee in question).

292.    J. Brown shared that this employee and another employee had come to him to complain about Goodman and Bedsole but that his focus was on terminating Bedsole based on her prior supervision of his assigned Court Reporter.

293.    Other judges, including Serrott, Hawkins, Phipps, Munson, and Aveni echoed similar thoughts about terminating Bedsole.

294.    Judge Cocroft told the judges that, in her experience as Administrative Judge, Bedsole did not have the ability to make any decision or to advise any employee without Goodman's direction,

input, and permission and that, if Bedsole had done anything, then Goodman was aware and had approved whatever was done.

295.   Judge Cocroft also said that, because all FCCP-Gen Judges decided not to participate in the meeting and had expressed a desire not to involve themselves in managing an anonymous letter (including but not limited to Frye), and because the former employee did not make any specific allegations, then it would be difficult for the Court to take any affirmative steps without the risk of undertaking what could be alleged by Goodman and Bedsole to be an unfair and biased investigation.

296.   Judge Cocroft also told the judges present that she was aware of and was attempting to manage some allegations brought to her attention that occurred as many as four years prior to her term as Administrative Judge but that the Court needed to be thoughtful in how it handled the matters.

297.   Specifically, Judge Cocroft was managing allegations from FCCP-Gen Probation Officers regarding racism and racist practices that were ignored by Goodman, Bedsole, Davis, a former Chief Probation Officer, "L.F.", and several FCCP-Gen Judges who were notified about the claims before Judge Cocroft was notified including, but not limited to, Serrott, J. Brown, Held Phipps, and Munson. (Exhibit 23) Additionally, C.K., the Language Access Coordinator, alleged that she was held against her will in the office of a FCCP-Gen Director in 2018 and that Goodman, Bedsole and Davis did not investigate or take any corrective action.

298.   After Judge Cocroft provided this information, Hawkins accused her of getting talking points from Goodman and Bedsole before the meeting because she had captured her thoughts on a notepad from which she was reading.

299.    Judge Cocroft told Hawkins that she was offended by the suggestion and that she did not need to confer with anyone about things she had witnessed firsthand.

300.    During that same meeting, Judge Cocroft raised the issue of implementing a communications seminar for all FCCP-Gen employees and Judges so that each could be more cognizant of how to address one another.

301.    At that point, Judge Cocroft told J. Brown how offended she was by his decision to give her a list of Black women whom she should be more like. J. Brown told Judge Cocroft she needed to move on and get over it. None of the FCCP-Gen Judges present said anything.

302.    Shortly thereafter, Serrott told Judge Cocroft that, during the December 2021 meeting at which he told her that he would not want to be Black in America, Judge Cocroft called him a racist.

303.    Judge Cocroft told Serrott she never spoke that word and, instead, told him and J. Brown that they did not get to come to her office, in paternalism and privilege, and tell her what kind of Black woman she should be. Serrott then apologized for making up that statement.

304.    Hawkins came to Judge Cocroft's office later that afternoon so that she could provide more detail regarding the complaints about which she had become aware involving Goodman, Bedsole, and Davis that occurred prior to her term as Administrative Judge.

305.    Hawkins was shocked by the information.

306.    Judge Cocroft told Hawkins that when she asked Davis about the allegation of an employee held against her will, Davis initially pretended not to know what she was referencing. Eventually, however, Davis admitted that C.K. reported the incident but did not state that she investigated, as she is required to do as Director of Human Resources.

307.    Judge Cocroft also allowed Hawkins to review S.W.O.T. analyses submitted by every FCCP-Gen Director that included concerns about Goodman and other issues.

308. Hawkins apologized to Judge Cocroft for his accusation and said that he made the statement because he was tired and had only three hours of sleep the night before.

309. At the conclusion of the meeting, Judge Cocroft received multiple messages from Goodman asking about what happened. Bedsole was copied on those communications.

310. Judge Cocroft responded, "All is well. Rest your minds. I will share more tomorrow. No bad outcomes. There was a little dust-up but not about you…as is custom, I was thrown under the bus." Goodman responded, "How in the world could this be turned around to be negative to you. We can talk tomorrow, just surprised."

**F.    The Setup, Shakedown, and Takedown**

311. On Friday, November 4, 2022, Frye scheduled an Assigned Counsel Board meeting to discuss concerns related to a lawyer. Frye insisted that the meeting occur in person.

312. The Assigned Counsel Board is comprised of the Administrative Judge, Presiding Judge (Frye), and most senior Judge of the Court. Goodman, as Court Administrator, also participates in these meetings.

313. Judge Cocroft sat next to Goodman during the meeting.

314. During the meeting, Judge Cocroft discussed a concern regarding a lawyer on the Appointed Counsel List. Other courts were asking FCCP-Gen to remove the lawyer from its list.

315. Goodman brought the concern to Judge Cocroft's attention, so Judge Cocroft deferred to Goodman to explain the concern in more detail.

316. At the conclusion of the meeting, Frye said that he needed to talk to Judge Cocroft. As Goodman left the room, Judge Cocroft said, "Have a great weekend!"

