521.    Upon information and  belief and as of the filing of this complaint, there has been no further action regarding this ad hoc committee.

522.    On May 22, 2023, Judge Cocroft had a few cases that required the use of interpreter services, consistent with the requirements of Rule of Superintendence 88.

523.    On that same date (May 22, 2023), Judge Cocroft learned for the first time that the employee who coordinated the assignment of interpreters was on extended leave, that there were no Spanish interpreters, and that there were three people whom counsel and/or the FCCP-Gen Judges could contact in order to request an interpreter.

524.    Judge Cocroft sent an email to McIntosh on May 22, 2023 and said, "I do not recall receiving a communication regarding the change in procedure regarding how an interpreter is requested, though I could have missed that email. Was anything sent to the judges? Is there an issue with interpreter shortages or is this just an anomalous circumstance this week? Should judges advise counsel to request an interpreter within a certain timeframe?" (Exhibit 48)

525.    McIntosh responded the same date and wrote, "There has not been a change in procedure. [The employee's] responsibilities have been picked up in her absence. We still need sufficient lead time to get interpreters and there is a shortage. On your Monday case I know the PD was made aware last week that we did not have an interpreter available for Monday." (Exhibit 48)

526.    Judge Cocroft replied, "I will agree that [the Public Defender] was notified on last Thursday at 4:50pm that he would not have an interpreter on yesterday. But I wasn't made aware of the fact until yesterday and that matter was set for resolution through plea. So I believe that it would be helpful for the judges to know of any issue relating to interpreter services. Additionally, it was my understanding that persons who needed interpreters contact [the employee] directly; I

67

was not aware that other Court staff were contacted about requests." (Emphasis added.) (Exhibit 48)

527.    To Judge Cocroft's knowledge, she is the only FCCP-Gen Judge who was not aware of changes made in how interpreters were requested and assigned.

528.    Rule of Superintendence 88 mandates strict compliance and the decision of FCCP-Gen not to advise Judge Cocroft of any changes jeopardized her ability to comply with the rule.

529.    On June 1, 2023, Judge Cocroft received an email from Bedsole regarding upgrades to her courtroom's audio-visual system. (Exhibit 49)

530.    Bedsole requested that Judge Cocroft select preferred dates for scheduling the upgrades. At the time that Bedsole sent the communication, two dates were marked as unavailable and noted the FCCP-Gen Judges who were given certain dates.

531.    The dates of June 26-July 14 were assigned to K. Brown.

532.    Judge Cocroft provided date preferences and sent the information to Bedsole on June 5, 2023. (Exhibit 49)

533.    On June 25, 2023, Bedsole sent an email to the FCCP-Gen Judges with the finalized schedule for audio-visual upgrades. (Exhibit 50)

534.    In part, Bedsole's communication stated, "Based upon the requested preferences, and seniority, below is the schedule."

535.    Judge Cocroft noted that K. Brown, who does not have seniority over Judge Cocroft, was scheduled for audio-visual upgrades four months prior to Judge Cocroft.

534.    Judge Cocroft was given her last preference in the upgrade schedule.

535.    The June 25, 2023 email from Bedsole was the first time that seniority was mentioned, though Bedsole did not apply seniority when making the schedule.

536.     On June 25, 2023, Judge Cocroft sent an email to Bedsole, advising that she had an intractable two-week wrongful death/medical malpractice trial that would conflict with a move to another courtroom while upgrades occurred in her courtroom (Exhibit 50)

537.     Judge Cocroft further stated that she would be willing to allow her chamber mate to proceed with her upgrade and that she would pick another date.

538.     On June 26, 2023, Judge Cocroft sent an email to Bedsole and stated, "As a follow-up to my communication from yesterday, I looked at the original email you sent and it indicated that Chambers 5E (K. Brown)/5F were already slotted for June 26 installation. Neither of those judges has more seniority than I do, so I remain confused about how the assignments were made." (Exhibit 51)

539.     Bedsole responded on June 26, 2023 and stated,  "As to seniority, I did not mention it initially because I never expected all 17 judges would want to go first! LOL After the results were in, I used it since ties in our Court are always decided by seniority. As to 5E/F, with the departure of Judge K Brown's court reporter, she needed the recording equipment in her courtroom immediately; therefore, her courtroom was scheduled first (* * *)." (Exhibit 51)

540.     As an additional explanation, Judge Cocroft was told that K. Brown was given priority because, at the time of the updates, she was chair of the Technology Committee.

541.     Historically and as a matter of course, FCCP-Gen employs at least two "float" Court Reporters who assist judges who are without their assigned Court Reporter for any period of time.

542.     On Friday June 9, 2023 at around 12:00pm, Young's staff attorney sent an email to Judge Cocroft's staff attorney, advising that Judge Cocroft would be required to handle a hearing on a motion for temporary restraining order that was assigned to Young's docket.

543.    The FCCP-Gen Local Rules require the judge assigned to a case to hear all motions unless the judge is unavailable.

544.    If the FCCP-Gen Judge is unavailable, then the matter is heard by the Duty Judge.

545.    Young was notified of the motion for temporary restraining order on June 8, 2023.

546.    At the time that Young was notified of the motion for temporary restraining order, he was available and in his office.

547.    At the time that the motion for temporary restraining order was filed, Judge Cocroft was not the Duty Judge.

548.    Despite this, all counsel contacted Judge Cocroft's staff to schedule a hearing on the motion for temporary restraining order for the week of June 12, during which she was the scheduled Duty Judge.

549.    On March 14, 2023, Judge Cocroft requested Court Reporter coverage for June 15, 2023.

550.    Bedsole is responsible for providing Court Reporter coverage using "float" Reporters.

551.    By June 12, 2023, Bedsole had not provided any update to Judge Cocroft regarding Court Reporter coverage.

552.    As Duty Judge, a FCCP-Gen Judge is required to handle extradition hearings, which require the presence of a Court Reporter.

553.    Because Judge Cocroft had not received an assignment from  Bedsole, she requested the assistance of another Court Reporter whom she knew would be available, as the Reporter's assigned judge was out of the office.

554.    The Court Reporter agreed to assist Judge Cocroft.

555.    Shortly after the Court Reporter contacted Judge Cocroft and agreed to assist, Bedsole sent a message to Judge Cocroft's bailiff, indicating that the Court Reporter secured by Judge Cocroft was being assigned to K. Brown.

556.    On June 14, 2023, Judge Cocroft sent an email to McIntosh outlining the concerns related to the Young and Court Reporter matters. (Exhibit 52)

557.    In reference to the Young matter, Judge Cocroft wrote, "I am concerned by what seems to be an attempt to avoid handling a matter that has already been assigned. I am also concerned by the fact that, despite having received notice of the TRO filing on Thursday, my staff was not notified until noon on Friday, after Judge Young was out of the office when my staff and I had no opportunity to confer with [Young] and his staff. Instead, an expectation was established that we would resolve the matter, and, though I am willing to meet the expectation established without my input, I am concerned by the approach."

