784.    Further, Hummer said that she wanted to ensure that Judge Cocroft was protected, including protection from the Prosecuting Attorney's Office. Hummer said that she had no hesitation about appointing special counsel. (Emphasis added.)

785.    Hummer then suggested alternatives to resolve Judge Cocroft's claims, including the engagement of a Black, female investigator who was under contract with her office. Hummer indicated that Judge Cocroft could gather more information about the investigator and then let her know if she agreed to her engagement.

786.    Hummer agreed to meet with Judge Cocroft on January 22, 2024.

787.    While Judge Cocroft had only limited information about the investigator, she located her curriculum vitae and was prepared to agree to her engagement at the January 22, 2024 meeting.

788.    On January 21, 2024, Hummer sent an email to Judge Cocroft, indicating that she had consecutive meetings and would only be able to meet for 15 minutes. (Exhibit 78)

789.    Hummer also asked if Judge Cocroft would be "comfortable" with Dean attending the meeting.

790.    Judge Cocroft replied that 15 minutes would be sufficient time and she had no objection to Dean attending.

791.    Judge Cocroft met with Hummer and Dean on January 22, 2024. (Exhibit 79, Recording 117)

792.    Despite Hummer's initial representations regarding the engagement of an investigator, Hummer and Dean told Judge Cocroft that they had to figure out "how to do this" because they could not tell FCCP-Gen to engage an investigator.

793.    Hummer said that "everybody was weird when it comes to the Court inputting their hands in the Court's business."

794.    Hummer also said that her office would need to determine whether the investigator would want to be involved.

795.    Thereafter, Hummer and Dean began to propose alternatives to an investigation. Specifically, Hummer and Dean proposed a mediation with a local attorney or through the Supreme Court of Ohio.

796.    Dean then commented that, given the bases of Judge Cocroft's complaint, the Supreme Court of Ohio may not be the best option because the Court is comprised of "Caucasian men who tend conservative."

797.    Hummer said that mediation through the Supreme Court of Ohio would not be a good idea because the process would become "too political."

798.    Hummer and Dean said that any decision about how the Court would proceed would first have to be discussed with the FCCP-Gen Administrative Judge, K. Brown.

799.    Judge Cocroft said that she would call K. Brown to discuss the circumstance on January 22, 2024.

800.    During the meeting with Dean, K. Brown, and Judge Cocroft, Dean said that neither she, Hummer, nor their office could order an independent investigation for the Court. Dean noted, however, that she and Hummer were the FCCP-Gen legal advisers and that their legal advice, generally, is that "if an employee makes a complaint and is willing to go a third-party investigator route rather than immediately going to file with EEOC or OCRC, it is appropriate to have an investigation." (Emphasis added.)

801.    As Judge Cocroft provided minimal details to K. Brown about her allegation of a bad-faith complaint filed by Goodman, Dean responded, "And my point with asking that question is that we

did give some advice at that point to the Court so that is one of the other reasons we would end up recusing ourselves because that advice could be at issue, as well." (Emphasis added.)

802.    On January 26, 2024, Judge Cocroft requested an update on the status of the FCCP-Gen position regarding her complaint.

803.    Dean replied on the same date and said that the request was "moving forward".

804.    On January 31, 2024, Dean and Hummer were sent a communication, reminding them of an instance in 2022 wherein Judge Cocroft, on behalf of FCCP-Gen, engaged an outside investigator when the complainant did not want Judge Cocroft, Goodman, or Bedsole to investigate their claims under the Anti-Harassment Policy. In that instance, the full investigation was completed without incident.

805.    On February 1, 2024, Dean responded and seemingly appeared to change the initial position taken by Dean, Hummer and K. Brown. (Exhibit 80) Dean wrote:

> Judge [K.] Brown has requested and authorized that we communicate the following information to Judge Cocroft. Initially, by the rule's own terms, it's not clear it was meant to apply to a complaint from one judge against another (or against the court as a whole). Through the test of the rules, when there is an intent to apply to judges or the court usage of the words "judge" or "Court" are used. As you are aware, there are numerous contexts in which an elected official is not deemed to be an employee for purposes of various laws like unemployment and Title VII.  Then, even if we read the policy to apply to complaints made by judges, it only says that the information will be reported to the "Administrative Judge in order to initiate an investigation." The rule does not speak to any process. In many cases, this could refer to having HR begin an investigation – obviously that won't happen here. However, it's entirely unclear that the AJ has authority (as set forth in Rule 4.01 of the Rules of Superintendence) to institute an outside investigation of other judges without any notice or discussion with those judges. In other words, Judge Brown, as AJ, does not find a prohibition to having this request reviewed by the Court.
>
> We are dealing with a client made up of 17 independently elected officials. (* * *) Judge Brown is trying to make this process as efficient as possible, as well as being fair to Judge Cocroft's request and the concerns raised. To that end, [K. Brown] would like to approach the court with a recommendation that they contract with an independent investigator (* * *) who can look at the court's policies and procedures as they relate to claims by and against judges, determine if there are deficiencies, identify best practices, and make a recommendation for moving forward in a way that benefits everyone at the

<u>Court.</u> Again, Judge Brown wants Judge Cocroft to know that her recommendation to the Court to move in this direction is to make clear that Judge Cocroft's concerns are not being dismissed but are rather being heard.

806. Nothing in Dean's response on behalf of K. Brown indicated that the claims of discrimination and hostile work environment asserted by Judge Cocroft on January 18, 2024 would be investigated.

807. Based on Dean's February 1, 2024 response, an email was sent to Dean and Hummer on February 5, 2024, notifying them of Judge Cocroft's complaint under Section II(F) of the FCCP-Gen Anti-Harassment Policy based on the filing of a bad faith complaint against her by Goodman on or about November 1, 2022. (Exhibit 80). On February 6, 2024, Judge Cocroft asserted a claim of retaliation based on statements made by Dean that were wholly inconsistent with the position taken by Hummer initially. (Exhibit 81)

808. On February 7, 2024, Dean sent an email to Judge Cocroft, stating in part, "Judge [K.] Brown has requested that you provide her with specifics on the complaint against Ms. Goodman, and <u>it is her plan to provide that to the Court for their review and determination as to whether and how to move forward. Judge Brown indicated you will have an opportunity to be fully heard by the court concerning your complaint</u>." (Exhibit 81) (Emphasis added.)

809. Judge Cocroft was confused by how the original position was evolving and took time to reply to the February 7, 2024 email.

810. Judge Cocroft sent a response on February 20, 2024 and discussed: a.) her confusion with the distinction Dean attempted to create regarding when she, Hummer and their office represented the Court and individual judges based on the mandates of R.C. 309.09; b.) the lack of forthrightness regarding when Judge Cocroft provided notice and specificity regarding her claims and those of her Black staff; c.) meetings that Dean, Hummer and another lawyer in their office had with FCCP-

Gen Judges regarding the November 2022 public record request before Judge Cocroft and her counsel at the time had notice that the request existed. (Exhibit 82)

811. Judge Cocroft also restated the language of Sup R. 4.01, which permitted K. Brown to act related to Judge Cocroft's claims without having to have my claims reviewed by FCCP-Gen Judges. On February 21, 2024, Hummer replied, "[W]e sincerely recommend that you agree to this first step and allow [the investigator] to look at the court's processes and procedures. This investigation may open the door for your specific concerns to be addressed. (Exhibit 82)

812. After notifying K. Brown, Hummer and Dean of her claims of discrimination and hostile work environment, Judge Cocroft received an email from Aveni on February 13, 2024 requesting to meet for lunch based on Judge Cocroft's statements at the October 2023 FCCP-Gen Judges' meeting that some judges are alienated from certain conversations and information. (Exhibit 83)

813. Judge Cocroft told Aveni that she did not believe it would be beneficial or healthy to accept his offer, as she was both mentally exhausted and emotionally drained, and leery of having a private conversation as a remedy for a dynamic about which every judge was aware.

814. On February 14, 2024, Judge Cocroft had a criminal matter set with a defendant who also had a matter set on the docket of Serrott.

815. Unbeknownst to Judge Cocroft, counsel conferred with Serrott regarding a mechanism to resolve both his case and Judge Cocroft's case.

816. Shortly after conferring with Serrott, counsel came to Judge Cocroft's courtroom and advised her of the plan that was developed.

