**Cocroft, Kimberly X.**

EXHIBIT

21

| | |
|---|---|
| **From:** | Cocroft, Kimberly X. |
| **Sent:** | Tuesday, August 16, 2022 6:13 PM |
| **To:** | GEN_Judges |
| **Cc:** | Goodman, Jennifer L.; Bedsole, Susan E. |
| **Subject:** | Concerns Regarding Prospective Jurors |

Good evening:

As I shared on yesterday, we had 56 jurors who reported for service this week. Over the last 8 months, there has never been a week where the number has been this low. Conversely, we had 6 judges and 1 magistrate who requested a panel. Over the last 8 months, there has never been a week where that many requests for panels have been submitted. While we do not know what caused this circumstance, we could presume that the numbers may be related to students returning to the classroom (yesterday started move-in week at Ohio State and many grade, middle and high schools also returned on yesterday) or it could be end of Summer family vacations. It could also be that COVID has changed the way that people prioritize responding to a juror summons. Whatever the reason, I wanted to provide context regarding the events of yesterday, since it was an anomaly, and to inform you of some plans to address this challenge.

First, I did not become aware of the number of prospective jurors available until that information had been widely disseminated around the courthouse. In fact, a lawyer who had a trial matter set in my courtroom informed me of the dilemma initially. Shortly thereafter, I received the requests for panels, along with additional information that might demonstrate the urgency of each request. For example, some of us had out of town witnesses or jury views scheduled. There were two requesting judges whose defendants were in custody; one of those assignments was mine. More specifically, the defendant on my docket, who was in custody, was charged with Murder and various other counts and had been awaiting trial for two years (due to changes in all counsels' schedules). Additionally, this defendant was no longer waiving time and the State indicated that it had three days until speedy trial rights would have been violated. Despite the fact that this Court has adopted a protocol that would prioritize just the kind of trial matter that was on my docket, I attempted to facilitate a resolution short of trial and contemplated not taking a panel immediately and managing the consequences of that choice. My goal was to avoid any discussion regarding even an appearance of impropriety (since my service as AJ requires me to set the priority) and to eliminate any cynicism associated with an assignment of prospective jurors to my case. Despite my review of the plea offer and potential sentencing consequences associated with a guilty verdict on the record, my defendant chose to exercise his constitutional right to jury trial and our priority system permitted me to make the assignment. As I presumed, that assignment resulted in a few lawyers questioning my bailiff and me about how I received a panel when their cases could not move forward.

Because I understood the gravity of the circumstance our Court was facing, I asked our Administrative Team to reach out to Municipal Court to determine whether it had available prospective jurors. Regrettably, we never received a return call or email communication from either the Court Administrator or Jury Manager. So, we were left to do what we could with what we had. I sent an email to each judge, bailiff and magistrate who requested a panel, advising them of all the circumstances surrounding their request and giving them their position in the priority list. Based on that communication, some judges decided to reschedule their cases and others decided to remain to see if a panel could be secured. There was a panel that was made available today

and it is my understanding that, upon reviewing the questionnaires, the lawyers in that matter decided that they did not want to move forward with trial.

I have given more detail than is necessary but it is always my goal to provide as much information as possible in an effort to create as much clarity of actual circumstances as possible. Having shared that background, the following changes will be implemented **immediately**:

1. We will increase the number of prospective jurors summoned. Because summons are sent 5 weeks prior to service date, the first week that will be impacted by this change is **September 19.**
2. We will disallow unlimited deferrals. The Court will permit **one deferral for a 3-month period and not for 6 months as permitted currently** . The increase in time for deferrals was made in response to the onset of COVID-19, so we will re-institute our pre-COVID deferral policy.

I have also asked our Administrative Team to research the costs and complexities of implementing a call-in or web-based stand-by system for prospective jurors. We know that Municipal Court utilizes this technology; however our current system does not support this technology. If feasible, then this would be a long-term fix but I believe it is important to begin the groundwork for this potential solution now. Finally, our Administrative Team is developing other options, which will be finalized and then shared with you in the near future.

Please know that I take the work of this Court and our individual and collective obligations seriously. As soon as I become aware of an issue, I attempt to work (with varying degrees of success) to find a solution. While we have not always been happy with the number of jurors I have assigned to a trial matter, there had never been an instance (prior to yesterday) where every request in a criminal or civil matter had not been filled. That is always my goal because the litigants and lawyers who prepare for trial deserve that.  So we will do what we can to ensure that there is a more robust jury pool available and that yesterday's occurrence remains a one-time event.

If you have any questions or concerns, then my door is always open for constructive conversation. And, as always, I appreciate your patience and understanding.


KC




**Judge Kimberly Cocroft**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.7200| (F) 614.525.4641**
Kimberly_Cocroft@fccourts.org | http://www.fccourts.org

09-26-2022

Hello to all General Division Judges,

Thank you for your service to the people of Franklin County.

Reportage contained in this letter is for informational purposes only and is provided to allow the judges to make informed choices for future operational considerations concerning their court division.

Based on a collective of individuals employed at the Franklin County General Division, there is a common sentiment that needs to be communicated to resolve a myriad of challenges the court is now facing.

Given frustration with the mid level management, numerous employees are leaving based on miserable work conditions, feelings of being undervalued and disrespect for them is rampant. Referenced are smart, intelligent employees that have been with the organization for many years. Their expertise of the institution, procedural operations and how it functions on a day to day basis will soon be elusive and difficult to replace. The court should incentivize current employees to stay, based on their current working conditions and low market pay grades.

With base employees regularly leaving their positions, directors refuse to fill positions when the incumbent employee is still in position to share and pass on knowledge to the next employee, to be successful and allow for that knowledge to be communicated. It is wholly and completely unacceptable that there have been so many positions *still vacant months* after the chair has been vacated.

Current management style is handicapping the organization. The space created between judges and lower level employees, with management in-between leaves the judges out of touch with what is really happening within the ranks. Plans for the *privatization of the judicial support system* by a specific deputy court director should be a glaringly obvious warning sign for all judges. This is a dangerous path and demands remedy. The court needs dedicated individuals that uphold sacred principles and also possess the emotional intelligence to carry out the hiring and retention of employees that understand the importance of the system of justice. Your employees are unequivocally underpaid, based on current market values. Positions are left unfilled because of the current salary offerings. The court will now lose more extremely vital positions as well, based on the mentioned conditions. Directors manage their teams clearly based on punishment verses reward for service. The deterioration of the organization reflects this philosophy.

This note is provided by the writer, (who, for the record is currently not an employee) based on respect for the justice system and with sadness that there are a certain three individuals marginalizing the daily operations and making the court system less effective. Given inaction, judges and management will eventually place it in jeopardy if efforts are not put forth to resolve the above stated issues. When there is a collapse of the data center or a major breach in security that cripples the judiciary's important work, only *then* will you realize what is transpiring?

In my somewhat brief time with the court system, all of the above dysfunction was glaringly evident. I was, in my opinion, simply abused and looked down upon, my capabilities were marginalized by the disfunction that exists. There are three people in the General Division who seem to rule as it's their



EXHIBIT

22

own fiefdom with absolutely no oversight. Their behavior toward others is abominable and quite frankly dangerous.

From federal, to state, to local entities, there has been a movement to place a stranglehold on our governmental systems that allow the United States to be a free and fair society. These systems are now in jeopardy. Yours is just a microcosm of the destruction and deterioration of institutions that are an absolute necessity for functioning democratic countries.

Clearly, when a cartoon portrait of "Pepe the Frog" hangs in an entry foyer behind security, which is a well known **racist symbol** of ultra fascist far-right wing factions, all should understand that you all are totally out of touch.

Best of luck to you.

Sincerely,
Why I Just Quit.



EXHIBIT

23

To Whom it May Concern:

In light of recent events that have deeply impacted the Black community and the expression of privilege through continued silence by our leadership team, we have united with the purpose of seeking accountability for the Administration and Department leadership. Accountability is sought regarding the decades of oppression of Black employees, silence on pressing issues that are destroying morale and fostering a departmental divide, lack of acknowledgement and focus on policies, procedures, and practices that allow and contribute to unequal and disproportionate treatment towards Black individuals we serve, and the non-compliance of administrative, management, and supervisory staff with their own Mission and Vision statements and Core Values.

What follows is a detailed account of observations and direct experiences that support the claims made above in attempt to shed light on the pain, trauma, and exhaustion experienced daily in #FCAP. We have a vision for a new Probation Department where silence is no longer a luxury enjoyed by leadership parties; where a truly safe, diverse, and inclusive environment is shared by all employees and those we serve; where the words chosen and advertised by management are upheld and honored.

These accounts are not born from a place of malice, but rather from a place of desperation cloaked in hope. The intent is to demonstrate the need for change. To prove the need for training that truly addresses the issue of race and allows all staff of the court to come together and develop the plan for that change. In the spirit of provoking internal parties to lead the internal change, we ask that you not react defensively and read every word with an open mind. Previously the Probation Department's environment was assessed by employee satisfaction surveys, along with other means, after a group of concerned probation officers collectively approached the administrative judge at the time and voiced their grievances with the injustices in the department. Those concerns were met with a sense of urgency. The same sense of urgency these concerns deserve to be met with.

Unlike the Franklin County Court of Common Pleas- General Division, the Supreme Court of Ohio's Justice Maureen O'Connor issued a statement on Criminal Justice Reform: *" It is long past time to address the recommendations contained in the Commission on Racial Fairness Report, the Ohio Supreme Court's history of failure to enact real substantive change in data collection, systemic equality, and self-examination. We, as individuals and as embodiment of an institution created to ensure fairness for ALL, must not let this opportunity go the way of the past.*

*Ibram X. Kendi wrote in his 2019 book, "How to Be an Antiracist," that racism is like a cancer and "before we can treat, we must believe. Believe all is not lost for you and me and our society. Believe in the possibility that we can strive to be an antiracist from this day forward."*

*I believe that we can and must do better. Together, with the governor and the leadership of the Senate and the House and the members of Ohio's judiciary, we can clear that path forward so that the public's trust in our political system increases and all those who find themselves before a judge believe that the system is fair."*

We hope this helps our court to understand that it is not okay to issue a statement about impartiality. There is NOTHING wrong with the court issuing a statement in support of its staff and defendants that reaffirms that it is committed to ensuring that all staff, defendants, and visitors are treated with decency and respect and all defendants receive fair and impartial services from all facets of the court. It is okay to say that the court exists for us all and we all deserve to feel welcome, heard, and valued when in the courthouse or partaking in any of its services. Countless courts and members of the judiciary have made statements condemning racism and supporting the equality demanded by the

#BlackLivesMatter movement. It is time for the Franklin County Common Pleas Court- General Division to join in the fight. To stop standing on the wrong side of history and stop condoning the unjust and unfair treatment currently being allowed by our court. It is time to join the right side of history and let your unquestionable commitment to justice and equality be known to the entire community.

This has been a long-standing issue with our Court and within FCAP, and there is a need for more significant progress. Pre consultation with agencies and ever since the surveys, focus groups, etc. (please see attached survey results) things have been "in the works" that should have been accomplished by now. The Adult Probation Department has prioritized the use of evidence-based practices (EBP's) and has realized that in order to effectively incorporate EBP and core correctional practices (CCP's) into our department, the process must be treated as a journey and not as a one-time learning experience. FCAP has revised its policies, procedures, practices, and job descriptions operating from an EBP lens and in that same spirit, it must address the issues of race that currently exist. There must be a focus on race and cultural competency that mirrors this philosophy that includes on-going training that not only allows awareness but skill acquisition that translates into positive changes of thoughts and behaviors.

Following this letter, you will find the personal testimonies of those impacted (Appendix A) and copies of correspondence sent to leadership (Appendix B), some of which have gone unanswered to this day.

Our requests in response to this document are:

- No form of retaliation or ill regard by any member of the judicial, administrative, managerial, or supervisory staff of the Franklin County Common Pleas Court- General Division to those expressing their experiences, disappointments, and hopes for a better future.
- Immediate reinstatement of the Diversity and Inclusion committee independent of the team building committee and under the influence of the SIMS manager and not the Chief PO.
- Investigation administered and results tallied and disseminated by external sources, without direct assistance or interruption from internal Common Pleas staff, to garnish the true morale of the Court and Probation Department without fear of retaliation.
- Creation of data collection measures that include authentic and vulnerable examinations of current policies and procedures, including but not limited to periodic comparisons of hiring and promotion interview scores, sanctions imposed on both employees and probationers, opportunities for advancement, and the approval, implementation, and use of probationer assessment tools.
- Adoption of community supervision strategies that are sensitive to the experiences and trauma within the Black community.
- Proper racial diversity training, from an antiracist framework, that specifically speaks to all components of white anger and denial that include white privilege, white fragility, white rage, etc. and addresses the factors that contribute to Black trauma and pain that include oppression and systematic racism.
- Genuine, honest effort to understand and validate issues, uprooting white supremacy and providing a safe, supported, and respected Probation Department for all staff and the many individuals we serve.
- Formation of an advisory board of internal and external individuals to work independently of Chief PO and Court administration in a formal capacity to review and consult policies, procedures, and practices to ensure cultural competency.

- Creation of a position similar to an Ombudsman so that staff, defendants, and visitors may report if they feel discriminated against or unsafe in the courthouse or affiliated spaces.
- Development of policy and procedure to create opportunities for employees to file grievances for disciplinary actions suspected to be out of retaliation or disproportionately used against any population; that also addresses abuse of power by administrative, management, or supervisory court staff.
- Creation of policy to allow requests to have disciplinary actions taken out of employee files.
- Similar to the anti-harassment policy, creation of a race-related/discrimination policy to address problems with race, racism, and racist acts conducted while in the commission of court work hours or affiliated events and activities.

