**Frye, Richard A.**

**To:** Goodman, Jennifer L; ODonnell, Colleen
**Subject:** RE: Harassment Complaint

I have the noon hours open today after my criminal docket. So, whenever Judge O'Donnell is free we can meet.

Richard A. Frye, Presiding Judge
Franklin County Common Pleas Court
345 South High Street, Courtroom 5F
Columbus, OH 43215
614-525-3811; 614-525-2464 (fax)
Richard_Frye@fccourts.org

**From:** Goodman, Jennifer L. <Jennifer_Goodman@fccourts.org>
**Sent:** Wednesday, November 2, 2022 8:53 AM
**To:** ODonnell, Colleen <Colleen_ODonnell@fccourts.org>
**Cc:** Frye, Richard A. <Richard_Frye@fccourts.org>
**Subject:** RE: Harassment Complaint

Good Morning Judge O'Donnell:
I will make myself available whenever you are both free. I do have an appointment outside of the office today, leaving at 3pm but that is my only conflict.
Thank you. Jen



**Jennifer Goodman**
Pronouns: She/Her/Hers
Executive Director
**Franklin County Common Pleas Court**
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
**(P) 614.525.4147 | (F) 614.525.4480**
Jennifer_goodman@fccourts.org | http://www.fccourts.org

**From:** ODonnell, Colleen <Colleen_ODonnell@fccourts.org>
**Sent:** Wednesday, November 2, 2022 6:55 AM
**To:** Goodman, Jennifer L. <Jennifer_Goodman@fccourts.org>
**Cc:** Frye, Richard A. <Richard_Frye@fccourts.org>
**Subject:** Re: Harassment Complaint

Good morning:

Thank you for the email, Jen.

I have dispos this morning, but will make myself available to meet with you both whenever convenient for your schedules.

Thanks!

1


EXHIBIT
24

On Nov 1, 2022, at 8:15 PM, Goodman, Jennifer L. <Jennifer_Goodman@fccourts.org> wrote:

Good Evening Judge Frye & Judge O'Donnell:

It is with deep regret that I find myself in a position with no other options other than to submit this complaint to both of you. In all my years with the Court, I never thought I would be in this position.

I wish to speak to both of you in person, in the morning – if possible.

Sincerely,

<image001.png>

<Documentation.pdf>

**Anti-Harassment Complaint**

| | |
|---|---|
| Pursuant to: | HR – Anti-Harassment Policy |
| Submitted to: | Judge Richard Frye, Presiding Judge, per Section I.B. |
| | Judge Colleen O'Donnell, Personnel Chair, per Section I.B. |
| Filed by: | Jennifer Goodman, Executive Director |
| Date: | November 1, 2022 |

**Opening**

I file this action only after attempting to remedy this ongoing situation in several manners to include many attempts to have conversations to resolve the issues. In my 28 years of tenure, I have worked with many Administrative Judges in multiple employment capacities, including three Administrative Judges over eight years in my current role as Executive Director. I do not take this action lightly and hoped these issues could be resolved in another manner.

Over the last several months, I have been: harassed; demeaned; belittled; constantly criticized; undermined in relation to the supervision of my direct staff; and, have had my employment threatened. This situation has impacted the executive team's ability to work productively with one another. Further, personally, it has impacted my mental and physical health.

Within the following pages, I have documented situations and conversations as an example of the ongoing harassment I have experienced.

I respectfully request assistance to resolve this matter and for all harassment to cease immediately. Further, I am very concerned regarding retaliatory actions and efforts and ask the Court to address this issue.

**Documentation**

**Onboarding Situation**

The AJ hired a new Staff Attorney (SA) who began employment on July 5, 2022. The date the SA started the AJ was out of the office, along with key IT and Court Support staff members. While the SA was greeted and trained, all aspects of onboarding did not go as smoothly as normal. The SA wanted access to meetings scheduled by the previous SA; however, the Court's IT systems do not automatically do this so a 'work around' was offered. This is what is offered to all staff that request this functionality. This was not acceptable to the AJ or the SA so the ED and DD stayed late and manually entered each meeting on the calendar. Additionally, it was communicated the training from IT was not helpful, that it was confusing. Further, it was reported the Court Support Services (CSS) Director training was not adequate. AJ called ED to chambers to discuss her dissatisfaction with this onboarding process. AJ claimed team member actions related to onboarding were intentional and deliberate because the new hire was an African American female. ED assured her this was not the case and apologized. AJ indicated she was very angry with us and we must have every single issue resolved by the next day or 'heads would roll'. AJ claimed we intentionally did this to make her look bad. Again, ED assured AJ this was not the case. At this point, AJ walked out of chambers leaving ED sitting in the guest chair. ED then met with new SA to ensure there was a clear understanding of all the issues. SA provided three issues, one of which was calendaring which was

resolved manually as systems were not capable of doing what she desired. The other two were resolved through scheduling additional training.

<u>Initial Leadership Meeting</u>

In late spring 2022, AJ sent an email to all the members of the executive team asking them to answer a series of leadership and culture questions, as well as prepare a personal and organizational SWOT analysis. These documents were to be submitted to the AJ in preparation for an upcoming leadership meeting the AJ was scheduling for the executive team.

Leading up to the leadership meeting, the ED inquired several times with the AJ as to the structure and concept for the meeting to be informed and involved as the leadership team reports to the ED. The AJ would not share her vision for the meeting and indicated I would find out at the meeting. Again, the meeting was with all my subordinates and I had no idea or ability to work with the AJ to be a part of a successful leadership discussion.

