"I know we have not worked this closely together for a long time but you have impacted me in so many ways in this short time. It was your talk on our way back

Quite frankly, it probably saved my life.

From the bottom of my heart, thank you."

The above is a text message that I received from Executive Director, Jennifer Goodman. It is difficult to reconcile that someone who expressed these sentiments would now allege that I have acted in ways that are wholly inconsistent with who I am both personally and professionally.

For over 14 years, I have served as a Judge in the General Division of the Court of Common Pleas with pride, professionalism and passion. I believe in the work that I do on behalf of the citizens who elected me and have a demonstrated record of success both inside and outside of the courtroom. I have been recognized for my commitment to the causes of fairness and equality in the justice system and I take seriously my oath to treat not only persons who appear before me, but those with whom I work with dignity and respect. As such, I deny unequivocally each and every allegation contained in Ms. Goodman's complaint.

To say that I am stunned by what is alleged would be an understatement. On Friday, November 4, 2022, after participating in what was scheduled as an Assigned Counsel Board meeting, I was blindsided with a surprise notice of the allegations by Judge Frye (though he did not provide me with the complaint, itself until Monday, November 7, 2022). After communicating to me his seeming belief that everything articulated in the complaint was true, without giving me an opportunity to view or to respond to the complaint, Judge Frye proposed the following solution based on Ms. Goodman's request – if I would resign as Administrative Judge for 2023, then she would withdraw her complaint and allegations. On November 7, 2022, Judge Frye clarified his solution to explain that the idea of my resignation was advanced by both Judges Frye and O'Donnell and that it was framed in the context of "If" I resigned, then would Ms. Goodman withdraw her complaint, with her apparently responding in the affirmative. At best, the proposed "solution" is tantamount to blackmail – demanding a benefit from someone in return for not revealing alleged compromising or damaging information. At worst, it is a hasty rush to resolution wherein the accused is presumed guilty with no opportunity to prove innocence. It is with this understanding that I provide the following response to the unfounded, untrue, and unfair allegations.

During my tenure with the Court, I have been a member of several committees central to the operation of the Court with the hopes that, one day, I would have enough knowledge about the inner workings of the Court to feel comfortable enough to offer my name for consideration as Administrative Judge. That time came in July 2021, and I was unanimously elected by the judges


EXHIBIT
28

to serve in this important capacity. With my election, I became the first woman to serve as Administrative Judge in the General Division. Because of the novelty of my election, I knew that I would have to approach the service opportunity with an additional layer of focus, attention to detail and consistency. The fact of the matter is that, as a Black woman, there is often a different measure of achievement and accomplishment associated with my work; that is not a reality with which I lead or use as a crutch. But it is an inescapable truth that I have navigated for my entire professional career. However, I was excited about the opportunity to serve and to work with Ms. Goodman and other members of the leadership team, even though, as a judge, I have both heard about and received written record of complaint about Ms. Goodman's interaction with employees in both Court and Probation departments. Nevertheless, I came to the experience with a positive attitude and desire to create a strong work relationship.

I also came with vision – vision for how we could build on the solid foundation already existing while addressing gaps in our delivery of services to justice-involved individuals. I also had vision for enhancing our relationship with justice partners and opening lines of communication that even Ms. Goodman acknowledged were challenging relative to the Court's relationship with justice partners like the Clerk of Courts, the Franklin County Sheriff's Office, and the Franklin County Prosecuting Attorney's Office. I shared my vision with Ms. Goodman and other administrative leaders through my guiding theme of continuing "R.A.I.S.E. The Bar" and the administrative leaders were openly enthusiastic about the opportunity for growth. Ms. Goodman, however, expressed an immediate concern about the guiding theme and became defensive about her perception that the guiding theme suggested that the Court was not a good place to work. I told her that my goal was to enhance what existed currently and to build on the foundation to make the Court even stronger. From that moment, I understood that I would have to be thoughtful and careful in how I interacted with Ms. Goodman.

Despite her initial trepidation, Ms. Goodman became increasingly grateful for my service leadership. In fact, she asked me to begin talk with our justice partners to stabilize relationships that were both difficult and struggling. For example, the Court had experienced several issues associated with the implantation of our updated Case Management System and Ms. Goodman asked if I would be willing to talk with the company implementing the new technology to address challenges that every General Division Director involved in the implementation process shared with me. I was happy to facilitate positive resolutions and the relationship has, in fact, improved, after years of dysfunctional interactions.

Initial Leadership Meeting

As I navigated my responsibilities and observed the interactions of Ms. Goodman with others, it, became clear to me that there was limited opportunity for them to do the jobs they were hired to do. My observations were confirmed by Directors during the first quarter of 2022 when Ms. Goodman was out of the office. During that time, every Director expressed to me that Ms. Goodman micromanaged their work, second-guessed their work product, interrogated them about time out of the office and hindered almost completely their ability to make any decisions

2

consistent with the positions to which they were hired. Every Director also expressed to me that each was afraid to raise these issues with Ms. Goodman because, historically, there had been swift backlash and repercussions, and each was fearful that collateral consequences would result from any attempt to speak up for themselves either directly to Ms. Goodman or to the Judges of the Court. In truth, prior to Ms. Goodman's return to the office at the end of the beginning of the second quarter of 2022, the administrative team was working, they were smiling (sounds like a small thing but one Director told me that it was the first time she felt comfortable laughing out loud on the second floor) and they were excited and enthusiastic about coming to work. But upon Ms. Goodman's return, the energy and enthusiasm disappeared, and Directors shared how they once again felt constrained in their ability to do the work they were hired to do.

Because I know that organizations work best when employees have the latitude to operate in their areas of expertise and because I know that every Director has a wealth of knowledge that deserves to be used, I tried to find a way to address their concerns while protecting the integrity of every employee, including Ms. Goodman. To that end, I implemented quarterly leadership team meetings during which I would present information on a given topic to not only build increased team synergy but to address the consistent concerns expressed by Directors. The first leadership meeting, which was originally scheduled for June 2022, focused on personal and corporate S.W.O.T. (Strengths, Weaknesses, Opportunities, Threats) analyses. In addition to the analyses, I posed the following questions:

1. How do I define the culture of FCCP-GEN?
2. How do I believe that others define the culture of FCCP-GEN?
3. What am I doing that impacts positively the culture of FCCP-GEN?
4. What am I doing that impacts negatively the culture of FCCP-GEN?
5. Am I the best Leadership Team member that I can be? If yes, then why? If no, then why?
6. Do I trust my Leadership Team members? If yes, then why? If no, then why
7. Do you trust your leadership team members? If yes, then why? If no, then why?

I told every Director that I hold the information in confidence and without attribution in my continuing effort to protect the integrity of every Director, including Ms. Goodman. With almost no deviation, every Director, except for Ms. Goodman, shared the following thoughts (in no particular order):

- Culture defined internally by Directors as restrictive, focus on status quo, no desire to change or to implement progressive options, no opportunity to interact with judges, no connection to the people, selfish motives and inability to be empathetic, rigid leaders, fear of offering new ideas, disappointing, cliques, racism, fear, anger, employees being isolated or punished when they don't do what's always been done.

- Culture defined externally by others as prestigious work opportunity, segmented internal staff, very little faith in Executive Director, negative, uncaring, failure to address cultural differences, petty, superficial biases.
- No trust of leadership team based on lies, manipulation, and sabotage by people who have the power to get away with choices that impact others negatively, no celebration of successes, inauthentic work relationships, micromanaging, questioned, not given the benefit of the doubt, pettiness which creates distrust, Executive Leader has no faith in Executive Team.
- Interestingly, the election of a new Administrative Judge with a new philosophy was viewed as an opportunity. However, the consistent themes relating to Weaknesses and Threats revolved around continuing to do business as it has always been done, failing to recognize the necessity and DEI and issues related to social justice, not integrating Directors into more interactions with Judges, not giving all Directors an opportunity to serve as an Ex Officio member of Court Committees, frustration with lack of communication by superiors, non-progressive culture and requiring too many meetings.

While Ms. Goodman represents that she has more than 28 years of experience that allow her to have an in-depth understanding of the Court, its employees and its operations, her S.W.O.T. analysis was in complete opposition to every Director. For example, in discussing how she defines the culture, she wrote, "[I]n speaking with newly hired staff, we receive a lot of feedback that the culture in our Court is much more engaging and transparent than where they have come from, which is positive." When providing her perspective on how the culture is defined externally, she stated, "[W]e want others to we engage with to find our Court and staff approachable and willing to work with others to resolve issues and build relationships. (Emphasis added.) She identified weaknesses and threats as "[B]eing open to change proposed and desired by justice partners and the inability to provide desired benefits that would help retain staff." Based on my review of the conflicting views, I realized quickly just how entrenched the differing perspectives and beliefs were.

Ms. Goodman has told one truth – I did not give her a detailed account of what the meeting would be, beyond the specifics provided in the calendar invite for this event. In truth, I did not know what the encounter would be because I knew I had a responsibility to manage the information in a way that protected the integrity of everyone who was willing to share their thoughts, including Ms. Goodman. And while she seems to suggest in her allegations that she had a right to know the sum and substance of what would transpire in the meeting based on her position, the Table of Organization for the Court places the position of Administrative Judge as the supervisor for the Executive Director. In that regard, I did not believe I was required to explain how I would lead the meeting or to get her approval regarding its contents.

I recall that, in presenting the information, I was intentional about not identifying who believed or said what. However, whenever I would review something that Ms. Goodman perceived as a

negative, she would offer a comment to demonstrate how what was shared was not true and that the Directors worked well together and were supportive of one another. And I commented that my goal was not to undermine any of the hard work that anyone had done but to give everyone an opportunity to speak freely so that the Team could grow and move forward in an even more positive way.

Prior to discussing the S.W.O.T. analysis information, there was an icebreaker exercise so that the Directors could learn some things about each other. I asked if someone would volunteer to start the conversation after I did a very abbreviated introduction. I was hopeful that Ms. Goodman, as the Executive Director (and through her own words, the supervisor for "all my subordinates"), would begin the icebreaker introductions. The other Directors were literally looking at Ms. Goodman and waiting for her to begin. Instead, she sat in silence and another team member started the conversation. In truth, Ms. Goodman was the last person to speak and there was an obvious tension in the room among the other members based on what appeared to be her lack of engagement. Despite the tension, the Directors all said that they learned things they never knew about the Directors with whom they've worked for years, and that they appreciated the opportunity to get to learn more about their co-workers' personal and professional journeys.

At the conclusion of the meeting, I talked with Ms. Goodman in the presence of the Deputy Director. And I said that I was surprised that she did not start the icebreaker session because, in watching the other Directors, I could see that they were waiting for her to lead the conversation and were attempting to take cues from her. Ms. Goodman said that she was trying to give the others an opportunity to speak, and I encouraged her to lean into her role as Executive Director and to set an example for active and open engagement. I shared that her body language seemed closed off to the conversation and that, frequently, when Directors would share their concerns, she would often undercut what they were saying and reframe their thoughts in a way that she deemed more favorable. Ms. Goodman and I exchanged more thoughts and took the elevator to the garage together. After exchanging small pleasantries, we all departed. The next day in the office, I sent Ms. Goodman several email and Teams communications to which she did not respond. But I continued to do work and presumed she would respond to me eventually. However, she remained so quiet that, in one text exchange, I asked the Deputy Director, "Is Jen here today?" Then, about three days after the event, Jen came to my office with the Deputy Director and admitted that she was upset because she perceived that I was unhappy with her in some way. However, she stated that, after talking to the Deputy Director, she realized that she was allowing her insecurities to get the best of her and that she understood that I was just trying to grow the Leadership Team. She committed herself to being open to learning more and again commented that, while we had not worked together for a long period of time, she had learned so much from me and wanted to learn to become a stronger manager and leader.

Finally, while Ms. Goodman attempts to suggest that I spoke so much that no one else had an opportunity to talk, the meeting actually ran 30-40 minutes longer than scheduled so that every

employee had an opportunity to be heard. And when I suggested that we could cut the meeting short if the Team had things they needed to do, every Director remained and commented that they were enjoying the conversation.

<u>Onboarding Situation</u>

One of the responsibilities of the Administrative Judge is to sign hiring packets for all new employees. On June 3, 2022, I signed the hiring packet for my new Staff Attorney and the offer of employment was extended by the Director of Human Resources. Because my Staff Attorney was moving from another state to accept the position, we selected a start date of July 5, 2022 with the understanding that I would be out of the office so that I could attend a necessary medical appointment due to an unexpected health concern. Ms. Goodman and other members of the Administrative Team were aware of my scheduled time out of the office but assured me that everything would be in place to ensure a smooth onboarding policy. In fact, prior to my new Staff Attorney joining my chambers, I answered many questions for Ms. Goodman and others related to the transition process for my new staff to ensure that emails would be directed to another employee until my new Staff Attorney started and other logistical issues associated with her start date. On July 5, I reached out to my new Staff Attorney and assured her that her arrival was anticipated and that she would have everything she needed to transition successfully. To my dismay, that was not the case. When I came to the office on Tuesday, my Staff Attorney shared that there was almost nothing that she was able to do – from accessing the calendar of the prior Staff Attorney or my calendar, receiving a copy of the motions docket, being trained on how to access voice mails, having access to the Efile Review – nothing was available to her. In fact, it was almost as if no one knew she was starting. I was admittedly disappointed and sent the following email on July 6 at 10:25am:

**From:** Cocroft, Kimberly X.
**Sent:** Wednesday, July 6, 2022 10:25 AM
**To:** Goodman, Jennifer L. <Jennifer_Goodman@fccourts.org>; Bedsole, Susan E. <Susan_Bedsole@fccourts.org>; Worthington, Stacy A. <Stacy_Worthington@fccourts.org>; Davis, Cameo E. <Cameo_Davis@fccourts.org>; Scott, Christopher M. <Christopher_Scott@fccourts.org>
**Subject:** New Staff Attorney - Daenayia Harris

Good morning:

I wanted to touch base regarding my new Staff Attorney's transition to the position. In conversation with her today, she shared some issues that arose on yesterday.

First, the IT person with whom she trained stated that he could not answer most of her questions because he did not work court-side IT. I do not know with whom she met but I would appreciate Daenayia having the opportunity to talk with someone who can answer her questions.

The other IT issue that exists is if or how entries that were on the calendar for my previous Staff Attorney can be transferred to Daenayia's calendar. I was talking with her about status conferences that are set for next week and she had no idea what I was referencing because those entries have not been made available to her. I don't know if it is possible to do a transfer or if I will have to manually forward those calendar invitations to her.

Next, we do not keep an abundance of supplies here in chambers and I want to confirm that the 2nd floor supply room is available for staff, as well. I do not believe that there was conversation with Daenayia regarding the process for requesting supplies that she will need for her office so it would be helpful if someone could review that with her.

Finally, Daenayia shared with me that a review of efile system will not take place until Friday. In the interim, I have asked Isaac Rinsky to share insights with her and then the training of Friday can supplement the information he provides. I believe that my prior Staff Attorney created a binder of my preferences and left it with Stacy for purposes of training so I would appreciate that information being reviewed, as well. For example, all of my civil status conferences are through the telephonic Teams system, so Daenayia will need to learn how to create and assign that information.

I think that's all for now but will let you know if there are other issues as I confer with Daenayia.

Thanks and be well.

Best,
Judge KC

At 3:29pm, the Deputy Director sent the following "collective responses" to my 10:25am email (answers are in blue):

**From:** Bedsole, Susan E. <Susan_Bedsole@fccourts.org>
**Sent:** Wednesday, July 6, 2022 3:29 PM
**To:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>; Goodman, Jennifer L. <Jennifer_Goodman@fccourts.org>; Worthington, Stacy A. <Stacy_Worthington@fccourts.org>; Davis, Cameo E. <Cameo_Davis@fccourts.org>; Scott, Christopher M. <Christopher_Scott@fccourts.org>
**Subject:** RE: New Staff Attorney - Daenayia Harris

Good afternoon Judge:

Thanks for the email, please see our collective response below.
**From:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Sent:** Wednesday, July 6, 2022 10:25 AM
**To:** Goodman, Jennifer L. <Jennifer_Goodman@fccourts.org>; Bedsole, Susan E.