317.    Once Goodman left, Frye told Judge Cocroft there was a serious situation and that someone had filed a complaint. Frye then informed Judge Cocroft that Goodman filed the complaint, it was against Judge Cocroft, and it was serious. (Exhibit 24)

318.    Judge Cocroft asked Frye for a copy of the complaint. Frye said that he did not have it and that, while he had not reviewed it, it was very long and had a lot of detail. Frye then provided much of the detail and then informed Judge Cocroft that Goodman had "lawyered up."

319.    Frye then said Goodman informed him that, if Judge Cocroft agreed to resign as Administrative Judge for 2023, consistent with the FCCP-Gen Anti-Harassment Policy (Exhibit 25), then she would withdraw her allegations.

320.    Judge Cocroft told Frye that, perhaps, she should lawyer up, as well and that she wanted to take the weekend to consider his "offer" on Goodman's behalf to resign as Administrative Judge for 2023.

321.    Frye continued to repeat that Goodman's complaint was "very serious" but that if Judge Cocroft would resign, then the issue would go away.

322.    On Monday, November 7, 2022, Frye delivered the complaint to Judge Cocroft's office and they had an approximately 35-minute conversation wherein Frye repeated Goodman's offer. (Recording 22, Exhibit 26)

323.    At the beginning of the conversation, Cocroft told Frye that she had thought about his offer to resign over the weekend and believed that the offer amounted to blackmail.

324.    Frye said that it wasn't blackmail and Cocroft asked what his offer was, if it wasn't blackmail.

325.    Frye said that his offer was a way for both parties to walk away from the situation and that Judge Cocroft could just say she was too busy to do the work of Administrative Judge.

326. Judge Cocroft replied that his offer was the classic definition of blackmail – that is, if she did not do what Goodman and Frye wanted her to do, then this allegedly disparaging information would be made public.

327. Frye said that it wasn't that.

328. Frye further stated that, beyond the allegations Goodman made against Judge Cocroft, there were things that Cocroft had done about which she did not notify the FCCP-Gen Judges.

329. Judge Cocroft asked Frye what she had done about which she did not notify the FCCP-Gen Judges. Frye said, that the "DEI stuff came to me cold" during the budget review process and that there should have been monthly budget meetings prior to the budget submission in October 2022.

330. Judge Cocroft reminded Frye that there had never been monthly budget meetings in her fifteen years of service and that the decision on when the Finance Committee meets is within the discretion of the Committee Chair who was Lynch.

331. Frye then said that he had been trying to convince Goodman and Lynch to have monthly meetings and Judge Cocroft asked how the lack of meetings was her fault when she was following the process that had been in place for years.

332. Frye also stated that he did not know about a Public Relations position that was in the budget and Judge Cocroft told him that she didn't know about the position, either, because it was Goodman's idea.

333. Frye stopped discussing the Public Relations position once Cocroft once again informed him that it was Goodman's idea.

334. Cocroft then told Frye that she had discussed the DEI Director position with the FCCP-Gen Judges during the January 2022 meeting and asked if he attended (though she knew the meeting minutes reflected that Frye had attended).

44

335.    Frye said that he didn't know if he was there and he wasn't going to go back and check the meeting minutes.

336.    Judge Cocroft had also discussed the DEI Director position at a July 2022 meeting of the FCCP-Gen Access to Justice Committee.

337.    Frye admitted that he and O' Donnell, a Caucasian woman who was appointed by Judge Cocroft to serve as Chair of the FCCP-Gen Personnel Committee for 2022 and shared office space with Judge Cocroft, had actually created and proposed the resignation resolution to Goodman.

338.    Judge Cocroft noted she was intrigued by O'Donnell's participation in any discussions since O'Donnell had spent a large majority of her workdays campaigning to maintain her position as a FCCP-Gen Judge in 2022.

339.    Judge Cocroft asked Frye if he or O'Donnell thought it necessary or prudent to speak with Judge Cocroft before developing a plan of action.

340.    Frye said that they did not feel it was necessary to talk with Judge Cocroft about Goodman's allegations because they knew Judge Cocroft "would deny everything." This decision is in violation of the FCCP-Gen Anti-Harassment Policy.

341.    Further, Frye said that the FCCP-Gen couldn't lose the "longtime Executive Director of the Court" and that Goodman had threatened to quit if Judge Cocroft didn't resign as Administrative Judge.

342.    Goodman had been Court Administrator since 2014. Judge Cocroft was appointed to an open seat as FCCP-Gen as Judge in 2009 and was then elected for the first time in 2010.

343.    Judge Cocroft stated that it appeared that he was willing to get rid of a judge to accommodate Goodman. Frye said nothing.

344.    Frye said that Judge Cocroft needed to manage this in a "humane" way.

345.    Judge Cocroft told Frye that the Anti-Harassment Policy required that he and anyone else notified of the allegations give her the same consideration and opportunity to share her version of events as they had given to Goodman.

346.    Frye reemphasized that he knew that Judge Cocroft would just deny everything so it really wasn't necessary to speak with her.

347.    Frye attempted to explain his position and then stated that his offer was "not blackmail, it's not greenmail – it's not any of those things."

348.    During the conversation, Frye told Judge Cocroft that she should just do the job of Administrative Judge the way that others before her had done, so that Goodman would not be upset by Judge Cocroft's requests.