558.    Regarding the lack of Court Reporter assignment by Bedsole, Judge Cocroft said in her June 14, 2023 email, "At this point, I don't know what my reporter and I need to do to get assistance with coverage. We have followed the protocol adopted by the Court. We also followed the additional guidance you provided in your June 1 communication (Exhibit 53), which is the reason I reached out to [another judge's] reporter directly since my reporter had not received any response from other reporters or administration regarding assistance. But even when we attempt to facilitate a resolution using the protocol or through our own efforts, we do not end up with a favorable result. (* * *) I am unclear on how or why one judge's docket is prioritized over another judge's docket, particularly when the staff person who is requesting coverage and has done everything required in a timely way."

559.    Because Judge Cocroft was never provided with a Court Reporter assignment for June 15, 2023, she made the decision to cancel her docket on June 14, 2023 so that counsel and clients would not be required to be in court when Judge Cocroft would not have the ability to handle any cases on the record.

560.    When Judge Cocroft went into her courtroom on June 15, 2023, there was a woman seated with stenographer equipment. Judge Cocroft had never seen this woman and asked whom she was.

561.    The woman gave her name and said that she was the assigned Court Reporter. Judge Cocroft informed the Reporter that she had canceled her docket because she was never told that someone would be assisting her.

562.    Shortly thereafter, Judge Cocroft sent an email to Bedsole regarding this situation. (Exhibit 54)

563.    Judge Cocroft explained that the Reporter was in her courtroom, that she had canceled her docket because she did not know she would have coverage, and that she was frustrated by the inability to get assistance and/or information when she followed the rules in place.

564.    Bedsole replied and stated she was "perplexed" by Judge Cocroft's email until she realized that, on June 13, 2023, she sent an email with Court Reporter assignments to every FCCP-Gen Judge who requested coverage except for Judge Cocroft. (Exhibit 55)

565.    Every FCCP-Gen Judge who was notified of Court Reporter coverage is Caucasian.

566.    Bedsole wrote, "I failed to include yourself and your bailiff on the email."

567.    On June 5, 2023, Judge Cocroft sent an email to Goodman, notifying her that the Chief Reporter refused to provide her Reporter with the information needed to prepare the record and transcript for appellate review in a matter assigned to Judge Cocroft's docket. In 2023, the Chief Reporter was a Caucasian woman. (Exhibit 56)

568.    Goodman did not reply to Judge Cocroft until July 12, 2023. (Exhibit 56)

569.    Appellate review of trial matters are time sensitive issues.

570.    Goodman did not meet with Judge Cocroft and her Court Reporter about the issue until August 8, 2023 and the information was not provided to Judge Cocroft's Reporter until after the August 8 meeting.

571.    Upon information and belief no other judge has been required to wait more than sixty days for their assigned Court Reporters to receive recordings and other information necessary to complete a record for appellate review.

572.    On July 12, 2023, an employee from the FCCP-Gen Technology department came into the office of Judge Cocroft's staff attorney without her knowledge or permission. The employee was found taking pictures of the staff attorney's printer.

573.    The employee entered Judge Cocroft's work area while she was in her courtroom.

574.    Shortly thereafter, Judge Cocroft sent an email to the Director of the Information Technology Department to advise of this situation (Exhibit 57)

575.    Judge Cocroft copied McIntosh, Goodman and Bedsole on the email.

576.    The Director replied that the employee was in Judge Cocroft's area because IT "received a message concerning 4 printers on our printer server" and that FCCP-Gen was "hyper sensitive to printers on our print server because one recently caused the server to crash (* * *)." (Exhibit 57)

577.    The IT Director, who was out of the office when this happened and indicated that he did not give the instruction for the employee to go into an office in Judge Cocroft's suite, stated, "The bigger issue is staff entering offices without notification."

578.    Judge Cocroft responded and stated that neither she nor her staff were ever notified of any printer server crash and wrote, "I am not aware of any court employee who has the independent

latitude to make a decision to enter anyone's office, and certainly not the office of any judge's staff, without direction from someone serving in a supervisory or administrative capacity. So I am definitely interested in learning as soon as possible who gave [the employee] that direction."

579.    The IT Director confirmed that he did not give the direction.

580.    Neither Goodman nor Bedsole denied that they ordered this and, based on the FCCP-Gen Table of Organization, they are the only other two employees who could have made the order.

581.    Thereafter, Judge Cocroft asked that she and her staff receive notice to access our offices in the same way that the employee who had entered in the recent incident would normally provide notice.

582.    Judge Cocroft stated that this staff person was not the kind of employee who would make this choice unless they believed they were required to do so, because FCCP-Gen employees do not have the latitude to make that kind of executive decision.

583.    Judge Cocroft asked to be informed of who made the order to enter her suite area and staff's office.

584.    As of the filing of this complaint, Judge Cocroft has never been told who gave the employee an instruction to enter the work area of Judge Cocroft's staff without her knowledge or permission.

585.    In the Court's Table of Organization, the Deputy Court Administrator, who was Bedsole when the July 2023 event occurred, supervises the Director of Information Technology, and oversees and instructs the Information Technology employees.

586.    In the court's Table of Organization, the Deputy Court Administrator is supervised by the Court Administrator. Goodman was Court Administrator when the July 2023 event occurred.

587.    Judge Cocroft learned that two of the printers which created the concern were located on the second floor of the FCCP-Gen courthouse. Goodman's, Bedsole's, Davis's and Worthington's offices are or were located on the second floor.

588.    Upon information and belief, no employee took pictures of the printers located on the second floor.

589.    As of the filing of this complaint, there have been no additional notifications regarding the crash of a printer assigned to Judge Cocroft or her staff.

590.    On August 24, 2023, Judge Cocroft received an email from a Probation Officer assigned to supervise probationers on her docket. (Exhibit 58)

591.    The email related to a defendant whom Judge Cocroft placed on non-reporting probation supervision based on her authority and understanding of the case.

592.    The probation officer wrote, "I understand you made this decision to make the order above, but can you provide me and the Department the reason how he could be placed on non-reporting. Please and thank you." (Emphasis added.)

593.    Judge Cocroft replied that she was stunned to receive an email where she was asked to explain why she made a decision she is permitted to make and requested to meet with the probation officer, the officer's manager and the Chief Probation Officer. (Exhibit 58)

594.    During the meeting on August 28, 2023, both the manager and Chief Probation Officer continued to ask Judge Cocroft to explain her decision. (Exhibit 59, Recording 74)

595.    During the meeting, the probation officer, manager and Chief Probation Officer all admitted that they have never asked a Caucasian FCCP-Gen Judge or any judge to explain their decision. However, the manager continued to ask Judge Cocroft to provide an explanation regarding her decision. She told him that she would not.

596.   In July 2023, the FCCP-Gen Judges were scheduled to vote on maintaining video arraignments.

597.   On Friday, July 14, 2023, at 6:02pm, McIntosh sent an email to judges regarding the process for the vote and said that, in order to encourage in-person attendance at the meeting, he decided that judges would be able to vote by secret ballot. He further stated that judges who participated in the meeting by Zoom would have to provide a voice vote. (Exhibit 60)

598.   Because Judge Cocroft believed that this procedure may be violative of Sunshine Laws, including the Open Meetings Act, she sent an email to McIntosh on Saturday, July 15, 2023. (Exhibit 60) She then forwarded the July 15, 2023 email on Monday, July 17, 2023. McIntosh did not respond.