817. Given the defendant's history, Judge Cocroft was unwilling to go along with Serrott's proposed plan of action.

818.    Because Serrott, for all intents and purposes, made a promise to counsel that impacted Judge Cocroft's management of her case, she sent an email to Worthington and K. Brown, asking that the matter be transferred to Serrott because counsel in the case "already had extensive conversations with [Serrott] and his staff regarding a universal plan of action" to resolve both cases and neither Judge Cocroft nor her staff were involved in those discussions. (Exhibit 84)

819.    K. Brown, as Administrative Judge, is responsible for signing an entry of transfer. She agreed to sign the entry in this case and Serrott accepted the case.

820.    Upon information and belief, Serrott has not developed a plan of action for a case on another FCCP-Gen Judges' docket without first talking to the assigned judge.

821.    On February 15, 2024 at 9:27pm, Judge Cocroft's staff received an email from a prosecutor regarding a criminal case assigned to Judge Cocroft's docket.

822.    The email stated that the prosecutor received an email from another county, indicated that the defendant "was released this past week on his case in front of Judge Cocroft, only to head up to [the other county] to break into the victim's home (this is the same victim in [Judge Cocroft's]) case." The prosecutor's request was to revoke the defendant's bond.

823.    The FCCP-Gen local rules state that the Court and the Clerk's Office close at 5:00pm. As such, Judge Cocroft had no way of filing the request to revoke bond at 9:27pm.

824.    The prosecutor was notified at 8:53am on February 14, 2024 about the case but did not notify Judge Cocroft until 1 ½ days later.

825.    As a matter of course, Judge Cocroft does not set bonds in criminal matters and did not set the bond that allowed this defendant to "head up" to another county to break into an alleged victim's home.

826. Judge Cocroft sent an email to the prosecutor on February 16, 2024, requesting that she receive notice during regular business hours so that she can respond appropriately or that notice is provided to the Duty Judge after hours, as contemplated by the FCCP-Gen Local Rules.

827. Judge Cocroft copied defense counsel on her email, who was not included on the prosecutor's February 15, 2024 communication.

828. During the week of February 19, 2024, Judge Cocroft was the scheduled Duty Judge, which required her to be on call 24 hours a day, seven days a week to sign warrants and handle emergency issues.

829. February 19, 2024 was a federal holiday and, as such, the duty phone was in the possession of the Duty Judge from the preceding week (Lynch).

830. On February 22, 2024, Judge Cocroft noticed that she received a call and voicemail on her private cell phone on February 19, 2024 from a number that she did not recognize. When she checked the message, it was from a law enforcement officer who was requesting Judge Cocroft's assistance in signing a warrant.

831. In her fifteen years of service, Judge Cocroft has never given FCCP-Gen permission to provide her private cell phone number to any law enforcement personnel as a part of Duty Judge responsibilities.

832. To find out how the officer obtained her number, Judge Cocroft returned the call from her FCCP-Gen office phone.

833. When the officer answered, Judge Cocroft identified herself, apologized for missing the call and asked how the office obtained her private cell number.

834. After pausing, the officer told Judge Cocroft that FCCP-Gen has a duty list that contains the private cell numbers of all FCCP-Gen Judges, and he got the number from that list.

835.    Judge Cocroft told the officer that no such list exists.

836.    On February 22, 2024, Judge Cocroft sent an email to Worthington, Goodman, and K. Brown explaining the situation, asking if a list of private cell phone numbers was created, and requesting that her number be removed if such list existed. (Exhibit 85)

837.    K. Brown responded and recited the text of the FCCP-Gen Local Rule regarding the hours of Duty Judge service and stating that, if a duty week begins on a holiday Monday, then "it would be up to the two judges as to how calls on the holiday are handled". K. Brown concluded by stating, "I will remind the judges at next week's meeting that they are not to share other judge's private numbers."

838.    Judge Cocroft replied and noted that, in her fifteen years of service, there had never been a circumstance for which the Duty Judge who served during the week preceding a holiday did not manage duty calls and that no other accommodations needed to be made. (Exhibit 85)

839.    Judge Cocroft also advised K. Brown that, when she served as Duty Judge in October 2023, she received a stack of garnishments that were left incomplete by the Duty Judge from the preceding week so "full compliance with the plain text of the Local Rule is not always accomplished."

840.    In October 2023, K. Brown was the Duty Judge for the week preceding Judge Cocroft's service and had the incomplete garnishments delivered to Judge Cocroft's bailiff.

841.    On February 23, 2024, Judge Cocroft sent a letter to the President of the Franklin County Board of Commissioners (the "FCBOC"), notifying them of her complaints of discrimination based on race and gender, hostile work environment, retaliation, and the filing of a bad faith complaint by Goodman. On May 19, 2020, the FCBOC passed a resolution asserting that "racism is a public health crisis affecting our entire county" and noting that "racism is a social system with

multiple dimensions" including "systemic racism that is institutional or structural (* * *)." Further, the resolution stated that "racism unfairly disadvantages specific individuals and communities, while unfairly giving advantages to other individuals and communities, and saps the strength of the whole society through the waste of human resources, and Franklin County's collective prosperity depends upon the equitable access to opportunity for every resident regarding of the color of their skin (* * *)".

842.    Judge Cocroft received a response, indicating that the FCBOC was requesting to be "advise[d] accordingly" regarding of any duties. Hummer was copied on the responsive communication.

843.    Under the Anti-Harassment Policy, FCCP-Gen was required to investigate once "the person" notified an outside agency of a complaint.

844.    For her entire life, Judge Cocroft has been a "person".

845.    On February 20, 2024, K. Brown sent an email to Judge Cocroft regarding her complaint of discrimination, based on race and gender, hostile work environment, and retaliation. (Exhibit 86)

846.    K. Brown wrote:

> In an effort to address your concerns, I intend to proceed with requesting the policy and procedures review at a Special Judges Meeting. I plan to formally recommend this review for the Judges' consideration. If the investigation uncovers information related to the specifics of your complaint, that information can potentially be addressed within the investigation. You will be permitted to make your own proposal at the Judges' meeting, should you wish to do so. I would like to get to work on scheduling the meeting, so please let me know if you have any bad dates in the next month.

847.    On March 8, 2024, K. Brown sent an email, indicating that she had scheduled a meeting for March 13, 2024. (Exhibit 87)

848.    On March 11, 2024, Judge Cocroft sent a follow-up email to K. Brown. (Exhibit 88)

849.    Within that email, Judge Cocroft: a.) asked K. Brown whether she had conferred with Hummer and Dean regarding Judge Cocroft's concerns with their continued involvement and representation; b.) expressed concern regarding what would be accomplished during the Special Meeting because K. Brown stated there was only a *potential* that my complaint would be investigated; c.) reminded K. Brown that Sup. R. 4.01 gave her latitude to administer personnel policies, including those related to investigation of complaints under the Anti-Harassment Policy; and d.) inquired about any precedent for a complainant being required to go before FCCP-Gen Judges to explain their complaint and why an investigation should take place.

850.    Judge Cocroft also advised K. Brown that, while K. Brown continued to vacillate on whether an investigation would occur, she and her staff continued to be subject to retaliatory behavior. Specifically, Goodman came to Judge Cocroft's suite toward Judge Cocroft's office before being stopped by Judge Cocroft's secretary, at which point Goodman said that she didn't realize she was on the wrong floor.

851.    Goodman's office is located on the second floor; Judge Cocroft's office, with prominent signage, is on the fourth floor.

852.    Judge Cocroft told K. Brown that she believed the goal was to leave her so exhausted by the process that she would withdraw her complaint and endure the discriminatory, hostile and retaliatory treatment.

853.    K. Brown did not respond until 11:11am on March 13, 2024 – less than one hour before the Special Meeting she scheduled. (Exhibit 89)

854.    In her response, K. Brown stated that FCCP-Gen "had not reached the point where the Court needs to hire independent or special counsel in this matter."

855.  K. Brown also stated that she did not believe the Anti-Harassment Policy gave her unilateral authority to launch an investigation into a judge or the Court as a whole. Further K. Brown wrote that Judge Cocroft "was invited to provide specifics as to your complaints so that I could provide information to judges for review and determination as to whether and how to move forward" and that Judge Cocroft had never provided that information. (Emphasis added.)

856.  K. Brown also said that because she had provided "a path forward for the Court's consideration" she did not "believe any additional in person meeting [with Judge Cocroft] would be beneficial at this time."