Sincerely,
Concerned Employees of the Franklin County Adult Probation Department

**The Franklin County Adult Probation Vision Statement:**

*The Adult Probation Department is committed to maintaining a dynamic, evidence-based organization that empowers staff, promotes diversity, values learning, and works collaboratively with the community to positively impact individuals under our supervision while protecting the citizens of Franklin County.*

The Department Leadership has failed to meet their vision statement in the following ways:

1. Empowers staff
   a. Fear of retaliation and lack of trust in leadership is bred amongst staff. [See Personal Testimony 1, 2, 4, 13, 14, 17, & 32 in Appendix A]
2. Values Learning
   a. Lack of diversity training, specifically regarding privilege and systematic racism.
      i. In effort to increase education on diversity in the department, one agency was contracted to provide ongoing training. This has become a watered-down version of diversity with little opportunity to actually hold open and honest discussions (particularly in regard to race) with our co-workers or to challenge concrete thinking that minimizes the experience of Black people. This lack of race-based education leaves the Community Supervision Unit (CSU's) white rage and fragility unchecked and speaks to the lack of understanding and support from our management team. [See Personal Testimony 1, 30 & 31 in Appendix A]
      ii. The lack of education on issues of privilege and systematic racism does a disservice to officers that are expected to navigate these sensitive issues and topics with probationers. When there is a clear division along racial lines between staff members, the expectation that white officers have meaningful cross-cultural relationships with people they supervise will fail time and again. The impact on those we serve then goes beyond the Probation Department and into the communities where frustration and oppression unfortunately often manifest as violence and other crimes. [See Personal Testimonies 1, 13, 19, 20, & 25 in Appendix A]
   b. Failure to appropriately educate staff or honor Black History Month, as done in previous cultural recognition months.
      i. Upon realizing that Black History Month was not going to be celebrated in the same manner that cultural awareness months had recently been celebrated, due to the ongoing Thin Blue Line flag incident and the halt to Diversity and Inclusion Committee meetings, a group of individuals met to take on the task of distributing educational materials throughout the month. When seeking approval from the Chief PO, only a few items were approved and most were rejected, under the guise of scheduling a Diversity and Inclusion meeting to plan events. The meeting was never scheduled, and events were never planned.
3. Promotes Diversity
   a. Lack of diversity in supervisory, management, and administrative positions.
      i. There had been no black supervisors or managers until 2017 when Shelly Quarles was promoted to Manager and Valerie Johnson was hired as the Services and Inclusion Manager. The hiring continues to be done mainly by white women that hire people who look like them.

    b. Limitations of the Services and Inclusion Manager

        i. The Services and Inclusion Manager position was created in response to previous racial concerns expressed by staff at FCAP, and the position was placed in the Probation Department as opposed to the Court side of operations. This position not being aligned with Human Resources implies that diversity is a probation problem and not a court-wide initiative. [See Personal Testimony 22 in Appendix A]

        ii. The Department created a management position to answer the call for diversity, which has become a position that is severely limited and under-utilized. The Services and Inclusion Manager has a silenced voice evidenced by the lack of input on creating meeting agendas that reflect the concerns of the department, often times even being excluded from meetings all-together. She has since been assigned the task of also managing urine lab and support staff which hinders her time and ability to focus on issues of diversity in the department. This makes the position ineffective and unable to influence true change within the department. [See Personal Testimony 15 in Appendix A]

        iii. The Services and Inclusion Manager does not have the freedom to act independently of the Chief Probation Officer and all decisions must be ran by this entity, therefore, the Services and Inclusion Manager position and the Diversity and Inclusion Committee are essentially ran by a group of white women in leadership.

    c. Lack of diversity in specialized units (Community Supervision, Sex Offender, Mental Health, and Pre-Sentence Investigation) and committees (Transitional Advisory Committee).

        i. The Community Supervision Unit and Sex Offender units are comprised solely of white individuals. These are also the only two units that represent the Franklin County Adult Probation Department in the community, sent to probationer's homes with guns and badges. When a well-qualified Black candidate scored the highest throughout the interview process for the most recent open CSU position, he was denied the opportunity and the interview process was reopened to allow someone else, whom happens to be White and deemed as a more appropriate fit with the unit, to assume the position.

        ii. There is only one Black officer who serves on the Mental Health team (another person was placed on the team temporarily due to restrictions within programming due to COVID-19) and one Black officer in the entire Pre-Sentence Investigation unit, writing reports for the entirety of Franklin County. [See Personal Testimony 4 in Appendix A]

        iii. There is a lack of diverse representation on many of the specialized committees. The Transitional Advisory Committee members were decided by managers, and not one Black male officer was approved. When it was brought to the attention of the Chief PO she reported that no Black male officers volunteered to serve on the committee that was not already on the OCSS committee and further declared that no officer could serve on both TAC and OCSS. No efforts were made to recruit a Black male officer although it was emphasized to the Chief PO

that the committee would be advising, creating, and forming policy that would impact a large number of Black males disproportionately placed under FCAP's supervision; all supervisors were required to participate on TAC. Membership on the Diversity and Inclusion Committee has been completely voluntary and only one supervisor (previous head of the Teambuilding committee stayed on as the committees merged) has chosen to participate. This, as well as the ill-advised, disrespectful decision to transition the Team Building Committee into the D&I Committee suggests the lack of respect for and ingenuine concern for diversity efforts in the Probation Department. [See Personal Testimonies 3 and 32 in Appendix A]

    d. Biased hiring practices

        i. In response to concerns regarding the hiring process in 2017/2018, a panel format was adopted to include employees from all departmental levels, with special attention to include at least one "diverse" individual. It was advised by HR that this practice was being modeled after the study that showed that having one Black member on a jury increased the cultural competence of the jury. It was pointed out to HR and other members of the administrative team that with no discussion between panel members before interview scores are recorded and submitted, the fidelity of the concept of jury cultural competence would not be met and the newly devised system would not effectively challenge the biases that may be present for other members of the panel and one "diverse" scorer against the other five to six scorers would not impact the overall score.

        ii. The panel is not permitted to ask follow-up questions during the interview. While the intention is to ensure that no one candidate has an unfair advantage, in reality it makes it impossible to get to know the individuals and may in turn exclude a well-qualified candidate, possibly intimidated by a room full of strangers, mostly who do not look like them; and there are times when follow up questions are allowed, when deemed appropriate by HR or administration, so no two interviews are the same which creates that perceived unfair advantage the system was designed to prevent.

        iii. Often times, members of the panel have no idea what the job they are interviewing for entails, are not permitted to collaborate with other members on the panel and are not equipped to choose the most ideal candidate. [See Personal Testimony 5 in Appendix A]

        iv. Recruitment efforts have not noticeably changed, such as the wording of job postings, pre-hire screening methods, the inclusion of "blind-screening" technology, collaborations with community agencies serving diverse populations to promote open positions within the department, or any other proven method of diversifying the workforce. [See Personal Testimony 28 in Appendix A]

4. Works Collaboratively with Community

    a. With a lack of diversity in CSU the outside contact with community partners and members is limited to law enforcement and fails to foster much needed relationships with a variety of community partners, those we serve, and their families.

**The Franklin County Adult Probation Mission Statement:**

*As an integral part of the Franklin County Court of Common Pleas – General Division, the Adult Probation Department provides services and interventions from pretrial release through post-conviction supervision. We strive to protect the community, reduce recidivism, operate in a safe and secure manner, support victims and others impacted by crime, assist the Court in decision-making, and promote positive change.*

The Department and leadership team have failed to uphold the mission statement in the following ways:

1. Protect the Community
   a. Unfair and biased treatment of probationers, including higher numbers of arrests of Black probationers. Concerns about specific officers and their questionable conduct were presented to supervisors, without change. [See Personal Testimony 1 in Appendix A]
   b. Community Supervision Unit
      i. The Community Supervision Unit, comprised only of white individuals, provide home checks on probationers of which they have no prior interaction or rapport. They often are perceived as law enforcement by probationers and their presence has been reported as intimidating and challenging. Their immediate supervisor not only allows, but supports their misinformed, sexist, and at times flat-out racist discussions and behavior and there is a clear culture of zero accountability within the unit. This group of bastions have formed such solidarity and support of racist ideals, that it will surely breed tragedy if left unchecked and undoubtedly impacts their day to day supervision activities. In fact, it already has caused division in FCAP so much so that they revel in the divisiveness and proudly walk amongst the hallways not speaking to the perceived enemy, and those within the unit who may have concerns are too uncomfortable or scared to voice their differences in beliefs. And for this, they have received thank you snack/gift bags for their service.
2. Operate in a safe and secure manner
   a. "No Ego" style of management.
      i. All managers and supervisors were assigned the "No Ego" book to read and incorporate into their supervisory practices and leadership style. This book directly instructs one to "stop worrying about employees' happiness and start worrying about their accountability." The author argues that shielding employees from change creates a sense of entitlement and dissatisfaction amongst employees. Complaints of racial injustices are NOT entitlements. Responding to these issues in the same manner that a supervisor might respond to an employee resistant to change is yet another example of a lack of insight and compassion; Especially during these turbulent, unprecedented times. It is completely irresponsible for the administration to decide to focus on having employees' *asses in chairs* as opposed to being concerned about the nationwide outrage regarding race or the Coronavirus pandemic, which has disproportionately impacted Black people. [See Personal Testimonies 24 and 32 in Appendix A]

    b. Outward acts of racism.
        i. There have been multiple and varied accounts of racism, including a manager questioning a Black male officer employed with the county for years if he worked there after seeing him in a secure area and blatantly racist comments and actions made to and about Black officers. [See personal testimonies 6-8 in Appendix A]

3. Promote positive change
    a. Misuse and discontinuation of the Diversity and Inclusion committee.
        i. The Team Building committee was forced to transition into the Diversity and Inclusion committee, despite the vastly different missions of each. When employees challenged the decision to transition in that manner, they were informed that if there was no such transition, there would be no Diversity Council or Committee formed. The committee was idealized to be a sounding board for fellow employees to act as mediators and to suggest solutions to management. Ignoring the outcries of employees demonstrated how insignificant administration viewed the committee from the beginning. It further suggested how oblivious those creating the committee were to the true meaning and purpose of diversity and inclusion.  In essence, the Diversity and Inclusion committee only ever had the opportunity to plan parties. As soon as the first diversity issue presented itself, the Chief of Probation took over and the committee was shut down and no longer permitted to meet or respond to the Thin Blue Line flag, with the last official meeting taking place in October of 2019.
        ii. Although management insists that the D&I Committee is still active and that "things are in the works", there has not been a meeting of the full committee, or any communication regarding next steps since Fall of 2019. Management may insist that the committee still exists, but departmental employees believe the committee has been dismantled, especially with today's climate and the outrage in the community that the committee could be addressing. Employees were informed that the committee was not meeting due to employees being at home and was further told that no committees have met since employees started working from home; but in fact, the CQI Committee has met after employees were sent home. Team meetings have also been conducted via Zoom since March of 2020.
        iii. When racism was declared as a public health crisis it was encouraged that all companies come up with a plan to address issues of race within their agencies, organizations, and departments. There have been no publicized efforts made by the Court or FCAP.
        iv. When it was suggested to the Chief PO that she allow the Services and Inclusion Manager to lead efforts to address the public health crisis of race and racism while the Chief PO address the public health crisis of COVID, she responded that "things are in the work". And instead the Services and Inclusion Manager is not addressing diversity issues with the department, staff, or those we serve but is handing out COVID supplies and supervising the Urinalysis Lab and Support Staff.

**The Franklin County Adult Probation Core Principles and Values**

*We believe in:*

- *Protecting the community through the use of evidence-based practices, emphasizing risk reduction and accountability;*
- *Empowering people to make positive changes in their thinking which promotes pro-social behavior;*
- *Respecting the dignity of every individual;*
- *Embracing the multifaceted diversity of our community;*
- *Encouraging the personal and professional development while learning from our individual and collective experiences;*
- *Functioning as a cooperative team by emphasizing ongoing communication, both internally and with our partners and stakeholders;*
- *Promoting productivity, health, and balance in a safe, supportive, and respectful working environment;*
- *Incorporating current technology into our supervision strategies and daily operations;*
- *Evaluating and continuously improving our programming, practices, and interactions.*

Key areas the department has failed to meet their own Core Principles and Values

1. Respecting the dignity of every individual
   a. Differential treatment exists in the enforcement of work standards and general treatment of black employees.
      i. Black employees are targeted for disciplinary action disproportionate to other employees, who may or may not be held accountable at all (i.e. work arrival times, case management practices). [See Personal Testimonies 9, 10, 11, 12, 15, & 21 in Appendix A]
2. Embracing the multifaceted diversity of our community
   a. Department staff are not representative of the community in which they serve due to lack of overall diversity in hiring and promotion.
      i. Severe underrepresentation of Black men in supervision officer, supervisory, management, and administrative positions.
      ii. Lack of Black, Asian, Latin, Native, and other cultures in direct service and leadership positions.
      iii. Lack of bilingual staff in all positions.
   b. Silence on societal movements inadequately prepares and educates staff to properly engage and support probationers.
      i. Serving the community as white officers, many PO's must remain aware that their presence in a law enforcement sense (when doing arrest or home visits) is at best often uncomfortable and at worst, terrifying. The trauma of continuously seeing black lives ended at the hand of people meant to protect and serve weighs heavily on their hearts and minds and there has been no

acknowledgement or discussion on the part of management, save for one supervisor that acted on his own. [See Personal Testimony 1 in Appendix A]

    c. Standardized tools are not culturally sensitive and created/adopted trailers and additions lack consideration of culture.

        i. Research and evidence exist that documents and articulates the cultural insensitivity of many standardized tools.

        ii. Many tools used lack a focus on culture and their specific needs (i.e. no cultural component to or consideration of with the ORAS).

        iii. Mandatory Carey Guides, EBP interventions, and EBP training primarily focus on individual accountability and fail to consider or address systemic issues such as poverty and racism, which can serve as a burden to Black probationers when discussing issues with sometimes unprepared and unaware White PO's. This puts Black probationers at risk of inappropriate sanctions from a lack of understanding by undertrained PO's. [See Personal Testimony 1 in Appendix A]

        iv. The mandatory adoption of the Zip Code/ Address chart by FCAP for ORAS scoring purposes (that was created by FCAP officer without specialization to create such) unfairly depicts neighborhoods that are overrepresented by Black probationers. There is no consideration taken into the research that exists about racial profiling, the over policing that happens in many of these neighborhoods, and the impact of structural racism in these neighborhoods that could easily impact this score. There is also no consideration of subsections within huge zip code areas that have a varying degree of police interaction, violence, drug availability, etc. This can severely impact a person's ORAS score, which in FCAP determines their supervision level and needs, and this disproportionately impacts the Black defendants we serve.

3. Encouraging personal and professional development.

    a. There is no mentorship program, therefore there are limited ways for staff to move up within the department; rather one must gain outside experience in order to excel within the agency. This creates a huge disadvantage for Black officers who oftentimes do not have intimate relationships with those in power and do not benefit from personal conversations that enhance their chances for advancement.

    b. A mentorship program was proposed by a supervisor in the department; however, it has not been reviewed or considered since its introduction.

    c. The incorporation of new training procedures has left officers with a limited number of training opportunities within the department. As a result, the diversity of training opportunities (especially outside of the Courthouse) have been significantly decreased.