The leadership meeting was held on August 2, 2022. The meeting went fair although it was awkward and many of the staff were tense, not knowing what to expect. There was an ice breaker where staff shared something personal about themselves and there was an opportunity to have general discussion about some of the items/issued submitted in the leadership question responses.

After the meeting, the AJ, ED and DD stayed after to have a discussion. AJ persistently criticized the ED indicating I should have spoken up first in the ice breaker. I explained I was attempting to give others an opportunity and often if ED or DD speak up first others tend to follow in a similar manner versus be more independent in their thoughts. ED was also criticized for the way in which I sat in my chair, indicating I sat in a tense or awkward manner. AJ also felt that my facial expressions showed I wanted to say something but did not, although I spoke up several times. Again, my mindset was to not dominate the conversation. Further, the AJ did the vast majority of the talking so many times there was not an opportunity to interject. This post-leadership meeting criticism and berating occurred in front of my subordinate, the DD.

<u>2nd Leadership Meeting</u>

A follow-up leadership meeting was scheduled by the ED with the executive team on September 29, 2022. Again, there was no communication between the AJ and ED as to the meeting other than an email that was sent to all the executive team discussing the subject matter would be communication, specifically more communication directly with the Judges. I inquired if there was something I could prepare to be more participatory in the meeting with my subordinates and was advised she was presenting the materials. A PowerPoint regarding basic communication skills was presented to the team. The meeting went fair with some interaction and engagement from staff, including myself.

<u>DEI Director/Manager Situation</u>

In the beginning of 2022, AJ stated she wanted to expand the role of DEI to encompass not only Adult Probation (APD) but also all of Court staff. ED and DD agreed and disclosed we, too, had voiced the desire to expand the DEI efforts to Court staff, along with APD staff, over the last several years, even prior (during Judge Guy Reece's tenure as AJ was when it was first mentioned).

*[Comment: It should be noted the only reason a DEI program exists in the Court is through the efforts to do so by the ED and DD after experiencing racially driven tension among staff in the APD. This position was developed and secured by the ED and DD, along with the CPO and HR Director, in 2017.]*

On July 20, 2022, at a Judges' Access to Justice committee meeting, the AJ invited Valerie Johnson (current DEI manager for APD) to the meeting and announced, unbeknownst to ED, DD or other Judges, she wanted to make Ms. Johnson's position a Director level from her current manager position and have her handle both APD and court staff DEI efforts. The AJ asked the ED for next steps to accomplish this and I advised the committee the following would need to occur: preparation of a proposal for the initiative, as well as a job description for the new position; presentation at the Judges' Personnel Committee and their approval; presentation at the Judges' Finance Committee and their approval; presentation and approval by the full Court; and, approval of funding from the Board of Commissioners (BOC).

*[Comment: It is unheard of to announce a position change, especially a position level and salary adjustment in front of the person that would benefit from the change before that change is approved by the Court and funded by the BOC. Due to the announcement being made in this manner, this situation was made awkward from this point forward.]*

After the Access to Justice committee meeting, the ED, DD and HR Director discussed next steps. Part of the discussion was concerning how this change was structured, as a stand-alone Director position. It was agreed by all that it was the work that was important – not the position level. Further, historically, Ms. Johnson, in her current capacity, often leaned on the HR Director for support and direction. Through our internal brainstorming, we discussed this position remaining a manager level and be placed under the supervision of HR (partially due to training components of DEI, along with the direction and support previously required); however, still introduce and manage DEI for both APD and court staff. We also discussed the Court having a candid conversation around the importance of the bench embracing DEI efforts and encouraging their staff to be participatory to ensure the introduction of these efforts to court staff was successful and meaningful.

*[Comment: At this point, this idea was not discussed with the AJ. One, because the approach needed to be strategized; two, as the proposal had already been discussed by the AJ in front of the person impacted we were unsure how we would be able to walk this back and handle the matter differently.]*

In the meantime, the ED, DD, HR Director, Chief Probation Officer (CPO) and Ms. Johnson continued to meet to discuss a consulting contract related to DEI efforts for both the APD and court staff. There were two separate meetings with all staff included and additional meetings with the HR Director, CPO and Ms. Johnson regarding the same matter. In addition, the cost to increase the position from a manager to a director was added to the 2023 operating budget request. These efforts were made to keep the initiative moving forward, despite the direction ultimately taken related to the position level and reporting structure.

In September of 2022, the DD and AJ met to discuss another matter (ED was out of the office due to my son being hospitalized), during this meeting the AJ asked about the status of the DEI manager becoming a DEI director. The DD responded by explaining to her what the ED, DD and HR Director had discussed as an alternative. After learning we had discussed an alternative, per the DD, the AJ became very upset that we had not come to her with our idea before now. The DD tried to explain that while it was discussed internally (as the executive team does with many matters), we had not approached her yet as we were not certain there was a path to successfully go this route. During this meeting the AJ advised the DD that

the ED, DD and HR Director could no longer be trusted; lacked integrity; and, that she was disappointed in all of us. The DD recognized her frustration but stressed this was one issue/instance and it should not negate all previous interactions and accomplishments. The AJ advised she disagreed and continued to express her anger and frustration stating we should have immediately spoken with her with any alternative ideas.

*[Comment: It is regular practice and an expectation that members of the executive team vet ideas and strategize the best solutions on behalf of the Court. Further, it was not certain that this alternative would or could even be presented due to the manner in way the proposal was introduced.]*

Later the same week, after the DD briefed the ED that this conversation had occurred and how poorly it went, the ED stopped by the AJ chambers with the DD. The ED asked the AJ to have a conversation regarding this matter. The AJ advised the ED she was too frustrated and angry to do so and refused to discuss the matter.