<Susan_Bedsole@fccourts.org>; Worthington, Stacy A. <Stacy_Worthington@fccourts.org>;
Davis, Cameo E. <Cameo_Davis@fccourts.org>; Scott, Christopher M.
<Christopher_Scott@fccourts.org>
**Subject:** New Staff Attorney - Daenayia Harris

Good morning:

I wanted to touch base regarding my new Staff Attorney's transition to the position. In conversation with her today, she shared some issues that arose on yesterday.

First, the IT person with whom she trained stated that he could not answer most of her questions because he did not work court-side IT. I do not know with whom she met but I would appreciate Daenayia having the opportunity to talk with someone who can answer her questions. We are happy to answer any questions she has, she has already spoken with Chris Scott and he answered her couple of questions.

The other IT issue that exists is if or how entries that were on the calendar for my previous Staff Attorney can be transferred to Daenayia's calendar. I was talking with her about status conferences that are set for next week and she had no idea what I was referencing because those entries have not been made available to her. I don't know if it is possible to do a transfer or if I will have to manually forward those calendar invitations to her. Every person has their own individual calendar that is private only to them (unless permission is given for access of course). When a person leaves the Court, their account is terminated and their email/calendar ceases to exist. Although Microsoft can export calendars (unless there are private meetings, then it can't export), we don't normally do so because most calendars contain personal information and it wouldn't be appropriate to copy over onto another person's calendar. Chris S will give her access to see Amy's old calendar temporarily and will show her how to manually add them to her calendar.

Next, we do not keep an abundance of supplies here in chambers and I want to confirm that the 2nd floor supply room is available for staff, as well. I do not believe that there was conversation with Daenayia regarding the process for requesting supplies that she will need for her office so it would be helpful if someone could review that with her. Since we were unable to do the tour yesterday, she was not shown the supply closet until today. She should be good to go with respect to supplies!

Finally, Daenayia shared with me that a review of efile system will not take place until Friday. In the interim, I have asked Isaac Rinsky to share insights with her and then the training of Friday can supplement the information he provides. I believe that my prior Staff Attorney created a binder of my preferences and left it with Stacy for purposes of training so I would appreciate that information being reviewed, as well. For example, all of my civil status conferences are through the telephonic Teams system, so Daenayia will need to learn how to create and assign that information. Stacy had a death in the family and is unexpectedly out of the office thereby delaying training; however, going forward we will ensure there is a backup trainer.

At some point after I received the 3:29pm response, Ms. Goodman came to my office. I expressed my concern that, while there had been consistent questions to me about the start date for my new Staff Attorney, nothing was in order for her arrival. In fact, my Staff Attorney didn't even know where to go to get office supplies like pens, highlighters or writing tablets. I told her that I was disappointed by the fact that my Staff Attorney was the second employee for my staff for whom there was little to no preparation or training (when my Bailiff started in September 2021, there was little to no training). And I did articulate that I wanted the issues corrected but there was no assertion that "heads would roll". Additionally, I did not leave Ms. Goodman sitting in the chair in my office; we actually both walked out at the same time and continued the exchange between the office for my Bailiff and Staff Attorney. It was I who introduced my Staff Attorney to Ms. Goodman and I told my Staff Attorney that Ms. Goodman was there to ensure that she had whatever she needed to do the work she was hired to do. Ms. Goodman did apologize for the failure to onboard properly both my Staff Attorney and Bailiff (who joined my staff in September 2021 and who, at the time of my Staff Attorney's hiring was still continuing to experience challenges with receiving erroneous information about her position or no information when questions were posed). Further, I can state that, when the Staff Attorney before the current Staff Attorney was hired, there were no issues or challenges with onboarding, nor did the Bailiff prior to my current bailiff have any challenges with onboarding. And, it was the Deputy Director, not Ms. Goodman, who informed me that she had entered the calendar information in the system for the new Staff Attorney. In truth, the technology issues that my new staff face are consistent with the chronic IT challenges that I have experienced in my 14 years of service. It is not hyperbolic to say that, as least two to three times per day, my system fails in some way. So much so that, on July 7, 2022, the Deputy Director sent the following text message:

"Good evening! I have an update on your computer that I want to tell you about before you log in tomorrow. It will look a little different, so wanted to give you fair warning! LOL. And just checking in on you 😊

I replied, "Thank you for the warning. I'm still frustrated and disappointed. I have been intentional in advocating and running interference for our administrative team and just the court as a whole. I had a detective who came in today to get a Governor's warrant signed and she complimented me on how I advocated for the court when we had the first zoomversation about generic usernames (…). And it feels like some folks are very casual when it comes to my staff and me. I work overtime not to be unnecessarily burdensome to anyone. And the times I need assistance for my new staff, it is non-existent."

The Deputy Director replied, "Let me know what I can do to help."

My records indicate that Ms. Goodman had little to no involvement in correcting this issue and my interaction with her regarding this issue was no more than 5 minutes. While she was the first administrator listed in my 10:25am email, it was the Deputy Director who replied five hours later. This undercuts Ms. Goodman's representation regarding the level of help she provided. In fact, Ms. Goodman did not arrive in the office until 9:19, as reflected in an email she sent to the Deputy Director and to me with the subject, "I'm here 😊". How then could she have provided any help when my new employee arrived if she, herself, was not in the office?

## 2nd Leadership Meeting

At the conclusion of the first leadership meeting, many of the Directors indicated that they enjoyed the informal opportunity to engage and connect with one another and to consider information that would help them to develop more cohesion as a team. They also asked if it would be possible to continue the encounters. To that end, a second leadership meeting was scheduled for September 29, 2022. The focus on the conversation was navigating the communication maze. Even though my uncle was found deceased in his home on September 26 and I was in the process of helping my father and cousins plan his final service, I still devoted my time, energy and effort to developing a thoughtful presentation. While Ms. Goodman once again states that she was not made aware of what I would present (which is untrue because the focus of the presentation was included in the initial email request to select a date), I will restate that I was not obligated to allow Ms. Goodman to review my presentation to receive her approval of the contents. The discussion focused on why effective communication is important, types of communication (both verbal and nonverbal), and other components and aspects of effective communication. While the Directors enjoyed the presentation (with one Director asking for a copy to keep for their records and future reference), Ms. Goodman looked and appeared disconnected from the conversation (as was observed and commented on later by other Directors). In many regards, her engagement was similar to the first meeting - reframing what others had to say into a construct that she found more acceptable.

## DEI Director/Services, Equity and Inclusion Manager

At the first Judges' Meeting of 2022, I introduced several initiatives that I wanted to implement for the betterment and forward progression of the Court. Those included the creation of the Access to Justice Committee to help the Court identify gaps in our delivery of services, the implementation of an online payment portal for financial sanctions in criminal matters, the translation of criminal and adult probation forms to other languages, identifying sources for individuals interested in becoming certified interpreters and the creation of a courtwide Diversity, Equity and Inclusion Director position. Because 2022 was the first year that every Director had an assignment as an Ex Officio member for the Court's standing committees, I conferred with Ms. Goodman and made the recommendation that Ms. Johnson, Services, Equity and Inclusion Manager for the Probation Department, would serve as Ex Officio Member of the

Access to Justice Committee. From January 2022 through the Committee's first meeting at the end of July 2022, Ms. Goodman never provided me with any update regarding work that would facilitate the expansion of the DEI Director position. At the July meeting, I reaffirmed my commitment to creating a DEI Director position and shared that, because Ms. Goodman and others who work for the Court frequently discuss the desire to promote from within, I believed it would be best to expand the SEI Manager position to the courtwide DEI Director Position. Admittedly, no one, including Ms. Goodman, knew that I was going to make that announcement or suggestion but there was no sinister or nefarious motive attached to the suggestion. While Ms. Goodman states that it is unheard of for an employee who is not in a position to be advised of the desire to elevate them to a different position, this exact set of circumstances arose when Ms. Goodman had a preferred candidate for a Probation Manager position. Moreover, the argument that none of this could be disclosed until BOC approved the funding is slightly misplaced because, if the Court or the Board of Commissioners did not approve funding for the expanded position then the SEI Manager would continue to serve in the current role. Nevertheless, I later learned (on September 30, 2022 through the Deputy Director) that Ms. Goodman was upset that I made the suggestion to expand an already-existing position, versus creating a new one, even though an expansion would cause less of a financial impact to the Court's budget.

In any event, Ms. Goodman committed to doing the work necessary to have the position included in the Court's 2023 budget proposal. While Ms. Goodman decided not to advise me of any progress she was making, I never questioned her process or challenged her authority. However, without my asking, the SEI manager kept me apprised of meetings that were scheduled by Ms. Goodman, as well as when those meetings were rescheduled for various reasons related to unexpected life circumstances.

Finally, in September 2022, I had a meeting with the Deputy Director on a wholly unrelated issue but, at the conclusion of that discussion, I asked about the DEI Director position since budget season was approaching quickly. The Deputy Director sighed deeply and said, "Oh Judge…" and I said, "What?" She then said that she knew I was going to ask about the position eventually and that, two weeks prior to our meeting, the Director of Human Resources told the Deputy Director, "You know that Judge Cocroft is going to ask about the position soon and we have nothing to share." The Deputy Director then shared that no action had been taken regarding the expansion of the SEI position into a courtwide DEI position. She explained that they started the work and then Ms. Goodman had concerns and wanted to reconfigure the position as a DEI Manager that would be supervised by the Director of Human Resources. The Deputy Director then shared that, at Ms. Goodman's direction, everyone stopped working on the initiative. The Deputy Director also shared that the Director of Human Resources shared with another Director that the position would be created potentially and that Director said that the Court did not need another director position. Needless to say, I was stunned. More directly, I told the Deputy Director that I was pissed. I told her that, while I appreciate her saying something to me finally, I could not understand why Ms. Goodman, or any Director, would not share that information with me. And

I shared that I was disappointed to know that any of them would treat me in that regard. I also shared with the Deputy Director that, because I was managing the death of my uncle and literally watched the Coroner carry his remains out of his home, I did not have the strength to manage the information and would just talk another time. I made no reference to questioning the integrity, trustworthiness or confidence placed in anyone because my family was my focus.

Then, on Friday September 30, 2022, at around noon, both Ms. Goodman and the Deputy Director came to my office as I was about to leave to buy burial clothes for my uncle. Nonetheless, I stayed to hear what Ms. Goodman wanted to share. She started off by saying that the Deputy Director had informed of her of our conversation and that she wanted to let me know that she was working on the DEI Director position. And I told her that is not what the Deputy Director told me on yesterday. Then she shared that some Directors (I presume Ms. Goodman, the Deputy Director and Director of Human Resources) discussed the idea of making the DEI Director position, a manger position that would be supervised by the Director of Human Resources. Ms. Goodman also shared that she had concerns with the SEI Manager's ability to handle the responsibilities of being DEI Director based on some information that was never articulated. I shared with her that Human Resources and DEI are separate and distinct issues. And I reminded her that the Court had a challenge in 2020 when several probation officers submitted a substantial packet to Ms. Goodman and other lead administrators regarding allegations of racist behavior in the Adult Probation Department for which no investigation was ever undertaken. I then told Ms. Goodman that, in that moment, I did not have the emotional bandwidth to have the conversation because of my necessary task of buying burial clothes. Further, I shared that I wanted to speak to all Directors about the issue, since all Directors had been involved in conversations about the necessity of the position.

The meeting with all Directors was held the following week. And I told the Directors that, for 10 months, I had worked to be responsive to their desire to have more connection with the Judges, to listen to their concerns and to provide mechanisms for them to address any issues. And I told them that I was bothered by something I had learned – that no work was proceeding to advance the expansion of a currently existing position into a DEI Director position and that there was conversation among staff about whether the position was even necessary. And I told Ms. Goodman that, as the direct report to the Administrative Judge, it was my expectation that, if there was an issue with something that we had discussed or that I was made to believe was moving forward, then I expected to hear that information from her and not from anyone else and she said she understood. I told the Directors that it had become my increasing sense that there was a level of passive aggressive behavior through which Directors would tell me things were happening, but they were not happening. Another example beyond the DEI Director position involved a situation where Judge O'Donnell sent a communication to my Bailiff regarding a recusal entry. A Director had indicated to Judge O'Donnell in an email that the entry had been dropped off but that I had never signed it. However, I had never received the entry at all. Nonetheless, the impression that was created was that I was ignoring a request from a judge (I have a series of emails that confirm this event).

So, I told the Directors that I am a judge of the Court and asked for the same respect that other judges are accorded in myriad situations. I also shared that the Supreme Court of Ohio created a DEI Director position and that, if the highest court in the State believed in the necessity of the position, how or why would our Court (the busiest trial court in the State in an urban center) not appreciate the importance of the position. I concluded by saying that I wanted to proceed with the plan as I shared it with the judges – that is, I wanted to proceed with creating a stand-alone DEI Director position. Then I asked if everyone had any questions about what I shared. I then said, "Thank you" and left the meeting. I cannot speak to any of Ms. Goodman's assertions regarding employees who may have been crying or any other aspect. However, I can say that, since every Director was involved in the initial conversation regarding what Ms. Goodman determined would not be happening, I am surprised to read that there was any level of confusion.

The following week, I shared with Ms. Goodman and the Deputy Director that I also wanted to meet with the SEI Manager to give her a full and fair opportunity to respond to Ms. Goodman's assertion that there was work assigned to her in her current and potential positions that she failed to do. With full disclosure, the SEI Manager and I are members of the same sorority organization; however, my professional credibility and integrity means more to me than advancing a candidate for the Court's consideration with whom there were issues. The meeting with the SEI Manager took place on October 13, 2022 (not October 4, 2022), and Ms. Goodman, the Deputy Director, the Director of Human Resources and the Chief Probation Officer were present. While the calendar invitation and scheduling email explained the purpose of the meeting, I restated why we were gathered. And I asked for someone to give me perspective on the challenges that Ms. Goodman perceived about the SEI Manager. Initially, Ms. Goodman was silent. So, I stated that I knew that, during the height of the pandemic in 2020 and 2021, the SEI Manager was not doing DEI work but was, instead, distributing PPE supplies and monitoring the urine lab. While Zoom was being used readily by the Court and other businesses and organizations, all DEI meetings and activities were suspended, leaving the SEI Manager with nothing to do. The SEI Manager also shared that, when she was hired in the position in 2017, she was not doing DEI work. So, I asked Ms. Goodman why that happened, and she stated that she was given other tasks so that the prior Chief Probation would be able to figure out if the SEI Manger could be "trusted". Then the Deputy Director stated that Ms. Goodman and the Deputy Director wrote the SEI Manager position description and that demonstrated a commitment to DEI. And I said that the commitment had to be tangible beyond the creation of the position because, if the SEI Manager was supervising the urine lab, that did not support the work of DEI.

Ms. Goodman then asked the Director of Human Resources to share those times that the SEI Manager had failed to fulfill her current and potentially expanded work responsibilities. However, the Director provided no example, which frustrated Ms. Goodman. Through all of this, I was listening to all parties with almost no comment because much of the information shared related to matters about which I knew nothing. For example, the Deputy Director said that she was still disappointed in the SEI Manager from a meeting encounter that happened in 2017. The Deputy Director said that, during the meeting, the SEI Manger was not paying attention to the

conversation because she was not contributing. The SEI Manager said that she was brand new to the position and had no idea what was being discussed and did not want to contribute to the conversation with no solid knowledge base.

I allowed the parties to talk for some time and then concluded the meeting by telling the SEI Manager that she had a responsibility to work with both Ms. Goodman and the Deputy Director and that, if the Deputy Director had provided an offer of help, then she should accept it. There was a commitment to move forward collaboratively, and the meeting concluded.