349.    Judge Cocroft told Frye she did not have to do the job the way Goodman wanted her to do it and that Rule of Superintendence 4 provided her authority. Frye said he didn't want to hear about that rule.

350.    During the conversation, Frye told Judge Cocroft that she was being "defensive." Judge Cocroft remarked that his characterization was offensive.

351.    At the end of the conversation, Judge Cocroft suggested to Frye that he facilitate a conversation between Goodman and Judge Cocroft because that is what professionals do.

352.    At the time Judge Cocroft suggested a conversation, she had no idea what was in the complaint because she did not receive a copy until the November 7, 2022 meeting, despite the fact she was notified of the complaint on November 4, 2022.

353.    Frye said that he would take the idea of a conversation to Goodman and then get back to Judge Cocroft.

354.    Later that same day, and after finally providing Judge Cocroft with a copy of the complaint, Frye sent an email to Goodman and her regarding an opportunity for probationers. Frye asked one of us to send the communication to the Chief Probation Officer. (Exhibit 27)

355.    Judge Cocroft was anxious and confused about why Frye would send this communication to her and to the person who had just filed an unjust and unfounded complaint against her wherein Goodman alleged that she was fearful of Judge Cocroft.

356.    Judge Cocroft replied to Frye's communication and asked Goodman if she wanted to forward the communication or would prefer that Judge Cocroft send it. Goodman stated that she would send it.

357.    At the time Frye sent the email to Judge Cocroft and Goodman, Judge Cocroft still had no idea what was in Goodman's complaint because she was managing her docket for the day.

358.    Judge Cocroft was not able to review Goodman's complaint until she got home from work at 7:00pm.

359.    Goodman's complaint was not supported by any documentation.

360.    Judge Cocroft began drafting her reply at around 8:00pm on November 7, 2022 and stayed up until 7:00am on November 8, 2022 writing a 31-page response, which was supported by documentation. (Exhibit 28)

361.    As of the filing of this complaint, no one with FCCP-Gen has asked for a copy of Judge Cocroft's reply to Goodman's bad faith complaint.

362.    On Tuesday, November 8, 2022 at approximately 4:00pm, Frye dropped off a copy of a letter he sent to all FCCP-Gen Judges by email. In the letter, he stated that the judges needed to discuss a "corrective plan of action" to address the allegations made by Goodman against Judge

Cocroft. Frye sent the letter at approximately 4:30pm and scheduled a meeting for November 14, 2022. (Exhibit 29)

363.    When Judge Cocroft received the letter, she called Frye and asked what happened to the idea of a guided conversation between Goodman and her. Frye responded that Goodman did not want to meet so he had to do something else and sent the letter.

364.    The letter was sent to FCCP-Gen Judges on the Court's Outlook system before Judge Cocroft was notified that it was being sent or received a paper copy.

365.    Judge Cocroft was on the November 2022 ballot as an unopposed candidate and was scheduled to attend the Election Night party on the day the letter was sent. However, she did not attend because she was both embarrassed and humiliated by the events of the day.

366.    Judge Cocroft later learned that Frye's letter was a topic of discussion at the Election Night Party.

367.    As of the filing of this complaint, Judge Cocroft has never celebrated her unopposed 2022 election.

368.    After Judge Cocroft was notified of Goodman's complaint on November 4, 2022, she began to have problems with sleeping, loss of appetite and anxiety. These problems are documented in text communications between Judge Cocroft and her staff. Later, Judge Cocroft's hair began to fall out, as documented in a photo taken by her hairstylist.

369.    Neither Frye nor O'Donnell notified Judge Cocroft that she was entitled to representation from the Office of the Franklin County Prosecuting Attorney regarding Goodman's bad faith complaint.

370.    While Hummer and Dean had a statutory duty to represent Judge Cocroft regarding Goodman's complaint, they never contacted her regarding the matter. Additionally, upon

information and belief, Hummer, Dean, or other lawyers in their office provided advice to Frye regarding his and O'Donnell's decision to attempt to remove Judge Cocroft from the Administrative Judge position and Goodman's bad faith complaint.

371.    So, in determining what steps Judge Cocroft should take regarding Goodman's complaint, she contacted and engaged with private counsel.

372.    On or around November 10, 2022, Judge Cocroft's private counsel was advised by Frye and/or Serrott that, without hearing Judge Cocroft's version of events, every judge of the Court, with the exception of one FCCP-Gen Judge, was prepared to vote Judge Cocroft out of the position as Administrative Judge without an investigation.

373.    Because Judge Cocroft was led to believe that only one FCCP-Gen Judge would not vote to remove her, Judge Cocroft did not believe that she would receive a fair investigation of Goodman's complaint.

374.    After consulting with counsel, Judge Cocroft decided to prepare a letter of resignation to be read at the November 14, 2022 meeting.

375.    After the resignation letter was read, McIntosh was re-elected to the position of Administrative Judge for the balance of 2022 and 2023.

376.    Once McIntosh was re-elected, J. Brown said, "Welcome back, Mac."

377.    The day following the November 14, 2022 meeting, Goodman was permitted to send notice to all FCCP-Gen employees and all of its justice partners, indicating that, effective immediately, McIntosh would be the Administrative Judge. (Exhibit 30)

378.    Shortly thereafter, Judge Cocroft began to receive phone calls, visits from court staff and other email communications in support of Judge Cocroft.