599.   At the meeting held on July 18, 2023, McIntosh referred to Judge Cocroft's emails and explained that his decision was based on a concern about judges being "outed" regarding a vote in 2010 related to maintaining the commercial docket. (Exhibit 61, Recording 61)

600.   Judge Cocroft was the only judge who expressed a concern in 2010 but that concern had nothing to do with be "outed" regarding a vote.

601.   During the July 18, 2023 meeting, McIntosh then asked if there were concerns with the process. Judge Cocroft referenced the fact that she had sent two emails expressing her concerns.

602.   McIntosh then explained why he believed the Court was not considered a public body. Then Lynch and Serrott provided opinions regarding why the meeting was not subject to the Open Meetings Act.

603.   Lynch and Serrott referenced most of the information Judge Cocroft provided to McIntosh in her emails to him only and it was clear that McIntosh had either discussed Judge Cocroft's emails with Lynch and Serrott or provided them with copies of the emails.

604.    Despite Judge Cocroft's concerns, the vote proceeded with four judges being required to provide a voice vote and thirteen voting by secret ballot. Judge Cocroft was required to provide a voice vote.

605.    At the conclusion of the vote, Judge Cocroft restated her belief that a secret voice related to funding issue may be a violation of Rule of Superintendence 46(G)(1), which defines "Administrative Document" as "a document and information in a document created, received, or maintained by a court that serves to record the administrative, fiscal, personnel, or management functions, policies, decisions, procedures, operations, organization, or other activities of the court, subject to the exclusions in division (G)(2) of this rule."

606.    McIntosh continued with the meeting.

607.    On August 28, 2023, Judge Cocroft sent an email to Worthington regarding the number of temporary restraining order motions that were being assigned to Judge Cocroft's docket (Exhibit 62)

608.    As a general rule, each of the 17 FCCP-Gen Judges gets no more than a handful of these motions in a year.

609.    Between June 2023 and April 2024, Judge Cocroft received no less than eight (8) temporary restraining order motions.

610.    In 2022, J. Brown and Aveni (Caucasian male judges) raised the issue of receiving a high number of these cases and the issue was resolved immediately. During 2022, Judge Cocroft served as Administrative Judge and responded to the concerns raised.

611.    When Judge Cocroft raised the issue with Worthington for the first time in 2023, Worthington stated that nothing could be done and that Judge Cocroft was receiving assignments under the random draw system.

612.    When Judge Cocroft raised the issue again in March 2024, she asked Worthington to meet with her and her bailiff to explain the system in more detail.

613.    Worthington explained specifically that each civil case is filed with an informational summary sheet and that, if counsel mark "Yes" for the filing of a temporary restraining order motion, then that case is not assigned through the random draw system but through another process.

614.    Immediately after the meeting, Judge Cocroft received two to three additional temporary restraining order cases. However, since Judge Cocroft and her staff had just learned about the informational summary sheet, Judge Cocroft's bailiff printed that documentation and noted that the cases should not have been assigned to Judge Cocroft.

615.    Judge Cocroft provided that information to Bedsole and Worthington (who was out of the office when the issue arose) on March 27, 2024. (Exhibit 63)

616.    At first, Bedsole agreed with Judge Cocroft's assessment and informed her the cases would be reassigned. (Exhibit 63)

617.    The very next day, Bedsole told Judge Cocroft and her bailiff that their assessment was incorrect and that the cases were properly assigned. Judge Cocroft was also told that the informational summary sheets were being eliminated from use. (Exhibit 63)

618.    After Judge Cocroft and her staff provided additional proof, Bedsole conceded that the assignment process was incorrect and reassigned the cases. (Exhibit 63)

619.    On April 10, 2024, Judge Cocroft sent an email to the Clerk of Court's staff regarding the TRO assignment process. Judge Cocroft sent a carbon copy email to K. Brown, C. Brown, who served as Chair of the FCCP-Gen Technology Committee, Goodman, Bedsole, and Worthington. (Exhibit 64)

620.    Judge Cocroft reiterated her concern regarding how cases were being assigned and noted that she had not received documentation demonstrating how many FCCP-Gen judges had received seven TRO matters in three months.

621.    On April 11, 2024, Worthington assigned the 8th TRO matter to Serrott, as required by the assignment policy.

622.    Surprisingly, Worthington told Judge Cocroft's bailiff that she wanted to give Serrott a "heads up" about the assignment since it was likely that he would receive back-to-back TRO cases and she did not want Serrott to be caught off guard (Exhibit 64).

623.    When Judge Cocroft raised a concern regarding 8 consecutive TRO cases, Worthington told her initially that nothing could be done and no "heads up" was given to Judge Cocroft.

624. To Judge Cocroft's knowledge, no other FCCP-Gen Judge has been assigned eight temporary restraining order motions in a compressed timeframe.

625.    On September 20, 2023, McIntosh asked Judge Cocroft to be a part of a small working group to discuss the continued use of video arraignments and to represent the position of FCCP-Gen in discussions with the Franklin County Sheriff and Franklin County Administrator and Deputy Administrator.

626.    McIntosh, Holbrook and Serrott were the other members of the small working group.

627.    Holbrook and Serrott were in favor of eliminating video arraignments. Judge Cocroft was in favor of keeping video arraignments.

628.    During the only meeting of the working group on September 25, 2023, Serrott said that "I'd like to see the Court unified and we're not. So I think the Commissioners are getting mixed signals from us. It certainly does not help if half the judges are like 'we're not behind this.' We took a vote and when we take a vote, we live by it."

629.    While the vote regarding arraignments was supposed to be a secret ballot, both Holbrook and Serrott knew how each judge voted. During the working group meeting, Holbrook said that he would lose the vote of "Phipps and Miller" if the "Commissioners get their act together" to correct issues relating to video arraignments.

630.    Serrott them emphasized that he has the idea that the FCCP-Gen Court "is not united" and, as such, the Commissioners weren't taking the matter seriously and that the challenges were only caused by "two rebels" (Holbrook and Serrott).

631.    When Judge Cocroft asked Serrott for any proof that the Court was not united, he said that he did not have any.

632.    Serrott then said that "people" were talking about losing money and Judge Cocroft told him that she was the "person" who mentioned the potential financial consequences of eliminating video arraignments.

633.    When the working group met with representatives from the Franklin County Sheriff's Office, as well as the Franklin County Administrator and Deputy Administrator, Holbrook and Serrott spoke primarily on behalf of FCCP-Gen, and Judge Cocroft had to interject repeatedly in order to literally be heard.

634.    Close to the end of the meeting, Holbrook once again stated that he and Serrott were willing to go back and talk to the FCCP-Gen Judges "who voted yes" in favor of eliminating video arraignments and Judge Cocroft asked how he knew who voted "yes" because it was a secret ballot vote.

635.    Serrott  said, "Of course we know" and Judge Cocroft said, "I don't."

636.    Holbrook then said, "You had an issue from day one, so we weren't talking to you at all."

637.    Judge Cocroft replied, "I know you don't. You don't talk to me about a lot of things but I'm still here. Imagine that."