857.  Because of K. Brown's March 13, 2024 reply, Judge Cocroft did not have an opportunity to respond and, instead, chose to attend the Special Judges' Meeting. (Exhibit 90, Recording 132)

858.  Both Hummer and Dean attended the meeting.

859.  During the meeting, K. Brown introduced the meeting and noted that Judge Cocroft requested that K. Brown launch an investigation into Judge Cocroft's complaint and indicated that she needed more specifics into the complaint (even though that information had been provided in the February 2024 communications with Hummer, Dean and K. Brown).

860.  K. Brown then stated that her "interpretation" of the Anti-Harassment Policy and Sup. R. 4.01 did not allow her to launch an investigation and that, instead, she needed to get specifics on the complaint so that the FCCP-Gen Judges could decide if or how they would act on the complaint.

861.  K. Brown then stated that she was recommending a review of policies and procedures to see how these issues were handled in the past.

862.  K. Brown then noted that Judge Cocroft had "the right to speak" and disagreed with her plan of action.

863. While K. Brown said that Judge Cocroft had the right to speak, she did not give her an opportunity to speak as an initial matter.

864. Hummer then asked Judge Cocroft whether she agreed with K. Brown's overview and whether her statements were accurate.

865. Judge Cocroft then refuted all of what K. Brown articulated, noted that all complaints were to be confidential and that no other complainant was ever required to vet his/her complaint to the FCCP-Gen Judges.

866. Judge Cocroft also stated that she was saddened and disappointed by the way in which FCCP-Gen Judges were managing her complaint, when there was a level of intentionality when the Court managed Goodman's bad-faith complaint.

867. Despite this, Judge Cocroft called for the question on a vote regarding the implementation of a policies and procedures review.

868. Thereafter, Hummer and Dean explained why they were participating in the meeting and explained they were advising FCCP-Gen that there was value in undertaking a policies and procedures review.

869. Instead of calling for a vote on Judge Cocroft's question, several of the FCCP-Gen Judges began to insult and denigrate Judge Cocroft:

- Lynch said "What's with the snowflake here? What's happening? If you don't like someone, that's tough."
- Lynch said that each FCCP-GEN Judge was the head of their own kingdom and she was "appalled by the whole thing."
- Serrott said that he thought a policies and procedures review was a bad idea.
- Lynch commented that the review was a "total bad idea".
- Holbrook wanted to know if anything that happened with the review would be made a public record request.
- Lynch said that, historically, if the judges don't like an AJ, they can vote them out but noted that she wasn't present in November 2022 when Judge Cocroft was voted out.

114

- Hawkins and Lynch asked how much "the person" conducting the review would be paid.
- Hummer then said that the judges were not at the meeting to vote, even though Judge Cocroft requested a vote and called for the question.
- Holbrook also asked who was going to pay and what the expenses would be.
- C. Brown said that if Judge Cocroft had a concern, then she should do what he did and call the Dispatch. J. Brown, Serrott, Lynch and several others laughed after C. Brown made that comment.
- Lynch said that she had never heard of such an issue related to race in all her years of service.
- Serrott continued to emphasize that he just didn't see any policy that would be workable.
- Lynch said that no vote on any issue would occur during the meeting.
- Aveni asked whether the inquiry itself could become a public record request.
- Lynch asked why the FCCP-Gen Judges would not pick its own investigator and Hummer said her office was trying to streamline the process.
- McIntosh noted that this policy would be a certain level of complaints and concerns and gave an example regarding what the internal process would be if a claim was raised between judges. He gave the example of a claim between himself and Lynch if Lynch asserted sexual harassment.
- Lynch responded that she would do what she did with a former judge and tell the person to "keep their fucking mouth shut".
- Young asked about multi-judge courts that have this kind of policy related to disputes between judges. As of the filing of this complaint, no such information has been obtained.
- Holbrook said that he did not want to pay someone $300/hour to investigate this issue.
- Serrott focused on not wanting a policy that dealt with a personality problem.
- Lynch said that in 20 years, the Court has never had a high-level issue.
- Lynch said that she thought the meeting was called for Judge Cocroft and that if it wasn't called for Judge Cocroft, then what was everyone doing there.
- Lynch asked whether the new policy would say that people had to be nice if an administrative judge was removed.
- Lynch said that they would not implement a policy that said you must be nice.
- Aveni said that the better argument against a policies and procedures review was what impact taking steps and doing a review would have in the future.
- Aveni focused on spending taxpayer money, rather than allegations of discriminatory and hostile behavior, and the filing of a bad faith complaint by Goodman.
- Serrott wanted to know what would happen if the FCCP-Gen Judges rejected a policy.
- Hawkins said that elected officials needed to grow up and act like adults.

870.    The meeting concluded with no vote, a possible plan to get information on policies from other courts, no movement toward conducting a legally mandated internal investigation of Judge Cocroft's and her staff's complaints, and with Judge Cocroft being further humiliated.

871.    Judge Cocroft sent an email to Hummer and Dean on March 13, 2024, expressing her: a.) disappointment and shock at the tone of the Special Judges' Meeting; b.) surprise that the K. Brown would write that additional in-person meetings with her would not be beneficial, c.) concern with Hummer's and Dean's continued involvement, representation of the court, and their clear conflict of interest; d.) shock that K. Brown would selectively exercise the authority granted under Sup R. 4.01; and e.) disappointment about the words and phrases spoken by FCCP-Gen Judges about her and her legitimate claims, including being referred to as a "Snowflake." (Exhibit 91)

872.    In conclusion, Judge Cocroft restated her claims of discrimination based on race and gender, hostile work environment, and retaliation.

873.    Hummer sent a response on March 15, 2024 (Exhibit 92) and acknowledged that "the meeting did not go in the direction that I had hoped." Judge Cocroft replied that she appreciated her attempt at optimism and that it was becoming increasingly clear that her concerns were not being taken seriously.  In another meeting, Hummer called the March 13, 2024 meeting "horrific".

874.    On March 18, 2024, Judge Cocroft sent a Preservation Letter to Hummer and Dean relating to her claims of discrimination based on race and gender, hostile work environment and retaliation, as well as her claim that Goodman's complaint against her was filed in bad faith in violation of the Court's Anti-Harassment Policy. (Exhibit 93)

875.    On March 18, 2024, Judge Cocroft sent Davis a request for records related to the allocation of Court Support Specialist resources to FCCP-Gen employees who had no leave time available and the investigation of an employee complaint filed on or about October 20-October 21, 2014.

876. On March 19, 2024, one day after Judge Cocroft sent the Preservation Letter, as well as the request to Davis, she received a calendar update from the account of Goodman's former Executive Assistant who had not worked for the Court since February 5, 2022.

877. This calendar update was for an event that occurred 473 weeks prior in 2015.

878. Judge Cocroft then sent an email to Hummer and Dean on March 20, 2022, expressing her concern about receiving the calendar update and expressing that it was illogical to receive an update for an event that occurred nine years prior unless someone was attempting to alter records that were associated with her public record requests submitted to Davis. (Exhibit 94)

879. Dean responded and stated that she was unaware of any staff or elected officials not following the preservation letter and Judge Cocroft replied that the purpose of her communication was to provide notice that someone may not be complying.

880. Judge Cocroft also informed Dean that, out of nowhere, both she and her bailiff were receiving error messages on their computer and could not use certain applications and inquired about whether the mirror clone imaging process outlined in the preservation letter had started.

881. Dean stated she would make sure "IT" was aware of the concerns.

882. On March 22, 2024, Judge Cocroft sent an email to Hummer and Dean with copies of two Advisory Opinions, 09-003 and 2019-09, from the Supreme Court of Ohio's Board of Professional Conduct. (Exhibit 95)

883. Judge Cocroft wrote that each opinion seemed to indicate that, in order for Hummer, Dean, and their office to be in compliance with Rule 1.7 of the Ohio Rules of Professional Conduct, the appropriate course of action would be to provide Judge Cocroft with standalone counsel from another assistant prosecuting attorney within the civil division and requested a response to her request by 4:00pm on March 25, 2024.

884.    Dean responded, with a carbon copy to Hummer, stating that they did not believe that their office had a duty to appoint counsel, as they were unaware of their office ever representing an elected official making claims against the FCCP-Gen or the FCBOC (Exhibit 96).