4. Functioning as a cooperative team by emphasizing ongoing communication, both internally….

    a. Management consistently upholds a stance of silence on pressing issues, despite pleading from staff for communication. A hostile work environment is forced, as retaliation is feared for seeking assistance on issues related to protected classes by the Constitution. [See Letters in Appendix B and Personal Testimonies 18 & 23 in Appendix A]

    b. The transparency promoted by management falls short on all fronts, as we are continually told "things are in the works" on a variety of topics, but there are never any

updates or resolutions and we are stuck in a never-ending cycle of waiting and management approaches issues with a "stay silent until it blows over" mindset. In reality, most things "in the works" or being discussed are a matter of public record available through a Freedom of Information Act request since this is a public agency. Employees are also residents of Franklin County entitled to answers from the Court.

c. In response to a push for communication on Black Lives Matter, a statement was made by the Administrative Judge that essentially said no statements would be made as we are an entity of the court. However, an internal statement of support by our management team or acknowledgement of the department's connection to the issues, as done by Municipal Court's Chief, is necessary and long overdue. It speaks to the privilege and lack of commitment to truly understand on part of the management team, as racial oppression has never "blown over."

5. Promoting productivity, health, and balance in a safe, supportive, and respectful working environment.

a. The lack of response from the Services and Inclusion Manager, Management Team, or Administration on racism being declared as a public health crisis by both the city of Columbus and Franklin County and how it impacts the department, our staff, and the individuals we impact is unacceptable.

b. The mishandling of issues of race within the department.

i. The Thin Blue Line flag was hung on the 6th floor by a member of the Community Supervision Unit and similar symbolization is prevalent throughout the department with complete disregard for the impact to Black employees or Black individuals we serve. Efforts to have the flag removed by other employees through the expression of the trauma and impact of the flag fell on deaf ears when brought to management. The CSU dictated management's response to the flag issue, effectively silencing the voices of those who were affected. Comments from the CSU include, "we're just going to be painted as racists no matter what we say," "we'll just hang the flag in the radio room," and "I'm allowed to hang my flag on my wall." [See Personal Testimony 16 in Appendix A]

ii. The Thin Blue Line flag incident was responded to by holding a closed meeting with only select individuals from the Diversity and Inclusion committee, while the entire CSU unit was invited to attend, further fueling the distrust of administration. This decision was defended to some by explaining that those who seemed impacted or had an opinion on the matter were invited, which was not true as some members of the D&I committee who expressed concern were not invited and others who had remained silent and not expressed concern were invited. Performance Consulting Services, contracted to provide diversity education, was dismissed and Napoleon Bell was instead contracted to facility a diversity conversation amongst the selected individuals. This appears to be an attempt to find someone that would deliver management's pre-scripted message, yet again not facilitating honest conversation. At this meeting, the white man that hung the flag was permitted to yell, directing anger at the first Black female to speak, and he was not stopped, but instead permitted to "have his turn to speak." [See Personal Testimonies 14, 15, & 26 in Appendix A]

      iii. Due to the lack of response by Management to the Thin Blue Line flag, racism being declared a public health crisis, and Black History Month, an "us versus them" mentality has been bred and a division is now strong within the department. Racist ideals have been strengthened and emboldened, while further marginalizing the voices of historically oppressed people.

c. Lack of retention of current workforce, specifically diverse individuals and their allies

      i. Considering the salary and provided benefits, Franklin County Adult Probation has been experiencing an unfortunate loss of employees, including tenured employees with no secured future employment. The lack of effort by management, toxic environment created and allowed to fester, and disdain by staff for the tolerance of cultural incompetence, has made it difficult to retain competent employees who have been with the department for multiple years. It is disheartening as these staff members have maintained a high level of performance and made valuable contributions. The lack of effort by management reinforces the message of "You are replaceable" and fosters an environment where individuals do not feel safe and supported to speak up or support issues that are not addressed by management and leadership. [See Personal Testimonies 21, 27, & 29 in Appendix A]

d. Work-life balance is only promoted when it serves leadership or benefits the Court. Flex schedules, that managers and administration once benefitted from themselves but now have older children, are no longer approved unless management requires a task to be performed outside of general work norms.

**Appendix A**

Personal Testimonials

**Personal Testimony 1:**

Since the senseless murder of George Floyd to the horrific shooting of Jacob Blake and all the outrage before, during, and after we have waited for a response from our court. A response of some sort from our place of employment that has proclaimed that it supports, respects, and values us and our experiences. But nothing. There have been outcries of injustice from working in FCAP for decades- pain shared through your formal information gathering and informal conversations between staff, supervisors, management, and/or administration. Pleas for help and change. But still nothing. Officer 1 departure letter- Still nothing!

This neglect has caused issues, marginalization, and oppression. It has promoted a lack of cultural competence in staff that remains. Recently Officer 2 made a questionable recommendation of prison for a young, African American male defendant with very little criminal history (traffic offenses), who was arrested on an absconder warrant for his F4 instant offense, had pending traffic charges and a misdemeanor assault pending. He had not ever been referred to or received any services from the department or outside services due to his AWOL nature. We see this every day and at first glance think- oh he's been arrested let me see what services we can put in place for his restoration to community control. But no, there was a recommendation for ODRC made and his mother was understandably livid. So much so that her inclination was to contact the news media, community advocates, and politicians who were much more in tune to the #BLM movement and the understanding of disproportionality within the criminal justice system. However, thankfully she contacted another probation officer in our department for advice. This officer was able to calm her and asked for the opportunity to bring the issue to the department's attention before drastic measures were taken by her or other family members. She agreed and the situation was diffused- especially after all charges were dismissed. He remained in FCCC until his September court date and a CBCF recommendation was made by FCAP. No consideration of restoration and outpatient services as has been made for numerous white defendants.

A recent questionable in-office interaction from a Caucasian male officer with an African American male defendant. The defendant spoke to verbalize his discontent with the system that is the subject of ongoing community outrage. The officer addressed the matter by engaging with the defendant stating certain activities and behaviors were not allowed such as to go out and protest. This situation was witnessed by at least 4 other officers. The officer's response may have provoked this situation to become intense with the interaction. The probation officer's supervisor became involved at the request of the officer. The other officers nearby that witnessed the incident collectively agreed that the defendant was not threatening or that there was a need to enter the office to intervene. There is a concern that this incident has appeared to be subjective based on observation. A staffing with the defendants Judge was conducted with a subsequent miscellaneous hearing filed. Although the Judge was not privy to the interaction, it is known that the officer completed a summary that possibly painted the defendant in an unfavorable and unfair light.

Reports of these kind of incidents are countless. From similar incidents of disrespect of African American defendants in all units to concerns about the treatment of staff- still nothing. When it was brought to the attention of management that White officers get window offices at a much higher rate than non-white officers, out of the guise of seniority, the comments were ignored. When it was explained that the

Court had admitted to unintentional preferential hiring for White officers since its inception and that they will continue to benefit from their Whiteness when seniority is used, the comments were still ignored. When it was advised that White officers get preferential experiences that put them in line, or proper position, for advancement, the comments went ignored. This is evidenced by the recent email celebrating Supervisor 2 recent appointment to work with the Carey Group. Preferential hiring leads to advancements, advancements lead to opportunities, opportunities lead to appointments and promotions and leave non-White people behind. So now he is prepared and equipped to take the next management spot due to this privilege. He would not even deny it.

It is acknowledged that when George Floyd's murder occurred and the national outrage began, our Chief texted and reached out to a VERY limited number of her African American officers, but nowhere near all or enough of them. How do you think the ones felt who knew she cared enough to reach out to a couple? When an African American officer recently reached out to our Chief and urgently informed her that her Black employees are NOT alright and that she needs to gauge her department, a slight minimal attempt was made to speak with him and some managers poked their heads in to (again) a limited number of African American officers offices and awkwardly asked them if they were okay or needed anything. Again, missed the mark. We have to change… We must change… We have to learn from others that it is best to come up with impactful, real change internally before being forced to change on other's terms for failing to do so. The time is NOW!

**Personal Testimony 2:**
Around 2011/2012 then Senior Officer 3 came down to my quad office that I shared with 3 other officers and got overly defensive and rude with me because I did not agree with the removal of one of my probationers from the in-house Equip Group. She was highly emotional and rude. She attempted to have this unprofessional exchange in the presence of my other officemates (both officer 4 and officer 5 were witness to this). I later went to her office to express my disappointment with her demeanor and she apologized for her behavior. Unfortunately, this would not be Senior Officer 3's last time being disrespectful in our quad.

Not long after that, then Senior Officer 3, talked disparagingly to Officer 5 regarding Officer 4 following a disagreement Senior Officer 3 had with Officer 4. As Senior Officer 3 made her remarks Officer 4 caught her in the act. This situation was disappointing to say the very least. This is a white woman, in a position of power, speaking ill of a black subordinate female to a white subordinate female in the office they share which is also the SAME office that Senior Officer 3 was disrespectful to me (another black subordinate female). What positive intent was to be assumed from this interaction? How can leadership be trusted when actions like this are excused for persons in power but unacceptable to the rest of the staff? This is important to note as Senior Officer 3 was my supervisor from my start in 2009 until she was promoted to CM in about 2016/17. During that time, I had never heard Senior Officer 3 speak that way about or to any white officers. These incidents appear to represent a pattern of unprofessionalism and bias.

**Personal Testimony 3:**
2017 I was chosen to be a part of the Transition Action Committee (TAC). This committee was put together to assist the department leaders and the Court transform our department into an evidenced based organization. To be a part of this committee, interested parties had to submit a written notice to our Chief explaining why they were interested and what would make them a good candidate for the committee. The committee consisted of all of the department CMs, many of the seniors (now

supervisors), and various staff that represented different areas of our department. I was only 1 of about 4 staff chosen that identify as a POC. THERE WERE NO BLACK MEN CHOSEN NOR ENCOURAGED TO BE A PART OF THIS COMMITTEE. NOT ONE! There were a few that even expressed interest but still were not chosen. In a department where we employ black men and supervise many black men you would think it would be important to get a black man's perspective when a shift in the department was happening.

**Personal Testimony 4:**
It has been my experience over the last two years being the only Person of Color in a unit equals being excluded. No effort is made to make you feel comfortable or to be inclusive. Ninety-five percent of my day is spent in my office with little to no contact or interaction from my unit, including my supervisor.

**Personal Testimony 5:**
I have participated in three hiring panels, once as an active scoring member and two times to role play scenarios with candidates. Sitting on the hiring panel for a management position, we narrowed it down to the top two candidates. At that point, all of the managers, who had not been a part of the first interview in any way, were invited to the second interview to not only observe the presentations, but to offer input on who should be hired. How does this make sense, since they were not a part of the initial conversation? After talking so disparagingly about one candidate, one manager had to apologize upon realizing that we were friends. The candidate that they chose because she was "so pretty and so funny" has been underwhelming in her position, to say the least. Acting as a role play participant in two other panels, it became clear to me that the people scoring the interviews had no idea what they were looking for in a candidate, because they did not understand the job functions of the position. As an unofficial participant of the interview, I was not permitted to offer insight on what I saw as a person that actually performs the job every day. Additionally, a manager that had only been employed for a few weeks, at best, was on the panel. How could she possibly know what to look for when hiring a specialized position with no background in Criminal Justice whatsoever?

**Personal Testimony 6:**
In 2017 I was promoted to Intensive Supervision Officer. The same day the announcement was made, several colleagues and myself attended an annual probation officer/corrections training. I was taking over a programming facilitator position left vacant by Manager 1 who had just been promoted to classification manager. Let me preface this by saying that Manager 1 and myself had only a professional relationship at that time and even still today. We have never had any conversations outside of duties. Manager 1 took this time to come over to me and not congratulate me but rather to say "don't mess this up" regarding my promotion. I was shocked as we had never been friendly to the point where we joked with one another so I clearly took this as a snide remark. Later that day, at the same training, the event was coming to a close. I was seated at a table with staff from our department. There were at about 5 white women, 2 other black women and myself seated at this table. Manager 1 left the table. When she returned she had completion certificates from the training in her hand. She proceeded to give each of the white women their certificates- she did not bring the certificates for the 2 other black women or myself. I asked her why she did not bring ours as well and she looked me dead in the eye and stated "I couldn't carry them all". These certificates are literally 8.5 X 11 regular sheets of paper.

That following week I brought this incident to the attention of our Chief. I explained to her what happened and my disappointment with Manager 1's behavior. Our Chief asked me if I felt comfortable addressing my issues with Manager 1 in which I responded that I absolutely did not have an issue

addressing this head-on I just wanted to give our Chief a heads up because I felt the situation would be misconstrued had I not let our Chief know what was going on from the beginning. I left our Chiefs office to find Manager 1 but was then tracked down by our Chief who had spoken with the two other black women involved. Our Chief then called a meeting with all parties who were at the table during this incident. We met in the newly hired Services and Inclusion Manager's office as she was one of the other black women excluded. It was disappointing that when questioned about the situation only 1 maybe 2 of the white women at the table viewed Manager 1's purposeful exclusion as being a problem until it was brought up in this meeting. Manager 1 gave a tearful apology, but the damage was done. She claimed she didn't view her actions as being exclusionary UNTIL we all sat in that meeting to discuss the situation. Manager 1 is now my Manager.

**Personal Testimony 7:**
Once I received my promotion there were rumblings about why I got the job. A fellow job candidate, Officer 6, was upset he was not chosen for the position and began telling staff in the department that I got the job over him because I was black, and the department is on a diversity push. He further stated that he wanted to leave the department because as a white man he did not feel he would have an opportunity to advance because of the push for diverse hires. I was shocked that he was spreading this narrative throughout the department. I asked to speak with him about it and he admitted that he did say those things. He stated that he felt he should have been chosen over me because he was already trained on the curriculum. Although I did not need to, I did explain to him that I was a teacher for 3 years out of college and facilitated a number of programs for other employers prior to coming to FCAP. He appeared shocked. This type of slander unfortunately had become common to me by this point. I was very uncomfortable that this had happened and reported the incident to Manager 2 and Manager 3. They said they would address his comments with him. I never received a follow up regarding this incident. Officer 6 left the department shortly after this incident to take a job with federal probation. It is unclear if this incident was discussed with him at all.

**Personal Testimony 8:**
I was hired in 2008.

My first racist experience at FCAP happened between myself, Officer 7, Officer 8, and Officer 9 (for you old timers). This happened around 2011 or 2012. Officer 7 was in her office with officer 10. I stopped by her office since our offices were so close. Officer 7 was joking with Officer 10 about being a smoker. I chimed in and started mocking someone who smokes. Officer 7 said something to the effect of me going go get watermelon. Officer 10 turned red and I was shocked she would say that. Her and I had a decent relationship so I was stunned she would make that reference. So I left her office and went to mine to mull over what was said. While I was in my office, Officer 9 came by. He saw some paper fliers that a probationer left me. He looked at the fliers and said "Officer 11 (writer) is this some black gathering or something". I was like "damn, for real". Not to say he said it out of malice but out of ignorance. So he left. I then decided to confront Officer 7 about what she said. As we were talking, Officer 8 came by. She said "Officer 11 (writer), you fit the stereotype of black people… being lazy and not working". At that time I was like "WTH" and I went back to my office. CM Manager 4 got word of what happened. Came to my office and asked what happened. I told him. I said I didn't want anything to happen to the parties involved but to let them know it is inappropriate. Everyone involved met with the former chief. She just reiterated it was inappropriate to say those things. Officers 7, 8 and 9 apologized. After the meeting, Officer 9 came by my office to have dialogue which was fruitful. Officer 7 avoided me from that day on.