The following week, on September 29, 2022, the AJ called a meeting with all executive team members. The AJ advised the ED only that the meeting was about the DEI position matter and that I should expect it would not be pleasant. During the meeting, in addition to the ED, DD and HR Director, the CPO, Finance Director, and Court Support Services Director were also made to attend; despite having a minimal part of the DEI position discussion. Again, the ED, DD and HR Director primarily discussed this alternative course of action. At the beginning of the meeting the AJ recognized the discussion may not be for all, but anyone who was not involved should know it was not intended for them. Further, the AJ stated this would be a discussion she was having with us, there would not be opportunity for dialogue. During the meeting, the AJ voiced her frustration, stating again she was disappointed and that actions demonstrated a lack of integrity. She advised she lacked trust in us and said she thought we were better than this. She also stated she will not allow us to "do" her. The AJ then specifically addressed the ED as the person she was most upset with because the ED is her direct report. All the ED's subordinates were around the table so this was witnessed by all. The meeting lasted 45 minutes with the AJ repeating many of the frustrations then abruptly ending the meeting and leaving. The ED felt demeaned, belittled, criticized, and harassed during this meeting.

After the meeting, the executive team stayed afterward for about an hour. Many of the staff were confused and many were crying. The ED and DD attempted to talk through the situation with the team members and calm the team members down.

During the meeting between the AJ in DD in September when the AJ first learned the ED, DD and HR Director were brainstorming alternate options for this proposal, it was disclosed that the ED, DD and HR Director had concerns regarding Ms. Johnson performing the work of the DEI Director independently, without support and guidance from the HR Director. This was another point of contention by the AJ.

Considering this, the AJ called another meeting on October 4, 2022 with the ED, DD, HR Director, CPO and Ms. Johnson. The executive team members present were advised by the AJ that we needed to communicate to Ms. Johnson directly during the meeting any concerns we had about her working independently as the DEI Director. Further, she stated that while the AJ and Ms. Johnson were sorority sisters this had no bearing on her ability or inability to do the work. The ED and DD attempted to communicate the concerns, but the meeting became immediately confrontational, as would be expected in this forum. Ms. Johnson was very defensive. The HR Director was noticeably uncomfortable and crying. Further, the HR Director became non-committal about the level of support and guidance she had provided

Ms. Johnson in the past assumedly due to the confrontational nature of the meeting. The AJ was very active in the conversation, challenging most of what the ED, DD and HR Director were saying. In the ED's opinion, the conversation was non-productive with many participants raising their voices and in tears. It was very apparent the AJ did not share the concerns voiced so, personally; I did not feel comfortable being 100% candid. The ED felt demeaned, belittled, criticized, and harassed during this meeting.

After this meeting, the AJ, ED and DD stayed for further discussion. During this time, the AJ continued to criticize, primarily the ED, with the DD present. The AJ repeated much of what had been said previously, restating her lack of trust and belief the ED lacked integrity. Further, the ED was criticized for having a look on my face as though I wanted to say something. Candidly, it was very difficult to get a word in edgewise. Again, this meeting occurred in front of the DD, the ED's subordinate, and the ED felt belittled, criticized, and harassed. At the end of the meeting, the ED asked to have a one on one meeting with the AJ as I had not yet been able to do so regarding this matter.

The following day, the AJ agreed to meet with the ED. The ED started the meeting by indicating I understood the AJ was frustrated and disappointed. ED stated she would work harder to avoid situations such as these in the future. ED stated she valued the AJ's opinion and wanted to work with her in a more productive manner. ED further stated she has always worked very hard to be loyal to the Court and Judges and to reflect the Court in the best way possible. Further, ED stated she had worked with many AJ's over the last 28 years and was confident I could learn, understand, and embrace her expectations. I tried to reiterate our mindset regarding our brainstorming alternative solutions for the DEI situation. I explained that it was commonplace for the executive team to bounce around ideas and strategies and by doing so we were in no way doing so in a manner or with any intent to disrespect her. The AJ repeated her previously stated criticism: stating she could not trust the ED; ED had no integrity; ED's actions did not match words stated. ED suggested a regularly scheduled AJ/ED/DD meeting, as has been done with each of the previous AJ's. AJ agreed but questioned if it was necessary. ED felt harassed, belittled, criticized, and demeaned during this meeting.

AJ/ED/DD Meeting – October 26, 2022

On this date, the AJ, ED and DD had a meeting in the Judge's chambers. The meeting was initially to discuss a recent Personnel Meeting at which new policies and positions were discussed. The meeting then transitioned to discussion pertaining to an anonymous letter received by the Court regarding an employee that recently resigned in the IT Department. AJ advised the ED and DD certain Judges wished to have a meeting to discuss the letter the following day. AJ generally reviewed what she planned to discuss pertaining to the letter, including her opinions. AJ said if an investigation was desired, she would bring up the need to have actions of a certain Judge (unnamed) investigated as they were salacious. AJ advised ED and DD that see believes there is a good cop/bad cop mentality with ED as the good cop and DD as the bad cop. AJ said she believes ED intentionally makes this the case by making decisions and then forcing DD to deliver the message. AJ stated all things that happen are the ED's responsibility. ED tried to explain/express other perspectives but struggled to get a word in edgewise. Meeting continued with criticisms, belittling and demeaning statements towards mostly ED but also DD. AJ stated she talks to a lot of people but would not say with whom or what was conveyed but that she knows "things". AJ indicated all say there is a good cop/bad cop dynamic. AJ then recited an incident shared by the Language Access Coordinator (LAC) to her involving the Finance Director (FD) from 2018/2019. AJ stated FD blocked doorway so LAC could not leave the FD office. Then, DD was required to be present when FD and LAC met.