After the meeting, Ms. Goodman complained that the Director of Human Resources was not honest about the work that she did for the SEI Manager. In the same regard, Ms. Goodman as Executive Director also never mentioned or referenced the information that the Director of Human Resources provided to her, which undermines her position in other areas of her complaint about her supervisory relationship to "all my subordinates". Additionally, I was sitting directly across from the Director of Human Resources, and she was not crying. If anything, the Director of Human Resources found herself in the position of being confronted by Ms. Goodman regarding why she was not "honest" about the work she did allegedly on behalf of the SEI Manager. This is similar to an instance relating to the hiring of a new employee who was not the candidate to whom the offer was made in the first instance. During that meeting, Ms. Goodman diminished the decision of the Director of Human Resources and the method by which she notated the hiring decision. Ms. Goodman criticized and became combative with the Director of Human Resources about the hiring decision until the Director of Human Resources becamse visibly flustered and upset. In that meeting, I told both Ms. Goodman and the Director of Human Resources that I trusted her (Director of HR) judgment as the subject matter expert and that, with her understanding of laws or requests relating to the hiring decision, I believed she would do what was necessary to protect the Court. The Deputy Director, who was present in this meeting, brokered a solution between Ms. Goodman and the Director of Human Resources regarding the hiring decision. But this is a demonstration of how Ms. Goodman's behavior instills fear into "all my subordinates".

Nevertheless, pertaining to the DEI Director position, at the conclusion of the October 4 meeting, I stayed to talk with Ms. Goodman and the Deputy Director, and I commented about the ongoing tension that seemed to exist between Ms. Goodman and the SEI Manager. As I was talking to Ms. Goodman, she had her foot in a chair and was fixing the "lip" of her tennis shoe. So that was yet another clue that she was somewhat disinterested in hearing what I had to say. There were no elevated voices during the conversation and the only person who cried was the Deputy Director. The SEI Manager appeared hurt but she did not cry. Despite Ms. Goodman's assertions, I was not active in the conversation. In fact, for most of the conversation, it looked like I was watching a tennis match as I constantly turned my head to look at and listen to the comments of Ms. Goodman, the Deputy Director, the SEI Manager and the Director of Human Resources.

Ms. Goodman's repeated references to my statements regarding a lack of integrity and trust are misplaced and conveniently deceiving. What I said to Ms. Goodman and the Deputy Director was

that, based on their decision not to share critical information with me until I happened to ask for it by chance, it was difficult for me to trust their professional integrity because we had worked so closely together and there had <u>never been an issue or concern that Ms. Goodman had not discussed with me, except for concerns relating to the DEI Director position.</u> And, while Ms. Goodman attempted to paint me as angry, I told her repeatedly that I was not angry because no one is entitled to that emotion from me. Rather, I was disappointed because I thought that our relationship was better than what had been demonstrated but that I knew I would move forward if given the time and understanding to do so.

On October 14, 2022, there were communications between Ms. Goodman, the Deputy Director and me, which are included below:

-----Original                                                                                           Message-----
From:        Cocroft,        Kimberly        X.        <Kimberly_Cocroft@fccourts.org>
Sent:        Friday,        October        14,        2022        8:10        AM
To:   Goodman,   Jennifer   L.   <Jennifer_Goodman@fccourts.org>;   Bedsole,   Susan   E.
<Susan_Bedsole@fccourts.org>
Subject:                                                Follow                                                Up

Good                                                                                            morning:

I     just     wanted     to     touch     base     on     a     couple     of     issues.

First,   I   am   available   at   9:15   this   morning,   Jen,   if   you   would   like   to   talk.

Next, in navigating the creation of the DEI Director position, I noted that there were a few meetings that were set with both of you, Walt, Cameo and Valerie on August 19, September 9, September 16 and September 20. It is also my understanding that, relative to those meetings, Valerie was asked to be prepared to define what diversity looks like for the Court and to develop a spectrum of mandatory to non mandatory DEI training options. It is also my understanding that there   were   concerns   regarding   deliverables   for   the   consulting   proposal.

First, did any of these meetings occur? I do not think they did due to various unforeseen life circumstances. However, was there any follow-up with Valerie to request the information that should have been created in anticipation of these meetings? Or was the expectation that she would both discuss and present these items at an in-person meeting? If there is anything that should   have   been   submitted   and   was   not,   then   it   is   important   for   me   to   know.

Thank                                                                                            you.

Judge KC

-----Original                                             Message-----
From:       Goodman,      Jennifer      L.      <Jennifer_Goodman@fccourts.org>
Sent:        Friday,       October      14,       2022        8:59         AM
To:     Cocroft,    Kimberly    X.    <Kimberly_Cocroft@fccourts.org>;    Bedsole,    Susan    E.
<Susan_Bedsole@fccourts.org>
Subject:                RE:           Follow              Up

Good                                                          Morning:

9:15am is a good time for me. We planned on looking over the minutes for the Judges' meeting but with the meeting cancelled we have some time to do this.

In looking at my calendar, I did not have meetings regarding DEI initiatives on those dates; however, we did have in-person meetings (myself, Susan, Cameo, Walt and Valerie) on July 26th and September 20th. The first meeting was going over the original consultant contract proposal and proposed budget for the new role obtained/prepared by Valerie and Cameo. The contract proposal was dated (I believe a year old) and was in a format we would not be able to get the Purchasing Department and Prosecutor to approve. Specifically, the payment structure was simply a monthly fee. Consulting contracts need to have specific milestones with payment deliverables, per these offices, to obtain their approval. Further, we suggested some additional detail be included as the contract totaled $100K and we needed to make sure we received all that Valerie and Cameo had hoped we would as part of the contract.

The second meeting was to review the modifications to the contract since our last meeting. Shortly (a couple of days) before the meeting was to occur, Cameo communicated to Susan and I that she had reached out to Valerie to make sure she was working on the modifications. Cameo stated Valerie indicated she had not; however, she did so upon receiving Cameo's call.

While the structure was modified to some extent, there was a number of milestones that did not include clarity or fully capture what was disclosed to us as what they were wanting to obtain. We used the meeting time to begin to modify the contract together, talking through what the vision was for the services Valerie was looking to receive. We also provided feedback and suggestions.

We did not discuss the proposal or job description for the position at that time. Personally, I assumed this was something Valerie was working on as Cameo communicated to us she had discussed this with Valerie - that this was something else to be working on. As we still had time

(at that point) before the Personnel Committee meeting, I assumed this was something she would bring to the next meeting or we would prompt to discuss as the date neared.

Please let me know if this response does not answer your questions. Thank you. Jen

riginal                                                                    Message-----
From:         Bedsole,        Susan        E.        <Susan_Bedsole@fccourts.org>
Sent:         Friday,        October        14,        2022        10:03        AM
To: Goodman, Jennifer L. <Jennifer_Goodman@fccourts.org>; Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
Subject:                    RE:                    Follow                    Up

Morning:

I don't see a meeting on my calendar for 8/19, 9/6, or 9/16. I cannot remember that far back if there was something scheduled and it was cancelled or rescheduled. At the 9/20 meeting, deliverables were worked on, the attached document was modified during the meeting.

While Ms. Goodman appears to assert that I was attempting to undermine her employment and authority, I actually suggested that, in an effort to avoid any representation that the Director of Human Resources was doing the work of the SEI Manager, the SEI Manager should work directly with Ms. Goodman or the Deputy Director or whomever Ms. Goodman believed appropriate.

After the above-referenced communication, Ms. Goodman asked if she could come to my office to discuss issues. I told her that she was welcome to come. When she arrived, she apologized for what had transpired and said that she recognized that she should have communicated her belief that the DEI Director should actually be a DEI Manager supervised by the Director of Human Resources. I told her that while I appreciated her apology, it was unnecessary. I restated my position that I was both hurt and disappointed that she or any Director would choose to deal with me in that way and that I thought we were better than that. Ms. Goodman began to cry and ask what she could do to make the situation better and I told her there was nothing that could be done and that I just needed some time to process what happened and that I would eventually be able to move on (the same position I had always taken). She then asked what I thought about scheduling monthly meetings with Ms. Goodman, the Deputy Director and me. I told her that I saw and accepted the calendar invites for the meetings and that I would participate though I don't know what we would discuss, since the issue of the DEI Director position is the only matter that Ms. Goodman has not discussed with me. And I shared that I could not understand why she chose not to talk with me about this particular issue, and she had no answer. Then she asked if I was saying that I had lost confidence in her. I told her that I wasn't saying that, but I was saying that, based on what I perceived as a violation of professional trust, I was having a challenge with

giving credence to her professional integrity BUT that, with time, I would move beyond that phase and would just appreciate time to get to that place.

To this day and prior to my knowledge of her complaint, I have not removed any meeting that she had scheduled with me and have continued to speak with her, despite my lack of insight that she had filed allegations asserting that I was being intimidating and harassing.

<u>Administrative Judge/Executive Director and Deputy Director Meeting –October 27, 2022</u>

In reciting this allegation, Ms. Goodman has skipped an important step. When the "Why I Quit" letter was received by most of the judges, Ms. Goodman was out of the office. While I informed the Deputy Director immediately that the letter had been sent, I placed a copy of the letter under Ms. Goodman's door so that she would receive it whenever she returned to the office. When Ms. Goodman returned, she did not reach out to me immediately to inquire about the letter or to express any concerns. And, candidly, because the letter was submitted by a former employee, I was disinclined to turn the situation into a huge matter because I believe it is best to talk through situations as high-level professionals before engaging in decisions and behaviors that become difficult to manage once a process is in progress. While I thought the matter had settled, a colleague reached out and, in that colleague's commitment to me to keep me informed of things about which he believes I should have knowledge, the colleague informed me that several judges wanted to discuss the "Why I Quit" letter. I then went to each judge individually to advise that I would notify everyone of an informal meeting, since the information provided in the "Why I Quit" letter was just allegations. Even though the allegations outlined a continuing theme of conduct by Ms. Goodman and others, I did not want to elevate the circumstance without giving Ms. Goodman and others notice of what was transpiring. So, once the informal meeting was set, I asked Ms. Goodman and the Deputy Director to come to my office. I advised them that an informal meeting had been set, and I provided no additional information. I told them that I would advise of any outcomes but that I would provide the facts, as I knew them to be. During that meeting, I also discussed my sense that there was an ongoing dynamic that existed, whereby I perceived that the Deputy Director was viewed as the "bad cop" and Ms. Goodman was viewed as the "good cop" and that, more often than not, the Deputy Director was the bearer of not so good news which gave myriad people an idea of who and how the Deputy Director is, even though Ms. Goodman's belief about procedural and substantive issues was in full agreement with what the Deputy Director was communicating. I further shared that it was my impression that this dynamic allowed Ms. Goodman to go through difficult court experiences with clean hands while the Deputy Director did not have the same favorable position. I shared with both of them that, as Ms. Goodman has pointed out in her complaint, she is the Executive Director and that, even if there is an assignment of a matter to a Director, she should be prepared to be fully accountable for both favorable and unfavorable information that is communicated. While Ms. Goodman says that she could not get a word in edgewise, that is a prevarication. She shared with me that she does feel she is fully accountable and the difference in perception was based on a difference in management styles between her and the Deputy Director. However, in 2020

communications from several probation officers, there is a consistent belief that there is no real difference between Ms. Goodman and the Deputy Director (I have this documentation). And I also shared with them that, despite the fact that there had been a decision not to communicate information with me, I would still honor my responsibilities as Administrative Judge and share what I knew regarding the "Why I Quit" employee and letter.

One of the reasons I am sincerely shocked by Ms. Goodman's allegations is that, during the meeting regarding the "Why I Quit" letter, one of my colleagues suggested that the notes I had in the meeting were based on talking points I received from Ms. Goodman and the Deputy Director, even though I had no discussion regarding the substance of the letter with either of them. In other words, I defended Ms. Goodman as a valuable employee who has protected the Court and its employees. I did not think it was appropriate or necessary to pile on confirmed information I had received from Directors and other employees about Ms. Goodman's behavior.

At the conclusion of the meeting, I told Ms. Goodman and Ms. Bedsole to rest their minds and that there was a dust-up but it was related to the belief that I had gotten talking points from both of them. Ms. Goodman's October 26, 2022 response? "How in the world could this be turned around to be negative to you. We can talk tomorrow, just surprised."

In any event, I shared a brief overview of the concerns that were raised and that the Deputy Director was viewed as the problem with judges saying that they have never heard "that much" about Ms. Goodman. And I shared that, because Ms. Goodman holds such a critically important position, it is necessary for her to be fully accountable for any issues that arise. While Ms. Goodman is correct that I discussed an incident raised by the Language Access Coordinator during our conversations regarding the translating of forms, the October 27 meeting was not the first time that I discussed the issue. In fact, when the Language Access Coordinator shared with me that she had filed a complaint about an incident that occurred four years ago but that no one ever talked with her about it and there had been no investigation, I called the Director of Human Resources and asked if she remembered this event. Initially, she did not recall the event but, as I continued to provide what details I had (since I was not serving as Administrative Judge in 2018), she admitted remembering the event. The Director of Human Resources then read to me the email that she sent to the Deputy Director regarding the allegation. Because Ms. Goodman was out of the office when I was first made aware of this incident, I only had the chance to speak with the Deputy Director about it, who recalled that the modification that was made to address whatever issue occurred is that the Deputy Director would participate in all meetings between the Language Access Coordinator and the other employee involved. So, when I raised the example with Ms. Goodman on October 27, it was for the purpose of demonstrating that, apparently, there was a complaint filed and, based on the recollection of the employee involved and the communication sent to the Deputy Director, Ms. Goodman was not involved in investigating or facilitating a resolution. I never stated that the incident occurred because of poor leadership. But I did say that I was concerned by the fact that an employee who is one of her

subordinates believes that nothing was done and still believes that nothing was done four years after the event.

Executive Director Request for Meeting Denied – October 26, 2022

Once again, Ms. Goodman has framed her allegation in a way that makes it appear that I chose to ignore her for sport. In fact, her representation appears to be intentionally incorrect. To be clear, it is true that we did not meet on October 26, consistent with her request. However, here is the entire communication string:

Jen: Hi Judge - we worked on some supplemental information for presentation at the Finance Committee meeting. Please let us know if you have some time to take a look before you are off on Friday. Thank you!

Judge KC: Hey, Jen and Susan. I will be free in about 30 minutes. You can stop up or I can pop down. I was trying to leave early but that probably won't be happening. I will call once I'm available to see if both of you are free.

Jen: ⸻ I am here. I am in a meeting with Roxlauna and Kimberly but they do not need me to stay the whole meeting, just meeting the caterer. Can I come up at 345?

Susan: ███████ but feel free to meet with Jen, no need to wait for me.

Judge KC: Well shoot...texting shortly...

Jen: The vendor is actually a no show (NOT good). I can come up earlier if you prefer.

Jen: The vendor showed, whew, but we are done

Jen: Would you like for me to come up?

Judge KC: Let's just wait until tomorrow. I'd like to speak with both of you together.

Jen: Ok, going to be a tough evening. Any word you can share?


The last message, which was sent by Ms. Goodman at 4:01pm, reveals the true reason for her urgency in meeting – to learn what was discussed in the informal Judges' Meeting. The "denial" that Ms. Goodman attempts to frame as my continued demonstration of some level of disdain for her is absolutely untrue. Rather, I have the ability and autonomy to make the decision to have one conversation with two employees who are interested in hearing outcomes in which both were discussed. And the text message that I sent to both said, "Rest your minds", so Ms. Goodman cannot honestly say that she had no idea that there were no negative outcomes, particularly given her "I can't believe they would turn this around" text that I referenced earlier.