379.    To Judge Cocroft's knowledge, there has never been any other circumstance where the person who filed a complaint was given the authority to notify justice partners that the person against whom they made a complaint would no longer be in a position.

380.    On November 15, 2022, Judge Cocroft went to her courtroom bench to use the computer and noticed that a member of the Court's IT staff had logged into her computer. (Exhibit 31)

381.    Judge Cocroft did not submit a request to IT to service her computer and the IT employee in question never mentioned to Judge Cocroft that they had logged in to her computer.

382.    On November 22, 2022, FCCP-Gen received a public records request for "any and all documents related to the change in administrative judge this month as well as any documents detailing concerns or complaints regarding former Administrative Judge Kimberly Cocroft." (Exhibit 32)

383.    It is the standard practice of the FCCP-Gen to notify a judge if they are the subject of a public record request.

384.    This practice was confirmed in a May 20, 2024 communication from Davis in which she informed Judge Cocroft that it is the FCCP-Gen policy to notify people who are impacted by a public records request as quickly as possible. (Exhibit 33)

385.    No one notified Judge Cocroft of the November 22, 2022 request until after it had been sent to FCCP-Gen Directors and all FCCP-Gen Judges.

386.    Neither Hummer nor Dean notified Judge Cocroft's counsel of the public record request. Hummer and Dean, whose office reviews public record requests, discussed the sum and substance of the request with Goodman, Bedsole, Davis, Worthington, and McIntosh.

387.    Hummer and Dean did not discuss the request with Judge Cocroft or her counsel. Judge Cocroft informed her counsel of the record request when she was notified.

388.   After the public records were collected, Judge Cocroft was notified on the day of the scheduled release, January 27, 2023, that if she wanted to include a statement with the release, then it had to be submitted by 4:00pm, as the records were going to be released on the same date at 5:00pm.

389.   Judge Cocroft and counsel were notified of this deadline at approximately 2:27pm.

390.   Judge Cocroft submitted her statement by 3:03pm. (Exhibit 34 ) While Judge Cocroft and her counsel were advised that Goodman withdrew her bad faith complaint, there is no formal written statement from Goodman, affirming that her bad faith complaint was withdrawn and neither Frye, O'Donnell, McIntosh, Hummer, or Dean required Goodman to submit the same.

391.   On January 27, 2023 at 6:34pm, Judge Cocroft was contacted by her private counsel and notified that, when Ms. Goodman saw her statement, she decided that she may want to add additional public records. Goodman was given until January 31, 2023 to add records.

392.   Specifically, the message from Judge Cocroft's counsel said, "Got a call * * * about a half hour ago that once [Goodman] saw our addition she may wish to weigh in with some public records submission of her own. Nobody is really sure but suddenly the 5:00 deadline is no longer applicable and nothing is going out probably until next week."

393.   On April 10, 2024, Judge Cocroft sent an email to Hummer and another lawyer in her office, reminding them that Goodman received an extension to provide additional documents and that she never received a copy of those documents .

394.   As such, Judge Cocroft requested that she receive a copy of any additional documents Goodman was given time to review and, potentially, submit. (Exhibit 35)[1]

---

[1] To the extent that an attorney-client privilege exists regarding communications between Hummer, Dean and/or Judge Cocroft, Judge Cocroft hereby waives the privilege relative to the filing of her complaint, the inclusion of any documents between Judge Cocroft, Hummer, and/or Dean in support of the same, and all future pleadings and proceedings in the instant matter.

395.     Hummer responded that she would look into the circumstance and get back to Judge Cocroft.

396.     As of the filing of this complaint, Judge Cocroft has never received an explanation regarding why the intractable deadline was extended for Goodman.

397.     As of the filing of this complaint, Judge Cocroft has never received copies of the additional public records Goodman contemplated submitting with the public record request. In addition, there has never been any sort of investigation regarding Goodman's false and bad faith complaint against Judge Cocroft.

398.     Between November 4, 2022 and November 14, 2022, Goodman, Bedsole, Davis and Worthington permanently deleted all internal Teams messages between Judge Cocroft and them as well as Judge Cocroft's Black staff and them. These messages related to the administrative work of the Court and, under Rule of Superintendence 26.01, should have been maintained permanently. (Exhibit 36)

399.     As of the filing of this complaint, K. Brown, as current Administrative Judge, has done nothing to address this violation of Rule of Superintendence 26.

400.     In 2022, Judge Cocroft was selected to serve as Adjunct Faculty at the Moritz College of Law at The Ohio State University.

401.     Because of the volatile nature of Goodman's bad faith complaint, Judge Cocroft had to notify the hiring Dean at Moritz of the situation and her inability to teach during Fall Semester 2023.

402.     Judge Cocroft did not want to potentially damage the school's reputation and did not know if or how Goodman's bad faith complaint would be used against her in the future

403.     In  July 2022, Judge Cocroft was notified that she would receive the William K. Thomas Distinguished Jurist Award from the Moritz College of Law and The Ohio State University.