638.    Judge Cocroft was embarrassed and humiliated by Holbrook's comment that he, Serrott and other FCCP-Gen Judges were not going to talk to Judge Cocroft "at all" about an issue that was a matter for <u>all</u> judges to decide.

639.    Upon hearing Holbrook's statement, Judge Cocroft recalled that Serrott suggested that some judges were not united regarding the current position and believed that his statement related to her.

640.    Holbrook then began to list the judges who voted in favor of eliminating video arraignments and mentioned that it would be "easy" to get his chamber mate (Miller) to change his position, if Holbrook instructed him to do so.

641.    Beyond those issues identified for future discussion, Judge Cocroft told the attendees at the meeting that, before the next meeting, we would also work on finding a way for Holbrook to speak to her more respectfully. Holbrook replied, "We will?" and Cocroft responded, "Yeah, we will or we won't be saying anything to each other."

642.    On September 26, 2023, Judge Cocroft sent an email to McIntosh and resigned from participation in the working group. Judge Cocroft wrote,

> To have one judge [Holbrook] state to our county justice partners that I was intentionally disregarded as the Court attempted to work through this issue initially is both disrespectful and unacceptable and is a clear indication that the "unity" that has been discussed consistently is an illusion. Moreover, to have another judge [Serrott] state that there have already been preliminary conversations with other judges regarding what has been discussed over the last two days about which I, as a committee member, was not made aware until today's meeting (because everyone knew where I stood) is dismissive, at best, particularly given the fact that I have witnessed an attempt to persuade an individual to support a certain position. But for judges, who seemed to suggest that they 'control' the thoughts and positions of other judges, to be summarily dismissive and then to vocalize the behavior and decisions publicly is beyond what I will tolerate. My service as a judge of this court is no less important, necessary and valued than any other judge who serves. What

transpired today was both embarrassing and uncalled for and I will not subject myself to that behavior for the good of the Court and at the sacrifice of my own well-being and professional integrity.

(Exhibit 65)

643.    McIntosh responded, noting that Judge Cocroft "had and [has] so much to offer" and that, "[u]nfortunately, there has developed within our court a "[clique] of judges that routinely discuss issues among themselves and come to meetings with an agenda." (Emphasis added.) (Exhibit 64)

644.    The issue of video arraignments is associated with the work of the FCCP-Gen Criminal Committee for which Holbrook served as Chair in 2023.

645.    The Criminal Committee met on September 27, 2023 to discuss the working group's meeting with the Franklin County Sheriff's representatives, as well as the Franklin County Administrator and Deputy Administrator.

646.    Goodman and Bedsole were present during the meeting, as were Phipps, K. Brown and the Chief Probation Officer.

647.    During the Criminal Committee meeting, Holbrook stated that he and Serrott represented that they would talk to the "yes votes" about potentially changing their positions. Chris Brown then asked how they would do that since the vote was by secret ballot, excluding those judges who were required to provide a voice vote.

(Exhibit 66, Recording 94)

648.    Serrott said that he knew he voted yes because he was trying to get the votes to win and he talked to most of the FCCP-Gen Judges.

649.    Thereafter, a verbal altercation ensued between C. Brown and Serrott regarding how the judges voted.

650. Chris Brown said that for everyone who talks about principles, we hid the vote behind a secret ballot and that Serrott was "not being honest".

651. Serrott then began to yell and told C. Brown, "Don't accuse me of not being honest. You do not want any problems with me." Holbrook then told C. Brown and Serrott to "Shut up."

652. Serrott and C. Brown continued to argue and then Holbrook then said, "You guys can just go out in the hallway."

653. Phipps then added that the FCCP-Gen Judges did not hide behind a "secret ballot".

654. Chris Brown continued to ask which judges voted for or against video arraignments and then stated that it was "fucking cowardly" to discuss principles and values while being unwilling to take a public vote. C. Brown also described the behavior of some of the judges as "chicken shit".

655. During this entire exchange neither Goodman nor Bedsole said or did anything.

656. While Judge Cocroft had thoughts about everything that transpired and how Holbrook treated her during the September 26 meeting, she told the Committee that she would wait until the October FCCP-Gen Judges' meeting to share her thoughts.

657. Serrott then said to her, "Well that's cryptic." Judge Cocroft replied that it was an attempt to diffuse a tense situation and that she wasn't afraid to share anything she was thinking.

658. Judge Cocroft advised the Criminal Committee that she had resigned from the small working group based on Holbrook's comments and began to address the FCCP-Gen Judges cliques and mistreatment she endured during the September 26, 2023 meeting. Judge Cocroft stated that she would restate her sentiments at the October FCCP-Gen Judges' Meeting.

659. At the October 24, 2023 FCCP-Gen Judges' meeting, Judge Cocroft was not given full opportunity to state her position but did notify all the FCCP-Gen Judges that she had resigned from the working group and the reason for her resignation.

670.    Judge Cocroft also stated that there needed to be a larger conversation about how persons and votes are respected and that representations were made (by Holbrook and Serrott) that they could persuade judges to change their votes. Judge Cocroft further stated that she was attempting to be respectful in her remarks, despite the fact that she was disrespected in front of the FCCP-Gen justice partners and that, hopefully, her attempts to be respectful weren't again deemed "cryptic."

671.    On October 24, 2023, C. Brown sent an email to Judge Cocroft and stated,

> I just wanted to say I appreciated your comments at today's meeting. I know it was difficult for you, because I know the backstory behind your remarks. You walked a tight line between being respectful while being righteously upset at how you were treated by certain members of the ad hoc committee. I thought you did a great job expressing your experience to everyone at the meeting.
>
> You don't need my approval, but I just want you to know I saw you, I understood the context, and I admire your courage for speaking about your experience. You shouldn't be put in that position, but I thought you did a great job in handling it and expressing yourself.

(Exhibit 67)

672.    In September 2023, a FCCP-Gen Probation Officer (Caucasian female) came to Judge Cocroft's office prior to her sentencing hearings and told her that she wanted to speak with Judge Cocroft "just to make sure that [Judge Cocroft] was going to follow her recommendation."

673.    Judge Cocroft told her that she will never be able to "make sure" that Judge Cocroft does anything, because Judge Cocroft was solely responsible for decision-making and outcomes.

674.    Later that day, Judge Cocroft sent an email to the Probation Officer and her immediate supervisor and asked them to come to her office and meet with her. (Exhibit 68) Only the Supervisor, with whom Judge Cocroft has had an amiable relationship, appeared.

675.    When Judge Cocroft asked the Supervisor where the Probation Officer was, the Supervisor replied she thought Judge Cocroft only wanted to see her.  Judge Cocroft stated the communication made clear that she wanted to speak with both of them.

676.    On September 25, 2023, the Probation Officer and Supervisor came to Judge Cocroft's office so that she could explain her concerns. The Probation Officer apologized and said that she would do better moving forward.

677.    On October 18, 2023, Judge Cocroft's bailiff was the victim of a road rage incident involving Serrott's bailiff, a Caucasian woman.

678.    The incident occurred while Judge Cocroft's bailiff was attempting to park in the employee garage.

679.    When Judge Cocroft arrived in the office on that day, her bailiff was visibly shaken and was having a difficult time focusing on her work.