885.    Dean further stated that, even if a conflict existed, her office could not unilaterally appoint outside counsel.

886.    Judge Cocroft responded and stated that Dean's email seemed to suggest that the acts about which she filed a complaint were made in good faith and in the scope and course of employment. Further, Judge Cocroft stated that the Advisory Opinions outlined an intractable responsibility to provide her with standalone counsel. Judge Cocroft also noted that Dean's and Hummer's unwillingness to fulfill their ethical obligations was a continuation of the pattern of retaliation to which Judge Cocroft had been subjected. (Exhibit 96)

887.    Thereafter, on March 25, 2024, Judge Cocroft contacted the Director of the Board of Professional Conduct as well as Chief Counsel for the Supreme Court of Ohio to discuss the conflict in Hummer's and Dean's continued representation. Neither was able to provide insight with the Chief Counsel suggesting that Judge Cocroft discuss the issue with the Administrative Judge, K. Brown, who had already informed Judge Cocroft that it would not be beneficial to have any in-person conversation with her.

888.    Later in the day on March 25, 2024, Dean again replied to Judge Cocroft and stated, "[W]e can reach out to the Board of Professional Conduct or Disciplinary Counsel if you want us to get an opinion on this matter." (Exhibit 96)

889.    As of the filing of this complaint, Judge Cocroft has never been advised by Hummer or Dean that they either contacted another agency and/or received guidance on a potential conflict of interest.

890.    On March 25, 2024, Judge Cocroft received an email for Dean, notifying her that FCCP-Gen employees had filed complaints and that Judge Cocroft had been identified as a potential witness. (Exhibit 97)

891.    The complaints were filed by Judge Cocroft's Black staff, her bailiff and secretary, for discrimination based on *inter alia* race and hostile work environment.

892.    Dean's email also stated that the investigation was being handled by an investigator from a local Columbus law firm "at the request of the administrative judge [K. Brown]."

893.    The investigator who was engaged was the same investigator that Hummer suggested regarding investigating Judge Cocroft's complaint.

894.    In February 2024, both Hummer and Dean told Judge Cocroft that K. Brown's position was that she did not have the independent authority to request an outside investigator and would need the agreement of a majority of judges to do so.

895.    To Judge Cocroft's knowledge, there was no FCCP-Gen Judges' meeting held to approve the engagement of an outside investigator regarding the claims asserted by Judge Cocroft's staff.

896.    During the April 2024 FCCP-Gen Judges' meeting, K. Brown raised the issue of allowing all judges to have access to the documents created by other judges and their staffs. K. Brown stated that the goal was to give FCCP-Gen staff attorneys more access to documents that may be commonly used among all staff.

897.    K. Brown asked that each FCCP-Gen Judge provide their position on this issue.

898.    On April 16, 2024, Judge Cocroft sent an email to K. Brown, stating that she did not wish to participate in any courtwide effort to give unfettered access to any documents created and saved by her and/or her staff. K. Brown acknowledged receipt of her position. (Exhibit 98)

899.    The next day, K. Brown sent an email to all FCCP-Gen Judges regarding the issue of access to documents and noted specifically that she received an email from a "colleague" stating that they did not want to give access to their documents. (Exhibit 99)

900.    Judge Cocroft was the only FCCP-Gen judge who sent this specific communication. K. Brown did not discuss or disclose the positions of any other FCCP-Gen Judges, despite the fact that she asked each to provide their position.

901.    On April 16, 2024, Judge Cocroft received a second updated calendar invite from the email account of Goodman's former executive assistant who had not worked for FCCP-Gen since February 5, 2022.

902.    This updated invitation was for an event that occurred 486 weeks prior, in December 2014.

903.    On April 17, 2024, Judge Cocroft sent an email to Hummer, Dean and one other lawyer from their office regarding this situation. (Exhibit 100)

904.    Therein, Judge Cocroft noted that this second update came after she submitted a request for records that would have been created or finalized around the same time as the event in the 10-year-old calendar update.

905.    As such, Judge Cocroft requested that Hummer and Dean provide a second reminder to Goodman, Bedsole, Davis and Worthington that no documents should be altered as required by the March 18, 2024 preservation letter.

906.    On March 18, 2024, March 27, 2024, April 10, 2024, and April 22, 2024, Judge Cocroft sent a request for documents to Davis. The requests related to records that were created at the request of Judge Cocroft and/or had been provided to Judge Cocroft in her official capacity.

907.    On April 23, 2024, K. Brown sent an email to Judge Cocroft regarding her requests (Exhibit 101) and stated, "Your requests have become very time consuming and are interfering with the

other duties for which administration is responsible. The subject matters of your requests are also concerning given your threatened litigation against the Court. At this time, I have advised administration to hold on any further action on your requests, until I have reviewed the Court's obligations, if any, to respond. I will advise you accordingly." (Emphasis added.)

908.    At the time K. Brown sent the April 23, 2024 email, Judge Cocroft was presiding over a murder trial.

909.    Because K. Brown is responsible for assigning jury panels in her service as Administrative Judge, she would have known that Judge Cocroft was in trial.

910.    Judge Cocroft responded to K. Brown's email on April 24, 2024. (Exhibit 101)

911.    Judge Cocroft noted *inter alia* that: a.) she had not threatened litigation and was confused by K. Brown's assertion of the same; b.) she sent a preservation letter because Goodman, Bedsole, Davis, and Worthington had permanently deleted internal messages, which constituted pubic records, between them and Judge Cocroft and them and Judge Cocroft's staff; c.) she was receiving calendar updates for events that occurred nine or ten years prior; d.) she remained a duly elected member of FCCP-Gen, irrespective of any complaint that she filed; e.) K. Brown's claimed "interruption" actually constituted Davis's job responsibilities and position description; f.) that K. Brown was treating her with a level of disrespect and contempt not shown to non-minority judges.

912.    Judge Cocroft also stated that it would be Hummer and Dean, as legal counsel for the Court, who would determine whether Judge Cocroft was entitled to the requested documents or whether there was legal justification for her not to receive the documents.

913.    K. Brown sent another reply and Judge Cocroft informed her that she had no intention to engage in an unconstructive back and forth conversation. (Exhibit 101)

914.    On April 25, 2024, Hummer contacted Judge Cocroft to inform her that her requests for documentation were being processed. (Exhibit 102)

915.    On May 6, 2024, K. Brown sent an email to all FCCP-Gen Judges regarding a request from Court employees to participate in an annual Summer parade. (Exhibit 103)

916.    Because neither FCCP-Gen nor its employees are permitted to sponsor an event or entity in order to maintain its neutrality and unbiased status, a "compromise" had been reached that would allow employees to wear t-shirts that did not contain the FCCP-Gen seal.

917.    K. Brown asked for feedback from all FCCP-Gen Judges regarding the compromise.

918.    K. Brown indicated that she was in support of the compromise but did not indicate that she played any role in creating it.

919.    In response, a few FCCP-Gen Judges said they were in favor of the compromise.

920.    Hawkins wrote that he would dissent from the compromise and stated, "I think this is highly inappropriate and unethical, especially given litigation that is pending in our Court and other similarly litigation that is reportedly headed our way." (Exhibit 103)

921.    For her response, Judge Cocroft asked K. Brown who proposed the compromise since the issue was not brought to all FCCP-Gen Judges before a compromise was developed. (Exhibit 103)

922.    Additionally, Judge Cocroft asked Hawkins for insight regarding what litigation was currently pending and reportedly headed to the Court that was implicated by the activity. (Exhibit 103)

923.    Shortly thereafter, C. Brown said that the conversation should be discontinued and should be discussed during a meeting. C. Brown made this statement after first writing, "I fully support the proposal." McIntosh and K. Brown agreed with C. Brown's new position and K. Brown

advised FCCP-Gen Judges that the issue would be discussed during a Judges' Meeting. (Exhibit 104)

924.    Given K. Brown's past references to Judge Cocroft's "threatened litigation", she believes that Hawkins' reference was to a lawsuit thought to be filed by Judge Cocroft.

925.    Two weeks later, on May 20, 2024, Judge Cocroft received an email from Davis. (Exhibit 105)

926.    The email stated that FCCP-Gen had received a public records request from a reporter with the Columbus Dispatch on May 17, 2024, requesting a copy of the complaint filed by Goodman against her in November 2022, as well as any documents between Judge Cocroft, K. Brown, and McIntosh between April 1, 2024 and May 17, 2024 regarding "retention and/or potential litigation." Judge Cocroft found the timing of this request curious and suspicious, given Hawkins' reference to "threatened litigation" just two weeks prior, and given the fact that Goodman's bad-faith complaint had been provided to another Dispatch reporter two years prior.