**Personal Testimony 9:**

I had been working in the department for a year and a half and requested to flex my schedule (this was in 2011). I was told that my request would be reviewed. Time went by with no resolve. I asked about a decision and was told by my then supervisor (senior at that time) Officer 3 that she had not talked to our CM, Manager 3, about it yet but was uncertain of his possible answer because two people on our team already flexed their schedules to be out on Fridays (I was asking to do 4-9s and a 1-4). A new white, female employee Officer 12 started shortly thereafter. She was on the same team I was. She was allowed to flex her schedule after six months of employment and still prior to my request. When I followed up with my supervisor asking how the newer employee's request was heard, determined and approved already when I had more seniority and submitted my request first, I was told by my supervisor that she [my supervisor] had forgotten and lost my original request. She then asked me to resend it to her. After I pushed it was then approved.

**Personal Testimony 10:**

I am a white female that has worked with three different black female officers under different supervisors. They were all clearly held to a different standard that I was. While they were being held accountable down the minute that they arrived, put on action plans for being late (despite efforts to change their schedules or flex their arrival times), and physically checked on for arrival times, no one has ever paid attention to what time I arrive and depart from work, which is admittedly not always perfect.

**Personal Testimony 11:**

I have two young children and being able to have a flexible work schedule was advertised to me as a perk of employment with this department. Flex schedules were taken away from staff in 2017. This made having a positive work/life balance challenging. Prior to 2017 I worked with several different supervisors in the department (Officer 3, Supervisor 3, Supervisor 2). All of these supervisors had no issue working with me with my schedule. In 10 years my time management has never been an issue that caused me to be reprimanded or that was addressed in my annual evaluations. In 2017 CM Manager 2 served as my new manager. Manager 2 began watching my comings and goings with a sharp eye. She would stand at my door at 8 am to ensure I was there on time. I was unable to come in at 8 am due to getting my child on the bus/dropped off to school (school doors don't open until 8 am). When I asked why I was being watched in this manner when there were several other staff members who came in at the same times I did with less issue I was not given an explanation. There was no attempt to assist me. I was asked if anyone else in my family could assist with school drop off or if my fiance' could assist- they never once offered to assist on their end. They denied my request to take the time off of my lunch hour and refused to allow me to make up the time after 5 pm. I was eventually given a written reprimand, which was placed in my personnel file. I was told that I would be able to get this removed from my file after one year. I was devastated. I had never received any discipline from the department. No other supervisor had any issue working with me except Manager 3. I later found out that she was TOLD to watch me specifically. I believe the department purposefully directed Manager 2 to address their issue with my time because we are both black women. At one point Manager 2, our Chief and the HR Director Human Resources 1 met in HR to review the policy regarding time at Manager 2 requests. During that conversation our Chief stated that she was surprised we weren't getting along. The odd part of that statement is that I had never worked with or knew Manager 2 prior to her taking her position with the department. We had nothing in common. I had worked in community corrections at this point for about 7-8 years and she had never worked with the courts. We are not the same age, not a part of the same social groups and didn't have any friends in common. The only thing we share in common is that we are both black women. It is clear to me that the department ASSUMED we would work well together or that she could (for a lack of better terms) 'get me together' because we are both black. Since that time I have

documented the comings and goings of officers who have never been addressed about arriving late, leaving early or abusing their time. There are several. What is even more bizarre was that I was able to adjust my work schedule AFTER I was written up. I was able to adjust my time by 15 mins in the morning and take 15 mins from my lunch. It is odd to me that this request wasn't allowed prior to being disciplined. It was almost like they wanted to stick it to me when they just could have worked with me in the beginning.

**Personal Testimony 12:**
In June 2007, Franklin County Adult Probation (FCAP) hired me as a Pre-Sentence Investigator (PSI). During this period, the PSI Unit was newly created to absorb the in-custody defendants awaiting trial. There were four investigators to conduct these investigations while the State of Ohio continued to complete the out-of-custody PSIs. I was the only person of color in the unit at the time and remained the only person of color (within the in-custody unit) until I transferred to a new position. The positions were grant funded and demanding.

The newly created unit had challenges with developing structural processes and understanding how much work the process would take. As a unit, we expressed how writing the investigations required time, which resulted with everyone taking work home to complete the reports. As we continued to complete PSIs, additional duties were added without any reprieve but more demands. With the ever-changing demands, rules, and challenges, we voiced our concerns and hoped that considerations would be an empathetic hope to create a wholistic working place. No results, but more demands, were added with the strict instruction of not to take work home and find a method to complete it all within the office within the allotted time frame.

An individual PSI writer was to be assigned a maximum number 20 investigations a month. We were told the investigations would have a 21-day turnaround (not business days); which almost equated to approximately 15 business days. After expressing our concerns, we were told the turnaround was 15 days not 21 days. As a unit, we challenged this and was told that this was the way it has always been. There was an attempt to discuss the challenges of completing a report within a short time frame only to be ignored.

Initially, the position required minimal information such as a basic interview and a running record. As time progressed, we were required to perform assessments to determine supervision levels. The fill-in the blank template of the basic interview now became a full questionnaire requiring specific information for an interview that could take an hour or longer depending on the individual. As a unit, we would go to the jails to interview up to 1 to 7 persons at a time. This was dependent on how many PSIs were ordered for the week and the requirement to meet the standard 15-day turnaround.

Our record check for the running record required us taking the information to import to the investigation. We obtained most of the record from the PTCH report (completed by Pre-Trial Unit), which had to be requested, if not completed in the last six months. This additional step required time to complete the investigation. It should be noted the PTCH report would be inaccurate at times thus causing a delay in submitting the investigation. By the beginning of 2008, the unit was instructed to start providing more details concerning the disposition of the charges i.e. probation, probation violations, details of the fees, etc.

Once we began importing the detailed disposition then we had to locate the details of the offense. I was the only PSI writer in the unit that was required to utilize the microfiche for Municipal Court and Common Pleas Court by our Senior at the time. I was no longer allowed to enter "details not available" as my other co-workers were permitted to use. The extra time it took to obtain the information led to my work falling behind.

As a unit, we all individually had our struggles. We continued to take work home. Through the years, the demands of the investigations grew requiring more and more information. As writers, we all made our best attempts to compile the information to the Courts in the allotted 15-day timeframe.

I once prided my work on the quality not the quantity. My struggles as a PSI writer were very traumatic and damaging to my health. I remained in the unit until 2017. During my time within the unit, my performance evaluations were below standard with the demanding tasks and two written disciplinary actions. As the only person of color, I often felt targeted and I had not a single person to voice my concerns. I admittedly had some trouble within the unit, but I was not the only person that was late on the submission of my work.

In August 2010, I was disciplined for the first time. I had not received an employee evaluation before this (the first evaluation was completed in 2013). The disciplinary action included PSIs that were 7 days, 3 days, and 8 days late and working beyond allotted work hours to complete investigations. During this time frame, I was on leave once again. I was disciplined for falsifying my timesheet by working over and not putting it on my timesheet. For an action plan, I was required to email daily upon my arrival, lunch, and my departure for six months. It should be noted, other writers' investigations were submitted the date of court or the case needed to be continued because the PSI was not completed. I never fell in neither one of these categories, but I was the only one disciplined.

My first employee evaluation received was in 2013 (almost 5 ½ years after my initial hire date).  This evaluation noted the quantity of my work rather than the quality. The evaluation noted concerns from 2011 to 2013. I felt this was unfair and an inaccurate way to evaluate employees on their job performances. My other co-workers were not penalized as I was when I was completing the same level of work.

My second disciplinary action in 2014 for the late submission of my reports. I provided a detailed explanation of why my reports were late. Especially since I was approved for medical leave shortly before the assignment of these reports. Upon return from leave, I was disciplined.

My second and last evaluation with the PSI unit was in 2017 (approximately 4 years later) and noted that my job performance again was underrated. I was being held accountable for duties that my other counterparts were not required to upkeep or follow (i.e. obtaining out of state information, victim contacts, etc.). I challenged the evaluation and was informed to "let the manager and senior aware of the issue".

From 2007 – 2017, my investigations were very thorough and detailed. Many compliments were given to me, not by my superiors but, by my peers or the Court. Throughout the years, I remained dedicated to my job with the consistent hostility I received while working in the unit. Feeling often targeted because my "profile" has already been set and determined as a "late PSI writer". I voiced these concerns to the Interim Chief PO. She spoke with me, my supervisor, and my manager but no reprieve was received.

Trying to explain the toxicity within FCAP:

1. We have frequent behind closed door conversations or after work conversations that take place speaking about the department and the unfair treatment.
2. Not being able to express our concerns openly with leadership without the repercussions of write up, job threat, hostile environment created to apply undo or unfair pressure, or being ignored.
3. The abrupt notices being ignored or unaddressed of tenured employees; staff consistently looking for better opportunities
4. Unable to bring up legitimate concerns with manager, senior, or administrators
5. Unable to go to HR with concerns
6. Other individuals have sought justice and were met with issues only to make them worse
7. It seems talks are only about target, goals, production, errors, infractions, verbal warnings, warnings, and chain of commands
8. Managers and supervisors are led through fear – appearance of "I'll do whatever my boss wants me to do" – including mistreating the employees
9. Meeting and training sessions – no one speaks
10. Input is not welcomed
11. Knowing you will not be treated fairly but you need your income
12. No-moonlighting policy
13. No-reference policy
14. Progressive discipline
15. Dictated hours
16. Formal performance management – daily tracking sheet
17. Job seems built around task not recidivism
18. Measurements are quantitative not qualitative
19. Unable to feel like we own the mission
20. No respect

**Personal Testimony 13:**
It has been difficult being a Black Probation Officer employed by FCAP. I must admit that I consider it a privilege to serve the community and work with those going through troubled times in their lives. To encourage and assist others during their journey and efforts of change is truly a blessing. If only that could be the job. Unfortunately, as a Black PO, a major part of the job is navigating the jealousy and painful unjust treatment from White PO's, supervisors, management, and administration. The judgment, the double standards, the biased discipline considered and imposed, and the downright attitudes and value systems of entitlement become too much. White women rant about sexism but refuse to acknowledge or care about racism. It's continual and the support given by administration and management through their silence or oppressive policies and procedures encourages it. Staff are

empowered- to have racist beliefs, to impose them and act upon them, and to hang a flag that symbolizes more hate than what we do.

Probation is NOT a part of law enforcement. Maybe that's part of the problem- a simple education lesson needs to be had. The criminal justice system is comprised of three components: 1) Police (local, state, and federal law enforcement agencies); 2) Courts; and 3) Corrections (institutional [jails and prisons] and non-institutional, more commonly referred to as community corrections [probation, parole, and intermediate sanctions]). Probation lies in CORRECTIONS not law enforcement. Technically probation officers are defined as case managers with limited law enforcement powers. Simple criminal justice lesson to say that the Thin Blue Line flag should not represent probation officers. Especially in a department where the Chief PO has determined no need to reflect such but instead defines us as an evidenced-based community corrections organization with the values, mission, and principal core principles and values created by the department- that do not 100% mirror a law enforcement agency.

We have had surveys, discussions, forums, etc. about diversity issues in the Court and in FCAP. There is a lack of diversity in staff at all levels. The Executive Director and Chief Probation Officer sat with officers and assured us (Chief with her infamous, shallow tears) that they wished they could do something about the lack of diversity with staff but there were no open positions. Then many positions became open, and the same stamp of officer was hired. Talk- no action. Why? Because the discussions were pacification moves- just as we said they were at the time. Really, you can't keep "having things in the works" or "missing the mark". It's an indicator that there is no intention, and someone needs to be in the positions that will get the work done. I'm tired of watching less qualified white women get positions and promotions that more qualified Black individuals didn't get- and possibly not even interviewed for. Games are played that administration think we are unaware of- like with applicant 1 (name redacted).

There is a need for genuine race training in the Court. The safer diversity trainings have been incorporated (personality, age, etc.) but it's in effort to avoid the real issue that needs to be addressed-race. When the Court began exploring diversity training options, they contracted with the Kirwan Institute to deliver a training on Implicit Bias. I approached our Chief and advised that, with my experience and education, I did not believe that the department was ready for Implicit Bias training. I further explained that the department first needed to have a discussion/ training/workshop about the simple concepts of privilege and oppression and her response was that she had asked staff if they needed training on privilege and they informed her that they did not because they felt they understood this concept. I pointed out that if staff had advised that they had a basic understanding of evidence based practices she would not have skipped over that training and went straight to the next level but would have (and did) subject staff to the introductory training anyway to ensure a grasping of necessary concepts. Many in the department still lack the basic understanding of privilege and oppression as is evidenced by their words and actions.

There have been Black women pulled aside and disciplined and/or had their attitude addressed and they have been called and labeled as angry- as angry Black women. It is unacceptable to use a stereotype to describe someone's frustration in response to oppression, especially when in fact it is the administration that exudes white rage. The rage described in the world of academia as, the White reaction, disguised in many forms such as policy assaults and legal contortions, to African Americans making advancements toward full participation in U.S. democracy. It is the angered, offended response to African Americans audaciously displaying ambition, drive, purpose, aspirations, and making efforts to demand full or equal citizenship, and refusing to accept subjugation or to give up. There are many incidents and moments of shame exhibited by administration and management beyond the admitted not hiring because "we just

didn't click" to the ignoring of matters and beyond; and all of this, and more, creates a lack of trust in the competence and ability of the leadership team to handle any issues, especially ones of diversity.

When Supervisor 3 was named Interim Chief PO, she declared that she would focus on FCAP getting healthy. But instead a toxic environment has been allowed to continue (past the previous Chief administration that she was complicit to and should not be absolved from) and an environment currently exists that does not challenge racism and does not fully support Black officers and their needs. While showing disgust for Black officers being offended by the Thin Blue Line flag and for speaking out on matters of race, she has shattered any trust, respect, or admiration that once existed for her. All we want is a culturally competent environment to be created so that all PO's can come to work, do their job effectively, and help probationers be their best so that we impact change and reduce recidivism. Because truthfully, that's what we're all here to do.