*[Comment: In finding emails from 3-4 years ago, the situation did not occur as stated. While there was an argument between the FD and LAC, FD did not prevent the LAC from leaving her office. Rather, the FD entered the HR Director office when the LAC was in the HR Director office. FD stated she entered to present her point of view.]*

AJ stated this occurred because of ED/DD poor leadership.

<u>ED Request for Meeting Denied – October 26, 2022</u>

At the end of the day on 10/26/22, ED Teams messaged AJ to request to meet. AJ said no, she would not meet indicating she wanted to only meet with ED/DD together. AJ stated she would meet with ED/DD the next day when DD returned to office.

<u>AJ/ED/DD Meetings – October 27, 2022</u>

1st Meeting: AJ/ED/DD:
AJ shared what transpired in meeting with Judges the day prior regarding the anonymous letter. AJ indicated in summation the Judges indicated DD was the problem and ED was "amazing". AJ indicated she told the Judges that no decision is made without the ED knowing it. AJ spent a good deal of time depicting exchanges she had with other Judges about the AJ and Judges relationships. AJ indicated she felt many of the Judges were disrespectful to her and challenged her integrity. AJ depicted that she called each out with counter points and criticisms. AJ indicated the final outcome of the meeting with the Judges was to have the Personnel Committee look into providing a court wide training on 'Communication'. AJ indicated that one or both of us may not be here in the future and that she would be AJ for 14 more months. ED was then told to leave and sit in conference room so AJ and DD could have a one on one meeting.

After about half an hour, ED was asked to rejoin meeting in AJ's chambers. DD remained in chambers with AJ and ED initially only to discuss that the co-chair of the Judges Finance Committee would have to lead the meeting the following week. DD then left.

2nd Meeting – AJ/ED Meeting:

AJ started one on one meeting with the AJ advising the ED that the ED/DD relationship needed to be recalibrated. AJ indicated that all happenings with any Directors or otherwise were "on me". AJ repeated her belief that ED comes up with plans and decisions and forces DD to communicate on ED's behalf. AJ then reiterated her position from the DEI position situation, indicating she could not and may never trust ED. AJ, once again, questioned ED's integrity. ED interjected to indicate her perception of me forcing DD to communicate my "bad news" was not accurate. ED indicated she and the DD have very different communication styles and while the message may be one ultimately decided by ED, or by the management team as a whole, how it is delivered to DD subordinates by DD can be very different than how ED communicates to others. AJ discounted this comment. ED communicated there are many times when the ED delivers the message. AJ discounted this comment. ED attempted to explain that often DD expresses she should be the person (the only person) that communicates policy/directives/process to her subordinates. ED expressed she has offered and requested to be present countless times. AJ discounted this comment. AJ restated that all happenings are my responsibility and fault. Reiterated, again, she did not trust me because of the DEI situation. ED mentioned the AJ/ED/DD meetings the ED suggested to AJ previously and subsequently scheduled were, again, an attempt to improve communication. ED stated, again, these meetings were scheduled in the past with the other AJ's and worked well to keep the

AJ/ED/DD up to date and informed on ongoing projects and matters. AJ said she accepted the invitation because she is professional but said she felt they were pointless/useless. ED indicated desire to build back trust and would continue to do so. AJ said she did not know if that could happen, but maybe. ED left meeting feeling harassed, belittled, demeaned. Further, ED felt future employment was threatened (see above in blue) and that this is retaliation for the perceived issue of distrust by AJ related to the DEI situation as this incident is repeatedly brought up and discussed by the AJ to the ED, and DD.

AJ/ED/ED Executive Assistant Meetings – November 1, 2022

On October 31, 2022, AJ sent a Teams message to ED and Executive Assistant (EA) stating the following: "Good afternoon. I'd like to meet with both of you tomorrow to discuss Roxlauna's responsibilities and other particulars related to her position. Beyond my morning docket, I have meetings from 1-2 and from 3-4. Please let me know what will work best for you and we can meet in my chambers. Thank you."

ED and EA met with AJ in chambers. AJ asked to be provided clarity as to whom EA directly reports to. ED explained she directly reported to ED; however, the EA was advised at her interview and during onboarding that the EA would be working with all Directors to accomplish projects and in the day to day operations. AJ inquired with EA as to how things were going 'generally'. EA voiced complaints regarding her interactions with the DD. EA depicted several interactions which she believed negative towards her and critical of her work and reporting time. The ED and EA agreed to meet weekly in an attempt to make sure there are set meetings to discuss operations and if there any issues have arisen.

*[Comment: During the meeting, the AJ repeatedly said she did not expect to hear what the EA was reporting. At one point she said she was blown away. It is ED's belief that she expected to hear complaints about the ED, not the DD. If that were the case, this would be yet another example of the ED being confronted in front of a subordinate, further undermining my ability to lead.]*

Zoom Meeting – AJ/HR Director/Ms. Johnson/CPO/DEI Consultant – ED asked to join mid-meeting – November 1, 2022

Mid-meeting the HR Director asked ED to join a meeting between AJ, the HR Director, Ms. Johnson and the DEI consultant. CPO was on the meeting but appeared to leave. When ED joined, the participants were discussing a pending DEI consultant contract and asked ED to review on screen, on the fly and advise if the information provided was suffice.

*[Comment: Versions of this consulting contract were reviewed previously. ED and DD advised the HR Director and Ms. Johnson the contract needed to identify milestones and deliverables within the contract, as a requirement of the Purchasing and Prosecuting Attorney's office. The original version of the contract established a $12,500 monthly fee with a presentation of deliverables broadly defined and not time oriented.]*

ED quickly read through deliverable section of contract. ED advised the group the information appeared suffice and defined. ED confirmed to the group it appeared to include all the information typically required of us by the Fr. Co. Purchasing and Prosecuting Attorney's office in order to have a consulting contract approved.