Regarding Ms. Goodman's assertion that I represented to her that either Ms. Goodman or the Deputy Director may not be here in 2023 and I would be the Administrative Judge for 14 months, she once again attempts to spin a benign comment into a controversial situation. Relating to my service as Administrative Judge, I have told Ms. Goodman, the Deputy Director and everyone else (including my colleagues) that I had no intention or desire to serve as Administrative Judge beyond December 31, 2023 because, as I shared with my colleagues, I believe it is important for all of us to understand just how complex the administrative work of the Court is. Regarding the Deputy Director, she has stated to me on several occasions that the continued investigations and questions about her character have worn her down and she cannot continue to do this and was considering whether she should seek another opportunity. Regarding Ms. Goodman, I told her that the only constant in the leadership model is her as the Executive Director. I told her that her position is a powerful one because, more than an Administrative Judge, she has the ability to set the consistent tone, temperature and tenor of the Court, even as Administrative Judges come and go. And I told her that she has a responsibility to that level of power, as we all do, to be the best we can be. I told her that she was an amazing director with a lot of talent and ability and that she was an asset to the Court. But I also told her that she can't get tripped up by little things and lose focus on the bigger goals. And the reason that she was sitting in my conference for 30 minutes? Because the Deputy Director was crying and sharing that she is exhausted from having her credibility questioned and I was trying to give her an opportunity to regain her composure before leaving my office. I told the Deputy Director that she had to learn to lead from behind and not to get in front of the Executive Director as it relates to being the "voice" of the Court. And I told her that she had to take care of her physical health because the stress is harmful and can wreak havoc (at the time that all of this was happening, the Deputy Director was going through multiple tests for an upcoming knee replacement surgery and was also wearing a glucose monitor on her abdomen, which she showed me in my office. So, she clearly wasn't afraid of me if she shared something so personal without a request from me to see it).

In truth, based on many comments that Ms. Goodman made in various settings, I was sincerely nervous about ever speaking with her in private without a witness in order to protect my own professional well-being. When both Ms. Goodman and the Deputy Director were back in the office, I told them that I wanted to work through whatever tension existed between them because, as previously stated, the Deputy Director expressed numerous concerns about the leadership of Ms. Goodman and had received several concerns from the other Directors. But, since it appeared to me that there would be no real resolution, I would leave the situation as I found it and move forward without working through the challenges that existed.

<u>Administrative Judge/Executive Director/Executive Assistant Meeting – November 1, 2022</u>

I attended the DEI Lunch n' Learn event sponsored by the Probation Department. As I was leaving at the conclusion of the event, I said hello to the Executive Assistant to the Executive Director and asked how she was doing. Immediately, her eyes filled with tears, and she said she was okay. I asked her if she was really okay and she said "Yes" and I told her that if she ever needed to talk,

then she could come to me. She came to my office shortly after I arrived and shared that she was having a tough time adjusting to the position. She said that everyone on 2 was giving her directions and work to do and that she was confused about to whom she reported and what her responsibilities were. She also said that she was concerned that she would not reach the end of her 6-month probationary period because she was constantly being criticized and belittled regarding her work. I told her that I was sorry that had been her experience, that she was a valuable member of the Court and that I would set a meeting with Ms. Goodman so that she could get clarity about her roles and responsibilities.

I shared with Ms. Goodman what happened when I saw the employee at the Lunch n' Learn and that I'd like to set up a time to chat. When Ms. Goodman and the Executive Assistant came to my office, I shared again why I wanted to chat and I shared with Ms. Goodman that, while I am genuinely concerned about every employee and their concerns, I try to give effort to ensuring that Black women, who may have a professional journey similar to mine, know that they can come to me because it is difficult to be the only person who looks like you or only one of two. So, I asked the Executive Assistant to share her experiences with Jen. The Executive Assistant said that she was not feeling safe or respected and that she was uncomfortable with the Deputy Director "barking" at her", which is something about which I was not aware. She also said that another employee was complaining about how the Executive Assistant had not completed a task correctly regarding an appointment to a Commission. She also said that on October 31, 2022, she contemplated giving her two-week notice because the environment was unbearable. She also said that she was accustomed to dealing with managers, but she had never had an experience like this one. I was totally unaware that the Executive Assistant was going to share this information and I expressed that to Ms. Goodman. The Executive Assistant also said that she did not have any idea where to find information about tasks she was asked to complete by Ms. Goodman, like sending an email regarding an appointment to a Commission. More specifically, the Executive Assistant said that Ms. Goodman told her to "look for an email that Sheila wrote like the one you need to send". So I asked, if there was a manual for the Executive Assistant and Ms. Goodman's quick response was, "She got a manual". Then I asked whether there was a manual of emails or could a manual be created and reviewed with the Executive Assistant and Ms. Goodman said that was a possibility. Ms. Goodman then apologized for the untoward behavior and said that she would speak with employees who had treated the Executive Assistant in an untoward way (no investigation was required, I presume). Then I asked whether it was correct to say that the Executive Assistant reported directly to Ms. Goodman and that, if others on 2 gave her assignments, then it would receive final approval from Ms. Goodman. Ms. Goodman said that was correct. I also asked whether the Executive Assistant should advise Ms. Goodman of any changes to her schedule or whether there was someone else who was in charge of the Executive Assistant's schedule. And she said that it was correct that the Executive Assistant should deal with scheduling changes with her. Then Ms. Goodman asked the Executive Assistant whether she remembers when the Executive Assistant received some arrival time leniency from Ms. Goodman based on family obligation. While I did not comment on that statement, I found it

curious, because Ms. Goodman has always received the same leniency when attending her son's football and baseball games and has never submitted a leave slip for her time out of office (I have documentation of the times she has arrived late and left early and has not submitted leave slips to be signed by me when I served as her supervisor).

After the meeting ended, I sent a Teams message to the Executive Assistant and Ms. Goodman and suggested that, perhaps, that could meet on Friday, November 4, 2022 to discuss emails relevant to the Executive Assistant's job. The Executive Assistant said that she was available but Ms. Goodman said that she had a doctor's appointment and could not meet on Friday. I did not engage in any additional follow-up. Despite Ms. Goodman's representation that I was expecting to hear complaints about her, in truth, I was only expecting to discuss what the Executive Assistant raised originally – that she was unclear on reporting structure and work responsibilities. I don't have the time or desire to set someone up intentionally to fail or to be subject to discipline, particularly given the fact that I had just defended Ms. Goodman to my colleagues the week prior to this conversation.

Zoom Meeting – Director of Human Resources, SEI Manager, Chief Probation Officer, Administrative Judge and Ms. Goodman

To begin, I did not schedule this meeting. I was invited to participate and actually forgot that it was on my calendar. At the time of the meeting, I was visiting the Court's Adult Probation Team (as I have done regularly since my service as Administrative Judge began). More specifically, I went over to congratulate two employees who were selected to present at a corrections conference that will take place in Columbus in January 2023. So, while there, I went around on floors 4 and 5 to speak with other officers and also had an opportunity to spend time with Heather Stein as many of our probationers were being switched from radio frequency monitoring to GPS. So, by the time I joined the meeting, it was about 3:20pm, though the meeting started at 3. When I joined the meeting, the Director of Human Resources was asking the DEI Consultant about deliverables in the consulting agreement. As a foundation, Ms. Goodman had concerns about how the deliverables were presented and asked for the agreement to be modified. One of the questions that the Director of Human Resources asked was whether the Consultant expected to be paid before the deliverables were completed. The Consultant appeared to be insulted and responded that her company does not have a cash flow problem and would not bill the Court until the services in a deliverable section had been completed. I allowed all on the call to ask questions and then shared that I knew the Consultant from her work in the Columbus community and that I knew her to be a well-respected practitioner who works hard at her craft and focuses on positive outcomes. During the lull in conversation, I asked the Director of Human Resources, "Who needs to approve the deliverables agreement so that this process can continue to move forward?" Because the HR Director was on the call, I presumed that she was standing in for Ms. Goodman, since it was Ms. Goodman's position that the Director of Human Resources was the person who was doing all the work related to the DEI Director position. However, the Director of Human Resources said that either Ms. Goodman or the Deputy Director had to approve the

agreement and I asked if either was available and whether she could determine if they could join the call. I later learned from the Director of Human Resources that Ms. Goodman saw the meeting on the HR Director's calendar, inquired about the meeting, and chose not to join. But it was my intention that Ms. Goodman participate and, historically, Ms. Goodman conceded that I am diligent in my decision to copy her on meeting invitations and other correspondence (e.g. discussions regarding Criminal Settlement Weeks between the Prosecutor's and Public Defender's Office and private defense counsel).

While the HR Director was getting Ms. Goodman, I shared with the other Zoom participants why this project was meaningful to me – specifically, as a judge who is required to run for office, I know that I and other judges make representations in ethnically diverse and socioeconomically diverse communities about concerns in these populations and that we make representations that we will demonstrate a tangible commitment to those concerns if we are elected. And I believed that we have an obligation to be as faithful to those representations as possible. The Consultant mentioned that integrating this work into an organization is tough and that there could be obstacles. And I shared an anecdote of a judge (Richard Frye) who referenced the work as "DEI stuff" that was just politically correct but had no practical impact. The judge further said that the Court's resources would be better served by increasing juror fees so that the Court could get more poor and Black people to serve. I told the colleague that juror fees were not the reason that poor or Black people did not serve (because the judge appeared to conflate these two groups). Rather, some people chose not to serve because of an inherent distrust about the justice system as reflected in documents like the Supreme Court of Ohio's 1999 Report from the Commission on Racial Fairness.

By this time, Ms. Goodman joined the Zoomversation, and I said to her it was my understanding that either she or the Deputy Director had concerns about the deliverables in the agreement and I asked whether she had been given a copy of the deliverables. She said she had not (I have a communication where Jen discusses deliverables and will find it to integrate). I then asked Jen if she would have the ability to review the 1 ½ page agreement while the Consultant was on the Zoom and she said that she could. As she reviewed the document, she said to the Consultant that she was looking forward to getting to know her and the Consultant reminded her that they had already had some conversation by email because Ms. Goodman asked the County Administrator if he could recommend a consultant and the Administrator recommended this Consultant and copied the Consultant on the communication. The Consultant said that she could forward the email to Ms. Goodman if she did not have it. Ms. Goodman did not respond. So, Ms. Goodman continued to review the deliverables and would occasionally say, "This looks good" or "This is the kind of detail we need" or "This is what we need to be able to show purchasing." The Consultant then interjected and said, "Are you talking about Megan in Purchasing" to which Ms. Goodman responded in the affirmative. Then the Consultant said that she has a consulting contract with Purchasing, the County, The Board of Commissioners and the Prosecutor's Office, so they are familiar with her agreements and her work. So, I said that getting this to the approval phase should be an easy lift since the entities to which submission would be made know the Consultant.

Then Ms. Goodman once again asked the Consultant about her payment schedule and whether she could sustain not being paid until each deliverable section was completed. The Consultant told Ms. Goodman that the Court's contract would not make or break her, and I shared that Cameo had asked the same question and the Consultant indicated that she does not have a cash flow problem. Then there was a discussion from Ms. Goodman about whether we would get things above and beyond what was listed in the deliverables. The Consultant said that the first agreement submitted included that level of flexibility; however, she was informed that Ms. Goodman requested more specificity in the agreement and, as such, the only things that the Consultant would do was what was listed. I asked if that construct put us at a disadvantage long term in that we are locked in with no opportunity for flexibility. Ms. Goodman then suggested that we could set aside a pot of money to re-engage the Consultant if that became necessary. But based on the information the Consultant shared with Ms. Goodman and all of those on the call, her schedule for 2023 was almost full and she was holding a potential spot for the Court as a courtesy. So I shared with Ms. Goodman that, if we did not fully engage this Consultant, then we would lose the opportunity to do so later and may have to find another consultant whose perspectives and methodologies were different from this Consultant's. I then said that, if it appeared to Ms. Goodman that everything was in place, then I thought it advisable to move forward with submitting the proposal to Purchasing for final approval. And I indicated that I was hopeful the process could be expedited since the County is familiar with the Consultant's work. I asked the Consultant when we would need to notify her of our decision, and she indicated that she closes her calendar on December 21 and does not start working until February 2023. So I asked Ms. Goodman to submit the agreement after the meeting so that we would have an opportunity, if the Court chose to do so, to engage with the Consultant who is already engaged with many of our County justice partners. Ms. Goodman and the HR Director agreed to prepare the submission email and the Consultant asked if there were any other questions before she terminated the call (since we were using her account for the meeting). There were no other questions and the call ended.

Another aspect of the Zoom that was concerning to me was, at one point, Ms. Goodman, asked the Consultant about the quality of her work and whether she could guarantee good outcomes. The Consultant explained that she is passionate about her work and believes in what she does but that the process doesn't work if the people who engage her are not committed. And she said that she was concerned by and uncomfortable with the tone and tenor the conversation had taken and that she wasn't certain that she wanted to engage with the Court. The Consultant then started to go through her accomplishments (of which Ms. Goodman was already aware) and I told the Consultant that she did not have to prove that to us and I apologized if she had the impression that we did not think she was experienced. It was disconcerting to watch the Consultant be subjected to what looked and felt like a hostile line of questioning, to the point that the Court almost lost the ability to engage her. However, the lack of consideration of DEI Consultants is a familiar theme because the last DEI Consultant that we engaged to help Adult Probation navigate claims of racism was immediately dropped from providing service with no

explanation from Ms. Goodman or follow-up. During our Zoom, I stated broadly that I was disappointed with what transpired and that is all that I would have to say on the Zoom. And I had no further conversations with Ms. Goodman on this matter.

Regarding the Director of Human Resources' impression that I was angry – nothing could be farther from the truth, and I expressed that to the HR Director. I told her that I was disappointed and saddened that something that is so necessary for this Court does not seem to be a priority. I told the HR Director that she appeared uncomfortable and that I had actually requested that Ms. Goodman not require her to participate so that she was not placed in the position of being the intermediary and not the final decision maker. I never criticized Ms. Goodman and I do not have the ability to control an adult and what they choose to say or how they choose to express themselves. Ms. Goodman has continually demonstrated a reticence toward embracing DEI. While she attempts to point to the creation of the SEI Manager position, there has been little else done to advance DEI initiatives. There was no investigation of allegations of racism submitted by Probation officers in 2020, Ms. Goodman combined the DEI Committee with the Team Building Committee until I approached Ms. Goodman and the former Chief Probation Officer to explain why having both committees exist as separate and distinct entities, there was no movement to advance the DEI Director position until the Deputy Director informed me that nothing had taken place substantively from July 2022 until the end of September 2022 and Ms. Goodman chose not to participate in a meeting about revised deliverables for the consulting agreement, even when she knew the meeting was taking place.

Ongoing Comments and Themes

Ms. Goodman is correct, I have shared with the entire leadership team, my staff, my colleagues and high school and college students with whom I share my story that, as a Black woman there is a different standard to which I must adhere. If I cry, then I am not emotionally stable. If I raise my voice even slightly, then I am angry. During one of my conversations with Ms. Goodman and the Deputy Director, the Deputy Director said to me that, as a judge, I don't know what it feels like to be criticized. And I shared with her that for 17 of the 22 years of my professional journey, I have been subject to experiences that most would not have been able to endure. And I shared that my journey as a judge began with an article on the front page of the Columbus Dispatch, in which a former judge questioned my ability to handle the position. I shared other experiences that highlight the challenges I have faced. And in an effort to demonstrate that she, too, has been subject to difficult circumstances, Ms. Goodman shared that a judge of this Court called her a bitch. I told her that it is unlikely that she will ever be in an employment experience where she is the only person who looks like her and that the weight of being in that position, while still trying to be professional and engaged and committed to excellence in your work is exhausting. And I will not apologize for my experience because it is that history that is allowing me to endure this time in my life in which two of my fellow judges propose blackmail as a resolution to an issue about which I did not know and about which I did not have an opportunity to respond until a

memo was sent, indicating that all of the judges needed to consider a "corrective course of action."

Further, I have never advised Ms. Goodman, the Deputy Director or any other Director to operate independently and to either fly or fail and it is so disappointing to have my words twisted in order to achieve a desired end. What I said was that each Director deserves the opportunity to do the jobs they were hired to do, that they deserve more of an opportunity to interact with the judges as they have requested for years and have not been able to do until now and that, if they want the chance to engage with the judges, then they cannot be afraid but have to make the intentional decision to fly or to fail. They have to put fear and anxiety aside and be confident in any presentation they make. And, more specifically, on October 26, I sent the following text message to Ms. Goodman and the Deputy Director:

"Relative to our discussion about my desire to integrate Directors into more presentations to the judges, I view the experience like the process of teaching a child to ride a bike – you hold on to the seat until you see them stable and riding on their won. I think each Director has the ability, but I think the process will necessitate us "guiding" and supplementing presentations until they can ride on their own. So, to the extent that we see a [Director] a little wobbly, we won't be able to look for an opportunity to jump in but will have to take it before the bike falls over. It's an analogy on steroids but you get my point.