404.     Judge Cocroft sent an email to Goodman and Bedsole on or around July 13, 2022, notifying them that she was receiving the Award. (Exhibit 37)

405.     Historically, Goodman, Bedsole, or Davis prepare an immediate press release if a FCCP-Gen Judge or other employee receives an award or is recognized by the public.

406.     Judge Cocroft received the Award in September 2022. On September 13, 2022, two months after being notified initially, Goodman sent an email to Cocroft asking for information about the Award. (Exhibit 38)

407.     After receiving the Distinguished Jurist Award, Judge Cocroft received a communication from Goodman stating that she was trying to prepare a press release but could not find information and hoped that I wasn't mad or upset with her because the press release had not been prepared. Judge Cocroft told her she was not mad or upset.

408.     In 2022, Judge Cocroft was notified that she would receive an Honorary Doctorate from Franklin University at its May 2023 Commencement Ceremony.

409.     Judge Cocroft did not share this achievement with FCCP-Gen Judges, Goodman, Bedsole, Davis, or Worthington because, given the conspiratorial nature of their actions, Cocroft did not want them to sabotage her receipt of the Honorary Doctorate.

### G.     Not A Happy New Year: More Discrimination, Hostility, and Retaliation

410.     In January 2023, McIntosh, with the assistance and input of Goodman and Bedsole, made assignments for the FCCP-Gen standing committees.

411.     For most of Judge Cocroft's fifteen years of service, she was a member of the FCCP-Gen Personnel and Finance Committees, which are central to the operations of the Court.

412.    In 2022, Judge Cocroft created the Access to Justice Committee to address gaps in FCCP-Gen's delivery of services to marginalized, ethnically diverse and underserved populations.

413.    As a general historical practice, FCCP-Gen Judges who serve as Administrative Judge are selected as members of the Committees on which they served prior to their term as Administrative Judge.

414.    Judge Cocroft was not selected to serve on either the Finance or Personnel Committees for 2023. Additionally, Munson, who never responded to Judge Cocroft's request to participate as a member of the Access to Justice Committee in 2022, was selected to serve as Co-Chair of the Committee in 2023 and Judge Cocroft was selected as a standard member of the committee she created.

415.    McIntosh sent committee assignments to the FCCP-Gen Judges on January 18, 2023, On the same date, Judge Cocroft sent an email to McIntosh, the FCCP-Gen Directors and Judges, asking to be informed of all committee meetings, so that she could participate in the meetings. (Exhibit 39)

416.    Judge Cocroft acknowledged that she could not vote at committee level but emphasized that there was historical precedent for judges participating in meetings for committees to which they were not assigned.

417.    After her request, Judge Cocroft learned that McIntosh sent an email to all Committee chairs, reminding them that all judges had the right to participate in committee meetings.

418.    Specifically, the January 24, 2023 email stated, "Judges there is not a policy in place that prevents a judge from sitting in a committee meeting that they are not a member. We have allowed judges to do so in the past. They cannot vote and it would be up to the chair if they would allow them to participate in committee discussions. All committees need to be consistent unless the court

decides to adopt a procedure that only committee members may attend committee meetings."
(Emphasis added.)

419.    To Judge Cocroft's knowledge and, consistent with the McIntosh from email, the FCCP-Gen Judges had never questioned a judge attending a committee meeting until Cocroft requested notification of committee meetings, and that, unless there was a vote to change this practice, Judge Cocroft would have to be allowed to participate in meetings.

420.    To Judge Cocroft's knowledge, there has never been communication sent to all judges reminding them of the ability of any judge to attend committee meetings and, in Judge Cocroft's fifteen years of service, she has never received such a letter.

421.    As a general practice, the Chair of every Committee schedules meetings after speaking with the FCCP-Gen Director whose daily work most closely aligns with the work of the Committee.

422.    In 2023, Held Phipps was the Chair of Personnel and Lynch was Chair of Finance.

423.    In 2023, there were five or six Personnel Committee meetings and Judge Cocroft was only notified of three.

424.    In 2023, Judge Cocroft was not notified of any Finance Committee meetings though there were at least two to her knowledge.

425.    In February 2023, Judge Cocroft presided over a high-profile rape and kidnapping trial that required a special panel to be summoned.

426.    During her abbreviated tenure as Administrative Judge, Judge Cocroft developed a new form to help with the management of and requests for special jury panels.

427.    When Judge Cocroft requested the special panel in July 2022, all counsel were available to conduct jury selection on the Friday prior to the February trial date. However, due to the changing

nature of trial schedules, neither counsel nor Judge Cocroft were available; Judge Cocroft was presiding over a murder trial.

428. Judge Cocroft notified the Jury Managers of this change in schedule and told them that she would greet the jurors on the Friday before trial as anticipated but would ask them to come back on the first day of trial for jury selection. Judge Cocroft told them that she would not be able to greet the jurors until about 9:30am because she was presiding over a murder trial.

429. Shortly thereafter, Judge Cocroft's bailiff, S.C., received an email from the Director of Court Support Services, Worthington.

430. Worthington and the Jury Manager stated that they expected Judge Cocroft to conduct jury selection on the Friday prior to trial and that, since jurors would be there early, Judge Cocroft needed to arrive no later than 8:30am.

431. Worthington and the Jury Manager also stated that jurors were going to be frustrated with not going through selection because many of them expected to learn whether they would have to serve.