680.    The inability of Judge Cocroft's bailiff to focus on her work impacts Judge Cocroft's ability to manage cases efficiently.

681.    Judge Cocroft asked her bailiff what happened and she recounted that Serrott's bailiff exited her vehicle and approached her while yelling as both were at the employee garage.

682.    Judge Cocroft advised her bailiff to send light-hearted communication about what happened and suggest that the person who did this looked a lot like Serrott's bailiff.

683.    Serrott's bailiff wrote back and said that she was not going to discuss the event on a government computer but that Judge Cocroft's bailiff could come to her office and they could talk about the incident.

684.    Judge Cocroft's bailiff did not respond and was unsettled and concerned for the rest of the day.

685.    The following day, October 19, 2023, Serrott's bailiff came into Judge Cocroft's office space and approached her bailiff's work area. Serrott's bailiff then said, "Oh, I didn't realize I was on the wrong floor."

686.    Judge Cocroft's office is on the fourth floor; Serrott's office is on the sixth floor.

687.    Judge Cocroft and her staff took the actions of Serrott's bailiff as an act of aggression and intimidation.

688.    On November 14, 2023, Judge Cocroft and an unidentified group of FCCP-Gen employees received an email from Davis regarding the impact of the passage of Issue 2 to legalize adult use and purchase of recreational marijuana on the FCCP-Gen Drug Policy. (Exhibit 69)

689.    Judge Cocroft replied to Davis on November 14, with a carbon copy communication to Goodman and Bedsole, and asked a series of questions including to whom the message was sent, whether the new policy position was vetted by the Court's Personnel Committee, which is responsible for changes to every policy, and whether the position was approved solely by McIntosh in his capacity as Administrative Judge and pursuant to Sup. R. 4.01 and the FCCP-Gen Local Rules. (Exhibit 69)

690.    Judge Cocroft then forwarded a copy of her communication and questions to Phipps who served as Chair of the FCCP-Gen Personnel Committee.

691.    On November 15, 2023, McIntosh sent an email to Judge Cocroft in response to her November 14 email to Davis, Goodman, and Bedsole and stated, "Judge Cocroft, I asked Cameo to send an email to all employees reminding them of the court's drug-free work policy (* * *). I did not wish to wait until Issue Two was to officially go into effect. I wanted our staff to know that currently it does not change court policy (* * *). Obviously, we as a court can change current policy after vetting it through personnel and a vote of the judges." (Exhibit 69)

692.    Judge Cocroft responded, "I have no issue with the Administrative Judge of this Court making an executive decision and requesting that a communication is sent, consistent with the authority contemplated under our Local Rules or Rule of Superintendence 4. And I'm grateful to

know that your purview is acknowledged and respected by our administrative team in that regard." (Exhibit 69)

693.    Judge Cocroft then explained the concerns she had with the statement. Specifically, she shared that the announcement ignored the impact of the Issue 2's passage on persons supervised by the Court. Judge Cocroft also advised that she expressed concerns to the leadership of the Personnel Committee.

694.    As of the filing of this complaint, no further action has been taken by the Personnel Committee to address the concerns Judge Cocroft raised in her November 15, 2023 email.

695.    As of the filing of this Complaint, neither Goodman, Davis, Bedsole, Worthington, or the FCCP-Gen Judges have questioned McIntosh about his authority under Sup. R. 4.01 to make a decision or to direct staff to send a communication without first getting approval from Goodman or the FCCP-Gen Judges.

696.    Upon information and belief, the suggestions and concerns of Caucasian judges have not been ignored by Goodman, Bedsole, Davis, and/or Worthington.

697.    On December 19, 2023, the same probation officer who stated that she wanted to make sure that Judge Cocroft was going to do what she wanted me to do in managing a case made another demand regarding Judge Cocroft's management of a different case.

698.    More specifically, this probation officer called and sent emails and other communications to Judge Cocroft's staff, demanding that Judge Cocroft sign an entry to transport a defendant to a treatment program.

699.    Prior to the current recommended program, this defendant had been given multiple opportunities to engage in treatment but failed to participate.

700.    The probation officer was aware of these failures but was incessant in her insistence that Judge Cocroft sign another entry.

701.    Judge Cocroft sent an email to the probation officer, with a carbon copy communication to her supervisor and the Chief Probation Officer, advising of the circumstances that prevented her from signing the entry immediately, though Judge Cocroft had no obligation to explain the timing. (Exhibit 70)

702.    On January 5, 2024, while Judge Cocroft was out of the office after the holiday season, Judge Cocroft received an email from the Chief Probation Officer regarding her December 19, 2023 communication. In it, the Chief Probation Officer stated,

> I spoke with [the probation officer] before the holiday and she is very apologetic <u>and remains anxiety ridden</u>. I explained that your courtroom was very efficient and there was no need to make several calls once she sent the initial Teams message. I could give you her explanation but don't want to give the appearance of excuses.

(Exhibit 70)

703.    When Judge Cocroft returned to the office, she replied to the Chief Probation Officer noted,

> "I just had this same conversation with [the probation officer and her supervisor] not even three months ago and, yet, I am having to address a similar circumstance once again.
>
> Additionally, I am unclear about why you are sharing with me that [the probation officer] may be anxiety ridden. Is that to suggest that I don't have the ability to request that she allow me to do the job I was elected to do? Is that to imply that I cannot provide contextual information to an employee who has exceeded yet again [their] professional boundaries with a judge, when I am unaware of her challenging another judge in the way [they have] felt comfortable with questioning me? What was your purpose in sharing that? I have been subjected to [numerous probation officers] demanding that I explain to them why I have made decision I am permitted to make as Judge. I have been subjected to having members of the Probation Department review records and other documents I have not asked them to review in order to assess whether a decision I have made has a basis in fact. Ther are few circumstances what could and have created the level of anxiety, concern, disappointment, and frustration that I have been made to endure based on circumstances I  have not created. And that anxiety, concern, and frustration has been heightened through this communication, which almost feels like an attempt to blame me for a situation that I did not create.

88

(Exhibit 70)

704.    On January 3, 2024, the FCCP-Gen Personnel Committee held its first meeting of the year. While Judge Cocroft was not selected as a member of the Committee for the second year in a row, she once again requested notification of all committee meetings. (Exhibit 71, Recording 110)

705.    At the end of the meeting, Phipps, who continued her service as Chair of the committee, discussed FCCP-Gen's decision to update the Employee Handbook.

706.    Phipps noted that it was important for the FCCP-Gen Judges to enforce the Handbook. Specifically, Phipps noted that employees may come to the judges with their legitimate complaints and those complaints are not handled properly.

707.    Phipps said that when a judge doesn't do anything about a complaint, that judge is encouraging a hostile work environment, which is not something that any judge wants to do.

708.    Phipps said that things need to be handled properly because she has had employees come to her expressing that when they went to FCCP-Gen Judges with complaints, nothing was done.

709.    Phipps stated that when she would ask employees if they filed a formal complaint, they would say "No" because employees don't feel like they can, based on fear of retribution.

710.    Phipps closed by remarking that judges have to ensure that things actually get done because, "Someone complaining to six judges they *feel* are their superiors and nothing gets done and then we've basically enforced the hostile work environment."