927.    Davis noted, "We will be accessing your email to gather this information."

928.    Thereafter, Judge Cocroft replied to Davis and copied Hummer, noting that every other public record request included a carbon copy to the FCCP-Gen counsel. Hummer acknowledged and thanked Judge Cocroft for forwarding the communication and advised Davis that she should respond that the matter is under legal review, as the records may involve privileged communications. (Exhibit 105)

929.    On May 20, 2024, Judge Cocroft sent an email to Davis, Hummer and another lawyer in Hummer's office, requesting legal representation under the FCCP-Gen liability policy for judges. The foundation of Judge Cocroft's request was the fact that there was an additional inquiry

regarding Goodman's two-year-old bad-faith complaint and Judge Cocroft was unclear about what issues might arise based on that request. (Exhibit 106)

930.    Judge Cocroft reminded the email recipients that, in 2022, she was not advised of her right to representation through the FCCP-Gen liability policy and that, in an incident that occurred in 2014, counsel was contacted on behalf of a different FCCP-Gen Judge.

931.    Davis stated that FCCP-Gen did not engage counsel on behalf of a FCCP-Gen Judge in 2014 and Judge Cocroft reminded her that she had documents provided by the Court that did not reflect this position.

932.    On May 21, 2024, Hummer sent an email to Judge Cocroft, indicating that she would have to call liability counsel herself, unless it was a broader FCCP-Gen matter. (Exhibit 106)

933.    Judge Cocroft responded that she believed the matter was a broader FCCP-Gen issue based on how circumstances had been managed and continued to be managed.

934.    As of the filing of this complaint, Judge Cocroft has never been provided with counsel through the FCCP-Gen liability policy.

935.    On May 23, 2024, Judge Cocroft received an email from McIntosh, with a carbon copy to K. Brown. (Exhibit 107)

936.    The purpose of the email was to determine whether Judge Cocroft would be willing to participate in mediation through the Supreme Court of Ohio's Dispute Resolution Section.

937.    McIntosh stated that the investigator who was not engaged to investigate Judge Cocroft's claims "had recommended some type of structured meeting or mediation to discuss pending issues."

937.    K. Brown replied that she would be willing to participate as the representative of FCCP-Gen.

938.    Judge Cocroft responded and asked a series of questions to better understand the process. (Exhibit 108)

939.    When McIntosh responded almost a month later on June 20, 2024, he noted that the recommended mediators would be a retired Caucasian male magistrate judge from Defiance County and a retired Caucasian female judge from Henry County. (Exhibit 109)

940.    The total Black population of Defiance County is 2.75%. The total Black population of Henry County is .54%.

941.    Based on the information that McIntosh provided, as well as Hummer's and Dean's prior representation that the Supreme Court of Ohio is comprised mostly of "Caucasian men who tend conservative" and that a referral for resolution would become "too political," Judge Cocroft advised McIntosh that she was unwilling to engage in the proposed mediation. (Exhibit 109)

942.    On May 23, 2024, Judge Cocroft filed a Charge with the Equal Employment Opportunity Commission, which Charge was accepted on the same date.

943.    On May 23, 2024, Hummer sent an email to the reporter who submitted a public record request on May 17, 2024 and stated that the records were exempt from release under attorney-client privilege.

944.    Thereafter, on May 29, 2024, Judge Cocroft sent an email to Hummer, asking for an explanation regarding the current position that records were exempt from disclosure based on attorney-client privilege, when Dean had been emphatic in her position that Judge Cocroft was not entitled to either legal representation or standalone counsel. (Exhibit 110)

945.    Hummer stated that her office does not represent individual employees or elected officials in claims against FCCP-Gen (even though Judge Cocroft had not relinquished her position as a member of FCCP-Gen, thereby still making her Hummer's client).

946. Judge Cocroft responded and expressed her frustration with the evolving nature of FCCP-Gen's and Hummer's position.

947. On May 31, 2024, Davis sent a calendar invitation to Judge Cocroft for an upcoming Personnel Committee meeting. Dissimilar from previous invitations, Davis did not provide any information regarding the focus of the meeting.

948. When Judge Cocroft asked for an agenda, Davis informed her that the Committee would be discussing revisions to the Anti-Harassment Policy, as well as a review of the Employee Handbook. Davis also noted that the Handbook had been reviewed by Hummer and/or Dean. (Exhibit 111)

949. When Judge Cocroft reviewed the Anti-Harassment Policy, which served as the basis for her claims of discrimination, hostile work environment, and retaliation, as well as those of her Black staff, Judge Cocroft noted that every provision upon which they had relied had been removed from the proposed Policy. (Exhibit 112)

950. Moreover, Judge Cocroft noted that the proposed Policy vested Goodman with sole authority to decide on the appropriate action if there was a finding that the Policy had been violated.

951. Noticeably absent from the revisions was any process or protocol that should be implemented when a FCCP-Gen Judge makes a claim against another judge or employee (e.g. Court Administrator).

952. These proposed revisions were made after FCCP-Gen, Hummer, and Dean received actual notice of Judge Cocroft's EEOC Charge.

953. On June 5, 2024, Judge Cocroft sent an email to Hummer, notifying her of the concerns. (Exhibit 113)

954.    Hummer was out of the office, so Judge Cocroft forwarded the communication to another lawyer in Hummer's office.

955.    On June 5, 2024, Dean responded to Judge Cocroft's email and stated that neither she nor Hummer were aware of the proposed changes to the Anti-Harassment Policy. Dean then said that she would be willing to attend the Personnel Committee meeting. (Exhibit 113)

956.    On June 6, 2024, Judge Cocroft responded and told Dean that, because she was neither the Chair of the Personnel Committee nor a member of the Committee, she could not proactively invite Dean to attend.

957.    On June 7, 2024, Dean sent another communication to Judge Cocroft, stating that she would advise the Personnel Committee that the changes to the Anti-Harassment Policy were premature. (Exhibit 113)

958.    On June 10, 2024, Judge Cocroft sent a duplicate email to Phipps regarding her concerns about the Anti-Harassment Policy proposed revisions.

959.    Phipps responded and stated:

> I began talking with [Davis], [Goodman], and [Bedsole] when I first became chair of the committee. I noticed a need for revisions as employees had difficulties with the chain of command when needing to file a complaint or address issues. This has been ongoing issue since I took the bench, as certain employees felt a need to ask [Judges] to assist them with their complaints.

960.    Judge Cocroft replied:

> [T]he timing of this effort and the edits in each document proposed to achieve this aim are troubling, at best. The irony of removing every provision upon which "a person" (language from the 2014 Anti-Harassment Policy) relied to assert the filing of a bad faith claim by the Court Administrator [Goodman] are legal, visual and public relations disasters waiting to happen, particularly given the fact that an EEOC Charge has been filed and accepted. However, should the Court choose to move forward with the meeting on tomorrow, I will restate my position.

(Exhibit 114)

961.    The scheduled June 11, 2024 Personnel Committee meeting went forward but the discussion regarding proposed revisions to the Anti-Harassment Policy was removed from the agenda.

962.    On June 11, 2024, Davis provided updates regarding the records that Judge Cocroft requested in March and April 2024.

963.    The "disclaimer" language in Davis's communications began to become increasingly expansive and included language not previously included in earlier communications.

964.    Judge Cocroft inquired about the change in a June 12, 2024 email to Dean, Hummer and another lawyer in their office and wrote:

> To be clear, the disclaimer that is at the bottom of the most recent communication from [Davis] has not been included in any other production provided to me. So, I have to presume that there was a genesis for the inclusion of this language and my belief is that the genesis was the filing of the Charge with EEOC.
> Moreover, I am confused by your [Dean's] statement that the Court may need to provide a different analysis based on the foundation of my request. I made the foundation clear when I sent the communication and my right to receive the documents was confirmed by Ms. Hummer. However, if I were to follow your initial position, then it appears that you provided the documents to me as a courtesy because I am a member of the Court, which would make me your client. If I am not considered a client, then it appears that the Court waived privilege to provide documents to a sitting judge who is a member of the Court but not your office's client.