**Personal Testimony 14:**
In 2019 a new staff member joined the Community Supervision Unit (CSU). With him he brought a "thin blue line flag", which he hung on a common wall on the 6th floor of the department adjacent to his cubicle. This flag stirred a lot of controversy in the department and triggered negative emotions from a number of staff members. This issue was brought up in the D&I committee. Mostly all the members expressed how this image was triggering due to the contentious relationship between law enforcement and black people. It was decided that this issue was growing so court administration, along with the department's diversity consultants (PCS), committee members and various leaders were brought together to discuss the flag and how we address the brewing situation in the department. Many in attendance expressed their feelings about the flag, with the majority being negative. I expressed my thoughts in writing, which I read to the room. My thoughts are enclosed in the open letter *Benefit of Doubt,* which is attached. Following the heated and emotional meeting there have been no more diversity trainings in our department, all regular D&I meetings were indefinitely postponed. Administration and leadership refused to make a formal decision on the hanging of the flag, although they had the officer take it off the wall but he has kept it folded on his desk. This has caused major division in our department. For whatever reason the CSU believes that they have been targeted by the D&I committee when our only issue was the flag- not who it belonged to but what it stands for in the eyes of a portion of staff.

From that point Manager 3, committee chair, was not able to communicate any information to the members per our Chief and no meetings could be scheduled without our Chief's presence. Our diversity consultants recommended that the flag be removed from the department but as leadership did not want to upset the members of the CSU, that did not happen, and PCS has not been consulted on this matter any further. Our Chief along with other leaders from the Court chose to bring in a deputy sheriff and his wife who is some sort of trainer/consultant. A meeting was scheduled with only select members of the D&I committee but all of the CSU. I was floored to know that members of the D&I committee had been EXCLUDED from a meeting that was first brought up at a committee meeting. Our Chief admitted that she chose the individuals to attend. Many members felt slighted for not been invited, as they should have. Once the members of the CSU arrived it was clear that they were upset with the committee and their body language showed as much. They did not speak, avoided eye contact and were short with their answers. The entire thing was odd and lacked direction or purpose. An opening was given by the Court Director and Deputy Court Director who had never been a part of our meeting before. The CSU sat on one side of the room and the D&I member sat on the other. Once we got into why we were there Officer 13, flag owner, immediately began going off and cursing stating in short that the D&I committee had no business discussing him or what he has in his office. He continued to yell and

curse. I stated to him that one of the problems was that he did not have an office so his flag was in a common area. That set him off. He yelled and cursed at me that he did have a "damn office" and it was none of our "damn business". The exchange became so intense that I told him that he needed to watch his tone and lower his voice when he was speaking to me. He then stared me down and stated that he did not have to do anything. I again told him to watch his tone when speaking to me. The lady consultant came over to me and told me that basically I had to allow him to have his emotions about the situation. I was again floored. I could not believe that this grown man cursed me out in a room full of people including the chief of the department, HR Director, Services and Inclusion Manager as well as a dozen or so other officers and NOT ONE PERSON CAME TO MY DEFENSE. Aside from the fact that this man was out of order and highly unprofessional, he had only been in our department less than six months. How is it that people I worked with for several years at this point did not value me enough to come to my defense but there were a line of people backing this man? Many members of the CSU continued to be standoffish throughout this meeting and when asked if we wanted to continue the dialogue, as nothing was resolved, none of them stated they would. This poses a number of issues with one of the major ones in my opinion is that these people are going out into the community and have no desire to see things from others perspectives or understand how the symbols they love are threatening to others- especially those they are visiting in the community. It is important to note that every member of the CSU is white. There have been no further meetings or discussion surrounding this topic.

**Personal Testimony 15:**
In 2018 is when my world changed forever. My wife worked here under CM Manager 1. My wife used to take issue with how Manager 1 would manage her. Eventually, our Chief, Manager 1, and my wife, Officer 14 met about it. Nothing happened of course because in this department, managers always have the support of the chief.

My wife and I always had an end date for her at FCAP so she can pursue other employment opportunities. The week she was to leave, my wife was frustrated with Manager 1. Officer 15 and Officer 16 overheard my wife voice her frustration, which was non-threating and laughed and paid it no mind. Well, while Officer 15 and 16 talked about it, Officer 17, overheard the conversation and told Manager 1. It turned into my wife saying "I am going to run down on Manager 1" which they interpreted as threatening. HR was involved and an investigation happened. My wife's last day was a Friday. As she was beginning her day, Manager 4 appeared and said she had leave and he would escort her out. I was furious. I had no idea what provoked all this. This was embarrassing. Why didn't they just call her to stay home before she was to come in? Officer 15 and Officer 16 told me that my wife did not threaten to hurt Manager 1 but again, as a manager here, you can' t do wrong.

Supervisor 2 and Manager 2 both apologized to me for what happened to my wife. Imagine that happening to you. But you have to put on a face and go to work every day like that didn't happen to you. Still messes with me to this day

Fast forward to 2019. We have a diversity and inclusion manager, Manager 2, here. The Diversity and Inclusion committee is formed which I joined. This committee has no other managers on this committee by the way. The D&I committee was also merged with the Employee Fun Committee. Why were these VERY different committee merged? A directive from the higher ups. In my opinion to prevent the D&I committee from doing actual work.

We have a situation with the Blue Lives Matter flag by the CSU unit. I am on the D&I committee. We have a discussion about it with our Chief, our Administrative Judge, PCS group and other members of

the D&I committee.  I was very vocal in saying there should be no political symbols in the department outside of the American flag and college or pro sports flags.  A decision was made to continue that conversation with another consulting group.  That discussion also excluded a number of D&I committee members; including me.  No explanation why I was excluded [was given].  I still [do not] have an explanation.  The entire situation happened in September/October 2019 and we still have no resolution.

The D&I committee hasn't met since September 2019.  Why is the question. Here are the optics:  three white women (Executive Director, Deputy Court Director, and Chief Probation Officer) are controlling the when, where, and what can be said in the D&I committee.  This is very disturbing and upsetting.

**Personal Testimony 16:**
It was reported by administration that the Thin Blue Line flag was taken down from Officer 13's cubicle but due to the undue silent support he receives from administration he defiantly hangs a flag at his desk in the face of the pained. Pictures taken after article declaring the flag had been removed:





**Personal Testimony 17:**
Our Chief made a point to visit with everyone else who started in my unit. I met her a month later at a department event. The only difference is I am Black.

**Personal Testimony 18:**
There are many problems with the HR Department and one that is especially problematic is the lack of confidentiality. My former coworker was facing health challenges and challenges in her personal life. She eventually ended up taking FMLA. She was devasted when our unit supervisor approached her regarding a leave form and talked about the purpose of the FMLA with her. The HR point of contact was the only person she shared this information with or who saw the paperwork. In order for our supervisor

to have known specifics about the issues, the HR point of contact had to have shared her medical information.

**Personal Testimony 19:**
When Philando Castile and Alton Sterling were murdered at the hands of police in 2016, I was triggered. Those murders happened on July 5th and July 6th, 2016. I came to work uneasy. I reached out to our newer chief, to tell her that I wasn't ok and that some of her black employees were not ok. Within a day or so, in the programming classroom, she created a space for people to talk about how they felt. The room was crowded. Judge 1 (Ret.) was in the room along with other probation officers sharing their stories. After that, two white probationers reached out to talk about what I shared; Officer 18 and Officer 19. Which birthed great dialogue. However, there has not been much progress afterwards.

With the murders of George Floyd, Ahmed Aubrey, and Breonna Taylor, I am very mad, sad, scared and frustrated. The court sent out an email by HR Director, on June 4th, titled "Community Events". How insensitive and tone deaf. That email gave mental health resources and how to have conversations to "exemplify tolerance, fairness and mutual understanding to support an environment that provides equality, empathy and shared goals". I emailed the HR Director back and stated how disappointing that email was.

**Personal Testimony 20:**
My unit was having our annual Christmas party and we did a white elephant gift exchange. Someone thought it was funny to purchase or wrap some figurines or dolls that resembled what appeared to be a pickaninny. Everyone laughed and thought it was funny. It was not funny but instead was highly offense. It was clear the members of my unit did not see anything wrong with this. It was even more upsetting that they found such amusement with an object that had such deep racist history. To think it was okay to give this as a gift at a gift exchange with two Black probation officers present was and still is problematic. These individuals are probation officers working in a very urban county and it's not far-fetched to think that they apply this flawed thinking as they perform their daily tasks. Coincidentally, this incident took place after the Agency had been engaged in diversity training.

**Personal Testimony 21:**
It was reported to HR that CSU was using their ID's and badges to get reduced law enforcement rates for non-work-related items. They were spoken with and given a second chance. This same mercy is not always afforded African American employees. Other employees were known to continually conduct real estate business on company time and were afforded this same talk and multiple opportunities to "correct" their actions; however, Officer 20 was given a discussion, write up, and then a demotion. Same as when former PO Officer 21 was given a demotion to PO from Intensive PO because the Work Release position was abolished, and she was receiving Intensive PO wages as a PSI Writer. When an Intensive spot opened up in Community Service/Programming and she declined it she was demoted and her pay reduced; all the while, Officer 22 and Officer 23 did not have to lose their title or pay when their positions were changed/abolished.

**Personal Testimony 22:**
The Court strongly insisted that PCS change items in their cultural diversity training and attempted at times to control the delivery of information, most notably in regard to race, to the advantage or liking of the Court. Those with NO cultural diversity concern or expertise were inappropriately influencing much needed training from an expert professional in regard to diversity.

**Personal Testimony 23:**

When I first started working in adult probation there was no formal training program for my position. I was assigned a mentor that was supposed to help me and provide on the job training. The person assigned to me was not a friendly person; she was cynical and negative. Being a new hire, it was very intimidating to even approach her. During my first six months not once did she attempt to mentor or train me. Rarely was this person available when I had questions, and when I knocked on her closed or semi closed door she often acted as if I was bothering her.  She seemed to be more interested in gossiping and talking to our coworker across the hall from her. I spent the first six months in the position figuring things out for myself and asking questions of my direct unit supervisor because this person was no help. After my first year in my current position my supervisor left the Agency. In my current position from time to time situations arise that aren't the norm. My current supervisor is very condescending and talks down to me when I ask her questions and/or am in situations where work has been completed based on the way the previous supervisor directed me. It is unfair to new hires to not be taught and not be equipped with the tools they need to do their job effectively. When speaking to others, I learned this is an experience unfairly impacting African American PO's at a greater rate.

**Personal Testimony 24:**

Although race, discrimination and bias are very pressing issues in our department, I would be remiss if I did not acknowledge the overall unprofessionalism of persons in leadership, lack of actually leading and overall inefficiency as a whole. The culture of secrecy, along with fear and retaliation is a constant in FCAP. Many staff members fear retaliation when bringing up issues as it is routinely turned into a witch hunt regarding "who said what" and if one is not willing to play that game their concern is dismissed. Leaders have historically shielded people they favor and expose those they don't. The department's leadership is based on favoritism and bias, as evidenced by those currently occupying those positions (there is also a culture of nepotism as several officers in leadership positions are related). Female officers are often reprimanded more often and more severely than males (i.e. abuse of leave without correction, lack of productivity without correction, informal discussions versus formal discipline, etc).

There is an expectation that officers and support staff treat probationers with empathy, understanding and respect but those expectations are not the same for leadership staff engaging with their own staff. Leadership staff have a reputation of being cold, rude and unapproachable. These undesirable attributes are often summed up with the excuse of "that's just how _____ is". No officer or other staff member would be able to display these types of behaviors in the workplace on a consistent basis without being called out. Why is this behavior acceptable for leaders? No one has the answer to this, but I am sure the philosophies of the book they have chosen as their leadership style guide "No Ego" has something to do with it. This book implies that in order to gain the optimal performance from your staff that leadership must stop focusing on addressing ego behaviors, working to get buy in, overcoming resistance to change and employee engagement. This type of leadership is in direct contrast to what type of service they expect their staff to deliver to the population they serve. While staff is held to such stanch expectations, the leadership in the department and the women they answer to, are often reactive versus proactive, emotional versus logical, and have chosen to micromanage versus empower.

These are only a few examples of their failing leadership style that lends to a hostile and unhealthy work environment. If we seek true accountability and positive change, everyone must be open to correction, especially the department leaders and its governing body.

**Personal Testimony 25:**

Due to the privilege of being white I have had the opportunity to observe several accounts of microaggressions and overt racism while at this department. I have admittedly been naive in thinking that change could happen in the department if we kept bringing the right people in through hiring. So in the past few years I have referred a few individuals for open positions in the department, but that will no longer happen due to what I perceive to be a terribly toxic work environment (especially individuals who are not white men or women). One of these referrals was a Black man, who I had known for several years prior to his employment at Franklin County Probation. When he was hired on as a Risk Reduction Probation Officer many other coworkers did not know of his and I's past working relationship so I became fully privy to the comments from coworkers including, "he was just hired because he is black" & "if you are black you automatically get hired now". I was awestruck that this was a go to response when a black person got hired at Franklin County Adult Probation, but over the years that attitude was fostered by the status quo and it still is.

Among other microaggressions that I've witnessed is the constant phrase of "he/she does not look like she should be on probation" comment. I have witnessed supervisors say this on many occasions regarding defendants in the lobby at the probation department who are clean cut white men or women. On one occasion I was speaking with a Black PO and he commented on seeing a supervisor make comments as I described above about a "young well put together white girl". This Black PO expressed his frustration with the comment because as he said to me, "What do you have to look like then to be on probation? What does that supervisor think probationers have to look like?" This Black PO and I both then talked about how if he were in the lobby he would probably always be mistaken as a probationer versus an employee at Franklin County Adult Probation.

Which brings me to my next situation to speak on, for which I lent my support for another Black PO. The situation involves this man being in the department and on two occasions being asked by other Officers, "Who are you here to see?" when he was walking around the department. My heart hurt hearing this story knowing that I have never once experienced anything like that in the department or courthouse no matter how uncommon my presence was on those floors and no matter how many people didn't know me.

Over the past few years, I have seen a progression in the suffering of many of my coworkers who truly want Franklin County Adult Probation to grow. We have suffered working in a place where ignorance is allowed to be fostered in the open while those of us with a more intersectional lens sit in silence as to not make them uncomfortable or to appear weak to those in power. I truly thought this would have changed a little bit when it was announced that an actual Diversity and Inclusion Committee was being formed, but I was wrong.

I was happy to join the Diversity & Inclusion Committee in January 2019 hoping that it would provide some type of way for those of us who want to serve the community to get our opinions and experience on the floor and to ensure that the Probation Department creates policies and procedures through a lens not catered to cis-gendered straight white men/women. I gave the committee a few months trying to work on party planning, while hoping that more serious conversations could happen, but quickly realized the committee was put there as another facade despite my naive hope. I was personally shown that this was just a check box for management when my involvement wasn't even noted on my performance appraisal & I had to have my management redo my performance appraisal to truly indicate the work I was putting in throughout the year. The fact that my management did not even know of my involvement should speak for itself.

My frustration truly came to a head when Diversity and Inclusion was shunned and silenced when they brought up the issue of the Thin Blue Line flag - a clear issue & not unreasonable one. In the following months I witnessed a catering to a unit who to this day believes they should be able to hang that flag despite its divisiveness. The issues that arose from that flag still exist today and management has continued to allow a toxic environment to be fostered despite constant pleas from employees that something needs to be done. This department has some of its most valued and passionate officers leaving due to the environment of the department - not because they hate their job.