AJ inquired if doing this contract, this way, we would be confined in scope. Consultant confirmed it was possible but felt in working with Ms. Johnson they had defined most of what was anticipated to be needed. ED suggested we could request a pool of hours to use as needed for training or consulting if we defined the manner the hours would be used and how they would be approved. AJ stated Consultant did not have unlimited time available during 2023 to provide a pool of hours as she was very busy.

*[Comment: This time issue must have been discussed prior to ED joining meeting as ED was not aware the consultant was limited in time. AJ stated she and consultant knew each other and this is how she was aware of her busy schedule]*

Consultant then communicated to group that leaders must support this course of action and she has witnessed other organizations be unsuccessful due to a lack of leadership support. She advised when leaders try to narrow the scope they just want to 'check off a box'. She hoped this was not the case with the Court as if so, she did not want to work with the Court.

*[Comment: This comment by the consultant, while somewhat related to the contract discussions, caught ED by surprise as ED had never met with the consultant, never communicated with the consultant and had certainly never communicated ED was not in support of moving forward. In fact, ED and DD had worked with Ms. Johnson and HR Director to move the contract forward in the manner we understood was required by the Fr. Co. Purchasing and Prosecuting Attorney's office.]*

AJ responded the Court was in support and she would not allow leadership to stand in the way. HR Director reiterated her support of the initiative. ED also communicated support of moving forward and that while there had not yet been the opportunity to meet and have a conversation with the Consultant, ED looked forward to doing so and moving this initiative forward.

Consultant then stated the requirements of Fr. Co. Purchasing and the Prosecutor's office being depicted by the ED were not accurate as she had previous and existing contracts with them which were not structured in this manner. ED responded this has been the requirements for other consulting contracts processed by the Court; however, if the requirements had changed providing courts and agencies more latitude that was unknown to us but good news.

AJ stated her disappointment and stated while she had nothing additional to say at this point, she would have plenty to say later, presumably to ED. She gave the directive to the ED to send the consulting contract, as is, to the Purchasing and Prosecuting Attorney's office yet this evening. The Consultant advised she would send the contract to ED, as revised, immediately after the meeting. ED agreed to do so. As of one and a half hours after the meeting, the ED has not received the contract.

ED spoke with the HR Director after the meeting to inquire why the meeting was so negative and why AJ and Consultant felt the ED was not supportive. HR Director advised she did not know and had not been part of any conversations; however, agreed the AJ appeared to be very angry with the ED and that the AJ was of the opinion the ED had somehow prevented this from moving forward or was not supportive, in general.

*[Comment: Being called into a meeting, mid-way through with little context of what was being discussed was unsettling. Further, the AJ obviously had pre-conceived notions ED was somehow not in support of this initiative. ED has communicated to AJ countless times that the ED was supportive and had previously*

*communicated to AJ the contractual requirements we have been held to previously. Further, AJ allowed Consultant, and in fact joined in, to contradict and criticize ED.]*

<u>Ongoing comments and themes</u>

As many staff have become emotional during meetings and discussions, the AJ has criticized ED, DD, HR Director and others for crying. AJ states, as an African American female, she does not have the luxury of becoming emotional due to stereotypical perceptions.

AJ repeatedly claims that many of the Judges we work with are racist and insensitive. AJ believes the Judges believe she will fail in this role because she is an African American female.

AJ repeatedly advises ED and DD to allow the other Directors on the executive team to operate independently and 'fly or fail'. This comment pertains to presenting at meetings, as well as preparing written correspondence. However, AJ also advises ED that all actions taken by the DD or Directors is the responsibility of the ED and the ED will be held accountable for each failure, perceived or otherwise.

AJ consistently criticizes, demeans and belittles the ED in front of subordinates undermining ED's ability to effectively lead. She calls meetings consistently with ED's subordinates and discusses ED with them. Sometimes these meetings are with the ED; sometimes the meetings are with only the subordinates (refer to several examples of these meetings stated above).

AJ purposely excludes ED and DD from meetings. As an example, the AJ, CPO, HR Director and Ms. Johnson had a meeting with a DEI consultant on 11.01.22 at 3pm. The ED and DD were not invited to attend, nor informed. The DEI Director is supposed to be a direct report to the ED. It is not productive or effective to exclude the ED and DD when they have the expectation and ultimate responsibility (ED) to ensure all actions and initiatives of the team are successful.

<u>History</u>

AJ has a history of being displeased with her personal staff. Some of this displeasure has resulted in termination of her employees. Others is discontent with an employee after they have resigned. All have stated an inability to meet expectations and work AJ.

- Amy Flowers, Bailiff (resigned)
- Amy Cooper, Staff Attorney (resigned)
- Prior Staff Attorney (termination)
- Rachel Cook, Secretary (resigned, works for another Judge in same capacity)
- Jill Dunlevy, Bailiff (termination)

Signed:

/s/ Jennifer Goodman



**Franklin County
Common Pleas Court - General Division**

**Policy:** Anti-Harassment
**Qualifying Employees:** All employees of the Common Pleas Court – General Division
**Approved by the Court of Common Pleas:** December 10, 2014
**Date Policy Effective:** December 10, 2014
**Date Policy Revision Effective:** February 23, 2016

## ANTI-HARASSMENT POLICY

The Franklin County Common Pleas Court strives to maintain a workplace that fosters mutual employee respect and promotes harmonious, productive working relationships. The Court believes that discriminatory harassment and retaliation in any form constitute misconduct that undermines the integrity of the employment relationship. Therefore, the Court prohibits discriminatory harassment that is based upon race, sex, sexual identity, religion, color, national origin, ancestry, gender identity or expression, sexual orientation, age, military/veteran status, disability, familial status, genetic information, or on any other basis that would be in violation of any applicable federal, state, or local law. This policy applies to all employees throughout the organization and to all individuals who may have contact with any employee of this organization, including suppliers, subcontractors, visitors and volunteers.