And a portion of Ms. Goodman's response was, "[Y]our point is well taken and we will support her."

The only people with whom I meet constantly and have constant communication are Ms. Goodman and the Deputy Director. But, in truth, as the Administrative Judge, I am charged with managing the administration, calendar and docket of the Court, pursuant to Sup. R. 4. And it is the people who work for the Court who make all these things come together. And I have the responsibility to engage them and to make them feel that they are valued and necessary. I would have preferred that all the issues about which I have become aware in the last 10 months that occurred as long ago as four years and as recently as four weeks would have never occurred. But I cannot pretend like the issues don't exist in order to satisfy Ms. Goodman's sense of how I should manage. And every employee who has a grievance should have the opportunity to have that grievance considered, in the same way that Ms. Goodman has exercised her opportunity. A judge (Richard Frye) said that this situation did not deserve the kind of consideration that a "low level employee complaining about a supervisor" would receive. But, as judges, we have the responsibility to ensure that every process is fair, irrespective of who is involved or what is alleged. And it is that approach to leadership that is new for Ms. Goodman. In fact, she told me and the judges with whom she filed her complaint that she is unaccustomed to providing the level of detail that I require. And I have previously shared with Ms. Goodman and others that, as the first woman to serve in this capacity who is also Black, there is a heightened level of scrutiny that exists, and it is to my benefit to have as much information as possible so that I can answer questions of justice partners and even allegations leveled in a complaint.

History

Regarding Ms. Goodman's assumption that I have been displeased frivolously with my staff, I am unclear on how I lose the autonomy to terminate an employee if they are not performing as expected or how an employee loses their right to seek new employment when they choose to do so. However, since Ms. Goodman is attempting to build this house of hideous behavior, I will demonstrate that her foundation is shaky:

- Amy Flowers – Bailiff to Judge Cocroft from 2010-2020; Left after becoming a Licensed Attorney and joined the firm of Ice Miller
- Amy Cooper – Staff Attorney to Judge Cocroft from 2014-2022; Left to join the firm of Perez Morris
- Jill Dunlevy – Terminated in 2021 after repeated attempts to rehabilitate employee through progressive discipline in which the Director of Human Resources was involved; Employee admitted that she was overwhelmed by managing the courtroom while handling all other responsibilities and failed to file continuance entries and place trials on the Court's calendar that she scheduled with counsel
- Rachel Cook  - Secretary to Judge Cocroft from 2016-2022; Left because of concerns related to well-being of children

Moreover, I am not aware of any other judge who has been asked to explain their hiring history or length of service for employees.

This text communication took place on the same day that my uncle was found deceased, yet, I still had the ability to demonstrate concern for her circumstance. This exchange doesn't suggest to me that I was angry with or attempting to harass Ms. Goodman and it is difficult to believe that she would ever advance such an unfounded claim.

Finally, let me state emphatically, I have NEVER said that the men and women with whom I serve proudly are racists. What an unbelievably hurtful and dishonest thing to say. Here is what I have said and I will stand in the truth of my belief – As a Black woman, there is a different standard against which my actions, choices, decision and service are judged. I have been keenly aware of that fact for my entire professional existence. And what I know to be true is that in professional spaces, there is often a higher level of expectation for me than for people who do the same work that I do. I shared with Ms. Goodman that two of the judges came to my office and gave me a list of Black women whom I should be more like. One of those same judges told me in a meeting with the Deputy Director that if he was going to "fuck me over", then he'd let me know before he did it. I raised both issues with then Administrative Judge McIntosh and he told me that's just how those judges are. The world got to see that difference in the confirmation hearings of Justice Kentanji Brown Jackson. And I shared with Ms. Goodman that I know that I would be scrutinized by everyone, even her, because being the first woman who is Black is something that has not been seen in the General Division. Think about the fact that, out of 723 judges in the State, only 53 are Black. Think about the fact that those numbers are not even equal to the 13% population level of Blacks in the State of Ohio. Those are the parameters under which I served. And I have shared personal experiences with Ms. Goodman and my colleagues that make real what I have overcome to be the servant-leader I am today. So, I will not allow Ms. Goodman to twist my story for her own motives, neither will I allow her to cast aspersions on me. Have I had tough conversations about race with judges and staff? Yes. Does that mean I believe that any of my colleagues is racist. Absolutely not. How shameful for Ms. Goodman to be permitted to make such an outrageous statement and to have it taken as truth.

Further, what I shared with Ms. Goodmand and every judge of this Court at a Judges' Meeting is that, if there was a willingness to create a subcommittee to investigate concerns from the Court Reporters, then I presumed there would be a willingness to form a subcommittee to investigate claims of racism from probation officers. Judge Jeff Brown (who offered the motion to create a subcommittee on Court Reporters) said he would support that and I asked him to make the motion, since he offered the other motion. Judge Brown never offered the motion, nor did any other judge of the Court. Finally, when discussing the DEI Director position, Judge Holbrook expressed his opposition and unwillingness to support. And I commented to him and all judges on the call that every judge who has run for office makes an intentional effort to campaign in socioeconomically and ethnically diverse communities because we understand the necessity of

that constituent support. So it shouldn't be a difficult thing for any one of use to support a DEI Director position.

Conclusion

It has been the honor of my life to serve as the Administrative Judge. I have had the opportunity to facilitate the implementation of many important initiatives including:

- Standing monthly meetings with the Clerk of Courts
- Regularly scheduled meetings with Franklin County Sheriff's Office Leadership
- Facilitated receipt of FCSO assignment information in a timelier manner
- Facilitated the ability of the Court of Common Pleas to participate in a Sealing Record of Convictions Clinic with a one-day notice
- Implementation of online payment portal for payment of financial sanctions in criminal cases
- Spearheaded effort to have all criminal and Probation forms translated to Spanish, Somali and Nepali
- Creation of streamline for the judicial requests for special panel in trial matters
- Assisted in creation of cover sheet for Auto Title applications
- Working to implement the expansion of DEI services to the entire court
- Integrating Directors into the work of the Court to create more contact and connection with Judges (one Director thanked me last week for giving them the opportunity to do the work they were hired to do; another Director thanked me for adding them as an Ex Officio member of a committee, which has never happened in their entire tenure as Director)
- Creating relationships with new justice partners to move our Court in a more fair, equitable and progressive direction

I am proud of the work we have been able to accomplish, and I am proud to be the first woman to serve in this capacity. I take the treatment of all employees, including Ms. Goodman, seriously. But as her Supervisor, I have the responsibility to address concerns that come to my attention currently, or that are brought to my attention based on historical events, in a way that protects Ms. Goodman's reputation and the work of the Court. I believe that I have been diligent in accomplishing those aims and, to that end, I categorically deny every allegation outlined in Ms. Goodman's complaint.

**Cocroft, Kimberly X.**

| | |
|---|---|
| **From:** | Frye, Richard A. |
| **Sent:** | Tuesday, November 8, 2022 5:35 PM |
| **To:** | GEN_Judges |
| **Subject:** | Personnel Matter - Judges meeting Monday Nov. 14 3:30 |
| **Attachments:** | Final Nov 2022 AJ Personnel Memo all judges.docx |

The attached memorandum is sent on behalf of myself and Judge O'Donnell.  Please be discrete in discussing this information.

Richard A. Frye, Presiding Judge
Franklin County Common Pleas Court
345 South High Street, Courtroom 5F
Columbus, OH  43215
614-525-3811; 614-525-2464 (fax)
Richard_Frye@fccourts.org

1



November 8, 2022

A personnel matter has arisen requiring consideration by all 17 General Division Judges, which has urgency.

On Nov. 1, Judge O'Donnell, as chair of the personnel committee, and Judge Frye as Presiding Judge received a 10 page "Anti-Harassment Complaint" from Executive Director Jennifer Goodman. Because the focus of her Complaint was Administrative Judge Cocroft the Complaint was directed to Judges O'Donnell and Frye pursuant to the Court's Anti-Harassment Policy last updated in 2016.

Through preliminary discussions with Director Goodman both Judges sought to determine if an agreed-upon corrective action [pursuant to paragraph I (D) of the Policy] might be possible before a full-scale investigation was launched. Director Goodman felt that if a new Administrative Judge were in place that would be sufficient. Judge Cocroft is not in agreement with the suggestion of a new AJ because she disagrees with the issues raised by Director Goodman, and does not feel she has acted improperly.

Judges O'Donnell and Frye wish to convene a meeting of all 17 judges in Executive Session to review the options available to this Court. Our goals must be to protect the Court, and keep it operating properly and in the public interest.

Pending further developments, we ask all judges to be discrete in discussing this information and not to initiate discussions with Executive Director Goodman, Deputy Director Bedsole, or other staff members. Please let either Judge O'Donnell or Judge Frye know if you can be available on **Monday afternoon November 14 at 3:30 p.m.** for a meeting. We propose to meet in the Judges' Conference Room (in-person or by ZOOM). In the meantime, if you wish to review the full Complaint please advise either Judge.

**Cocroft, Kimberly X.**

| | |
|---|---|
| **From:** | Goodman, Jennifer L. |
| **Sent:** | Tuesday, November 15, 2022 10:48 AM |
| **To:** | GEN_All_Staff |
| **Subject:** | Administrative Judge |

Good Morning:

Effective immediately, Judge Stephen McIntosh will be the Administrative Judge for the Common Pleas Court – General Division. He will serve in this capacity through December 31, 2023.

Thank you.



**Jennifer Goodman**
Pronouns: She/Her/Hers
Executive Director
**Franklin County Common Pleas Court**
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
**(P) 614.525.4147 | (F) 614.525.4480**
Jennifer_goodman@fccourts.org | http://www.fccourts.org

1



EXHIBIT

30



EXHIBIT

31

**From:** noreply@civicplus.com <noreply@civicplus.com>
**Sent:** Tuesday, November 22, 2022 5:01 PM
**To:** GEN_HR <GEN_HR@fccourts.org>
**Subject:** Online Form Submittal: Public Record Request

If you are having problems viewing this HTML email, click to view a Text version.

## Public Record Request

| | |
|---|---|
| Your First Name* | Jordan |
| Your Last Name* | Laird |
| Your eMail address* | jlaird@dispatch.com |
| Specific Record(s) Requested* | Hello, I would like to request any and all documents related to the change in administrative judge this month as well as any documents detailing concerns or complaints regarding former Administrative Judge Kimberly Cocroft. If you have any questions, please call or email me. Jordan Laird The Columbus Dispatch reporter Cell: 614-280-6305 |

* indicates required fields.

View any uploaded files by signing in and then proceeding to the link below:
http://oh-franklincourts.civicplus.com/Admin/FormHistory.aspx?SID=4765

The following form was submitted via your website: Public Record Request

Your First Name: Jordan

Your Last Name: Laird

Your eMail address: jlaird@dispatch.com

Specific Record(s) Requested: Hello,

I would like to request any and all documents related to the change in administrative judge this month as well as any documents detailing concerns or complaints regarding former Administrative Judge Kimberly Cocroft.

If you have any questions, please call or email me.

Jordan Laird
The Columbus Dispatch reporter
Cell: 614-280-6305

3



EXHIBIT

32

Additional Information:
Form submitted on: 11/22/2022 5:00:47 PM
Submitted from IP Address: 162.154.221.209
Referrer Page: https://www.fccourts.org/
Form Address: http://oh-franklincourts.civicplus.com/Forms.aspx?FID=172

**EXHIBIT**

**33**

**Cocroft, Kimberly X.**

| | |
|---|---|
| **From:** | Davis, Cameo E. |
| **Sent:** | Monday, May 20, 2024 5:05 PM |
| **To:** | Cocroft, Kimberly X. |
| **Cc:** | Hummer, Jeanine A.; Zervas, John A. |
| **Subject:** | RE: Online Form Submittal: Public Record Request |

Good afternoon,

I was scheduled out of the office Friday afternoon and did not see the request until this morning.

The initial priority was to alert the impacted judges, then the prosecutor's office would be included for a legal review.



**Cameo Davis**
Pronouns: She/Her/Hers
Director of Human Resources and Training
**Franklin County Common Pleas Court**
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
**(P)** 614.525.5312 | **(F)** 614.525.8903
Cameo_Davis@fccourts.org | http://www.fccourts.org

**From:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Sent:** Monday, May 20, 2024 1:53 PM
**To:** Davis, Cameo E. <Cameo_Davis@fccourts.org>
**Cc:** Hummer, Jeanine A. <jhummer@franklincountyohio.gov>; Zervas, John A. <jzervas@franklincountyohio.gov>
**Subject:** RE: Online Form Submittal: Public Record Request

Director Davis:

I noted that this request was submitted on this past Friday, May 17, 2024, at 4:27pm. Is there a reason that I was not notified until today? Was either Ms. Hummer or Mr. Zervas aware of this request prior to your communication, notifying me that the Court was going to go through my email account?



**Judge Kimberly Cocroft**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P)** 614.525.7200| **(F)** 614.525.4641
Kimberly_Cocroft@fccourts.org | http://www.fccourts.org

**From:** Davis, Cameo E. <Cameo_Davis@fccourts.org>
**Sent:** Monday, May 20, 2024 9:43 AM
**To:** Brown, Kimberly J. <Kimberly_Brown@fccourts.org>; McIntosh, Stephen L. <Stephen_McIntosh@fccourts.org>;

1

Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Cc:** Goodman, Jennifer L. <Jennifer_Goodman@fccourts.org>; Bedsole, Susan E. <Susan_Bedsole@fccourts.org>
**Subject:** FW: Online Form Submittal: Public Record Request

Good morning,

Please see the below request.  We will be accessing your email to gather this information.

Thank you.



**Cameo Davis**
Pronouns: She/Her/Hers
Director of Human Resources and Training
**Franklin County Common Pleas Court**
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
(P) 614.525.5312 | (F) 614.525.8903
Cameo_Davis@fccourts.org | http://www.fccourts.org


**From:** noreply@civicplus.com <noreply@civicplus.com>
**Sent:** Friday, May 17, 2024 4:16 PM
**To:** GEN_HR <GEN_HR@fccourts.org>
**Subject:** Online Form Submittal: Public Record Request

If you are having problems viewing this HTML email, click to view a Text version.

## Public Record Request

| | |
|---|---|
| Your First Name* | Bethany |
| Your Last Name* | Bruner |
| Your eMail address* | bbruner@dispatch.com |
| Specific Record(s) Requested* | The Dispatch would like to request, electronically if at all possible, a copy of a complaint or letter filed in 2022 by Jennifer Goodman regarding Judge Kimberly Cocroft. The Dispatch would also like to request, electronically if at all possible, a copy of any and all documentation from Judge Cocroft to Judge Kim Brown and/or Judge McIntosh pertaining to records retention and/or potential litigation between April 1, 2024 and May 17, 2024. I can be reached at 937-408-3453 for any questions or clarifications. |

* indicates required fields.

View any uploaded files by signing in and then proceeding to the link below:
http://oh-franklincourts.civicplus.com/Admin/FormHistory.aspx?SID=7548


The following form was submitted via your website: Public Record Request

Your First Name: Bethany


Your Last Name: Bruner

Your eMail address: bbruner@dispatch.com

Specific Record(s) Requested: The Dispatch would like to request, electronically if at all possible, a copy of a complaint or letter filed in 2022 by Jennifer Goodman regarding Judge Kimberly Cocroft.

The Dispatch would also like to request, electronically if at all possible, a copy of any and all documentation from Judge Cocroft to Judge Kim Brown and/or Judge McIntosh pertaining to records retention and/or potential litigation between April 1, 2024 and May 17, 2024.
I can be reached at 937-408-3453 for any questions or clarifications.