432. In 2015, Judge Cocroft summoned a special panel for a four-co-defendant trial and the lawyers did not select jurors on the Friday before the trial began. In that circumstance, Judge Cocroft used the Friday before the trial date to introduce herself and to give an overview of what the prospective jurors would experience when trial started the following Monday.

433. Worthington never expressed concern to Judge Cocroft about that process.

434. Judge Cocroft responded to the email from Worthington and the Jury Manager and gave them this information regarding her 2015 special panel. (Exhibit 40)

435. Judge Cocroft also told them that while she and counsel had hoped to be able to start on Friday, their respective trial schedules did not allow that to happen.

436.   Judge Cocroft informed Worthington and the Jury Manager that she would adjust her murder trial so that she and her staff could appear on Friday at 8:30am as requested.

437.   To Judge Cocroft's knowledge, Worthington has never asked a Caucasian judge to adjust their schedule for any reason.

438.   On the day that the special panel arrived, Judge Cocroft and her staff left her chambers at 8:15am to meet the special panel.

439.   As Judge Cocroft was walking down the hall toward the Jury Commission Office, Worthington walked quickly toward Judge Cocroft and asked, "Did you get my text?"

440.   Judge Cocroft told her that she had not and then checked her phone.

441.   While Judge Cocroft checked her phone, Worthington stated that there was a problem with juror check-in and they would not be able to start at 8:30am. Worthington stated that they would not be ready until closer to 9:00am.

442.   Worthington and the Jury Manager staff did not complete their work until around 10:00am.

443.   Judge Cocroft introduced herself to jurors and explained that the lawyers were not present because of other trials but that she could hear excuses.

444.   Contrary to representation from Worthington and a jury manager, no jurors complained or expressed frustration.

445.   After completing excuses and identifying the remaining prospective jurors, the Jury Manager staff told Judge Cocroft that they would not be able to assist her with juror check-in on Monday and with helping her to manage the more than 100 prospective jurors who would appear.

446.   Judge Cocroft was also informed that her special panel would not be permitted to be in the Jury Commission area because there was no room for them, as the Jury Manager staff could not manage the special panel and petit jurors.

447.    During a high-profile trial assigned to Holbrook, the Jury Managers and Administration provided support to him in managing the special panel. Holbrook is a Caucasian man.

448.    Upon information and belief , during a high-profile trial assigned to Young, Jury Managers allowed his special panel to be seated in the Jury Commission Office during the petit juror orientation. Jury Managers also helped manage Young's special panel. Young is a Caucasian man.

449.    Because Judge Cocroft received no support from FCCP-Gen staff employed to assist with any jurors, Judge Cocroft and her assistant, bailiff, court reporter, and staff attorney checked in and managed 135 jurors. This work pulled Judge Cocroft's staff away from their regular job duties.

450.    At the beginning of February 2023 trial, Worthington would not provide Judge Cocroft's bailiff with a key to the special proceedings courtroom where the trial was held, though she indicated she could not be available to provide us with assistance. After some effort, Worthington provided Judge Cocroft with a key to the courtroom.

451.    Upon information and belief, no Caucasian judge who has used the special proceedings courtroom has been denied a key to that courtroom while they were in trial.

452.    During the same February 2023 trial, Judge Cocroft's Court Reporter was scheduled for approved leave time and had notified Bedsole that Judge Cocroft would need coverage for two days of the trial. (Exhibit 41)

453.    Bedsole was responsible for making Reporter assignments.

454.    At the time Judge Cocroft's Reporter requested coverage, no other Reporters had requested leave time or coverage.

455.    By the time the trial was in session, several other Reporters decided to take time off.

456.   When Judge Cocroft followed up with Bedsole regarding her assignment request, Bedsole first indicated that she did not have any information regarding the request from Judge Cocroft's Reporter and that there were several judges who needed Reporters.  (Exhibit 41).

457.   Judge Cocroft's Reporter reminded Bedsole that she requested coverage for Judge Cocroft in October 2022, at which time no other Reporters had requested time and that Judge Cocroft was in a high-profile trial. (Exhibit 41)

458.   Shortly thereafter, Bedsole sent an email to several FCCP-Gen Judges who needed a Reporter (including Judge Cocroft) and indicated that each judge would have to contact Bedsole ten minutes before an assignment was needed and she would send a Reporter, if one was available. (Exhibit 41)

459.   Judge Cocroft then replied to Bedsole to confirm that she would have to follow this protocol while being in a high-profile trial and with her Reporter having provided notice in October 2022. (Exhibit 41)

460.   Bedsole eventually made an assignment for the trial and, fortunately, Judge Cocroft only needed a Reporter to take the verdict. (Exhibit 41)

461.   During her service as Administrative Judge, Judge Cocroft witnessed Bedsole do whatever was necessary to ensure that Caucasian Judges had Reporter coverage when requested with little to no follow-up or explanation. This was especially true since several of the FCCP-Gen Judges had threatened to terminate Bedsole.

462.   On March 17, 2023, "G.C.", a former Assignment Commissioner, sent an email to Judge Cocroft's staff regarding vacation time scheduled by Judge Cocroft. (Exhibit 42).