711.    Goodman, who has a primary role in the management of complaints under the FCCP-Gen Anti-Harassment Policy, responded, "Absolutely." Upon information and belief, Goodman, Bedsole, and Davis have received numerous complaints from FCCP-Gen employees and have taken no action to address those complaints.

**H. Goodman**

712.     Goodman has served as Court Administrator since approximately 2015.

713.     Since that time, Goodman has become accustomed to doing her work, and expects the right to do her work, without the supervision or input of the Administrative Judge. This was confirmed by Frye in 2022 when he told Judge Cocroft that she should do the job of Administrative Judge the way that other Administrative Judges had done the job, which would give complete autonomy to Goodman.

714.     When Judge Cocroft was elected Administrative Judge in 2022, she told Goodman and Bedsole that she would take a more active role in the position because, based on the novelty of her service as the first woman who also happened to be Black, she believed there would be a level of scrutiny regarding her service. The positions descriptions for Goodman, Bedsole, Davis, and Worthington do not give any of them authority over a FCCP-Gen Judge or Administrative Judge.

715.     Judge Cocroft was excited to serve as Administrative Judge and had a vision for how FCCP-Gen could build on the solid foundation already existing, while addressing gaps in our delivery of services to justice-involved individuals.

716.     Judge Cocroft also had vision for enhancing FCCP-Gen's relationship with justice partners and opening lines of communication that even Goodman acknowledged were challenging relative to the Court's relationship with justice partners like the Clerk of Courts, the Franklin County Sheriff's Office, the Franklin County Prosecuting Attorney's Office, and the Franklin County Public Defender's Office.

717.     Judge Cocroft shared her vision with Goodman and other administrative leaders through her guiding theme of continuing to "R.A.I.S.E. The Bar" (Respect, Accountability, Intentionality,

Success, Excellence) and the administrative leaders were openly enthusiastic about the opportunity for growth.

718. Goodman, however, expressed an immediate concern about the guiding theme and became defensive about her perception that the guiding theme suggested that FCCP-Gen was not a good place to work.

719. Judge Cocroft told Goodman that her goal was to enhance what existed currently and to build on the foundation to make FCCP-Gen even stronger. From that moment, Judge Cocroft understood that she would have to be thoughtful and careful in how she interacted with Goodman.

720. As a part of FCCP-Gen's daily practices in 2022 and in the preceding years, Judges received a daily staffing email regarding deputies assigned to each courtroom.

721. Initially, Judge Cocroft asked Goodman to send the staffing reports to Judges. However, although Goodman was copied on the reports, she was not sending them upon receipt.

722. As such, Judge Cocroft began sending the reports so that the FCCP-Gen Judges were aware of any security issues before the majority of lawyers and litigants arrived. Both McIntosh and the Administrative Judge who served prior to McIntosh sent deputy staffing reports, not Goodman.

723. Early in January 2022, Goodman notified Judge Cocroft that she would need to be out of the office. As Goodman's supervisor under the FCCP-Gen Table of Organization, Judge Cocroft had the responsibility of approving Goodman's leave time and signing a leave slip.

724. In March 2022, Judge Cocroft met with the entire Probation Department. It was the first time that an administrative judge met with the Department in person.

725. In March 2022, Goodman was out of the office on approved leave.

726. During this time, Goodman sent a text message to Judge Cocroft on March 5, 2022, Goodman wrote, "With the Judges, I always feel like some will see this as a crack in the armor (*

* *). Thanks for being so supportive I truly appreciate it." On March 6, 2022, Goodman sent another text expressing gratitude for the assistance that Judge Cocroft provided to her. Goodman wrote:

"I know we have not worked this closely together for a long time but you have impacted me in so many ways in this short time. (* * *)
From the bottom of my heart, thank you."

727.    During Goodman's absence, Judge Cocroft asked Bedsole, Davis, Worthington and two other Directors about how things were going administratively.

728.    Every Administrator expressed to Judge Cocroft that Goodman micromanaged their work, second-guessed their work product, interrogated them about time out of the office, contacted them incessantly when they were on approved leave from the office, and hindered almost completely their ability to make any decisions consistent with the positions to which they were hired.

729.    Every Administrator also expressed to Judge Cocroft that each was afraid to raise these issues with Goodman because, historically, there had been swift backlash and repercussions, and each was fearful that collateral consequences would result from any attempt to speak up for themselves either directly to Goodman or to the FCCP-Gen Judges.

730.    During Goodman's absence, however, Bedsole noted that the Administrators were working well together and they were accomplishing a lot. Bedsole also stated that people were enthusiastic and felt less nervous with Goodman out of the office.

731.    One Administrator told Judge Cocroft that she could laugh freely and did not feel that she would get into trouble.

732.    As a part of Judge Cocroft's term as Administrative Judge, she told Goodman that she wanted every Administrator to have an *ex officio* assignment to a FCCP-Gen Court committee.

733.     Prior to Judge Cocroft's service, Goodman did not permit Worthington to serve as an *ex officio* member of a committee. When Judge Cocroft advised Goodman and Bedsole of her decision to add Worthington to a committee, Goodman complained but eventually accepted Judge Cocroft's decision.

734.     When Goodman returned to FCCP-Gen at the end of the second quarter of 2022, Judge Cocroft noticed that the energy and enthusiasm among the FCCP-Gen Administrators disappeared and Bedsole, Davis and other Administrators told Judge Cocroft how they once again felt constrained in their ability to do the work they were hired to do.

735.     Because Judge Cocroft was concerned about what Administrators shared and wanted to improve morale, she decided to implement quarterly leadership meetings with FCCP-Gen Administrators.

736.     Judge Cocroft initially scheduled the first leadership meeting for June 27 2022, with a focus on personal and corporate S.W.O.T. (Strengths, Weaknesses, Opportunities, Threats) analyses.

737.     In addition to the analyses, Judge Cocroft posed the following questions:

1. How do I define the culture of FCCP-GEN?

2. How do I believe that others define the culture of FCCP-GEN?

3. What am I doing that impacts positively the culture of FCCP-GEN?

4. What am I doing that impacts negatively the culture of FCCP-GEN?

5. Am I the best Leadership Team member that I can be? If yes, then why? If no, then why?

6. Do I trust my Leadership Team members? If yes, then why? If no, then why

7. Do you trust your leadership team members? If yes, then why? If no, then why?

738.    Judge Cocroft told every Administrator that she would hold their responses in confidence and without attribution in her continuing effort to protect the integrity of every Administrator, including Goodman. Judge Cocroft received the following responses from Administrators (Exhibit 72):