(Exhibit 115)

965.    Dean responded on June 13, 2024, noting that Judge Cocroft was a client in her official capacity but that neither she nor her office could represent Judge Cocroft in a civil rights action against FCCP-Gen. (Exhibit 116)

966.    Because Davis revised the disclaimer language included in FCCP-Gen's production of documents, Judge Cocroft sent an email to Hummer on June 14, 2024, asking if Goodman, Bedsole, Davis, and Worthington were her clients, since one or all of them were managing how

they communicated with Judge Cocroft based on advice from Hummer, Dean or other lawyers in their office. (Exhibit 117) Hummer did not respond.

967.    On July 16, 2024, Judge Cocroft sent a communication to Worthington regarding a case that had been transferred from Munson's docket to her docket. (Exhibit 118)

968.    Counsel for the case appeared in Judge Cocroft's courtroom, expecting to have Judge Cocroft address the case. However, Judge Cocroft was not aware that the matter had been transferred to her.

969.    Upon further research, Judge Cocroft learned that Munson filed the recusal request on July 2, 2024 and it was transferred to Judge Cocroft's docket on July 12, 2024.

970.    Judge Cocroft reminded Worthington that, when a TRO case was transferred from her docket to Serrott, Worthington made a special trip to Serrott's office to advise him of the transfer.

971.    Judge Cocroft asked if or how she was supposed to receive notice of the transferred case, because neither she, Munson, nor Munson's staff advised Judge Cocroft of the same.

972.    On July 16, 2024, Worthington sent a response to Judge Cocroft attempting to explain the entire transfer process for any FCCP-Gen case and then stated that notice of the case transfer "was then placed in your Judge's drawer on the 2nd floor" on July 16 (the same date the case was scheduled to be heard) "so that the bailiff is notified of the judge transfer." (Exhibit 118)

973.    Judge Cocroft replied that it was unreasonable to expect that her bailiff would be able to anticipate or discern that notification of the case transfer was placed in her judge drawer on the same date the case was set.

974.    Judge Cocroft also questioned how or why she was not notified of the transfer when it occurred on July 5.

975.    Judge Cocroft also reminded Worthington that many bailiffs do not use the case history card to receive notice of new case assignments. Judge Cocroft forwarded the initial communication to K. Brown, in her capacity as Administrative Judge, and received no response. (Exhibit 119)

976.    Beginning July 23, 2024, Davis sent Judge Cocroft emails regarding a series of public record requests.(Exhibit 120) Judge Cocroft forwarded K. Brown and McIntosh these series of requests but received no response.

977.    The first request was submitted by the same local reporter who filed a first public records request in May 2024.

978.    The request was related to a copy of a hearing with a lawyer against whom Judge Cocroft was compelled to file a notice to show cause regarding a finding of contempt.

979.    The reporter was not present in Judge Cocroft's courtroom when the events giving rise to the possible contempt occurred.

980.    Davis sent the second request to Judge Cocroft on July 26, 2024.

981.    The request was submitted anonymously for a copy of video for all hearings held on 7/18/24 for Judge Cocroft and a copy of docket for Judge Cocroft from 7/22/24 through 8/7/24.

982.    Judge Cocroft was scheduled to be out of the office from July 22, 2024 through August 7, 2024, as she was working remotely.

983.    Judge Cocroft stated that she would defer to the legal position of Hummer, whom Davis had not copied on her communications, regarding the release of information based on her role as counsel for the Court.

984.    Davis sent Judge Cocroft the third public record request on July 26, 2024.

985. The request was submitted by a reporter with a local newspaper, requesting communications between Judge Cocroft and K. Brown and/or Judge Cocroft's bailiff and K. Brown regarding Judge Cocroft's "absence" between July 22, 2024 and August 5, 2024.

986. Upon information and belief, the requests related to the belief that Judge Cocroft was out of the office because she was upset by how the lawyer addressed her on July 18, 2024.

987. While the matter was both upsetting and embarrassing to Judge Cocroft, as the lawyer belittled her in front of two other lawyers, her staff and a Franklin County Deputy Sheriff, Judge Cocroft's time out of the office had been planned in advance.

988. Judge Cocroft used the time to write myriad civil decisions, as she had been unable to hire a new staff attorney because of the ongoing mismanagement of her discrimination claims.

989. On July 24 , 2024, Judge Cocroft sent a series of public records requests to Davis.

990. On August 9, 2024 and August 12 2024, Hummer met with Judge Cocroft to propose the idea of a structured mediation to resolve her claims, wherein the Court and Judge Cocroft would each select a mediator and the parties would jointly select a third.

991. Judge Cocroft stated that, if she were to consider participating in mediation then there would have to be findings that would be made public and an apology from the Court regarding the way in which she and her staff had been treated.

992. Hummer indicated that the findings of mediation are never public and Judge Cocroft indicated that was a necessary pre-condition.

993. Hummer said that pre-condition would not be possible and Judge Cocroft indicated that she would not participate in mediation.

994. On September 10, 2024, Judge Cocroft sent an email to Davis inquiring about the status of her record requests. (Exhibit 121)

995.    Davis stated that the requests were submitted to Hummer and Dean for legal review in August 2024.

996.    On October 16, 2024, Judge Cocroft sent an email to Davis regarding the status of her July 24, 2024 record requests. (Exhibit 122)

997.    On November 4, 2024 Judge Cocroft received a response to one of the public record requests related to any communications sent or received by FCCP-Gen Judges, Goodman, Bedsole, Goodman, Davis, or Worthington with a local reporter using the Court's Microsoft Outlook or Teams technology. (Emphasis added.)

998.    Within that response, Judge Cocroft received a series of documents that were not sent to the local reporter using the FCCP-Gen Microsoft Outlook or Teams technology.

999.    Rather, Davis responded with documents that Judge Cocroft sent to herself. The documents Judge Cocroft received did not even include a cover page email that would show the documents were sent to the local reporter using the FCCP-Gen Microsoft Outlook or Teams systems.

1000.   Judge Cocroft hired a new Staff Attorney whose first day of employment was September 16, 2024.

1001.   Davis and Bedsole were aware of the new Staff Attorney's start date in early August 2024.

1002.   Unbeknownst to Judge Cocroft, her new Staff Attorney was not provided with a key to his office on the first day.

1003.   Judge Cocroft did not learn of this until September 18, 2024, at which time she asked Davis about receiving a key. (Exhibit 123)

1004.   In response to that request, Davis forwarded an email from January 2023 regarding the prior staff attorney's separation from employment to suggest that Judge Cocroft was still in possession of the key. (Exhibit 123)

1005. Judge Cocroft reminded Davis that another FCCP-Gen Director collected the key and other equipment and that the key had never been in her possession.

1006. Davis stated that a new key would be ordered and would be provided to the new Staff Attorney "as soon as possible." (Exhibit 123)

1007. To Judge Cocroft's knowledge, no other FCCP-Gen Judges' staff attorneys have had to wait to receive a key to their office.

1008. Judge Cocroft later learned that a member of Davis's staff provided her staff attorney with a temporary key, though Davis never shared that information with Judge Cocroft.

1009. On September 19, 2024, Davis came to Judge Cocroft's chambers and into the office of her staff attorney.

1010. Davis had to pass the door to Judge Cocroft's office to get her staff attorney's office.

1011. Davis never acknowledged Judge Cocroft's presence as she came into or left Judge Cocroft's suite. Judge Cocroft sent Davis an email, thanking her for providing the key and advising that she heard her greet her staff while bypassing her. (Exhibit 124)

1012. On September 19, 2024, Hummer met with Judge Cocroft to discuss a potential resolution to her claims.

1013. Hummer stated that K. Brown, McIntosh, and Phipps met with her and others to discuss FCCP-Gen's willingness to agree to and fund a policies and procedures review, the same effort that several FCCP-Gen Judges refused and rejected during the March 13, 2024 meeting.

1014. Hummer also stated that FCCP-Gen wanted to engage in mediation.

1015. Judge Cocroft restated many of her concerns but indicated that she would provide a formal answer to the offer on September 20, 2024.

1016. Judge Cocroft submitted her formal response to Hummer's proposal on September 20, 2024 (Exhibit 125)

1017. In it, Judge Cocroft listed several pre-conditions and conditions to which FCCP-Gen would have to agree in order for her to participate in mediation.