**Personal Testimony 26:**
It was brought to my attention that there was a "secret meeting" pertaining to cultural diversity issues in the Probation Department in regard to the Thin Blue Line Flag on the 6th floor. In full transparency, many Officers (from all ethnicities) had concerns about this flag, however the Probation Department never wanted to address this issue as a whole Department. To hear that the Chief Probation Officer, The Executive Director and Deputy Court Director "cherry-picked" African Americans to a "secret meeting" regarding cultural diversity issues is disrespectful, hurtful and unforgivable. As a Probation Officer for approximately thirteen (13) years, I felt that my voice was not important nor valued. I also think that it is also very sad that the Chief Probation Officer and the Administration would try to divide and separate African Americans to think that this Department only values some voices and not all.

I hope this incident is investigated properly and appropriately.

**Personal Testimony 27:**
Throughout many probation surveys that were conducted years ago, it was increasingly clear that there was an abuse of power, lack of accountability, lack of discipline, lack of transparency and retaliation between Probation Officers vs. Probation Managers. Many Officers felt that there was a "broken" relationship between the Human Resources and did not feel there was a safe place to file a grievance against Probation Managers. Unfortunately, many Probation Officers do not feel this environment has changed. Several Probation Officers still feel retaliated against, having some Officers leaving the Probation Department all together. It should be noted that many Probation Managers that were addressed in the survey taken years ago are still working in the department today. This survey was conducted YEARS ago. The Human Resources Department (Court Administration) has not given a clear and transparent approach to dealing with grievances against Probation Managers. In the climate we live in, it is unacceptable not to have a thorough investigation regarding abuse of power from upper Personnel / Management.

It is respectfully recommended that the Court Administration creates a grievance policy for Probation Officers to feel that their voices can be heard against Probation Managers. It would also be appropriate to have Officer feedback on Management's performance evaluations.

**Personal Testimony 28:**
Several co-workers have witnessed racial discrimination with the hiring process and advancement in careers at the Probation Department. Unfortunately, many Probation Officers that experienced this treatment are no longer employed with Common Pleas Court.

An example is with ex-Probation Officer 24. Officer 24 was employed with the Probation Department for over ten (10) years. Some of his accomplishments in the Probation Department include being the Safety/ Self Defense Officer for the Probation Department for many years. Officer 24 applied SEVERAL times to

advance his career in the Probation Department as an Intensive Supervision Officer, however he was always denied, stating that he needed more experience. Eventually, Officer 24 decided to leave the Probation Department for career advancement at the State of Ohio as a Juvenile Parole Officer. Officer 24 tried to be re-hired back to the Probation Department on at least on two (2) occasions, all being denied again, stating that he did not score high enough on the hiring score process. Officer 24 is still employed with the State of Ohio.

Another example of this treatment was with ex-Probation Officer 25. Officer 25 has a master's degree and was employed in 2008 and was with the Probation Department for a few years. Officer 25 was trying to advance and diversify her career in the Probation Department. Officer 25 applied for a LATERAL position to work with Judge 2. At the time she applied for this position, Officer 25 was the only probation officer in the Department to apply for this lateral position. When Officer 25 did not get the job, she asked her Probation Manager 5 was there a reason why the Probation Department chose to hire someone outside the Probation Department versus hiring a current employee. Officer 25 stated that her Probation Manager told her that the Probation Department did not feel she "complimented" Judge 2s Courtroom. Months later, Officer 25 terminated her employment with the Probation Department.  Officer 25 discussed her concerns about this with then Administrator Judge 1, stating that she does not feel African Americans have a fair chance in advancement in the Probation Department. It should be noted that Probation Manager 5 is no longer employed with the Probation Department.

Another case was when the Court Executive Director verbally acknowledged to the Probation Department the problems with the hiring process, specifically dealing with an ex-Probation Officer 21 trying to be re-hired back. The Executive Director referred to this case as the "straw that broke the camel's back."

Officer 21 was employed for **years** at the Probation Department and was **promoted** as an Intensive Supervision Officer and the Alvis House Liaison.  Officer 21 left the Probation Department, and subsequently decided to apply back to the Probation Department. Officer 21 was interviewed (by her fellow co-workers) and was not hired back to the Probation Department. It was determined that Officer 21 did not score high enough points in the interview phase.  It should be noted that Officer 21 was **promoted on two (2) occasions** from the Probation Department – the same Probation Department in which she did not score high enough in the interview phase. The Executive Director recognized not re-hiring Officer 21 back was a mistake and changes need to be made with the hiring process.

In 2020, several Probation Officers are STILL expressing similar instances in which certain Officers / Candidates scoring high on their interview and writing assignments – and not getting positions in the Probation Department. Our Human Resource Director has informed some Officers that once the hiring committee submits all scores / paperwork into Human Resources– ANOTHER COMMITTEE (a Review Board) ultimately makes the final decision about hiring candidates. If this is true--- this makes the entire Hiring Committee deceptive, corrupt and not a fair process. If this is not true, what is clear is that the hiring process is still not transparent.

It is respectfully recommended that the Court looks into the hiring process of Officers /advancement of careers in the Probation Department.

**Personal Testimony 29:**

A fellow co-worker spoke to me about Officer 26 getting the Programming position and stated it was due to her being black and it was because of affirmative action. I told the person that is not how it worked and that isn't why she got the position.

Another incident that occurred was when both Officer 20 and Officer 27 were picked to go to training at OPOTA and I asked a supervising officer why they picked 2 males when only 1 was supposed to be chosen. I was told that Officer 20 was picked because he was black, and it wouldn't look good if there were only white officers picked.

**Personal Testimony 30:**

I have also had conversations with CSU officers, and it is apparent that they do not comprehend why the thin blue line flag is an issue and a few have taken it personally to where it now appears as us vs. them mentality.  It doesn't feel like they are willing to accept any feedback or even try and understand why the issues are. There appears no desire to see it anyway but as an attack.

I had to educate myself on why the flag was an issue and now I realize I was in the wrong for not doing my homework before thinking it was ok. I have really tried to be cognizant of things I may have said or done that could have contributed to systemic racism. I don't understand how we work in a department that is not actively fighting against a toxic environment. I am concerned with officers that have posted troubling statements, articles or memes on the social media and they are then supervising individuals that they clearly don't think come from disadvantaged communities and start life at a disadvantage.

**Personal Testimony 31:**

We were at a virtual training during COVID and the topic was communication. The trainer was saying that you could give people flags when it was their turn to talk. This was the brazen, audacious, sarcastic, confident response of someone who jokes of the racist issues in the department because she is allowed.



**Personal Testimony 32:**

Based on my personal experiences, the day to day job requirements are often met by the unfortunate challenges of a toxic environment. The workplace toxicity should hypothetically never happen; but, it does. The environment at Franklin County Adult Probation (FCAP) has an extensive history of hostility that create a toxic work environment for many employees. These circumstances influence my inability to uphold the philosophies that were developed to promote harmony amongst my co-workers and leadership.

The description of environmental toxicity will vary between employees. However, during my thirteen-year tenure with FCAP, here are some examples I have experienced:

1. Overhearing employees speaking about how much they hate their job and how ineffective leadership is
2. There is a consistent turnover of employees leaving the department (which is no longer surprising; it is known that people are seeking employment elsewhere)
3. Having to consistently remind myself that I have to stay employed; although, I know the environment is hostile
4. Accepting mistreatment to keep my employment due to fear of repercussions from leadership
5. Unable to present legitimate concerns without having it viewed as a challenge or being insubordinate
6. Utilizing the chain of command when there is a concern without support and facing "trouble" for speaking up
7. Lack of communication between employees
8. Fear of "breaking a rule" when it comes to providing services to probationers
9. Minimal interactions between staff and leadership
10. Impossible goals and duties to achieve in a reasonable eight-hour day
11. Micromanagement through policy and procedures that limit effective delivery of service
12. Employee input is not valued unless you are a member of a committee; input seems to be ignored and/or unaddressed
13. Lack of trust for employees to complete their daily tasks (i.e. monitoring all activities)
14. Measurement of quantitative work vs. qualitative work

The definition of leadership can be interpreted by many descriptions. Personally, the basic foundation of leadership is an individual that is capable of guiding, directing, and empowering their department. A leader should model what is expected of their teams and/or department. FCAP Leaders appear to be unsure of the next step. Without effective leadership, it creates an inability to adhere to our vision and mission statements, as well as the core values and beliefs.

These leadership modalities may have led to some of the toxicity and impacting the morale of the department:

1. Success are not recognized or acknowledged
2. Expectations are not clearly defined leading to being unsure about what to do
3. Conflicts are unresolved at times, due to lack of knowledge
4. Last minute communications regarding policies, changes, or procedures
5. Unable to present for new ideas
6. Inability to develop in the areas of interest
7. Lack of compassion
8. Fear of making a mistake
9. Unsure direction in completing daily task
10. Lack of transparency among staff and management

And all of this impacts the racial discord in our department and lack of progress in the area.

**Appendix B**

Correspondence Sent to Management

**Letter 1: From Officer Amanda Smith to Diversity and Inclusion Manager on 6/05/2020; No response as of 9/18/20**

Good morning Valerie,

I am reaching out to you as the Diversity and Inclusion Manager. This e-mail from Cameo today was resourceful in regards to mental health, but definitely missed the mark on the bigger picture. It's been 12 days since George Floyd was brutally murdered. I'm saddened that the only communication that we've received in relation to the current tensions in the world (they span far past a "community event") is simply a list of resources, put together by HR. It's no secret that our department has been a divided department before the recent call to action as a nation and a human race and this was an opportunity to show solidarity with the People of Color in our department. Instead, I fear this silence has and will only breed more division. As the nation is looking to its leader, we are looking to those in leadership in our own department for guidance, hope, support, and direction. Unfortunately, a list of places to seek your own refuge in your own time falls short.

Silence on this front shows alliance. With full understanding that we are a government entity and must be aware of making "statements" across the board, our very own vision statement implores that:

*"The Adult Probation Department is committed to maintaining a dynamic, evidence-based organization that empowers staff, promotes diversity, values learning, and works collaboratively with the community to positively impact individuals under our supervision while protecting the citizens of Franklin County."*

Furthermore, our Core Principles emphasize the need to "respect the dignity of every individual, embrace the multifaceted diversity of our community, and promote productivity, health, and balance in a safe, supportive, and respectful working environment."

If we are not empowering our officers behind the scenes, validating their pain during these tumultuous times, and aligning ourselves as a support system, how can we expect that they do the same for their clients? Can we honestly say that we are cultivating a "safe, supportive, and respectful" working environment if we are ignoring the active pain and trauma that is happening to our peers on a daily basis?

The D&I committee pledged a commitment to:

**"The Diversity & Inclusion committee strives to create an environment that upholds the inherent worth of individuals by reducing harmful stereotypes and demonstrating a genuine willingness to move from an awareness and tolerance of difference towards understanding and acceptance."**

These statements were written to provide us guidance and focus, especially during times of turmoil, and we have fallen far short of these missions. They should be more than words on a paper, but instead a call to action demonstrated in part by our leadership to show support, compassion, and solidarity with our peers, friends, and work family, in addition to clients. How many times do we need to ask for our

staff to be heard? It shouldn't take this long to do what is necessary and condemn racism. I would like to hear the leadership entities in our department state how they will be acting out these statements, It is the expectation of staff to uphold these missions and I want the same accountability for our leaders. Silence is not an option and there is no space to toe the line for the comfort of the majority.

Regards,

Amanda Smith

**Letter 2: From Officer David Buckley to Chief Probation Officer Lori Francescon**

Lori,

Between 2015-2016 our department began meeting to discuss the ongoing concerns of officers in the Probation Department. During one of the meetings with Managers Tom Castetter, Dan Wunderlich, yourself as acting Chief, several other officers and myself discussed our individual concerns. One of our co-workers responded to the issue of race in the department. She responded by stating, *"I have learned that it's just not something you talk about*." She was referring to the treatment of black men and women by law enforcement and the judicial system. This particular discussion came out of the Probation Department's lack of diversity and zero representation in leadership roles. I myself brought up the fact that if you are a black Probation Officer, once you have reached an intensive supervision position you have peaked. These statements are because there were and had not been any supervisor or manager positions held by black <u>officers</u>.

Moving forward you were promoted to Chief, a role that I myself believed you would excel in. Over the coming years many things have changed. While I don't agree with a lot of changes made, they were based on evidence based practices and considered the standard for best practices in our field. From 2016 -2020 the structure of the department has changed. We gained two minority women placed into supervisory roles and the department continues diversity training. There are many layers to the changes over those four years, but they are not what is driving this letter.

On March 9, 2020 Governor Mike Dewine issued an Executive Order "Declaring a State of Emergency" in response to the growing COVID-19 public health emergency. On March 13, 2020 Administrative Judge Stephon Mcintosh issued the court's orders in response to the pandemic.

On March 13, 2020 you addressed our department in person as a group and later that Sunday evening you sent out an email of encouragement. In that email you stated, *"I am thinking about all of you and the unique situation we are currently experiencing". "Certainly, this affects all of us to varying degrees". "One incredibly significant value of this department is the relationships we have with one another and the support that is consistently displayed in times of need or perhaps even in times of ..."just because".* I will return to these comments later.

As we navigated the new world brought to us by the pandemic it was identified by Franklin County Board of Health (Declaration May 12, 2020) and the Franklin County Commissioners (Declaration May 19, 2020) that racism is a public Health Crisis.

On May 25, 2020 and the following days our county and the world witnessed the murder of George Floyd. This event has led to and will continue to lead to protest, calls for Justice, calls for reform and also a time for individual self-reflection.

On June 1, 2020 The Columbus Board of Health passed a resolution declaring racism a public health crisis. Stating that, *"Columbus Public Health is committed to advocating for policies that achieve meaningful results to address the effects of interpersonal, institutional and structural racism"*.

As of Friday June 26, 2020, leadership or lack thereof have yet to address the probation department. It was my hope that the same words of encouragement you provided our department on March 13th would again be shown to black officers in our department. It is frustrating, sad and for many … scary to think at a time of need black men and women are left alone by their administration. I am embarrassed, frustrated and angry that my co-works have to return to their jobs ONCE AGAIN feeling hopeless and alone because we have NO IDEA what our department thinks or feels about the public health crisis called Racism.

Our Vision Statement reads

The Adult Probation Department is committed to maintaining a dynamic, evidence-based organization that **empowers staff, promotes diversity, values learning, and works collaboratively with the community to positively impact individuals under our supervision** while protecting the citizens of Franklin County.