The Court strictly forbids any conduct that constitutes discriminatory harassment. The Court will not tolerate a hostile environment created or maintained in the workplace. Any employee found in violation of this policy will be subject to disciplinary action, up to and including termination.

Unwelcome sexual advances, requests for sexual favors, or other verbal, visual, or physical conduct of a harassing nature will constitute harassment when the person involved feels compelled to submit to or tolerate that misconduct in order to keep his/her position, to receive appropriate pay, or to benefit from employment decisions.

Further, misconduct that interferes with an employee's work or creates an intimidating, hostile, or offensive work environment may also be considered harassment. This behavior can include but is not limited to suggestive or insulting noises, facial expressions, vulgar language, nicknames, slurs, sexually suggestive comments, derogatory comments, cartoons, jokes, written materials, and offensive gestures or touching.

I.  Reporting discriminatory harassment - The Court expects that everyone will act responsibly to establish a pleasant and friendly work environment.

   A.  Any employee who believes he/she has been subjected to and/or witnessed any form of discriminatory harassment must report that conduct to any of the following individuals within a reasonable amount of time: a Director level employee, a Deputy Director level employee, the Executive Director of the Court, the Chair of the Personnel Committee, the Presiding Judge, or the Court's Administrative Judge. Employees are not required, but are permitted, to approach the person who is harassing them, and they may bypass any



EXHIBIT

25

offending member of management. The person the harassment is reported to will take the necessary steps to report the information to the Administrative Judge in order to initiate an investigation of the harassment claim.

B. In the event that a claim involves the Administrative Judge, the complaint may be made to the Chair of the Personnel Committee or to the Presiding Judge of the Court.

C. The employee, whether the subject of or a witness to the harassment, is assured that no retaliation will result from reporting the issue.

D. All complaints are treated seriously and, unless the complainant is satisfied with the agreed upon corrective action, shall be thoroughly investigated as set forth in Section II.

II. Investigation - the Court will conduct its investigation in a professional and expeditious manner and will keep the complaint and investigation confidential to the extent such confidentiality is possible and allowed by law.

A. Interviews, allegations, statements, and identities will be kept confidential to the extent possible and allowed by law. However, the Court will not allow the goal of confidentiality to be a deterrent to an effective investigation.

B. Typically the inquiry will be made by the Director of the Human Resources Department, the Deputy Director of the Court and the Executive Director. Where a complaint involves a sitting judge, a visiting judge or a magistrate, the inquiry shall also include the Administrative Judge. Where a complaint involves the Administrative Judge, the inquiry shall also include the Chair of the Personnel Committee (excluding the Administrative Judge). Where a complaint involves the Executive Director, the inquiry shall also include the Administrative Judge (excluding the Executive Director) who will name the other two members of the panel.

C. Any conduct involving any indictable offense (e.g. assaultive behavior) may also be referred to the appropriate law enforcement agency.

D. In the event that the person reporting the claimed discriminatory harassment reports it to an outside agency, the Court shall conduct its inquiry upon learning of the report.

E. A timely resolution of each complaint will be reached and communicated to the employee as well as the alleged wrongdoer.

F. Reports or complaints made in bad faith may lead to disciplinary action, up to and including termination.

G. Appropriate corrective action, up to and including termination, will be taken promptly against any employee who is found to have engaged in or ignored discriminatory harassment. The corrective action issued will be proportional to the severity of the conduct. The alleged wrongdoer's employment history and any similar complaints or prior conduct may be taken into consideration.

2

III.      Judicial employees serve at the pleasure of their Judge. Ordinarily, it is within the sole discretion of that individual Judge to determine whether to hire, fire, or utilize the disciplinary steps outlined in this policy in reference to that Judge's judicial employees. In serious circumstances, following notice to the supervising Judge, the Administrative Judge and Personnel Committee may take action to investigate and/or place a judicial staff member on a paid administrative leave, pending action by a majority of the Court.

IV.      The Court prohibits retaliation of any kind against employees, who, in good faith, report harassment or assist in investigating such complaints.

    A.  If an employee feels he/she has been subjected to any form of retaliation, the employee should report that conduct to any of the following individuals within a reasonable amount of time: a Director level employee, a Deputy Director level employee, the Executive Director of the Court, the Chair of the Personnel Committee, the Presiding Judge, or the Court's Administrative Judge. Employees are not required, but are permitted, to approach the person who is retaliating against them, and they may bypass any offending member of management.

    B.  All complaints are treated seriously and, unless the complainant is satisfied with the agreed upon corrective action, shall be thoroughly investigated as set forth in Section II.

    C.  Reports or complaints of retaliation made in bad faith may lead to disciplinary action, up to and including termination.

    D.  Appropriate corrective action, up to and including termination, will be taken promptly against any employee who is found to have engaged in or ignored retaliation. The corrective action issued will be proportional to the severity of the conduct. The alleged wrongdoer's employment history and any similar complaints or prior conduct will be taken into consideration.

V.      Training- Discriminatory harassment training is required for all employees, bi-annually. Judicial employees will schedule the training based upon the convenience of the Judge.