Additional Information:
Form submitted on: 5/17/2024 4:16:27 PM
Submitted from IP Address: 198.30.81.2
Referrer Page: https://www.fccourts.org/
Form Address: http://oh-franklincourts.civicplus.com/Forms.aspx?FID=172

**Cocroft, Kimberly X.**

| | |
|---|---|
| **From:** | Hummer, Jeanine A. <jhummer@franklincountyohio.gov> |
| **Sent:** | Friday, January 27, 2023 4:33 PM |
| **To:** | Cocroft, Kimberly X. |
| **Cc:** | McIntosh, Stephen L. |
| **Subject:** | RE: PRR-0816_Request for records Change in Administrative Judge and Complaint (Dispatch) |

Thanks Judge.
Received

Jeanine Hummer
First Assistant Prosecuting Attorney and Chief Counsel Civil Division
373 S. High Street, 13th Floor
Columbus, OH 43215
Phone: 614-525-3269 Cell:614-5950099
Fax: 614-525-6012
jhummer@franklincountyohio.gov

Office of G. Gary Tyack
Franklin County Prosecuting Attorney
Franklin County Prosecutor's Facebook
Franklin County Prosecutor's Office

-----Original Message-----
From: Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
Sent: Friday, January 27, 2023 3:03 PM
To: Hummer, Jeanine A. <jhummer@franklincountyohio.gov>
Cc: ; McIntosh, Stephen L. <Stephen_McIntosh@fccourts.org>
Subject: PRR-0816_Request for records Change in Administrative Judge and Complaint (Dispatch)

Good afternoon, Ms. Hummer:

The statement below is intended to be part of the above-referenced public records release:

On November 15, 2022, a Judges' meeting was held, at which time The Honorable Kimberly Cocroft, through her attorney Sam Shamansky, denied all allegations set forth in Jennifer Goodman's complaint. Ms. Goodman withdrew her complaint. Judge Cocroft, for the good of the Court, resigned her position as Administrative Judge.



EXHIBIT
34

**Cocroft, Kimberly X.**

| | |
|---|---|
| **From:** | Cocroft, Kimberly X. |
| **Sent:** | Wednesday, April 10, 2024 2:27 PM |
| **To:** | Hummer, Jeanine A.; Zervas, John A. |
| **Subject:** | RE: PRR-0816_Request for records Change in Administrative Judge and Complaint (Dispatch) |

Thank you.



**Judge Kimberly Cocroft**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.7200| (F) 614.525.4641**
**Kimberly_Cocroft@fccourts.org** | http://www.fccourts.org

**From:** Hummer, Jeanine A. <jhummer@franklincountyohio.gov>
**Sent:** Wednesday, April 10, 2024 2:24 PM
**To:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>; Zervas, John A. <jzervas@franklincountyohio.gov>
**Subject:** RE: PRR-0816_Request for records Change in Administrative Judge and Complaint (Dispatch)

Judge
Let me follow up with John and report back to you by tomorrow regarding the information we have.
Thank you,
Jeanine


***This Opinion/Advice constitutes confidential legal advice that is protected by the Attorney-Client privilege and is not a public record. Do not cut, copy, paste, forward or disclose this Opinion /Advice, and do not save this Opinion/Advice in a public or shared file, folder, or location. If there are specific individuals within your department or agency who should receive this Opinion/Advice,  please contact me to provide their names and I will send this Opinion/Advice to those individuals directly. This will help ensure we maintain the Attorney–Client privilege associated with this Opinion/Advice.***


Jeanine Hummer
First Assistant Prosecuting Attorney and Chief Counsel
Civil Division
373 S. High Street,  13th Floor
Columbus, OH 43215
Phone:  614-525-3269  Cell:614-5950099
Fax:  614-525-6012
jhummer@franklincountyohio.gov

1



EXHIBIT

35

**Office of G. Gary Tyack**
**Franklin County Prosecuting Attorney**
Franklin County Prosecutor's Facebook
Franklin County Prosecutor's Office

**Office of G. Gary Tyack**
**Franklin County Prosecuting Attorney**

Franklin County Prosecutor's Office

*This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain private, confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, employee or agent responsible for delivering this message, please contact the sender by reply e-mail and destroy all copies of the original e-mail message.*

**From:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Sent:** Wednesday, April 10, 2024 2:09 PM
**To:** Zervas, John A. <jzervas@franklincountyohio.gov>; Hummer, Jeanine A. <jhummer@franklincountyohio.gov>
**Subject:** RE: PRR-0816_Request for records Change in Administrative Judge and Complaint (Dispatch)

Counsel:

In reference to the above-captioned matter, and consistent with the communication below, I was advised that the documents associated with this records request would be distributed at 5:00pm on January 27, 2023. However, after the 5:00pm deadline, I received a communication from my counsel, advising me that the production would be delayed, based on Ms. Goodman's request to review her records to determine whether she would supplement her production with additional responsive public records.

As of the date of this communication, I have never been provided with a copy of whatever records Ms. Goodman was given additional time to review, though my counsel and I were advised that the deadline for my statement and submission was intractable. My concern about Ms. Goodman withholding records is heightened by the fact that Ms. Goodman and every member of the Court's Administrative Leadership Team have permanently deleted all internal (Teams) messages, which I believe are public records, with me and every member of my staff. Those messages have been permanently deleted since at least November 4, 2022, though I still have Teams messages with persons who are no longer employed by the Court.

To that end, I am hereby requesting that your office procure a copy of whatever documents Ms. Goodman was given an additional opportunity to review regarding this public records request and that a hard copy of those documents be provided to me by this Friday, April 12, 2024.

Thank you.



**Judge Kimberly Cocroft**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.7200| (F) 614.525.4641**
Kimberly_Cocroft@fccourts.org | http://www.fccourts.org

2

**RULE 26.01.**          **Retention Schedule for the Administrative Records of the Courts.**

The following retention schedule shall apply for the administrative records of the courts:

**(A)     Administrative journal.**  Administrative journals that consist of court entries, or a record of court entries, regarding policies and issues not related to cases shall be retained permanently.

**(B)     Annual reports.**  Two copies of each annual report shall be retained permanently.

**(C)     Bank records.**  Bank transaction records, whether paper or electronic, shall be retained for three years or until the issuance of an audit report by the Auditor of State, whichever is later.

**(D)     Cash books.**  Cash books, including expense and receipt ledgers, shall be retained for three years or until the issuance of an audit report by the Auditor of State, whichever is later.

**(E)     Communication records.**  Communication records, including routine telephone messages on any medium where official action will be recorded elsewhere, may be destroyed in the normal course of business as soon as they are considered to be of no value by the person holding the records.

**(F)     Correspondence and general office records.**  Correspondence and general office records, including all sent and received correspondence, in any medium, may be destroyed in the normal course of business as soon as they are considered to be of no value by the person holding the records.

**(G)     Drafts and informal notes.**  Drafts and informal notes consisting of transitory information used to prepare the official record in any other form may be destroyed in the normal course of business as soon as they are considered to be of no value by the person holding the drafts and informal notes.

**(H)     Employment applications for posted positions.**  Employment applications for posted or advertised positions shall be retained for two years.

**(I)     Employee benefit and leave records.**  Employee benefit and leave records, including court office copies of life and medical insurance records, shall be retained by the appropriate fiscal officer for three years or until the issuance of an audit report by the Auditor of State, whichever is later.

**(J)     Employee history and discipline records.**  Records concerning the hiring, promotion, evaluation, attendance, medical issues, discipline, termination, and retirement of court employees shall be retained for ten years after termination of employment.



EXHIBIT

36

**(K)** **Fiscal records.**  Fiscal records, including copies of transactional budgeting and purchasing documents maintained by another office or agency, shall be retained for three years or until the issuance of an audit report by the Auditor of State, whichever is later.

**(L)** **Grant records.**  Records of grants made or received by a court shall be retained for three years after expiration of the grant.

**(M)** **Payroll records.**  Payroll records of personnel time and copies of payroll records maintained by another office or agency shall be retained for three years or until the issuance of an audit report by the Auditor of State, whichever is later.

**(N)** **Publications received.**  Publications received by a court may be destroyed in the normal course of business as soon as they are considered to be of no value by the person holding the publications.

**(O)** **Receipt records.**  Receipt and balancing records shall be retained for three years or until the issuance of an audit report by the Auditor of State, whichever is later.

**(P)** **Requests for proposals, bids, and resulting contracts.**  Requests for proposals, bids received in response to a request for proposal, and contracts resulting from a request for proposal shall be retained for three years after the expiration of the contract that is awarded pursuant to the request for proposal.

**Cocroft, Kimberly X.**

| | |
|---|---|
| **From:** | Cocroft, Kimberly X. |
| **Sent:** | Wednesday, July 13, 2022 2:46 PM |
| **To:** | Goodman, Jennifer L.; Bedsole, Susan E. |
| **Subject:** | Information Regarding Award |

Dear Honorable Cocroft,

*Congratulations* for being named the 2022 recipient of the William K. Thomas Distinguished Jurist Award. We are thrilled to have you take part in a great alumni tradition at Moritz.  I will be your point of contact for the event and have included information for you below.

<u>Event Details</u>
- Date: Friday, Sept. 9, 2022
- Location: The Faculty Club, Main Dining Room, 2nd Floor

Sent from my iPhone



EXHIBIT

37

**Cocroft, Kimberly X.**

| | |
|---|---|
| **From:** | Goodman, Jennifer L. |
| **Sent:** | Monday, September 12, 2022 9:19 AM |
| **To:** | Cocroft, Kimberly X. |
| **Subject:** | RE: My Schedule |

Hi Judge Cocroft:
I hope the award ceremony went well! So well deserved and congratulations! Talk to you soon. Jen



**Jennifer Goodman**
Pronouns: She/Her/Hers
Executive Director
**Franklin County Common Pleas Court**
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
**(P) 614.525.4147 | (F) 614.525.4480**
Jennifer_goodman@fccourts.org | http://www.fccourts.org

**From:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Sent:** Friday, September 9, 2022 8:54 AM
**To:** GEN_Executive_Management_Team <GEN_Executive_Management_Team@fccourts.org>
**Subject:** My Schedule

Good morning, Team:

I wanted to let everyone know that, once my dispos are completed, I will be leaving for the day. I am receiving an award from my law school at 5:30 tonight and I need to get myself together for that after what promises to be an interesting day. LOL!

Thanks,
Judge KC



**Judge Kimberly Cocroft**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.7200| (F) 614.525.4641**
Kimberly_Cocroft@fccourts.org | http://www.fccourts.org

**Cocroft, Kimberly X.**

| | |
|---|---|
| **From:** | Cocroft, Kimberly X. |
| **Sent:** | Tuesday, September 13, 2022 2:50 PM |
| **To:** | Goodman, Jennifer L.; Brown, Roxlauna S. |
| **Subject:** | Information Regarding Distinguished Jurist Award |

Good afternoon, Jennifer and Roxlauna:

I wanted to pass along information regarding the award I received on this past Friday from the Moritz College of Law and The Ohio State University.

The Moritz College of Law presents annual alumni awards in the areas of distinguished alumni, outstanding recent alumni, judicial excellence, community service, and public service. Nominations are accepted from fellow alumni and the legal community. Award nomination deadlines are in late spring and awards are presented in the fall.

In addition to awards given by the College of Law, The Ohio State University also has several alumni awards that are presented to law alumni. These include professional achievement awards, service awards, early career achievement awards, and citizenship awards.

The William K. Thomas Distinguished Jurist Award is given to an alumni who is a current or former judge and whose personal integrity and commitment to fairness, freedom, and equality exemplify the highest ideals of the judicial system. Moritz has presented this Award since 2000.



**Judge Kimberly Cocroft**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.7200| (F) 614.525.4641**
Kimberly_Cocroft@fccourts.org | http://www.fccourts.org



EXHIBIT

38

1

**Cocroft, Kimberly X.**

| | |
|---|---|
| **From:** | McIntosh, Stephen L. |
| **Sent:** | Wednesday, January 18, 2023 11:21 AM |
| **To:** | GEN_Judges |
| **Cc:** | Goodman, Jennifer L.; Bedsole, Susan E. |
| **Subject:** | Committee Assignments 2023 |
| **Attachments:** | Standing Committees - 2023.pdf |

Attached are the Committee assignments for 2023. Thank you to all the judges that agreed to serve or to continue to serve as committee chair.

**Judge Stephen L. McIntosh**
**Franklin County Court of Common Pleas**
345 South High Street, 4B
Columbus, Ohio 43215
**(614) 525-3550 (O)**
**(614) 525-3868 (F)**



EXHIBIT

39

1

# STANDING COMMITTEES
## 2023

**Finance**

**Julie Lynch, Chair**
Dan Hawkins, Vice Chair
Mark Serrott
Bill Sperlazza
Chris Brown
Sheryl Munson
Andria Noble

**Personnel**

**Karen Phipps, Chair**
Jaiza Page, Vice Chair
Michael Holbrook
Julie Lynch
Andy Miller
Mark Serrott
Kim Brown

**Rules**

**Carl Aveni, Chair**
Karen Phipps, Vice Chair
Michael Holbrook
Jeff Brown
Dan Hawkins
Kimberly Cocroft

**Assigned Counsel**

**Presiding Judge**
Kim Brown
**Administrative Judge**
Stephen McIntosh
**Chair, Rules Committee**
**Or Senior Judge**
Carl Aveni

**Technology**

**Kim Brown, Chair**
Chris Brown, Vice Chair
Julie Lynch
Andria Noble
David Young
Jaiza Page
Andy Miller

**Criminal**

**Michael Holbrook, Chair**
David Young, Vice Chair
Mark Serrott
Chris Brown
Jeff Brown
Karen Phipps
Sheryl Munson
Kimberly Cocroft

**Veterans' Service**

**Kim Brown, Chair**
David Young, Vice Chair
Bill Sperlazza
Dan Hawkins

**Access to Justice**

**Jaiza Page, Chair**
Sheryl Munson, Vice Chair
Jeff Brown
Kimberly Cocroft
Karen Phipps
Andy Miller

**Ex Officio Committee Members**

Administrative Judge Stephen McIntosh (All Committees)
Executive Director Jennifer Goodman (All Committees)
Deputy Director Susan Bedsole (All Committees)
Director of Human Resources, Cameo Davis (Personnel)
Interim Chief Probation Officer, Sara Shields (Criminal)
Director of Finance, Kimberly Canada (Finance & Assigned Counsel)
Director of Information Technology, Andrew Byerly (Technology)
Director of Court Support Services, Stacy Worthington (Criminal & Rules)

**Cocroft, Kimberly X.**

| | |
|---|---|
| **From:** | McIntosh, Stephen L. |
| **Sent:** | Wednesday, January 18, 2023 12:21 PM |
| **To:** | Cocroft, Kimberly X. |
| **Subject:** | RE: Committee Assignments 2023 |

We shall do so.

**Judge Stephen L. McIntosh**
**Franklin County Court of Common Pleas**
345 South High Street, 4B
Columbus, Ohio 43215
**(614) 525-3550 (O)**
**(614) 525-3868 (F)**

**From:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Sent:** Wednesday, January 18, 2023 11:38 AM
**To:** McIntosh, Stephen L. <Stephen_McIntosh@fccourts.org>; GEN_Judges <GEN_Judges@fccourts.org>
**Cc:** Goodman, Jennifer L. <Jennifer_Goodman@fccourts.org>; Bedsole, Susan E. <Susan_Bedsole@fccourts.org>
**Subject:** RE: Committee Assignments 2023

Thank you for sharing this information, Judge McIntosh.

Please accept this communication as my request to be advised of all committee meetings so that I may attend, though I understand that I will not be permitted to vote on any action items for Committees to which I have not been assigned.

Judge KC

**From:** McIntosh, Stephen L. <Stephen_McIntosh@fccourts.org>
**Sent:** Wednesday, January 18, 2023 11:21 AM
**To:** GEN_Judges <GEN_Judges@fccourts.org>
**Cc:** Goodman, Jennifer L. <Jennifer_Goodman@fccourts.org>; Bedsole, Susan E. <Susan_Bedsole@fccourts.org>
**Subject:** Committee Assignments 2023

Attached are the Committee assignments for 2023. Thank you to all the judges that agreed to serve or to continue to serve as committee chair.