463.   For any FCCP-Gen Judge who requests time out of the office, there is a specific form that bailiffs are told to complete and to submit to Assignment so that cases can be moved.

464.    Judge Cocroft completed the form used universally by all bailiffs.

465.    While the requested dates were blocked, G.C. sent Judge Cocroft's staff  the following email: "Please note, that if the judge wants there to be a 'waiver of time' for the criminal cases, you would need to reach out to counsel on the cases currently set on these dates and request for them to come in and execute a continuance entry so that there is a waiver of time in place. Our office is only able to execute a Court Unavailable entry to move the attached cases (excluding sentencing hearings), which requires us to set these cases in on the judges 'first available' date since there will not be a waiver of time on the entry."

466.    When Judge Cocroft's bailiff told her about this request, she informed the bailiff that she had never heard of or been requested to comply with this process.

467.    Judge Cocroft then sent an email to Worthington, who supervises the Assignment staff, with a copy to McIntosh, in his capacity as Administrative Judge to inquire about what appeared to be a new policy. (Exhibit 42)

468.    Judge Cocroft explained that this email to her bailiff and the policy were new and that neither she nor any prior bailiff had ever been asked to manage Judge Cocroft's time out of office in this way. Both of Judge Cocroft's prior bailiffs were Caucasian.

469.    Judge Cocroft concluded that she would appreciate a meeting so that she and her bailiff could better understand the policy and said, "While we will adhere to whatever processes are universally implemented and necessary (***), we would like to have clarity on what triggers this rule and when it becomes necessary to secure executed time-waived entries from counsel. Moreover, if it is the historical practice of the court to move cases to that next business day after a judge returns, then it seems as if the form that bailiffs complete to continue cases is neither helpful nor necessary and that, in every instance, a continuance entry from counsel would be required."

470.    Worthington responded on March 28, 2023 and stated, "In reading through the emails and speaking with Giuseppe, his email didn't articulate well what had been discussed between myself and the assignment office recently." She then discussed staff turnover and the impact of the pandemic on operations. She further explained that the policy was not new but had been emphasized by the Chief of Staff with the Prosecutor's Office in 2005. (Exhibit 42) (Emphasis added.)

471.    When Judge Cocroft sent a separate email to McIntosh to ask about the issue, she learned that he was not aware of this policy or practice  and was surprised by its implementation. (Exhibit 43)

472.    Judge Cocroft advised Worthington that her staff was never made aware of an issue raised in 2005 and that, if there was a concern about a time waiver, then the form given to all bailiffs to secure time out of office for a judge should be eliminated.

473.    As of the filing of this complaint, Worthington has never met with Judge Cocroft about this issue.

474.    As of the filing of this complaint, the forms used to secure time out of the office are still being used and there was no broad email sent to all FCCP-Gen Judges regarding Worthington's concern.

475.    However, to avoid the circumstance of all cases that are continued being set on the same day based on Judge Cocroft's time out of office, Judge Cocroft now has counsel and litigants sign individual continuance entries so that cases can be spread out over various days.

476.    Upon information and belief,  no Caucasian judges have ever been asked to account for time in the way Judge Cocroft was requested to manage time in the March 2023 correspondence from Worthington.

477.   On March 28, 2023, Judge Cocroft's bailiff received an email from an Assistant Assignment Commissioner, asking her to "start sending 4E daily dockets to our 'GEN_Assignment email.'" The basis for the request was that having Judge Cocroft's daily dockets would make it "easier and quicker for us to do monthly audits by keeping track of the capiases, inactive and closed cases." (Exhibit 44)

478.   When Judge Cocroft was advised of this email, she told her bailiff that neither she nor her prior Caucasian bailiffs had ever been asked for this information.

479.   Thereafter, Judge Cocroft asked her bailiff to find out whether this request was a new policy for all bailiffs and to copy her on the email.

480.   Once copied, Judge Cocroft asked the Assistant Assignment Commissioner to explain the necessity and origin of this request because her bailiffs had never been required to provide this information in the past.

481.   After Judge Cocroft sent an email to the Assistant Assignment Commissioner, Worthington sent an email to several groups of people responding to the questions Judge Cocroft posed to the Assistant Assignment Commissioner; but Worthington never replied directly to Judge Cocroft (Exhibit 44)

482.   Worthington's email attempted to explain why the daily dockets were necessary – due to staff turnover and to assist Assignment with ensuring that continuances are accounted for.

483.   In response, Judge Cocroft shared that this practice never existed during her time as judge and that her current bailiff was never trained by anyone on this practice.

484.   When the Assistant Assignment Commissioner replied to Judge Cocroft on March 29, 2023, he stated that he had to talk with his supervisor, Worthington, before he could respond to her questions. He then stated, "This is also a new practice for me as I have held this position for a few

months and the importance of daily dockets sheets was not emphasized enough until recently being short-staffed." (Exhibit 44)

485.    Upon information and belief, no Caucasian judges or their staff received the request for daily dockets.

486.    As of the filing of this complaint, Judge Cocroft has not sent her Daily Docket Sheets to Worthington or any member of her staff. To  Judge Cocroft's knowledge, no bailiff has sent these sheets and there have been no further requests for the Daily Docket Sheets.