- (Executive Team) Restrictive, fosters a "status quo mentality. I.E. Why change things; why do things differently, why look at new or progressive options. Why invest in our employees over what is required by status. Micromanaging of day-to-day operations and areas that are very deep in the weeds. Very untrusting within the group of Directors, mistrust based upon past behaviors.
- FCCP-Gen culture  - controlling, untrusting, dismissive, "old school", unconnected. Have very little faith in Executive Directors as voiced to me by virtually every level in the [Probation] department and 90% of employees with 2 or more years. <u>Negative</u>. Uncaring.
- Difficult to trust leaders who are distrustful, negative, look for the worst in subordinates that are in their division.
- Frustrations with old ineffective leadership style; Culture as a threat
- Lack of trust between Court Administrator and Deputy Court Administrator; Court Administrator failure to empower Directors; Dysfunctional leadership from Administrators
- Working tirelessly to avoid mistakes simply out of fear of losing job or acceptance by leadership; Not trusting other Administrator colleagues
- Fear and lack of support
- Leadership managed by fear; Some things are micromanaged, which does not foster an environment for inclusion
- Threat related to lack of support for directors and diversity and inclusion issues
- FCCP-Gen Culture as disappointing; Cliques; racism and biases that no amount training can change in some individuals
- <u>People that speak up against injustices become labeled as difficult people</u>; There are people who want those type of staff to be quiet.
- <u>Personal business is shared with other employees.</u>
- <u>Individuals who go against the grain find themselves in a negative work environment or forced out of the Court</u>. This creates a sense of fear and results in silence.
- One Administrator said that what happened to George Floyd was "unfortunate" but why should they feel about it.
- Persons who discuss their dislikes become participants in their own demise
- No trust for other Administrators because they lie, manipulate, sabotage, hurt individuals because they have the power to do so.
- Being excluded from conversations related specifically to position for which they were hired.

Worthington, the current Director of Court Support Services, provided the following responses:

- Threats of constant competition amongst executive team for recognition/validation; less opportunity to be at the table with Judges; Staff turnover; Lack of united front between Judges and Administration; Staff with expertise not always brought to the table before decision making; loss of historical knowledge due to turnover and retirement
- Opportunity with new Administrative Judge (Judge Cocroft) with new philosophy; New initiatives for the communities served

Bedsole, former Deputy Administrator, provided the following responses:

- Non-progressive culture; Distrust and lack of support; Death by meetings/not focused
- Not connected to the organization or most of the people; Environment that is replete with selfishness and inability to express empathy
- Too much pettiness among Administrators that creates distrust
- Constant competition among Administrators for recognition/validation; Less opportunity to be at the table with FCCP-Gen Judges
- Staff with expertise in specific areas are not brought to the table; Lack of united front between Judges and Administration

Davis, the current Director of Human Resources, noted the following:

- Leadership morale; Unsupported allegations are not managed; Micromanagement; Civility or lack thereof; Diversity as a challenge; Lack of compliance with policies and timekeeping
- Culture defined as fearful within the leadership circle as it is not safe to offer ideas and risk failure; Better to keep tried and true techniques; Political meaning a group of employees can influence the Court; Irrational meaning that policies can be suggested to the Court, but not adopted to please a group of employees
- Admission to participating in commiseration and witnessing others treated in a manner that is not respectful with no intervention.
- Successes are not celebrated and failures are painful and public. Could be targeted depending on the day, which is frustrating, humiliating and demoralizing.
- Each Administrator is micromanaged, examined, questioned, not given the benefit of the doubt.
- Unable to change/influence the culture and creating work arounds to navigate the culture to attain a desirable outcome, which does not reflect leadership behavior

739.    Though Goodman has served as Court Administrator for almost ten years, she wrote the

following in response to the same questions posed to the other FCCP-Gen Administrators:

- Team player, Financially responsible; Effective leadership of change management; Empathetic; Patient; Kind; and Honest
- Weaknesses as striving for perfection; sense of urgency to complete tasks or solve problems; Desire for information to be received positively
- Opportunities to obtain education regarding specific court processes in order to better develop solutions and efficiencies as Court Administrator; further develop relationships with Judges and staff to ensure connection to the culture and needs of the Court and staff
- Threats of maintaining positive and productive relationship with leadership of funders and justice partners; requiring changes to business processes
- Organizational strengths of effective management of largest caseload in the State; Effectively utilizing technology to a great extent in a non-traditional environment; knowledgeable and responsible staff
- Weaknesses as being open minded to change proposed and desire by justice partners; Ability to see what is best for the Court versus what is desired by one or a few
- Opportunities to embrace technology and embracing new practices
- Threats of limited ability to provide some of the desired benefits, which could result in a loss of the caliber of staff maintained
- Culture defined as multifaceted but more engaging and transparent than other work environments, Improving on a daily basis
- Extreme sense of urgency or importance when the Court identifies a problem or a matter needs to be addressed.
- Making herself available to discuss matters with Directors and staff; Effort to recognize staff and Directors and their accomplishments
- Intent to impact the culture positively; Team members interpret her intent to be informed as a lack of trusting Directors to accomplish an issue independently.
- Trusting and supporting team members are important aspect of being a good leadership team member
- Ask team members about their lives to make sure they are doing well.
- Responsibility to bring team members together to build trust
- Efforts to be supportive and inclusive

740.    Prior to the originally scheduled June 27, 2022 leadership team meeting and after Judge

Cocroft received responses from all FCCP-Gen Administrators, Goodman began asking Judge

Cocroft repeatedly what the meeting was going to be about and what, if anything, Judge Cocroft

needed her to do.

741. Judge Cocroft told Goodman that, consistent with her emails, she was going to discuss the S.W.O.T. analyses but that she had no idea how the meeting would go because, to her knowledge, there had never been leadership team meetings between a FCCP-Gen Administrative Judge and Administrators. Judge Cocroft told Goodman she did not need to do anything.

742. Goodman asked Judge Cocroft a few more times about the substance of the meeting and if she needed to do anything to prepare. Judge Cocroft gave the same responses as previously given.

743. Sup. R. 4.01 does not require an administrative judge to get the approval of a court's administrator before taking any action, nor is an administrative judge required to review information to be discussed in a meeting called by an administrative judge with a court administrator.

744. Due to various schedule conflicts, the leadership team meeting was not held until August 2022.

745. Judge Cocroft prepared a PowerPoint presentation to synthesize the findings (Exhibit 73).

746. During the meeting, Judge Cocroft was intentional about not identifying who believed or said what. However, whenever she would review something that Goodman perceived as a negative, Goodman would offer a comment to demonstrate how what was shared was not true and that the Directors worked well together and were supportive of one another.

747. Judge Cocroft reminded everyone in attendance that her goal was not to undermine any of the hard work that anyone had done, but to give everyone an opportunity to speak freely so that the Team could grow and move forward in an even more positive way.

748. Prior to discussing the S.W.O.T. analyses information, there was an icebreaker exercise so that the Directors could learn more about each other. Judge Cocroft asked if someone would volunteer to start the conversation after she did her own abbreviated introduction. Judge Cocroft

was hopeful that Goodman, as the Court Administrator and, in the words she chose in her bad-faith complaint against Judge Cocroft, the supervisor for "all my subordinates," would begin the icebreaker.

749.    Every Director looked to Goodman and waited for her to begin. Instead, Goodman sat in silence and another team member started the conversation. Goodman was the last person to speak and Judge Cocroft observed nervousness and tension from other Directors based on Goodman's lack of engagement.

750.    At the end of the meeting all Directors told Judge Cocroft that they learned things they never knew about the Directors with whom they've worked for years, and that they appreciated the opportunity to get to learn more about their co-workers' personal and professional journeys.