1018. On October 2, 2024, Judge Cocroft received a notice of right to sue letter from EEOC and advised Hummer of the same. (Exhibit 126)

1019. In response, Hummer said that she would "pass this on to the Client" and Judge Cocroft asked whom the client is, because Hummer had also referred to Judge Cocroft as "the client."

1020. Hummer replied that her office represented FCCP-Gen, which is the entity that would be responsible for decision related to her claims. (Exhibit 126)

1021. Judge Cocroft asked for clarification regarding whether notice went to K. Brown as Administrative Judge or whether notification would go to "every individual who is a part of and comprises the Client."

1022. Judge Cocroft then restated her belief that Hummer, Dean and their office may be conflicted from continued representation. (Exhibit 126)

1023. Hummer again restated that neither she nor her office represents any elected official pursuing a personal action.

1024. Once again, Judge Cocroft stated that she has always been aware that neither she nor her office represents Judge Cocroft in a personal capacity but was struck by her statement of passing along the notice of right to sue to "the Client" because she had neither forfeited nor relinquished her role as a FCCP-Gen Judge.

1025.   Judge Cocroft reminder Hummer that she had no obligation to advise either Hummer or FCCP-Gen of the notice of right to sue letter but was attempting to "partner" with the Court to resolve the matter, though she was continuing to be treated in a contemptuous way. (Exhibit 126)

1026.   Judge Cocroft did not receive a response to her September 20, 2024 letter until October 15, 2024. (Exhibit 127)

1027.   In response, Hummer stated, "The Court is willing to mediate through the Supreme Court's mediation program."

1028.   Judge Cocroft then replied, requesting answers to the questions generated by her September 20, 2024 letter and Hummer provided a reply to Judge Cocroft's first question only. Hummer then stated, "I look forward to hearing whether you are willing to utilize the Supreme Court's program."

1029.   Judge Cocroft then asked Hummer if it was correct to presume that she would not provide answers to the remaining questions so that Judge Cocroft could make an informed decision. (Exhibit 127)

1030.   Hummer did not reply.

1031.   Thereafter, on October 21, 2024, Judge Cocroft sent a letter to Hummer, with a carbon copy to K. Brown, McIntosh, and others, advising with great detail that she was rejecting the offer to mediate through the Supreme Court of Ohio's mediation program for the reasons Judge Cocroft had explained on myriad occasions. (Exhibit 128)

1031.   As of the filing of this complaint, FCCP-Gen, through Hummer and Dean, has not made any additional attempts to resolve this matter nor has any investigation into her claims been instituted.

1032. Beginning May 2024, Judge Cocroft's staff noticed that criminal continuance entries for matters set on her docket were being deleted from the FCCP-Gen hard drive.

1033.   Judge Cocroft contacted Worthington on May 29, 2024, to alert her of the issue. (Exhibit 129)

1034.   When Worthington responded, she blamed Judge Cocroft's bailiff for accidentally deleting the entries and stated there was a problem "on the front end".

1035.   Judge Cocroft responded to Worthington and told her that Judge Cocroft's bailiff was especially vigilant in managing criminal documents and asked that the Director of Information Technology investigate the situation.

1036.   When the Director of Information Technology responded, they advised Judge Cocroft that the continuance entries had been intentionally deleted and that it was not Judge Cocroft's staff who deleted them. (Exhibit 129)

1037.   The Director also notified Judge Cocroft that they could not determine who deleted the entries but that they would implement safety procedures to allow "look backs" on who accessed files. The Director also noted that they were going to eliminate permissions given to various FCCP-Gen employees to access Judge Cocroft's continuance entries.

1038.   Because of this issue, Judge Cocroft and her staff had to implement additional procedures to ensure there was record of everything signed. This process included taking screen shots of entries, printing extra copies and maintaining those copies in Judge Cocroft's chambers.

1039.   Upon information and belief, no Caucasian FCCP-Gen Judge has had a problem with continuance entries being deleted and then having their staff be accused of deleting the files.

1040.   All Administrative Judges received a 15% reduction in their caseloads due to handling administrative responsibilities.

1041. Judge Cocroft compared her monthly case assignments with those of her former suitemate (O'Donnell) and, with the exception of three months, it appeared that Judge Cocroft had as many, if not more, cases assigned to her docket than O'Donnell.

1042. For 12 ½ of the 15 years Judge Cocroft has served as a FCCP-Gen Judge, her staff was Caucasian.

1043. Judge Cocroft's first bailiff, a Caucasian woman, worked with her from 2009-2020. That bailiff left because she graduated from law school, passed the Ohio Bar and wanted to engage in the active practice of law.

1044. Prior to the hiring of her current staff attorney, the previous staff attorney was a Black woman who resigned after telling Judge Cocroft that she had never seen a judge treated the way Judge Cocroft had been treated and that it was taking a toll on her mental health.

1045. Before that, Judge Cocroft's staff attorney was a Caucasian woman who served from 2014-2023. That staff attorney resigned because she wanted to have a more traditional law practice.

1046. Prior to Judge Cocroft's current magistrate who is Greek Orthodox, her magistrate was a Caucasian woman who retired.

1047. Prior to Judge Cocroft's current Assistant, her former Assistant was a Caucasian woman. She resigned after being promoted to a new position with FCCP-Gen that had a higher level of pay.

1048. Upon information and belief, Judge Cocroft and her staff were referred to by other FCCP-Gen staff as the "Black courtroom" in 2022.

1049. FCCP-Gen Judges have questioned Judge Cocroft regarding why Caucasian employees left her staff.

1050.   To Judge Cocroft's knowledge, no Caucasian FCCP-Gen Judge has ever been asked to justify the race of employees they hire and/or to explain why former employees left their staff.

1051.   The race of most FCCP-Gen Judges' staff is Caucasian. The hiring practices of Caucasian FCCP-Gen Judges have not been questioned or challenged by other judges or Goodman.

1052.   Judge Cocroft experienced no sustained issues with a hostile work environment until she became Administrative Judge, tried to implement policies that created a more fair and equitable environment, advanced the plan to create a DEI Director position and hired a majority of Black staff. As recently as November 4, 2024 and November 12, 2024, K. Brown sent communications to Judge Cocroft that ignored her legitimate concerns regarding Worthington's and Davis's behavior toward Judge Cocroft and her staff. (Exhibit 130) Due to K. Brown's disregard for Judge Cocroft, her staff, and their concerns, Judge Cocroft resigned from her appointment to the Judicial Advisory Board on November 8, 2024. (Exhibit 131)

<u>Count One</u>
**Discrimination and Retaliation Based on Race and Gender**
**Title VII of the Civil Rights Act of 1964**

1053.   Plaintiff incorporates by reference Paragraphs 1 through 1052, as if fully rewritten herein.

1054.   Judge Cocroft is Black, female and a member of a protected class and Defendant Franklin County is an employer as defined in the statute.

1055.   Judge Cocroft was similarly situated in all relevant respects to Caucasian and male FCCP-Gen employees and Judges and was treated less favorably, and thus Judge Cocroft was subjected to race and gender discrimination and also subjected to a hostile work environment.

1056.   Upon complaining internally about race and gender discrimination and after filing a complaint with EEOC, Judge Cocroft was subjected to the retaliatory actions outlined above, including but not limited to Defendant's failure and refusal to investigate Judge Cocroft's complaints or to take any remedial action to address them.

1057.   Defendant Franklin County, by and through its agents, representatives, and employees, discriminated and retaliated against Judge Cocroft on the basis of race and gender with respect to the terms, conditions and privileges of Judge Cocroft's employment including, but not limited to, subjecting her to the potential of an unfounded investigation, failing to follow their own Anti-Harassment Policy, breaching confidentiality regarding the complaint filed by Judge Cocroft, inhibiting her right to participate in all FCCP-Gen committee meetings, and interfering with the ability of her Black staff to do the work they were hired to do, all in violation of 42 U.S.C. 2000e, *et seq*.

1058.   Defendant's stated reasons for the adverse employment actions taken against Judge Cocroft are pretextual.

1059.   As a direct result of Defendants' unlawful discriminatory conduct as set forth above, Judge Cocroft has suffered harm and she is entitled to compensation for all economic loss, compensatory damages, including but not limited to mental anguish, physical and emotional distress, humiliation and embarrassment, loss of earning capacity and loss of professional reputation.