Allegedly we believe in:

Protecting the community through the use of evidence-based practices, emphasizing risk reduction and accountability;

Empowering people to make positive changes in their thinking which promotes pro-social behavior;

**Respecting the dignity of every individual;**

**Embracing the multifaceted diversity of our community;**

**Encouraging personal and professional development while learning from our individual and collective experiences;**

**Functioning as a cooperative team by emphasizing ongoing communication, both internally and with our partners and stakeholders;**

**Promoting productivity, health, and balance in a safe, supportive, and respectful working environment;**

Incorporating current technology into our supervision strategies and daily operations;

Evaluating and continuously improving our programs, practices, and interactions.

As our stakeholders, the Franklin county Commissioners released the following statements in their May 19th Declaration,

*We support the action steps outlined in Franklin County Resolution No. 0341-20 to further work to solidify alliances and partnerships with other organizations confronting racism and fighting for social justice; to engage actively and authentically with communities of color wherever they live; to encourage racial equity training among all partners, vendors, and contractors; and to identify clear goals and metrics to assess progress towards equity.*

Lori, to sum up everything, I personally feel that The Franklin County Adult Probation Department has created a hostile work environment by failing to respond to Racism being declared a public health crisis in the community which we serve. This public health crisis directly affects all employees and even more directly the community we claim we serve. Silence brings speculation, speculation brings controversy and controversy brings inner department destruction.

I bring to you mostly facts and some personal feelings. I do so because over the past 30 days I have struggled to wait and watch how my employer will respond. I have put a lot of thought, prayer and time into what I presented to you. My honest fear is for that co-worker who spoke up back in 2015-16 will return to her place of employment with the same feeling she had back on that day.

I respect you as a woman who has worked her ass off to get where she is. I respect you as the detailed Manager that taught me so much of what makes me a great officer today. As we have no idea how hard this is for a white woman to address racism with her black employees, you have no idea how hard it is for black employees to return to work. I do not need a direct response and nobody needs to hear, " I can tell from your letter you are frustrated". We need real conversation from the heart and not from a book written by someone who has never experienced racism.

As I contemplate my employment with the Probation Department you have my word that I will continue to work for the greater good. My last name is my legacy and I will not tarnish it out of anger and frustration. I will continue to be accountable and reliable, but I will not remain an employee if significant changes are not made. We have already lost far to MANY good officers especially the last one. .

Respectfully,

David Buckley


**Letter 3: From former Officer Chakira Reid to Administrative Judge McIntosh**


Hello Judge McIntosh,

I am sending this email to express my disappointment, frustration and hurt with how the Franklin County Common Pleas Court and Adult Probation Department chose to address and handle raised concerns during the course of my employment and subsequently treated me on my last day in the office.

I was employed with the department for one year and 10 months. Shelly Quarles served as my manager. I returned from maternity leave on November 22, 2017. Upon my return, there were some changes in the department with a completely new computer system we had to use. I was technically still

new to the line officer position because I transferred from the PSI unit only a few months before going on maternity leave.

When I returned I had some difficulties adjusting to the new system and how things were operating. I asked for help from my Manager and at times was directed to obtain assistance from other (peers). The communication between my Manager, Ms. Quarles, and myself was limited as structured by her. If she had any concerns with my work she would communicate through Post-it notes or email. I did not feel supported under her management and did not feel I could go to her with the concerns I had, therefore I went to HR to discuss the matter.

I met with HR Supervisor, Cameo Davis, and she recommended a meeting be held with Ms. Quarles, our Chief, Lori Francescon and herself to discuss my concerns and she guaranteed there would be no retaliation from the meeting.

The meeting was held on March 13, 2017 and the concerns were addressed regarding how I felt Ms. Quarles was being excessively critical of my work. For example: if I left out an "R" in a name she would return all the work for me to correct when she was able to correct it from the same system she was reviewing it from or if I put 2017 and not 18 she would return that as well. I had at least 150 cases and my workload was heavy, as a Manager I would think small and minor errors she would want to assist her workers with considering paperwork cannot be moved along to the next phase without her approval. Her inaction essentially added time to cases that could have been moved sooner.

I was informed by a peer that Ms. Quarles, did not like my quality of work and that Ms. Quarles felt I wanted her to do my work for me i.e.: putting a requested file in my mailbox. This particular situation occurred one late afternoon if I forgot to get a file out of Ms. Quarles mailbox and I asked her if she could put it in my mailbox because I was overwhelmed with work. Our mailboxes are in the same room. Her response was "no, if she did it for me, then she would have to do it for everyone else." When I brought this up in the meeting I was asked by our Chief Francescon who disclosed this information to me. I declined to provide the officer's name because they were telling me as a heads up and did not want to be involved. This officer did not know the conversation that Ms. Quarles and I had and would have not known of the situation unless she had the conversation with someone. Chief Francescon responded to me by saying since I was not going to give up the name of the officer who shared this information with me they were not going to go on a witch hunt and would not think anything else of it; although Ms. Quarles admitted during this meeting that she did talk to someone about my work- just not an "officer". Following that meeting, Ms. Quarles began checking in on me a little more frequently and instead of leaving notes she would come down to talk to me, though it would be the last 15 minutes of the work day.

On March 22, 2018 I turned in my two-week notice, because I did not feel comfortable or supported working under my Manager Quarles and I did not have confidence that my concerns were being taken seriously by Ms. Quarles superiors. I spent my last two weeks trying to complete as much work as possible to avoid the next officer experiencing the same hardships I faced. My final week of employment with the department I noticed Ms. Quarles communication was again limited again. She continued to send work back to me for minor corrections. I was frustrated and spoke to some of my peers who were also managed by Ms. Quarles to gauge if the same thing was being done to them. One individual explained how they have been employed with the department for 17 years and Ms. Quarles was doing the same thing to them as well. I made a statement I was going to talk to her about her communication approach with officers because if her goal is to have a unit to work together, then

speaking with someone directly would yield more positive results than leaving Post-its notes or sending an email.

On my last day, April 6, 2018, I arrived to the department and was greeted in my office by Manager Dan Wunderlich. Mr. Wunderlich begin to explain to me how nothing was going to go in personnel file and "it's 2018". I was confused as to what he was saying and after asking for further clarification he proceeded to tell me that on Thursday, April 5, 2018 (I was not in the office on that day) someone reported to management that on my last day I was "going to come in and blow up on Shelly". I am appalled because that is not even how I conduct myself. I am a professional and I have always utilized HR if there is a major issue that is unable to be resolved independently on my part. Mr. Wunderlich then stated he had to take the threat seriously because it is 2018 and anything can happen. Again, no one asked me anything and only assumed from what someone else reported. I was never given the opportunity to address these allegations. I was then asked to leave and escorted out of the building as if I was terminated, which was embarrassing and hurtful because I would never threaten anyone, let alone my manager, over a disagreement regarding management style. It was my last day and to think my character would be disparaged as someone violent and unprofessional is upsetting.

I did not share this information with my family on Friday because I was extremely hurt and was still trying to process what just occurred. My father, Larry Dannals, who is employed with Franklin County Juvenile Court as a Court Diversion Officer, called me on April 9, 2018 and stated that a Deputy pulled him to the side and informed him that my picture was at security and they were instructed not to allow me back in the building as if I was a threat! It is devastating to find out that I would be put on threat watch list. I totally understand taking safety precautions, but again no one spoke to me about this situation or allowed me to address these heinous allegations. It is very disappointing to know that someone can essentially provide false information to management with no proof and their word is taking as absolute truth and I am escorted out of the department in front of my peers.

After receiving this information, I then contacted HR Director Cameo Davis regarding my photo being circulated to building security. Ms. Davis denied that my picture was ever given to security and further stated that she knew nothing about it. Ms. Davis stated she would look into the matter. She called me back a short time later and informed me that my picture was not with security. I am not confident that she (or whomever gave the go-ahead) is being truthful. I believe my photo was given to security officers but may have been removed once questions arose. My father has been with the Courts for over 20 years and personally knows the Deputy that shared this information with him. Neither of them had any idea what was going between the Probation Department and myself so there would be no reason for either of them to fabricate this story.

On April 9, 2018, I also had a chance to speak with the officer that admitted she repeated that I planned to talk to Ms. Quarles and she stated that she was questioned by Managers and was asked if she thought I would bring a gun to the department. This is completely outrageous. It is disturbing that making a statement saying I planned to talk to Ms. Quarles was escalated to this extent. For the record, I do not own a gun nor am I comfortable being around/handling them.

In closing, I would like to share with you the difference in how the Probation Department/HR chose to handle my situation and how an actual threat was handled in our department:

There was an investigation of former Lab Monitor, Aaron Masters. It was alleged that he was harassing female employees in the department as well as offenders who came to complete urine screens. Even

with such serious allegations against him, Mr. Masters was given an opportunity to address the allegations and he remained working in the lab (for a few weeks) throughout their various interviews with potential victims. He was later placed on leave and then eventually terminated. I do not understand how all employees are not given the same process and opportunity to address accusations against them, especially when we work in a building where those rights are honored daily.

I feel like I was targeted because I was outspoken and in retaliation I was completely humiliated. I am embarking on a new career and I have a baby under the age of one. I have far too much at stake to just toss it out of the window by threatening someone I have no intentions on ever seeing again. I believe the department was intimidated by my forwardness. I believe the manner in which the department handled my departure was in poor taste and was not consistent with how they have handled other employees in the past. I have no plans to return to this department but I would strongly suggest someone look into the practices of management/leadership, as they are obsessed with holding staff accountable but no one appears to be holding them accountable for their poor leadership and subjectivity. I plan to explore all options before me to further address this situation.

Sincerely

Chakira (Reid) Pullen


**Letter 4: From Officer Shana Harris to the Diversity and Inclusion Committee and HR on 10/15/19**


Open letter penned to FCAP D&I Committee: Benefit of the Doubt
By Shana A. Harris

I want to speak on the "benefit of the doubt". Working in law enforcement/corrections as a black woman has posed its challenges, specifically in the last 3+ years. It has been an internal struggle between the two worlds for me because historically police/law enforcement or individuals in power have always had a contentious relationship with black people. So working in "law enforcement/corrections" has been a very different experience.

I want to remind you all that back in August 2017 a speaker was brought into our department to facilitate a training entitled the **Competitive Edge (Calibre Press)**. This training was hailed as **a relevant, applicable and dynamic program geared towards the unique responsibilities and realities of dealing with offenders in a variety of situations.** The course was described as **constantly evolving, incorporating current events and relevant supporting material that meet the professional needs of Law Enforcement. Topics were to include:**

- **Command Presence**
- **Verbal Skills**
- **Body Language**
- **Pre-Attack Indicators**
- **Deceptive Behavior**
- **Statement Analysis**
- **The Unconscious Mind**
- **Understanding the Human Animal**

At the top of the training the trainer showed images of slain, unarmed African Americans at the hands of police and then he began to interject his personal opinions regarding what the victims did wrong. These images were alarming, triggering and hurtful to parts of the staff. Some black officers walked out due to the traumatic feelings attached to those images. Due to this happening, there was conversation amongst several officers (non Persons Of Color) stating that since some black officers left that training they would walk out of diversity training. **No one gave the officers that walked out the benefit of the doubt regarding their reasons why they left the training. No one asked their opinion or tried to look at things from a different perspective of their own**. Their next thought was 'well in that case I am walking out of diversity training'- that statement in itself is the reason for us to be partnered with Performance Consulting Services (PCS) and the creation of the Services and Inclusion management position in our department.

The evening following the training, I made a statement on my social media surrounding the training and how in a professional setting it is inappropriate to spew one's personal opinions regarding such a tough subject. I never disrespected any officers, I never stated where I work at, never named names, and I did not disparage the department. Yet some of my colleagues took exception to my post and then began to scour my social media accounts and printed out pictures of me dressed as a black panther for Halloween and any post they deemed in their minds to be incriminating. They took those printouts and put them in Chief Lori Francescon's mailbox. **No one came to me to discuss my views on various issues. No one brought me the printouts to discuss. Nothing. I was not afforded the benefit of the doubt.** It was **ASSUMED** my post were negative and whomever felt the need to secretly collect this "information" in hopes of what- exposing me, having me reprimanded or fired.

Let's be clear- I was not in that training. And there were questions that if I was not in the training how could I have an opinion about it or how could I possibly be upset. I say to that- I wasn't physically apart of slavery but that has affected me as well and I am entitled to my own opinion about it. I was not in the room when Tay Jefferson was murdered by a Fort Worth, TX officer just this past weekend but I still hurt from that situation- so that argument doesn't hold much weight with me. To suggest that a portion of your staff compartmentalize our feelings surrounding racism, unfair treatment of our community by law enforcement and to stay silent regarding **BLACK TRAUMA** is hurtful, disrespectful and a slap in the face.

This is why I have a problem with this blue line flag that has been hung in the department by a fellow officer in plain sight. This flag is respected and revered by those who are heavily law enforcement minded (which I thought was the opposite direction our department was moving in) as well as white supremacist and white nationalist. This flag was seen all throughout Charlottesville, VA when the riots in 2017 broke out. Being carried by and draped around the arms of white nationalist. That is an image I cannot ignore and it would be a dangerous message if our department ignores it. Why are we as a department ok with alienating any portion of staff? To many people of color that flag symbolizes white nationalism, racism and hate. The police have an organization that supports and backs them which is the FOP. Why not fly that flag???

It is insane to me that I had been with this department for nearly 7 years when the incident in 2017 occurred and **no one gave me the benefit of doubt. This new employee has been with our department for less than 30 days and he was treated with far more respect than I was given by my coworkers.**

It is disheartening to see the hands of time regarding race relations move backward on tv, news radio, and in everyday practice but then to come to work and see this flag honoring people, many who have

proven to value my life less than others, is quite disturbing. Instead of having a meaningful conversation with the department to address the strife some of the officers feel surrounding this flag, we are in an optional meeting, with likeminded individuals to discuss how to have a respectful conversation… we are missing the mark because the people who need to hear this are most likely not in this space.

This department has been running on a culture of secrecy but this is not a topic that needs to be hush hush.  If that flag can sit boldly in an open space I can speak out boldly regarding my disdain for it without being labeled a drama starter or otherwise.

In closing I will leave you all with this: I was reading an article from the LA Times from August 2019 entitled *2013-2018 Police Shooting Leading Cause of Death of Black Men*. They provided some jarring statistics:

- 1 in 1000 black men/boys in American will die at the hands of police (2.5 times more likely than white men/boys) These odds are more likely than winning on some scratch off lottery tickets.
- Latino men/boys are at 1.4 times higher risk of being killed by police than whites.
- Native American men/boys are at 1.2-1.7 times higher risk of being killed by police than whites.
- Women's risk in general is 20 times lower than men to die at the hands of police.
- Black women are at 1.4 times higher risk than white women to die at the hands of police.

I share these stats because these are the odds people who look like me face. We can't escape it. So, this is why I am triggered by the presence of that flag- because the people entrusted to "protect and serve" have not shown my community the same respect.