VI.     Nothing in this policy changes an employee's at-will status.

3



**Franklin County**
**Common Pleas Court - General Division**

**Policy:** Anti-Harassment
**Qualifying Employees:** All employees of the Common Pleas Court, including Judges personal staff
**Initially Approved by the Court:** December 10, 2014
**Initial Effective Date:** December 10, 2014
**Date Amended by the Court:**    February 18, 2020
**Date Amended Policy Effective:** February 18, 2020, September XX, 2024
**Previous Amendment Dates:** February 23, 2016, February 18, 2020

---

## I.    PURPOSE

The court prohibits harassment or discrimination by or against all employees, vendors, clients, and visitors. It is the policy of the court to provide a working atmosphere free from discriminatory insult, intimidation, or other forms of harassment. All conduct listed in this section is prohibited. Not only may the conduct be illegal, but such behavior may discredit the court and impair its efficient and effective operation.

The court has a strict policy against any form of unlawful discrimination. This policy prohibits both discrimination based on any protected characteristics, and retaliation against a person who opposes or complains about prohibited conduct or who participates in any way in the complaint, investigation, or reasonable accommodation processes.

## II.    PROHIBITED CONDUCT

**Discriminatory Harassment**: Discriminatory harassment is any conduct that purposefully or effectively creates an intimidating, hostile, or offensive work environment; substantially and unreasonably interferes with an individual's work performance; or otherwise negatively impacts an individual's employment opportunities due to their membership in a protected class (age, ancestry, color, disability that does not prohibit performance of essential job functions, familial status, gender, gender identify or expression, genetic information, HIV/AIDS status, military status, national origin, pregnancy, race, religion, sex, sexual orientation, protected veterans status, or any other basis that would be in violation of any applicable federal, state, or local law).

Discriminatory harassment encompasses a wide range of behaviors, including but not limited to: epithets, slurs, jokes, pranks, innuendo, comments, written or graphic materials, stereotyping, or any other threatening, hostile, or intimidating acts based on various protected characteristics under the law. Even derogatory remarks between friends may lead to overt acts of unlawful discrimination.

**Sexual Harassment:** Sexual harassment, as defined by both state and federal law, includes unwelcome sexual advances, requests for sexual favors, or any other verbal or physical conduct of a sexual nature that:

- Explicitly or implicitly conditions employment or employment decisions on submission to or rejection of such conduct.
- Unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive work environment.

Additionally, any sexually oriented conduct, whether intended or not, that is unwelcome and creates a hostile, offensive, intimidating, or humiliating work environment may constitute sexual harassment.

**Unbecoming Conduct:** Unbecoming conduct refers to behavior that raises doubts about a person's integrity, honesty, moral judgment, or character. Unbecoming conduct also includes any threatening or intimidating acts.

**Disparate Working Conditions**: Any conduct based on inequitable or disparate factors which affects an employee's working conditions. Working conditions include, but are not limited to, working hours, schedules, breaks, physical environment, safety, and disciplinary processes.

All conduct listed in this section is prohibited. Not only may the conduct be illegal, but such behavior may discredit the court and impair its efficient and effective operation.

## III.    COMPLAINT PROCEDURE

A. Any employee who believes they have experienced or witnessed harassment of any type may report the conduct to their direct supervisor, a manager/director within their chain of command, or the Director of Human Resources.

B. Complaints should be promptly submitted, preferably in writing, following an incident. The facts of the incident or incidents and the names of the individuals involved shall be contained in the complaint.

C. Direct supervisors, managers, or directors who receive complaints shall immediately report any complaints of harassment to the HR Department. The HR Director or their designee will investigate all such claims and take appropriate action. Investigation may include conferring with parties and witnesses named by the employee reporting the harassment. Because of the sensitive nature of such complaints, incidents must be investigated with particular care and should remain, to the extent possible, strictly confidential. Retaliation against individuals who make good faith complaints is strictly prohibited.

D. Employees have the option to approach the person harassing them, but are not required to do so, and may bypass any offending member of management by going directly to HR.

E. If the complaint involves a Judge, the Director of Human Resources shall notify the Executive Director who shall report the allegation to the Administrative Judge for whatever action the Court considers appropriate.

F. If the complaint involves the Administrative Judge, the Director of Human Resources shall notify the Executive Director who shall report the allegation to the Presiding Judge for whatever action the Court considers appropriate.

## IV. INVESTIGATION

A. Upon receiving a complaint or being informed of a potential policy violation, the supervisor, manager, or director shall notify the Director of Human Resources.

B. The Director of Human Resources will notify the Executive Director, or designee, and the prosecutor's office of the complaint.

C. An investigation will be initiated and will be conducted by either the Director of Human Resources or a designee. The complainant, respondent, and any witnesses will be interviewed during the investigation.

D. Following the investigation, the Director of Human Resources or designee will prepare a written report of the findings. The Director of Human Resources will review the report and make recommendations.

E. The Executive Director or designee will review the report and recommendations, deciding on the appropriate action.

F. If a policy violation is confirmed, appropriate disciplinary action will be recommended, considering factors such as the severity, frequency, and pervasiveness of the conduct, previous complaints, and the quality of

evidence. If the investigation is inconclusive or no policy violation is found, preventive action may be recommended by the Director of Human Resources.

G. The Director of Human Resources will separately meet with the complainant and the respondent to communicate the investigation's findings.

## V. CONFLICTS

A. Director of Human Resources – if the party or witness to an incident reported under this policy is the Director of Human Resources, the Executive Director shall designate another member of the Executive Team to perform the duties of the Director of Human Resources as required by policy.

B. Executive Director – if the party or witness to an incident reported under this policy is the Executive Director, the Administrative Judge shall perform the duties of the Executive Director as required by policy.