**Judge Stephen L. McIntosh**
**Franklin County Court of Common Pleas**
345 South High Street, 4B
Columbus, Ohio 43215
**(614) 525-3550 (O)**
**(614) 525-3868 (F)**

1

**Cocroft, Kimberly X.**

| | |
|---|---|
| **From:** | Worthington, Stacy A. |
| **Sent:** | Thursday, February 2, 2023 3:10 PM |
| **To:** | Cocroft, Kimberly X.; Adkins, Vanita R.; Clow, Andrea J.; Teague, Alishia R. |
| **Cc:** | Crum, ShaQuanna N.; Reynolds-Spivey, Ebony M.; McCall, Tamara L. |
| **Subject:** | RE: Special Panel - February 3, 2023 |

Good afternoon, Judge,

We appreciate you being flexible and being willing to come down earlier.  Our experience is that with a 8:00 a.m. report check in time we usually have them all checked in by 8:30 a.m. which typically includes all of the stragglers as well.   I agree that having a debrief after this panel is a great idea!

The reason we create a 1 page informational sheet to hand to jurors before they leave is because they have to report back at a different date, time, and location than their original summons indicates.  We find it is helpful for them to leave with something they can physically refer back to in case they forget over the weekend.

Thanks again, Stacy



**Stacy Worthington**
Director of Court Support Services
**Franklin County Common Pleas Court**
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
(P) 614.525.2529  |  (F) 614.525.4480
Stacy_Worthington@fccourts.org  |  http://www.fccourts.org

**From:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Sent:** Thursday, February 2, 2023 1:36 PM
**To:** Adkins, Vanita R. <Vanita_Adkins@fccourts.org>; Clow, Andrea J. <Andrea_Clow@fccourts.org>; Teague, Alishia R. <Alishia_Teague@fccourts.org>
**Cc:** Worthington, Stacy A. <Stacy_Worthington@fccourts.org>; Crum, ShaQuanna N. <ShaQuanna_Crum@fccourts.org>; Reynolds-Spivey, Ebony M. <Ebony_Reynolds-Spivey@fccourts.org>; McCall, Tamara L. <Tamara_McCall@fccourts.org>
**Subject:** FW: Special Panel - February 3, 2023

Good afternoon, Ladies:

As a follow up, perhaps we can debrief after this panel so that my staff and I can gain a better understanding of the preferred process for a special panel. My bailiff, Ms. Crum, was not trained on this protocol and I have shared with her what I remember from my single experience back in 2015. So, it may be a worthwhile endeavor to discuss whatever protocol exists currently and other logistics associated with this process. For example, I had no idea that the Managers provided a letter or information sheet to the special panel.

Just a thought!

1

EXHIBIT
40

Thank you.



**Judge Kimberly Cocroft**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.7200| (F) 614.525.4641**
Kimberly_Cocroft@fccourts.org | http://www.fccourts.org

**From:** Cocroft, Kimberly X.
**Sent:** Thursday, February 2, 2023 1:29 PM
**To:** Adkins, Vanita R. <Vanita_Adkins@fccourts.org>; Clow, Andrea J. <Andrea_Clow@fccourts.org>; Teague, Alishia R. <Alishia_Teague@fccourts.org>
**Cc:** Worthington, Stacy A. <Stacy_Worthington@fccourts.org>; Crum, ShaQuanna N. <ShaQuanna_Crum@fccourts.org>; Reynolds-Spivey, Ebony M. <Ebony_Reynolds-Spivey@fccourts.org>; McCall, Tamara L. <Tamara_McCall@fccourts.org>
**Subject:** Special Panel - February 3, 2023

Good afternoon, Jury Managers and Ms. Worthington:

I wanted to reach out to you regarding the special panel that has been summoned for a Rape trial set to begin on Monday, February 6.

First, let me apologize for my delay in responding to your communications during this week; as you know, I am presiding over a murder trial, so the time and opportunity for Ms. Crum and I to be as responsive as each of us may desire or hope has been limited.

Next, it has been almost seven months since we requested the panel, so I am sure you can understand if I am a bit "foggy" on the particulars of that request; there has been quite a bit that has transpired between then and now.

Third, I pride myself on being as flexible and understanding as possible and not panicking in or about a particular situation. This circumstance is no exception. Since jurors were summoned at 8am, then I will arrive by no later than 8:15am. I will ask my Court Reporter and Bailiff to accompany me so that the special venire is familiar with my staff and so that this part of the process can be captured. Additionally, while I would have hoped that we could begin the process on Friday, I, like each of you, am guided by the schedules of counsel who have the ultimate responsibility for making selections. And if their schedules changed in such a way that we cannot begin selection on tomorrow, then I have to accommodate those changes to the best of my ability.

To that end, I will advise the venire that they will need to appear on Monday so that counsel and the Court have an opportunity to hear their excuses. I don't want any of you to feel as if counsel or I have attempted to place you in an awkward position with the information provided seven months ago, versus what will transpire now based on unforeseen circumstances. Moreover, I had a special panel summoned in 2015 (when my heel caught in a floor plate, causing me to fracture a toe, tear a tendon and sprain my ankle and the County wouldn't even cover my bandage wraps! LOL!) and the lawyers did not begin jury selection the day panel appeared, nor did we entertain any excuses. The process began on the following Monday, and I do not recall my staff having to manage the check-in process for those persons in the special panel. Be that as it may, my staff and I will handle check-in and I will advise the panel to report to Courtroom 2A for that process.

My staff and I will do what is necessary to remove any actual or perceived concerns that may exist with the special panel, and we appreciate whatever support you will provide.

2

My staff and I are still in trial, so if you have any other questions or concerns, then please send an email to me, with copy to Ms. Crum, and I will respond as quickly as my trial schedule permits.

Thank you.

Judge KC



**Judge Kimberly Cocroft**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.7200| (F) 614.525.4641**
Kimberly_Cocroft@fccourts.org | http://www.fccourts.org

**Cocroft, Kimberly X.**

| | |
|---|---|
| **From:** | Reynolds-Spivey, Ebony M. |
| **Sent:** | Friday, February 3, 2023 5:11 PM |
| **To:** | Bedsole, Susan E. |
| **Cc:** | Crum, ShaQuanna N.; Cocroft, Kimberly X. |
| **Subject:** | RE: Trial- Coverage |

Susan,

Thank you for this information. However helpful this information is, my original request was submitted on 10/5/2022. If I can help with additional information, please let me know.

Thanks



**Ebony M. Reynolds-Spivey, RPR**
Court Reporter for the Honorable Judge Kimberly Cocroft
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.3760 | (F) 614.525.4641**
Ebony_Reynolds-Spivey@fccourts.org | http://www.fccourts.org

**From:** Bedsole, Susan E. <Susan_Bedsole@fccourts.org>
**Sent:** Friday, February 3, 2023 4:29 PM
**To:** Reynolds-Spivey, Ebony M. <Ebony_Reynolds-Spivey@fccourts.org>
**Cc:** Crum, ShaQuanna N. <ShaQuanna_Crum@fccourts.org>; Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Subject:** Re: Trial- Coverage

Ebony:

There are seven courtrooms next week that need coverage with only three resources. As always, I will send out an email to all involved. However, I am also drafting an email to all Judges regarding this issue.

Susan E. Bedsole
Deputy Court Director
Franklin County Common Pleas Court
General Division
345 S. High Street, 2nd Floor
Columbus, Ohio 43215
(O) 614.525.3668
Get Outlook for iOS

**From:** Reynolds-Spivey, Ebony M. <Ebony_Reynolds-Spivey@fccourts.org>
**Sent:** Friday, February 3, 2023 4:26 PM
**To:** Bedsole, Susan E. <Susan_Bedsole@fccourts.org>

1



EXHIBIT

41

**Cc:** Crum, ShaQuanna N. <ShaQuanna_Crum@fccourts.org>; Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Subject:** FW: Trial- Coverage

Good afternoon, Susan

Thank you for working on getting coverage for my requested days off.  Once you have finalized  your decision, will you be able to notify ShaQuanna?

Thanks



**Ebony M. Reynolds-Spivey, RPR**
Court Reporter for the Honorable Judge Kimberly Cocroft
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.3760 |  (F) 614.525.4641**
Ebony_Reynolds-Spivey@fccourts.org  |  http://www.fccourts.org

**From:** Reynolds-Spivey, Ebony M.
**Sent:** Friday, February 3, 2023 10:27 AM
**To:** Bedsole, Susan E. <Susan_Bedsole@fccourts.org>
**Subject:** RE: Trial- Coverage

Good morning,

No, I will be here Monday and Tuesday.  The coverage is needed for Wednesday, Thursday, and Friday.



**Ebony M. Reynolds-Spivey, RPR**
Court Reporter for the Honorable Judge Kimberly Cocroft
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.3760 |  (F) 614.525.4641**
Ebony_Reynolds-Spivey@fccourts.org  |  http://www.fccourts.org

**From:** Bedsole, Susan E. <Susan_Bedsole@fccourts.org>
**Sent:** Friday, February 3, 2023 8:46 AM
**To:** Reynolds-Spivey, Ebony M. <Ebony_Reynolds-Spivey@fccourts.org>
**Subject:** RE: Trial- Coverage

Good morning:

At the time of your initial request on 1/20, you indicated 2/8-2/14.  Although there was no available coverage except for one day, 2/14, your email from yesterday indicated you were 'off next week'.  Are you now also gone Monday and Tuesday?

2



**Susan E. Bedsole**
Deputy Court Director | Franklin County Common Pleas Court
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
**(P) 614.525.3668 | (F) 614.525.4480**
Susan_Bedsole@fccourts.org | http://www.fccourts.org

**From:** Reynolds-Spivey, Ebony M. <Ebony_Reynolds-Spivey@fccourts.org>
**Sent:** Thursday, February 2, 2023 8:31 AM
**To:** Bedsole, Susan E. <Susan_Bedsole@fccourts.org>
**Subject:** Trial- Coverage

Good morning, Susan

I will be out of the office next week and we are scheduled to start a trial.

If you have any questions, please feel free to contact me.

Thank you!



**Ebony M. Reynolds-Spivey, RPR**
Court Reporter for the Honorable Judge Kimberly Cocroft
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.3760 | (F) 614.525.4641**
Ebony_Reynolds-Spivey@fccourts.org | http://www.fccourts.org

**Cocroft, Kimberly X.**

| | |
|---|---|
| **From:** | Cocroft, Kimberly X. |
| **Sent:** | Monday, February 6, 2023 12:48 PM |
| **To:** | Bedsole, Susan E. |
| **Cc:** | McIntosh, Stephen L.; Crum, ShaQuanna N.; Reynolds-Spivey, Ebony M. |
| **Subject:** | RE: Court Reporter Coverage Issues - Week of February 6 |

Thank you for this update.



**Judge Kimberly Cocroft**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.7200| (F) 614.525.4641**
Kimberly_Cocroft@fccourts.org | http://www.fccourts.org

**From:** Bedsole, Susan E. <Susan_Bedsole@fccourts.org>
**Sent:** Monday, February 6, 2023 11:34 AM
**To:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Cc:** McIntosh, Stephen L. <Stephen_McIntosh@fccourts.org>; Crum, ShaQuanna N. <ShaQuanna_Crum@fccourts.org>;
Reynolds-Spivey, Ebony M. <Ebony_Reynolds-Spivey@fccourts.org>
**Subject:** RE: Court Reporter Coverage Issues - Week of February 6

Good morning Judge:

I certainly apologize for the mistake, I know you are in 4E, typing too fast is a killer on a Monday! As to coverage, whenever a Judge is in trial, I assign a specific person for the entire time. Now that I know how many trials there are this week, I will be assigning Carolann Shutek to cover for you Wednesday through Friday. Should the trial go into next week, Carolann would continue to cover on Monday and Tuesday also.

Please let me know if you need anything further. Thank you.



**Susan E. Bedsole**
**Deputy Court Director | Franklin County Common Pleas Court**
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
**(P) 614.525.3668 | (F) 614.525.4480**
Susan_Bedsole@fccourts.org | http://www.fccourts.org

**From:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Sent:** Monday, February 6, 2023 9:18 AM
**To:** Bedsole, Susan E. <Susan_Bedsole@fccourts.org>
**Cc:** McIntosh, Stephen L. <Stephen_McIntosh@fccourts.org>; Crum, ShaQuanna N. <ShaQuanna_Crum@fccourts.org>;
Reynolds-Spivey, Ebony M. <Ebony_Reynolds-Spivey@fccourts.org>
**Subject:** RE: Court Reporter Coverage Issues - Week of February 6

Good morning, Ms. Bedsole:

1

Thank you for this information. As a point of clarification, I am in Courtroom 4E. Jury selection for my trial will take place in Courtroom 2A today and then we will be back in 4E starting tomorrow.

Since Ms. Reynolds submitted her request for coverage on October 5, 2022, will it still be necessary for us to send a Teams message requesting coverage on Wednesday, Thursday and Friday?



**Judge Kimberly Cocroft**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.7200| (F) 614.525.4641**
Kimberly_Cocroft@fccourts.org | http://www.fccourts.org

**From:** Bedsole, Susan E. <Susan_Bedsole@fccourts.org>
**Sent:** Monday, February 6, 2023 8:47 AM
**To:** GEN_Judges <GEN_Judges@fccourts.org>; GEN_Bailiffs <GEN_Bailiffs@fccourts.org>
**Subject:** Court Reporter Coverage Issues - Week of February 6

Good morning:

I wanted to make all Judges and bailiffs aware of the coverage issues this week as everyone will be impacted.

With two long-term medical leaves and an additional assigned court reporter position, we have struggled to provide coverage during the month of January. This circumstance continues to exist; however, this week the needs are even greater. Below are the courtrooms needing coverage, and the available float resources. This shortage will require not only float coverage, but the use of assigned court reporters to also assist in coverage. At this time, I know there is one trial starting this morning, but there may be additional trials starting, which will reduce the number of available floats to move from courtroom to courtroom. Floats will not be permanently assigned to a courtroom for the whole day/week, unless there is a trial.

Therefore, I am asking the following request order be followed each day, when possible:

1. See if chamber mate court reporter is available (I understand this doesn't work for 3E/F and 5E/F)
2. Send Teams message to me requesting coverage (please give *at least* 10 minutes notice)
   a. If float is available, they will be sent
   b. If float is unavailable, email will be sent to all assigned court reporters

I appreciate everyone's patience.

| COVERAGE REQUESTED | | | | |
|---|---|---|---|---|
| **Monday, Feb. 6** | **Tuesday, Feb. 7** | **Wednesday, Feb. 8** | **Thursday. Feb. 9** | **Friday, Feb. 10** |
| 3E (Page) | 3E (Page) | 3E (Page) | 3E (Page) | 3E (Page) |
| 3F (C Brown) | 3F (C Brown) | 3F (C Brown) | 3F (C Brown) | 3F (C Brown) |
| 4F (Noble) | 4F (Noble) | 4F (Noble) | 4F (Noble) | 4F (Noble) |
| 5F (Sperlazza) | 5F (Sperlazza) | 5E (Cocroft) | 5E (Cocroft) | 5A (Miller) |
| 6A (Aveni) | 6A (Aveni) | 5F (Sperlazza) | 5F (Sperlazza) | 5E (Cocroft) |
| 7F (Phipps) | 7F (Phipps) | 6A (Aveni) | 6A (Aveni) | 5F (Sperlazza) |
| | | 7F (Phipps) | 7F (Phipps) | 6A (Aveni) |

|  |  |  |  | 7F (Phipps) |
|---|---|---|---|---|
| **Float Resources Available Each Day** | | | | |
| Laurel Aurigema<br>Melissa Fox<br>Carolann Shutek<br><br>Carla Manahan<br>(covering Page) | Laurel Aurigema<br>Melissa Fox<br>Carolann Shutek<br><br>Carla Manahan<br>(covering Page until 1:30) | Laurel Aurigema<br>Melissa Fox<br>Carolann Shutek<br>Anderson Reporting | Laurel Aurigema<br>Melissa Fox<br>Carolann Shutek | Laurel Aurigema<br>Melissa Fox<br>Carolann Shutek |

Thanks.