487.    On April 19, 2023, Judge Cocroft's magistrate informed her of an issue regarding security during arraignments.

488.    Judge Cocroft's magistrate raised the issue with other magistrates on April 17, 2023. Judge Cocroft's magistrate copied Goodman on her first communication but received no response.

489.    The magistrate then forwarded her email to Judge Cocroft on April 19, 2023, and she then forwarded it to McIntosh, as Administrative Judge. (Exhibit 45)

490.    She stated that a copy of the communication was sent to Goodman, though the magistrate was unclear whether Goodman had a discussion with McIntosh.

491.    McIntosh replied in part, "Jen [Goodman] already discussed it with me and she is going to have a conversation with [Court security personnel] about this."  Goodman never responded to the magistrate's  email and, while McIntosh promised to provide an update to Judge Cocroft regarding her staff's security concern, she never received an update.

492.    On April 25, 2023, the FCCP-Gen Personnel Committee met to discuss the DEI Director position description.

493.    This initiative was implemented by Judge Cocroft in January 2022 but was delayed after Judge Cocroft was forced to resign as Administrative Judge in November 2022.

494.     During the meeting, McIntosh discussed the importance of DEI initiatives and how he was not completely familiar with the language that should be used in addressing certain diverse communities.  McIntosh said that it would be important to be exposed through education regarding how to approach, understand or treat people that may be different. (Exhibit 46, Recording 48)

494.     Lynch responded that she did not believe there were any of us who were judges who didn't know how to properly address other people.

495.     Lynch then stated that McIntosh should feel free to go to a training class but that she would not accept such training being mandatory for her.

496.     Lynch replied that when you start getting into lists, then there is someone who is always going to be offended.

497.     Serrott then asked whether the DEI training would be mandatory for FCCP-Gen Judges and their staffs.

498.     Lynch then said that her staff would not be mandated to attend DEI training. Serrott agreed that "personal staff" of FCCP-Gen Judges should not be required to attend.

499.     Lynch then said that "any other staff" who were required to attend was not the same as "our staff".

500.     Lynch then said that "diversity is not just skin color. And I am tired of it being about skin color."

501.     Lynch stated that "someone in this room picked out somebody for this position and then developed this around that person."

502.     Lynch remarked  that she obtained this information from Goodman.

503.    Judge Cocroft was the person who developed the idea for a DEI Director position and advised the Court that the SEI manager position in FCCP-Gen Probation Department would be changed to courtwide.

504.    As such, Judge Cocroft realized that she was the "someone" whom Lynch was referencing.

505.    Judge Cocroft then addressed Lynch and told her she could speak to the issue and Lynch replied, "It wasn't you, Kim, so you're gonna open your mouth." Judge Cocroft said that she was going to "open my mouth" and correct the misinformation.

506.    Judge Cocroft explained that she understood that DEI initiatives exceeded conversations beyond that of race.

507.    Judge Cocroft also explained that the person who was serving as SEI Manager had not been given latitude to do her job since she was hired in 2018 and had spent much of her time passing out PPE supplies and/or supervising the urine lab after Goodman and the former Chief Probation Officer eliminated the DEI Committee in the FCCP-Gen Probation Department, such that her work did not exist.

508.    Lynch said that she talked to Goodman about the DEI Director position and asked what the "need" was for the position, as she had talked to "many others" who didn't "have the need" for a DEI Director.

509.    Lynch said that, when she talked to Goodman, she told Lynch that the need only existed in FCCP-Gen Probation. Goodman quickly tried to deflect from Lynch's statement.

510.    Lynch then stated that Goodman told her the need started based on allegations of racist behavior in the FCCP-Gen Probation Department about which Goodman was aware.

511.    Lynch further stated, "Whatever was going on in Probation, we don't even know if it's fixed yet because they yet again have another new Director." (Emphasis added.) The "Whatever"

Lynch referenced were the allegations of racism asserted by FCCP-Gen Probation Officers about which several judges were notified.

512.    Lynch said that the salary for the position needed to be lowered and that, when she discussed the salary with Holbrook and Serrott, they said the salary was the same as when they started as FCCP-Gen Judges.

513.    The salary for the DEI Director Position was the same as the salary of other Directors, if not lower.

514.    Upon information and belief, neither Lynch, Holbrook, nor Serrott ever articulated a complaint to all FCCP-Gen Judges about the salaries of other Director positions.

515.    On April 28, 2023, McIntosh sent an email to all judges regarding the efforts of the Ohio Supreme Court's Chief Justice to develop case management strategies. (Exhibit 47)

516.    Beyond Judge Cocroft's idea and creation of a criminal settlement week pilot program, she is also a member of the Supreme Court of Ohio's Case Management Advisory Committee.

517.    In his email, McIntosh stated that he was implementing a FCCP-Gen ad hoc case management committee and named four judges (all Caucasian).

518.    At the time of their selection, three of the four judges had more overage cases on their dockets than Judge Cocroft.

519.    McIntosh was aware of Judge Cocroft's service on the Advisory Committee for Case Management but did not ask her to participate on the ad hoc case management committee for FCCP-Gen.

520.    The FCCP-Gen ad hoc committee took Judge Cocroft's criminal settlement week pilot program as a foundation for this initiative and did not give her credit for its creation.