751.    This was confirmed in emails that several Directors, including Goodman, sent to Judge Cocroft on August 3, 2022 and August 4, 2022. (Exhibit 74)

752.    Ater the meeting, Judge Cocroft talked with Goodman in the presence of Bedsole and told Goodman she was surprised that she did not start the icebreaker session because, in watching the other Directors, Judge Cocroft could see that they were waiting for her to lead the conversation and were attempting to take cues from her.

753.    Goodman said that she was trying to give the others an opportunity to speak, and Judge Cocroft encouraged her to lean into her role as Court Administrator and to set an example for active and open engagement.

754.    Judge Cocroft shared that Goodman's body language seemed closed off to the conversation and that, when Directors would share their concerns, Goodman would frequently undercut what they were saying and reframe their thoughts in a way that she deemed more favorable. Bedsole

confirmed Judge Cocroft's perception in a text communication wherein Bedsole said that Judge Cocroft "hit the nail on the head!"

755.    Judge Cocroft, Goodman and Bedsole exchanged more thoughts and took the elevator to the parking garage. After exchanging small pleasantries, all three departed.

756.    The next day in the office, Judge Cocroft sent Goodman several email and Teams communications to which she did not respond.

757.    Judge Cocroft continued to do work and presumed Goodman would respond to her eventually.

758.    Goodman remained so quiet that, in one text exchange, Judge Cocroft asked Bedsole, "Is Jen here today?"

759.    About three days after the leadership team meeting, Goodman and Bedsole came to Judge Cocroft's office. Goodman admitted that she was upset because she perceived that Judge Cocroft was unhappy with her in some way.

760.    Goodman further stated that, after talking to Bedsole, she realized that she was allowing her insecurities to get the best of her and that she understood Judge Cocroft was just trying to grow the FCCP-Gen Directors. Goodman committed to being open to learning more and again commented that, while she and Judge Cocroft had not worked together for a long period of time, she had learned so much from her and wanted to learn to become a stronger manager and leader.

761.    Based on the bad-faith complaint filed against her, Judge Cocroft learned that Goodman began compiling her false allegations on July 6, 2022, which was less than a month after Judge Cocroft received confidential S.W.O.T. analyses from all FCCP-Gen Directors and about which Judge Cocroft did not share information with Goodman.

762. From July 6, 2022 until November 4, 2022, Goodman attempted to manufacture a series of encounters to bolster and substantiate her bad-faith complaint.

763. As Court Administrator, Goodman has a significant role in the investigations of all complaints filed by FCCP-Gen employees.

764. As Director of Human Resources, Davis is primarily responsible for the investigation of all complaints filed under the FCCP-Gen Anti-Harassment Policy.

765. Prior to 2015, FCCP-Gen had no policy to address complaints filed by FCCP-Gen employees.

766. Upon information and belief, Davis drafted the Anti-Harassment Policy and Goodman also made suggestions to be included in the Policy

767. In a December 5, 2014 communication regarding a draft of the Anti-Harassment Policy, the Administrative Judge at the time wrote to Goodman and Davis (Exhibit 75):

1. Paragraph 2, lines 1-2: "The court will not tolerate a hostile environment created by co-workers." First thought: I hope we won't tolerate one created by judges, either. Proposed solution: "The Court will not tolerate a hostile work environment created or maintained in the workplace." The rest of the paragraph will remain the same.

2. Page 2 Section II. Investigation. As written, it is fine. I am concerned about possible frivolous or completely unfounded allegations. Do we have – I think we should—any policy about such allegations? I understand not wanting to creating a chilling effect on reporting complaints, but I am also deeply concerned about vindictive employees (over some perceived slight by a supervisor, co-worker, etc.) making a truly "phony" complaint.

3. Page 2, Section II, Paragraph D. I am concerned about the use of the word "accused" here. I would substitute language used elsewhere (see Section III): "alleged wrongdoer." "Accused" implies a formal accusation, which I don't think a report actually is. It is a complaint by an employee, but prior to an inquiry, we have no idea whether it is valid or just plain wrong."

4. Page 2, Section IV, B: I would have it read, "All complaints are treated seriously and, unless the complainant is satisfied with an agreed upon correction action, shall be thoroughly investigated.

768.    The Anti-Harassment Policy was adopted by the Court and became effective on December 10, 2014. The Policy was revised on February 23, 2016 and again in 2020.

769.    Beginning in 2017, a Caucasian male FCCP-Gen Judge was accused by four employees of violating the Anti-Harassment Policy.

770.    Instead of Davis conducting most of the interviews related to the complaints, as contemplated by the position description for Director of Human Resources and her day-to-day responsibilities, the majority of interviews were managed by Goodman who does not have a Human Resources education or background.

771.    During the interview process, Goodman wrote the following notes:

> In summary,
>
> Would consider hostile working environment situation.
>
> Concerned about placing another staff in this role. Suggest [offering a solution] to avoid future liability to the Court.
>
> **Need to discuss course of action re: any further investigative interviews. <u>To what extent do we want to pursue investigation of a Judge *important to discuss*</u>.**
>
> <u>Need to consider communication to/with other Judges – None? ( * * * )</u>

(Emphasis added.) (Exhibit 76)

772.    None of the allegations against a Caucasian male FCCP-Gen Judge were ever discussed during a Judges' Meeting and no communication was sent to all FCCP-Gen Judges alerting them of the allegations and the need to determine a "corrective course of action."

773.    Based on her notes, Goodman developed a corrective course of action as an initial matter regarding the allegations involving the Caucasian male FCCP-Gen Judge. As of the filing of this complaint, no further action has been taken. As of the filing of this complaint and, upon information and belief, Goodman has never publicly questioned the authority of a Caucasian or

male FCCP-Gen Administrative Judge or filed a bad faith complaint against them for decisions they were permitted to make pursuant to Sup. R. 4.01.

### I.    Final Attempt at Resolution

774.    On January 18, 2022, Cocroft met with Hummer to address the years of discriminatory and hostile behavior she had endured. (Exhibit 77, Recording 116)

775.    Hummer said that she was not going to take notes but just listen.

776.    Judge Cocroft expressed that she was exhausted from the mistreatment and did not believe that she would continue to serve as a FCCP-Gen Judge once her current six-year term expired.

777.    Judge Cocroft also explained that her Black staff had been subject to discriminatory treatment based on race and she did not know if their treatment was based on an independent animus toward them or if her staff was being attacked to "get back" at Judge Cocroft.

778.    Hummer said that she was sorry for what Judge Cocroft had experienced and that she knew "a little bit" about the circumstance.

779.    Hummer said that the Court likes to govern and control its own issues and processes and that the Prosecuting Attorney's Office didn't know whether it was "in or out".

780.    Judge Cocroft showed Hummer the documentation and evidence she had compiled that supported her position.

781.    Hummer indicated that she needed to look at the Supreme Court of Ohio's rules and that, because her office had advised on Goodman's bad-faith complaint, there may be a conflict with her office taking any action regarding Judge Cocroft's claims. (Emphasis added.)

782.    Hummer also said that she cared about fairness and fairness in the treatment of a judge and a woman of color who serves in an authoritative role.