## Count Two
### Violation of Reconstruction Era Civil Rights Act, 42 U.S.C. § 1981

1060.   Plaintiff incorporates by reference Paragraphs 1 through 1059, as if fully rewritten herein.

1061.   By creating and failing to remedy a severe and/or pervasive hostile work environment based upon race and by denying Judge Cocroft equal opportunities and/or treatment for pretextual reasons because of her race, including denying her equal contractual rights, Defendants have intentionally and willfully violated Judge Cocroft's civil rights as stated in 42 U.S.C. 1981.

1062.   As a direct result of Defendants' unlawful discriminatory conduct as set forth above, Judge Cocroft has suffered harm and she is entitled to compensation for all economic loss, compensatory damages, including but not limited to mental anguish, physical and emotional distress, humiliation and embarrassment, loss of earning capacity and loss of professional reputation.

## Count Three
### Violation of Civil Rights, 42 U.S.C. § 1983

1063.   Plaintiff incorporates by reference Paragraphs 1 through 1062, as if fully rewritten herein.

1064.   Plaintiff is a "citizen" within the meaning of 42 U.S.C. 1983 and Defendants at all times relevant to this matter were acting under the color of state law.

1065.   By creating and failing to remedy a severe and/or pervasive hostile work environment based upon race and gender and by denying Judge Cocroft equal opportunities and/or treatment for pretextual reasons because of her race, Defendants have deprived Judge Cocroft of clearly established property and liberty interests without procedural and substantive due process and equal

protection of the laws in violation of the Fourteenth Amendment to the Constitution of the United States. Defendants' actions were taken with malice and/or reckless indifference to the rights of Judge Cocroft.

1066. Defendants acted pursuant to a policy or custom of Defendant Franklin County of fostering and refusing to remedy severe race and gender discrimination and refusal to follow their own internal policies regarding complaints of discrimination, hostile work environment and retaliation.

1067. Defendants further failed to adopt clear policies and failed to train their employees as to how not to create an environment which deprived Judge Cocroft of her rights under the constitution.

1068. As a direct result of Defendants' unconstitutional conduct as set forth above, Judge Cocroft has suffered harm and she is entitled to compensation for all economic loss, compensatory damages, including but not limited to mental anguish, physical and emotional distress, humiliation and embarrassment, loss of earning capacity and loss of professional reputation.

### Count Four
### Racketeer Influenced and Corrupt Practices Act (RICO), 18 U.S.C. §§ 1961-1968

1069. Plaintiff incorporates by reference Paragraphs 1 through 1068, as if fully rewritten herein.

1070. At all times relevant hereto, Defendants were engaged in a fraudulent scheme and enterprise designed to violate the law and deprive Judge Cocroft of her legal and constitutional rights.

1071. At all times relevant hereto, all Defendants participated in the illegal enterprise by engaging in a pattern of racketeering activity including but not limited to engaging in misrepresentation, fraud, mail fraud, electronic communication fraud and destruction of public records, all as outlined above, in violation of O.R.C. § 2921.12; O.R.C. § 2913.42; O.R.C. § 149.351; 18 U.S.C. § 1001; 18 U.S.C. § 1018; and 18 U.S.C. § 1030 all in an effort to advance the enterprise.

1072.   Defendants' illegal enterprise directly and proximately caused harm to Judge Cocroft by violating her lawful and constitutional rights, harming her professional reputation and causing her compensable harm.

**Count Five**
**Unlawful Discrimination and Retaliation: Ohio Revised Code §§ 4112.02 and 4112.99**

1073.   Plaintiff incorporates by reference Paragraphs 1 through 1072, as if fully rewritten herein.

1074.   At all times relevant hereto, all Defendants were subject to Ohio law codified in Ohio Revised Code §§ 4112.01 et seq.

1075.   Defendants' discriminatory treatment of Judge Cocroft and retaliation against her because of her race and gender violate Ohio Revised Code §§ 4112.02 and 4112.99. Further, the individual Defendants aided, abetted, incited, compelled, and coerced employment discrimination in violation of state law.

1076.   As a direct result of Defendants' unlawful conduct as set forth above, Judge Cocroft has suffered harm and she is entitled to compensation for all economic loss, compensatory damages, including but not limited to mental anguish, physical and emotional distress, humiliation and embarrassment, loss of earning capacity and loss of professional reputation.

**Count Six**
**Defamation against Goodman and Davis only**

1077.   Plaintiff incorporates by reference Paragraphs 1 through 1076, as if fully rewritten herein.

1078.   Goodman made a series of intentionally false, misleading and disparaging statements about Judge Cocroft in a complaint filed against Judge Cocroft and subsequent to the complaint, including but not limited to statements that were disseminated to all FCCP-Gen Judges, members of the local press, and other FCCP-Gen employees.

1079.  Within Goodman's bad-faith complaint, she included personnel information regarding Judge Cocroft's personal staff and stated that those staff left because they were fearful of Judge Cocroft.

1080.  Davis, as Director of Human Resources, is solely responsible for maintaining the records of FCCP-Gen Judges' personal staff.

1081.  Upon information and belief, Davis provided inaccurate information to Goodman for inclusion in her bad-faith complaint regarding the reason that former employees left Judge Cocroft's staff.

1082.  In her bad-faith complaint, Goodman asserted that Judge Cocroft called some FCCP-Gen Judges racist when Judge Cocroft never made any such statement to Goodman.

1083.  Goodman's and Davis's publications were without privilege or justification and constitute defamation per se.

1084.  The aforementioned acts were willful, wanton, malicious and oppressive, undertaken with the intent to harm Judge Cocroft and justify the award of exemplary and punitive damages.

1085.  Goodman's and Davis's defamatory statements proximately cause Judge Cocroft damages, including emotional distress and mental anguish, as well as loss of economic opportunity.

## Count Seven
### Destruction of Public Records, O.R.C. § 149.351

1086.  Plaintiff incorporates by reference Paragraphs 1 through 1085, as if fully rewritten herein.

1087.  As set forth above, upon information and belief, Defendants have permanently destroyed public records in an effort to cover up their unlawful conduct, including, but not limited to, destroying instant messages, calendar notations and other official documents after Judge Cocroft made multiple requests for public records to Defendants.

1088.  Judge Cocroft is a "person" who has been aggrieved by the removal, destruction, mutilation or transfer of the official public records.

1089.  Judge Cocroft is entitled to: a). an injunction prohibiting destruction of public records, b). civil forfeiture in the amount of $1,000 per violation, and c). compensatory and punitive damages.

**Wherefore,** Plaintiff, Judge Kimberly Cocroft, requests the Court grant the following relief:

A.  Declare that the acts and conduct of the Defendants constitute violations of Title VII, 42 U.S.C. §200e, the Civil Rights Act of 1991, 42 U.S.C. §1981a, the Ohio Civil Rights act, O.R.C. §4112.01, *et seq.*, 42 U.S.C. §1981, 42 U.S.C. §1983, federal common law and the common law of Ohio.

B.  Grant a permanent injunction enjoining Defendants and their officers, agents, employees and all persons in active participation from engaging in any employment practices which discriminate in any way, including discrimination on the basis of gender and race and retaliation, and prohibiting continued violations of civil and constitutional rights.

C.  Order Defendants to not only institute policies, practices, and programs that provide equal opportunities for all employees and eradicate the effects of past and present unlawful employment practices, but to ensure that those policies, practices, and programs and carried out and adhered to by Defendants and their officers, agents, employees and all persons in active participation by implementing performance evaluations that monitor the efficacy and practical impact of those policies, programs and practices.

D.  Order Defendants to make Judge Cocroft whole by providing her with any affirmative relief necessary to eradicate the effects of unlawful employment practices and constitutional violations.

E.  Grant to Judge Cocroft appropriate compensatory and exemplary damages, in an amount in excess of Seventy-Five Thousand Dollars ($75,000), along with the costs of this action.

F.  Such other relief as the Court deems just, appropriate, and proper in the public interest.

Respectfully submitted,

**s/ Kimberly Cocroft**
Kimberly Cocroft
Plaintiff *Pro Se*
345 S. High Street, #4E
Columbus, OH  43215
Email: kimberlycocroft@gmail.com
Telephone:  (380) 260-3123

## JURY DEMAND

A trial by jury is demanded herein on all issues presented to the Court.

**s/ Kimberly Cocroft**
Kimberly Cocroft
Plaintiff *Pro Se*
345 S. High Street, #4E
Columbus, OH  43215
Email: kimberlycocroft@gmail.com
Telephone:  (380) 260-3123