**Letter 5: From Officer Monica Harvell to Administrative Judge Stephen McIntosh on 4/23/2019**


**From:** McIntosh, Stephen L.
**Sent:** Tuesday, April 23, 2019 6:24 PM
**To:** Harvell, Monica N. <Monica_Harvell@fccourts.org>
**Subject:** RE: Concern regarding PSI vacancy

Thank you for your email. I will look at the process for replacements.

Stephen L. McIntosh
Administrative Judge
Franklin County Court of Common Pleas
345 South High Street, 4B
Columbus, Ohio 43215
(614) 525-3550 (O)
(614) 525-3868 (F)


**From:** Harvell, Monica N.
**Sent:** Tuesday, April 23, 2019 11:42 AM

**To:** McIntosh, Stephen L. <Stephen_McIntosh@fccourts.org>
**Subject:** Concern regarding PSI vacancy

Hello Judge,

I hope I am not out of order for this email. I did want to reach out to you to let you know in light of Katherine's notice of departure from PSI I will be the only person of color writing PSIs for Franklin County. I know we are down several positions that will not be filled, and we were just given a writer and she is nice. I would just like to say after working in the unit for almost 3 years and with Jodi now being the only supervisor I am somewhat concerned. I work with and get along well with my coworkers and we have had trainings and information regarding bias etc. but the thoughts, beliefs and attitudes of some of my coworkers are concerning with regards to race and some of the issues faced by offenders from poverty stricken or more urban areas. I am not sure if anything can be done when it comes to hiring but it may be helpful if another person of color could be considered for her vacancy should they choose to fill it.

**Letter 6: From Officer Shana Harris to HR Director Cameo Davis on 6/5/2020**

**From:** Harris, Shana A.
**Sent:** Friday, June 05, 2020 8:56 AM
**To:** Davis, Cameo E. <Cameo_Davis@fccourts.org>
**Subject:** RE: Community Events

Good Morning Cameo,

Question…Did our D&I consultants assist in crafting this statement? I am asking because this statement lacks empathy, depth, intention and purpose. Although I am not surprised, as this department has historically shied away from hard conversations, I am still disappointed. No one truly understands the plight of a marginalized person who does not feel supported in their community, by the country's leadership and in the workplace. You have employees who are hurting and instead of providing a statement of support we have chosen to pass the buck. And to be clear, what is happening in Columbus and throughout the country are not "community events"- a festival is a community event, a parade is a community event. What is happening in this city and country is an uprising of American citizens who no longer want to toe the line of injustice, racism, willful ignorance and abuse of power.

This was a great opportunity for this department to affirm its commitment to being a "dynamic workplace that empowers its staff, promotes diversity, values learning and that works collaboratively with the community". Sometimes doing the right thing is difficult but it is necessary. We missed the mark.

 Respectfully,

(Agency Email Stamp for Officer Shana Harris)

**Letter 7: From former Officer Micah Mitchell to the Department**

For someone to willingly leave their job during a pandemic when health insurance is necessary and unemployment is at an all-time high, there must be compelling reason to do so. I am not writing this because I feel that my actions need justification. Rather, I hope that my explanation will promote positive change within the Court. At the very least, I hope it promotes sincere self-reflection on these issues. Please read these opinions with an open mind. If it triggers a negative reaction within you, try to understand why that is. Dig deep.

There are two primary issues I want to address. First and foremost, the Court's response to the Black Lives Matter movement. The Court's stance, or lack thereof, is appalling. Emails with generic messages about how to respectfully talk through a disagreement with a coworker, emails claiming that our branch of government must remain silent because we must be "impartial" are simply not enough. This is a human rights issue for which the Court holds responsibility. George Floyd was lynched on the street by law enforcement, something that happens so regularly that our Court somehow has the capability to turn a blind eye, to remain silent. Do not forget that this problem plagues our own community. Henry Green, fatally shot seven times by Columbus Police Department: no indictment returned. Julius Tate, fatally shot five times by Columbus Police Department; yet, his girlfriend was charged with his murder. Tyre King, fatally shot by Columbus Police Department: no indictment returned. *He was thirteen years* old. We are so quick to incarcerate the average citizen for murder and push for the most aggressive sentence possible, as it should be, yet we as a probation department and a Court remain silent on murders by law enforcement simply because the offender is one of us. I cannot even begin to understand how that is impartial. We as a Court, we as a probation department must recognize that we *all* bear responsibility for this ongoing injustice. Black people are disproportionately represented in every facet of the criminal justice system. Racial disparities have always been prominent in arrest, conviction and incarceration rates. Racial disparities have always been prominent in police brutality and police murder rates. Community policing is not safe for the black community. The Court system is not safe for the black community. The fact that our department and our judges cannot even speak out to address our hand in this injustice is proof that this impartial branch of government is *not* impartial.

Let me remind you that just prior to quarantine, the probation department held a mediated meeting regarding the "blue lives matter" flag hanging on the sixth floor. A meeting where only a select few from the Diversity and Inclusion Committee were invited. A meeting with no resolution. A meeting that resulted in the discontinuation of the Diversity and Inclusion Committee. As a department, as a Court, we *cannot* claim to embrace diversity and inclusion simply by scheduling regular implicit bias trainings and checking off boxes. We must actively use that knowledge and speak out against bias in the workplace. We must actively work to dismantle the grip that Jim Crow laws still hold on our justice system. Administration and management hold the utmost responsibility to speak out, and yet they are the most silent when it comes to these issues. When confronted with these issues in their own workplace, management has done nothing.

To be a police officer or a member of law enforcement is a choice. To be a probation officer is a choice. To be a member of the judiciary branch of government is a choice. To be black and targeted by law enforcement as a result of the color of your skin is not. Management allowing the display of the "blue lives matter" flag to this day, and administration remaining silent on the murder of our black community by police are all actions *condoning* racism. It condones the murder of our black community by law enforcement. It is *not* impartial. It is complicit.

Lastly, I would like to address the way that the chemical dependency caseload is handled. As some of you know, I am a recovering addict and alcoholic. I struggled with addiction for ten years before finally getting clean. To work the chemical dependency caseload is more than a job for me – it is a mirror. I see myself in every single person on my caseload, and I can tell you with confidence that slapping a possession conviction on an addict and putting them through the system is not the answer. This is not to say that we don't help addicts through our involvement in some ways. We link them with treatment and monitor compliance. These things are necessary for recovery. What is unnecessary and rather harmful to the community is the branding of an addict as a criminal, and the incarceration of an

addict for "non-compliance". It's not that they don't want to comply – they simply cannot. Addiction is a mental disorder. Addicts use compulsively, regardless of what the logical side of their brain may be saying because in the throes of addiction, their brain is not functioning properly. We know this to be true because we are trained on this as a probation department. I know this to be true because I suffered from it for ten years. What this department fails to recognize is that addiction is a disorder fueled by shame. The shame of being branded a criminal, the shame of being on probation, the shame of not being able to quit using, of accruing probation violation after probation violation, and the shame of being thrown in jail only fuel an addict's compulsion to use. This is why you see so many addicts immediately overdose and die upon release from jail. Their incarceration only compounds their problems. Especially in the midst of a pandemic when being put in a jail cell could be a death sentence for those with pre-existing conditions, incarceration is not the answer.

When those on my caseload came into my office and complained about the criminal justice system or the inherent injustice of law enforcement, I couldn't help but agree. I can't help but feel that no matter what they do, they will always be branded as a criminal and an addict with a felony on their record for a disorder that cannot be healed through threat of force. A disorder that now limits them from good jobs, living wages, good health insurance. A disorder that I suffer from myself. There was always a fine line between probation officer and probationer in my office. The only thing that placed me on the "right" side of the desk was my privilege. I grew up in a good neighborhood. I grew up with opportunity. I grew up with hope. I grew up without fear of the police. I grew up with privilege, and I never got caught.

People with addiction do not need records, threat of incarceration or fear-based motivation. They need human connection. They need allyship and empowerment. No matter what you tell yourself, you will never truly empower someone with a badge and handcuffs silently waiting on your hip. Their behavioral changes will only come from fear. They will be temporary. Poverty, addiction, and mental health disorders are not criminal behaviors, yet they are criminalized by our justice system. These social problems impact *all* of us, yet only a percentage of citizens get caught in the system because of the way they were raised, the color of their skin, the redlining of their neighborhood. How is this impartial? Are you truly serving justice, or are you just serving yourself?

Regardless of my stance on these issues, I truly thank you for the opportunity to work with your department. I was at my rock bottom when I started this job and through this job, was afforded the opportunity to turn my life around. Thanks to access to great health insurance, great healthcare, a living wage, and some encouraging colleagues that made me feel safe and worthy, I am leading a life that I can finally be proud of. Imagine the difference it would make if our probationers were afforded the same.

For someone to willingly leave their job during a pandemic when health insurance is necessary and unemployment is at an all-time high, there must be compelling reason to do so. I am not writing this because I feel that my actions need justification. Rather, I hope that my explanation will promote positive change within the Court. At the very least, I hope it promotes sincere self-reflection on these issues. Please read these opinions with an open mind. If it triggers a negative reaction within you, try to understand why that is. Dig deep.

There are two primary issues I want to address. First and foremost, the Court's response to the Black Lives Matter movement. The Court's stance, or lack thereof, is appalling. Emails with generic messages about how to respectfully talk through a disagreement with a coworker, emails claiming that our branch of government must remain silent because we must be "impartial" are simply not enough. This is a human rights issue for which the Court holds responsibility. George Floyd was lynched on the street by law enforcement, something that happens so regularly that our Court somehow has the capability to turn a blind eye, to remain silent. Do not forget that this problem plagues our own community. Henry Green, fatally shot seven times by Columbus Police Department: no indictment returned. Julius Tate, fatally shot five times by Columbus Police Department; yet, his girlfriend was charged with his murder. Tyre King, fatally shot by Columbus Police Department: no indictment returned. *He was thirteen years* old. We are so quick to incarcerate the average citizen for murder and push for the most aggressive sentence possible, as it should be, yet we as a probation department and a Court remain silent on murders by law enforcement simply because the offender is one of us. I cannot even begin to understand how that is impartial. We as a Court, we as a probation department must recognize that we *all* bear responsibility for this ongoing injustice. Black people are disproportionately represented in every facet of the criminal justice system. Racial disparities have always been prominent in arrest, conviction and incarceration rates. Racial disparities have always been prominent in police brutality and police murder rates. Community policing is not safe for the black community. The Court system is not safe for the black community. The fact that our department and our judges cannot even speak out to address our hand in this injustice is proof that this impartial branch of government is *not* impartial.

Let me remind you that just prior to quarantine, the probation department held a mediated meeting regarding the "blue lives matter" flag hanging on the sixth floor. A meeting where only a select few from the Diversity and Inclusion Committee were invited. A meeting with no resolution. A meeting that resulted in the discontinuation of the Diversity and Inclusion Committee. As a department, as a Court, we *cannot* claim to embrace diversity and inclusion simply by scheduling regular implicit bias trainings and checking off boxes. We must actively use that knowledge and speak out against bias in the workplace. We must actively work to dismantle the grip that Jim Crow laws still hold on our justice system. Administration and management hold the utmost responsibility to speak out, and yet they are the most silent when it comes to these issues. When confronted with these issues in their own workplace, management has done nothing.

To be a police officer or a member of law enforcement is a choice. To be a probation officer is a choice. To be a member of the judiciary branch of government is a choice. To be black and targeted by law enforcement as a result of the color of your skin is not. Management allowing the display of the "blue lives matter" flag to this day, and administration remaining silent on the murder of our black community by police are all actions *condoning* racism. It condones the murder of our black community by law enforcement. It is *not* impartial. It is complicit.

Lastly, I would like to address the way that the chemical dependency caseload is handled. As some of you know, I am a recovering addict and alcoholic. I struggled with addiction for ten years before finally getting clean. To work the chemical dependency caseload is more than a job for me – it is a mirror. I see myself in every single person on my caseload, and I can tell you with confidence that slapping a possession conviction on an addict and putting them through the system is not the answer. This is not to say that we don't help addicts through our involvement in some ways. We link them with treatment and monitor compliance. These things are necessary for recovery. What is unnecessary and rather harmful to the community is the branding of an addict as a criminal, and the incarceration of an addict for "non-compliance". It's not that they don't want to comply – they simply cannot. Addiction is a mental disorder. Addicts use compulsively, regardless of what the logical side of their brain may be saying because in the throes of addiction, their brain is not functioning properly. We know this to be true because we are trained on this as a probation department. I know this to be true because I suffered from it for ten years. What this department fails to recognize is that addiction is a disorder fueled by shame. The shame of being branded a criminal, the shame of being on probation, the shame of not being able to quit using, of accruing probation violation after probation violation, and the shame of being thrown in jail only fuel an addict's compulsion to use. This is why you see so many addicts immediately overdose and die upon release from jail. Their incarceration only compounds their problems. Especially in the midst of a pandemic when being put in a jail cell could be a death sentence for those with pre-existing conditions, incarceration is not the answer.

When those on my caseload came into my office and complained about the criminal justice system or the inherent injustice of law enforcement, I couldn't help but agree. I can't help but feel that no matter what they do, they will always be branded as a criminal and an addict with a felony on their record for a disorder that cannot be healed through threat of force. A disorder that now limits them from good jobs, living wages, good health insurance. A disorder that I suffer from myself. There was always a fine line between probation officer and probationer in my office. The only thing that placed me on the "right" side of the desk was my privilege. I grew up in a good neighborhood. I grew up with opportunity. I grew up with hope. I grew up without fear of the police. I grew up with privilege, and I never got caught.

People with addiction do not need records, threat of incarceration or fear-based motivation. They need human connection. They need allyship and empowerment. No matter what you tell yourself, you will never truly empower someone with a badge and handcuffs silently waiting on your hip. Their behavioral changes will only come from fear. They will be temporary. Poverty, addiction, and mental health disorders are not criminal behaviors, yet they are criminalized by our justice system. These social problems impact *all* of us, yet only a percentage of citizens get caught in the system because of the way they were raised, the color of their skin, the redlining of their neighborhood. How is this impartial? Are you truly serving justice, or are you just serving yourself?

Regardless of my stance on these issues, I truly thank you for the opportunity to work with your department. I was at my rock bottom when I started this job and through this job, was afforded the opportunity to turn my life around. Thanks to access to great health insurance, great healthcare, a living wage, and some encouraging colleagues that made me feel safe and worthy, I am leading a life that I can finally be proud of. Imagine the difference it would make if our probationers were afforded the same.

To those who showed me kindness during my time here, especially those that supported me during one of the most vulnerable moments of my life – I cannot express how grateful I am. Thank you.

I wish you all the best.

https://www.nytimes.com/2020/06/16/opinion/state-supreme-courts-racial-justice.html