C. Administrative Judge – if the party or witness to an incident reported under this policy is the Administrative Judge, the Presiding Judge shall perform the duties of the Administrative Judge as required by policy.

## VI. RETALIATION

A. Retaliation against employees who report conduct under this policy or assist in investigations is strictly prohibited.

B. Employees experiencing retaliation should report the conduct following the established reporting structure.

## VII. TRAINING

A. Anti-Harassment training is required for all employees, bi-annually.

## VIII. PERSONAL STAFF

A. Personal staff members serve at the discretion of their supervising Judge. The Judge typically decides on hiring, firing, or utilizing the steps outlined in this policy. In serious cases, with notice to the supervising Judge, the Administrative Judge and Personnel Committee may investigate and/or place a personal staff member on paid administrative leave.

## Cocroft, Kimberly X.

| | |
|---|---|
| **From:** | Cocroft, Kimberly X. |
| **Sent:** | Monday, November 7, 2022 1:22 PM |
| **To:** | Goodman, Jennifer L.; Frye, Richard A. |
| **Subject:** | RE: Career Fair Inquiry - GCCC |

Awesome. Thank you, Jennifer and Judge Frye.



**Judge Kimberly Cocroft**
**Administrative Judge**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.7200 | (F) 614.525.4641**
Kimberly_Cocroft@fccourts.org | http://www.fccourts.org

---

**From:** Goodman, Jennifer L. <Jennifer_Goodman@fccourts.org>
**Sent:** Monday, November 7, 2022 1:09 PM
**To:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>; Frye, Richard A. <Richard_Frye@fccourts.org>
**Subject:** RE: Career Fair Inquiry - GCCC

Good Afternoon Judges:
I forwarded this to Valerie Johnson, APD Services & Inclusion Manager, upon receipt due to the short timeframe. She typically sends this type of communication to the Department. She has responded that she will disseminate this to staff right away so they have time to communicate the same to their probationers. Valerie also advised she will have this information added to the monitors that are located in the probation lobby. Thank you for sharing! Have a good afternoon!



**Jennifer Goodman**
Pronouns: She/Her/Hers
Executive Director
**Franklin County Common Pleas Court**
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
**(P) 614.525.4147 | (F) 614.525.4480**
Jennifer_goodman@fccourts.org | http://www.fccourts.org

---

**From:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Sent:** Monday, November 7, 2022 12:48 PM
**To:** Frye, Richard A. <Richard_Frye@fccourts.org>
**Cc:** Goodman, Jennifer L. <Jennifer_Goodman@fccourts.org>
**Subject:** RE: Career Fair Inquiry - GCCC

Good afternoon, Judge and Jennifer:



**EXHIBIT**

27

Thank you for passing this along. I think sharing this with Probation is a great idea. There is a short turn-around time since the event is Wednesday but it never hurts to present an opportunity. Jennifer, what are your thoughts? Judge Frye, did you plan to forward this to Walt?

Judge KC



**Judge Kimberly Cocroft**
**Administrative Judge**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.7200 | (F) 614.525.4641**
Kimberly_Cocroft@fccourts.org | http://www.fccourts.org

---

**From:** Frye, Richard A. <Richard_Frye@fccourts.org>
**Sent:** Monday, November 7, 2022 12:40 PM
**To:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Cc:** Goodman, Jennifer L. <Jennifer_Goodman@fccourts.org>
**Subject:** FW: Career Fair Inquiry - GCCC

Attached is an email from the Convention Center about a hiring/career fair there this Wednesday. I wonder if this should be shared with our Probation Dept. so that people having trouble getting employed can be alerted by their PO?

Richard A. Frye, Presiding Judge
Franklin County Common Pleas Court
345 South High Street, Courtroom 5F
Columbus, OH 43215
614-525-3811; 614-525-2464 (fax)
Richard_Frye@fccourts.org

---

**From:** Leslie Nutter <LNutter@columbusconventions.com>
**Sent:** Monday, November 7, 2022 11:16 AM
**Subject:** Career Fair Inquiry - GCCC

Hello,

I am Leslie Nutter, Marketing & Media Manager for the Greater Columbus Convention Center. I received your email from our sales and events team. On November 9, 2022 we will be hosting an interactive Career Fair at our North Atrium. We would love if you could help us get the word out! Below is general information about the event.

- **Date:** Wednesday, November 9, 2022
- **Time(s):** 11:00am – 2:00pm and 3:30pm – 6:30pm
- **Location:** Greater Columbus Convention Center – North Atrium
- **Cost:** FREE to the public
- **This Career Fair Features:**
    - Open interviews
    - Meet-and-greets with convention center management
    - Behind-the-scenes demonstrations
    - Free food and snacks
    - The chance to get hired on the spot!

- **Free Parking:** Goodale Garage, 70 E. Goodale St.
- **Register Here:** https://bit.ly/careerfairgccc
- **Apply Ahead:** https://columbusconventions.com/employment/

We also have a flyer available to visually help with promoting the Career Fair.

Thank you for your support!

Thank you,


**Leslie Nutter, CTA**
Marketing & Media Manager
Greater Columbus Convention Center/ASM Global
Direct: (614) 827-2605  in f 🐦 ▶️ 📷 📌

www.columbusconventions.com
www.asmglobal.com

  

#CBusConventions


Notice: This email may contain confidential and/or proprietary information and is intended only for the use of the Individual(s) or entity(ies) named above. Any unauthorized use, dissemination, or copying of this email is strictly prohibited if you are not the intended recipient of this email. If you have received this email in error, notify the sender by replying to this message and delete the email from your system. When responding to this communication, remember that it could be lost in transit and viewed by a party other than the addressee.