**Susan E. Bedsole**
Deputy Court Director | **Franklin County Common Pleas Court**
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
**(P) 614.525.3668 | (F) 614.525.4480**
Susan_Bedsole@fccourts.org | http://www.fccourts.org

**Cocroft, Kimberly X.**

| | |
|---|---|
| **From:** | Shutek, Carolann X. |
| **Sent:** | Wednesday, February 8, 2023 8:46 AM |
| **To:** | Cocroft, Kimberly X. |
| **Subject:** | RE: Court Reporter Coverage |

Thanks, Judge.

I'll be there a little after 9:00 to set up.

Carolann



**Carolann Shutek**
Court Reporter
**Franklin County Common Pleas Court**
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
**(P) 614.525.3789**
Carolann_Shutek@fccourts.org | http://www.fccourts.org

**From:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Sent:** Wednesday, February 8, 2023 8:44 AM
**To:** Bedsole, Susan E. <Susan_Bedsole@fccourts.org>
**Cc:** Crum, ShaQuanna N. <ShaQuanna_Crum@fccourts.org>; Shutek, Carolann X. <Carolann_Shutek@fccourts.org>; Aurigema, Laurel A. <Laurel_Aurigema@fccourts.org>; Fox, Melissa S. <Melissa_Fox@fccourts.org>
**Subject:** Re: Court Reporter Coverage

Good morning, Ms. Bedsole:

Thank you for this confirmation and thank you, Ms. Shutek, for assisting us. We plan to start at 9:30am or shortly thereafter in 2A.

Judge Cocroft

Sent from my iPhone

> On Feb 8, 2023, at 8:13 AM, Bedsole, Susan E. <Susan_Bedsole@fccourts.org> wrote:
>
> Good morning:
>
> This email confirms Carolann Shutek will provide coverage for the remaining duration of your trial.
>
> Thanks.



**Susan E. Bedsole**

Deputy Court Director | **Franklin County Common Pleas Court**
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
**(P) 614.525.3668 |  (F) 614.525.4480**
Susan_Bedsole@fccourts.org  |  http://www.fccourts.org

**Cocroft, Kimberly X.**

| | |
|---|---|
| **From:** | Worthington, Stacy A. |
| **Sent:** | Thursday, March 30, 2023 3:56 PM |
| **To:** | Cocroft, Kimberly X. |
| **Subject:** | RE: Exclusion Dates for Judge Cocroft 4E |

Sounds great, Judge. We will connect next week!
Stacy



**Stacy Worthington**
Director of Court Support Services
**Franklin County Common Pleas Court**
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
(P) 614.525.2529 | (F) 614.525.4480
Stacy_Worthington@fccourts.org | http://www.fccourts.org

**From:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Sent:** Thursday, March 30, 2023 3:49 PM
**To:** Worthington, Stacy A. <Stacy_Worthington@fccourts.org>
**Cc:** McIntosh, Stephen L. <Stephen_McIntosh@fccourts.org>
**Subject:** RE: Exclusion Dates for Judge Cocroft 4E

I think a conversation would be fantastic. I am not available on tomorrow but will reach out to you next week by Teams to figure out good days.

Take care.



**Judge Kimberly Cocroft**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
(P) 614.525.7200| (F) 614.525.4641
Kimberly_Cocroft@fccourts.org | http://www.fccourts.org

**From:** Worthington, Stacy A. <Stacy_Worthington@fccourts.org>
**Sent:** Wednesday, March 29, 2023 4:54 PM
**To:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Cc:** McIntosh, Stephen L. <Stephen_McIntosh@fccourts.org>
**Subject:** RE: Exclusion Dates for Judge Cocroft 4E

1



EXHIBIT

42

Good afternoon, Judge,

Thank you so much for your kind words and prayers. You are correct my husband lost his father last summer so it has been difficult.

I agree that putting them all on March 27th wasn't necessary and that was the confusion with Giuseppe when I had indicated setting them timely once the judge returns he took that literally the 1st date back. I went over this again with him yesterday afternoon and explained for the other (2) dates as you had indicated to spread those few cases out throughout the following week of your return and not all on the same day.

I think it would be a good idea to regroup with the prosecutor's office since perhaps their newer administration would not be of that same mind set as years past. Unfortunately, I think with COVID we found ourselves pushing out criminal cases a lot further out than we ever had in the past prior to the pandemic which added to this as well. If we want to add different language to the Court Unavailable Continuance Entry that assignment e-Files that is an option too. If you would like, I could speak with Judge Holbrook about this and we could add this topic to a Judge's Criminal Committee agenda as well.

I could meet tomorrow or Friday at 2:30 or 3:00 if either would work for you. I have interviews the next couple of days so I don't have as much availability this week.
Thank you again, Stacy



**Stacy Worthington**
Director of Court Support Services
**Franklin County Common Pleas Court**
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
(P) 614.525.2529 | (F) 614.525.4480
Stacy_Worthington@fccourts.org | http://www.fccourts.org

**From:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Sent:** Wednesday, March 29, 2023 3:28 PM
**To:** Worthington, Stacy A. <Stacy_Worthington@fccourts.org>
**Cc:** McIntosh, Stephen L. <Stephen_McIntosh@fccourts.org>
**Subject:** RE: Exclusion Dates for Judge Cocroft 4E

Good afternoon, Ms. Worthington:

Next, thank you for this information. I appreciate the fact that Assignment has lost a lot of historical knowledge through attrition and that the pandemic changed so much regarding how the Court manages its work. However, my continuing confusion relates to all cases that are continued being moved to the "next business day" on which the Court returns. My historical experience has been that cases are distributed to various days in the week that a judge returns. So I was

surprised that my docket for this past Monday was heavier than I have experienced in memory and that the explanation I received for this anomaly was that it was necessary based on no waiver of time.

I don't know that my bailiff was aware of the fact that a concern from 2005 was the genesis of this practice. In fact, Ms. Crum reviewed her communications with Assignment regarding her management of my docket and the last time she received any update, request or information from Assignment (beyond what has been sent to her over the last two days) was October 2021, and that communication did not relate to this issue.

Additionally, I was not aware of the concern from the prosecutor's office regarding waiver language. And, if that continues to be a concern, then it seems that the Court should eliminate the internal form that bailiffs submit and, instead, bailiffs should advise counsel directly of schedule modifications and require the completion of a continuance entry so that the time waiver is included. I am contemplating whether that will be the practice for my chambers moving forward.

I had a motion in limine hearing that went far longer than I expected this afternoon, so today is no longer an option for a discussion. But I would like to talk more with you about this and would appreciate you letting me know your availability over the next couple of weeks.

Thank you.



**Judge Kimberly Cocroft**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.7200| (F) 614.525.4641**
Kimberly_Cocroft@fccourts.org | http://www.fccourts.org

**From:** Worthington, Stacy A. <Stacy_Worthington@fccourts.org>
**Sent:** Tuesday, March 28, 2023 5:41 PM
**To:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Cc:** McIntosh, Stephen L. <Stephen_McIntosh@fccourts.org>
**Subject:** RE: Exclusion Dates for Judge Cocroft 4E

Good afternoon, Judge,

My apologies for not responding sooner.

In reading the through the emails and speaking with Giuseppe, his email didn't articulate well what had been discussed between myself and the assignment office recently. I would like to start with emphasizing the assignment office has had several staff turnovers over the last few years and unfortunately with that came the loss of historical knowledge. On top of add the pandemic in which many chambers changed the way continuances were executed throughout the pandemic and how continuances were and are processed which has added to the some of the breakdown as well.

There has not been a new policy or practice changed regarding Assignment filing "Court Unavailable" continuances. We have filed these in years past and the practice was and is supposed to be that since the "waiver of time" language was not on the document it was important to reschedule these timely once the judge returned. In most cases, which includes ALL of the requests that ShaQuanna submitted, we had the ability to reschedule these timely once you returned

because the instructions indicated they could be rescheduled to any new date. Having said that, in my recent discussions with assignment (ie (2) new assistant assignment commissioners along with Giuseppe whom has only been here about a little over a year) was that if the instructions read to set the cases out 4 to 8 weeks and there is NO "waiver of time" then we need to explain the importance of the waiver and encourage them to try to have continuances with the waiver language executed. This specific practice is something that I learned when I started overseeing the assignment office in 2005. The former Chief of Staff with the Prosecutor's office repeatedly brought this up to myself and the Judges the importance of the waiver language. It has been our experience if a "Court Unavailable" continuance is filed and it is not set back in timely (within a 3 to 5 days) the Prosecutor will execute the normal continuance entry with the waiver language and back date it when the last continuance with the waiver was filed (essentially making the court unavailable continuance moot or a duplication).

I would be happy to meet with you and Judge McIntosh. Perhaps if the State has changed their philosophy as to the importance of the waiver language we can set a new practice of how we go about this. I can speak with Assignment tomorrow and have the Court Unavailable continuances done for April 10th and May 8th filed tomorrow and will work with the Clerk to have them approved.

Please let me know when you would like to meet to discuss this further.
Thank you, Stacy



**Stacy Worthington**
Director of Court Support Services
**Franklin County Common Pleas Court**
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
(P) 614.525.2529 | (F) 614.525.4480
Stacy_Worthington@fccourts.org | http://www.fccourts.org

**From:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Sent:** Tuesday, March 28, 2023 2:30 PM
**To:** Worthington, Stacy A. <Stacy_Worthington@fccourts.org>
**Cc:** McIntosh, Stephen L. <Stephen_McIntosh@fccourts.org>
**Subject:** FW: Exclusion Dates for Judge Cocroft 4E

Good afternoon, Ms. Worthington:

I wanted to follow-up regarding the communication below that I sent last week regarding how continuances are being managed. I am sure you are working through a crush of emails since your return to the office so I wanted to ensure that you saw this. I have copied Judge McIntosh because he is also unfamiliar with this policy.

I am hopeful that you may have time to talk with Ms. Crum and me (and Judge McIntosh) on tomorrow regarding this process. For some of my cases that were reset this week, counsel did not receive notice of the continuances and for the cases that are continued to April 10, we have not received the continuance entries through efile. As such, those lawyers may not have adequate time to notify their clients or adjust their calendars.

I look forward to speaking with you.

Thank you.



**Judge Kimberly Cocroft**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.7200| (F) 614.525.4641**
Kimberly_Cocroft@fccourts.org | http://www.fccourts.org

**From:** Cocroft, Kimberly X.
**Sent:** Monday, March 20, 2023 4:35 PM
**To:** Worthington, Stacy A. <Stacy_Worthington@fccourts.org>
**Cc:** McIntosh, Stephen L. <Stephen_McIntosh@fccourts.org>
**Subject:** FW: Exclusion Dates for Judge Cocroft 4E

Good afternoon, Ms. Worthington:

I know that you are out of the office until March 27 but I wanted to send this communication for your follow-up once you return.

Ms. Crum forwarded the communication below and the first three PDF documents above that she received from Giuseppe Cespedes on this past Friday. Ms. Crum also shared that, in conversation with Mr. Cespedes, you may have indicated that Assignment may only continue matters until the next business day after the Court's return, unless counsel and defendants sign a continuance entry.

In reviewing Loc. R. 79, I did not see the limitation regarding continuances that you may have conveyed to Mr. Cespedes. And in the countless times I have needed or requested that cases are continued on my docket, my staff and I have never been advised of this caveat. Ms. Crum maintains continuance requests and other ancillary documents for our internal records and this is the first instance in her time of service that she has received this kind of communication. As an example of what we have done and what has been approved historically, I have attached the fourth PDF document, which is a copy of the standard continuance entry that has been processed.

To provide context to this issue, Ms. Crum originally requested continuances for cases set March 21 and March 22. Those continuance requests were submitted on February 6, 2023; however, due to an oversight, they were not processed until Ms. Crum sent a reminder communication on February 27, 2023. Then, on last Tuesday, March 14, Ms. Crum submitted continuance requests for cases set on March 23 and March 24. Finally, on this past Friday at 4:11pm, Ms. Crum was advised on how long a case could be continued, as well as the requirement of an executed continuance and time waiver from counsel. We were also notified that cases scheduled for continuance on April 10 and May 8 would be set for the next business day after the Court's return, unless continuance entries and waivers of time were signed by counsel and defendants.

Because all of this information is new to us, my staff and I would greatly appreciate the opportunity to speak with you upon your return. While we will adhere to whatever processes are universally implemented and necessary to facilitate the filing of continuance entries at the judge's request, we would like to have clarity on what triggers this rule and when it becomes necessary to secure executed time-waived entries from counsel. The form that bailiffs complete requesting a continuance does not indicate that cases will be moved to the next business day following the Court's return. Moreover, if it is the historical practice of the court to move cases to that next business day after a judge returns, then it seems as if the form that bailiffs complete to continue cases is neither helpful nor necessary and that, in every instance, a continuance entry from counsel would be required. Again, this is the first time my staff and I have received the kind of communication that is below and, candidly, we are confused about the genesis of this process.

Thank you.



**Judge Kimberly Cocroft**
Pronouns: She/Her/Hers
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.7200| (F) 614.525.4641**
Kimberly_Cocroft@fccourts.org | http://www.fccourts.org

**From:** Crum, ShaQuanna N. <ShaQuanna_Crum@fccourts.org>
**Sent:** Monday, March 20, 2023 9:55 AM
**To:** Cocroft, Kimberly X. <Kimberly_Cocroft@fccourts.org>
**Subject:** FW: Exclusion Dates for Judge Cocroft 4E



**ShaQuanna Crum**
Pronouns: She/Her/Hers
Bailiff for the Honorable Judge Kimberly Cocroft
**Franklin County Common Pleas Court**
345 South High Street | 4th Floor | Columbus, OH 43215-4554
**(P) 614.525.4644 | (F) 614.525.4641**
**ShaQuanna_Crum@fccourts.org** | http://www.fccourts.org

**From:** Cespedes, Giuseppe X. <Giuseppe_Cespedes@fccourts.org>
**Sent:** Friday, March 17, 2023 4:11 PM
**To:** Crum, ShaQuanna N. <ShaQuanna_Crum@fccourts.org>
**Cc:** Ruiz, Pablo E. <Pablo_Ruiz@fccourts.org>
**Subject:** Exclusion Dates for Judge Cocroft 4E

Good afternoon, ShaQuanna!

I received Judge Cocroft's vacation sheets this morning, and since Pablo is out today, I went ahead and blocked off all those dates from the system calendar for both the criminal and civil dockets. Here's a rundown of the dates I blocked off:

- March
  - 3/21 – 3/24 (3/21 and 3/22 were previously blocked off)
- April
  - 4/7 – 4/10
- May
  - 5/5 – 5/8
  - 5/19
- June
  - 6/16 – 6/19

**Please make sure the Staff Attorney moves any civil cases scheduled on these dates.**

6

I also attached a list of the criminal cases that will need to be moved from each of the following docket dates:

- 3/23
- 4/10
- 5/8

Please note, that if the judge wants there to be a "waiver of time" on the criminal cases, you would need to reach out to counsel on the cases currently set on these dates and request for them to come in and execute a continuance entry so that there is a waiver of time in place.

Our office is only able to execute a Court Unavailable entry to move the attached cases (excluding sentencing hearings), which requires us to set these cases in on the judges "first available" date since there will not be a waiver of time on the entry. For example, we would be required to schedule all the 3/23 cases on 3/27 when the Judge returns, which would result in a heavier docket that day.

If you have any questions, feel free to let us know!

Have a great weekend!



**Giuseppe Cespedes**
Assistant Assignment Commissioner
**Franklin County Common Pleas Court**
345 South High Street | 2nd Floor | Columbus, OH 43215-4554
**(P) 614.525.3455 | (F) 614.525.4480**
Giuseppe_Cespedes@fccourts.org | http://www.fccourts.org