## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **KIMBERLY COCROFT** | : | **CASE NO: 2:24-CV-4208** |
| 345 S. HIGH STREET, SUITE 4E | | |
| COLUMBUS, OH  43215 | : | |
| | | |
| **Plaintiff,** | : | **JUDGE MICHAEL J. NEWMAN** |
| | | |
| v. | : | **MAGISTRATE JUDGE** |
| | | **CAROLINE H. GENTRY** |
| **FRANKLIN COUNTY OHIO[1]** | : | |
| 373 SOUTH HIGH STREET, 26TH FLOOR | | |
| COLUMBUS, OH 43215 | : | |
| | | |
| **RICHARD A. FRYE** | : | |
| 1669 ROXBURY ROAD | | |
| UPPER ARLINGTON, OH  43212 | : | **AMENDED COMPLAINT** |
| | | |
| **COLLEEN O'DONNELL** | : | **TRIAL BY JURY DEMANDED** |
| 1160 GLENN AVENUE | | |
| COLUMBUS, OH 43212-3230 | : | |
| | | |
| **KIMBERLY J. BROWN** | : | |
| 345 S. HIGH STREET, SUITE 5E | | |
| COLUMBUS, OH  43215 | : | |
| | | |
| **STEPHEN L. MCINTOSH** | : | |
| 345 S. HIGH STREET, SUITE 4B | | |
| COLUMBUS, OH  43215 | : | |
| | | |
| **MICHAEL J. HOLBROOK** | : | |
| 345 S. HIGH STREET, SUITE 5B | | |
| COLUMBUS, OH  43215 | : | |
| | | |
| **JULIE M. LYNCH** | : | |
| 345 S. HIGH STREET, SUITE 7E | | |
| COLUMBUS, OH  43215 | : | |

---

[1] The Original Complaint incorrectly listed this Defendant as "Franklin County, Ohio Prosecutor". Because Franklin County is an entity, it listed the "c/o" address as the county's legal representative, pursuant to Ohio Revised Code 309.09. Plaintiff *pro se* has corrected the information to avoid confusion regarding the Defendant she intended to name.

**MARK SERROTT**                    :
345 S. HIGH STREET, SUITE 6E
COLUMBUS, OH  43215                 :


**JEFFREY M. BROWN**                :
345 S. HIGH STREET, SUITE 4A
COLUMBUS, OH  43215                 :

**CHRISTOPHER M. BROWN**            :
345 S. HIGH STREET, SUITE 3F
COLUMBUS, OH  43215                 :

**DAVID YOUNG**                     :
345 S. HIGH STREET, SUITE 7A
COLUMBUS, OH  43215                 :

**KAREN HELD PHIPPS**               :
345 S. HIGH STREET, SUITE 7F
Columbus, OH  43215                 :

**DANIEL R. HAWKINS**               :
345 S. HIGH STREET, SUITE 6B
COLUMBUS, OH  43215                 :

**CARL. A. AVENI**                  :
345 S. HIGH STREET, SUITE 6A
COLUMBUS, OH  43215                 :

**SHERYL K. MUNSON**                :
345 S. HIGH STREET, SUITE 7B
COLUMBUS, OH  43215                 :

**JENNIFER GOODMAN**                :
3820 CASWELL NW RD.
JOHNSTOWN, OH  43031                :

**SUSAN E. BEDSOLE**                :
425 SANDMAR CT.
PATASKALA, OH  43062                :

**CAMEO DAVIS**                     :
345 S. HIGH STREET, 2ND FLOOR
COLUMBUS, OH  43215                 :

**STACY WORTHINGTON**            :
345 S. HIGH STREET, 2ND FLOOR
COLUMBUS, OH 43215                :

**JEANINE HUMMER**              :
373 S. HIGH STREET, 14TH FLOOR
COLUMBUS, OH 43215                :

**THERESA DEAN**                 :
373 S. HIGH STREET, 14TH FLOOR
COLUMBUS, OH 43215                :

            **Defendants.**

## Preliminary Statement

Plaintiff, Judge Kimberly Cocroft ("Plaintiff" or "Judge Cocroft"), *pro se* brings this against Defendant Franklin County for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-1 *et seq*., as amended (hereinafter referred to as "Title VII"), and the Civil Rights Act of 1991, 42 U.S.C. 1981a, as amended; the Civil Rights Act of 1871; the Civil Rights Act of 1866, 42 U.S.C. 1981, 42 U.S.C. 1983 and the Ohio Civil Rights Act, Ohio Revised Code Chapter 4112.01 *et seq*. to vindicate federal and state protected rights against unlawful employment practices on the basis of race and gender, and retaliation and against individual Defendants Richard Frye, Colleen O' Donnell, Kimberly J. Brown, Stephen L. McIntosh, Michael Holbrook, Julie M. Lynch, Mark Serrott, Jeffrey M. Brown, Christopher M. Brown, David Young, Karen Held Phipps, Daniel R. Hawkins, Carl A. Aveni, Sheryl K. Munson, Jennifer Goodman, Susan E. Bedsole, Cameo Davis, Stacy Worthington, Jeanine Hummer, and Theresa Dean, in their personal capacities for their violations of equal protection, procedural and substantive due process guarantees of the Fourteenth Amendment and in their official capacities for prospective injunctive relief. The allegations and claims involve timely offenses and also continuing violations which serve to toll

the applicable statutes of limitation. Pursuant to Fed.R.Civ.P. 15(a)(1)(A), Plaintiff *pro se* submits the within Amended Complaint.

## Introduction

1.      At all relevant times, Plaintiff Judge Kimberly Cocroft was a judge for the Franklin County Court of Common Pleas, General Division ("FCCP-Gen").

2.      Judge Cocroft has served as a judge for the Franklin County Court of Common Pleas, General Division ("FCCP-Gen"), since April 6, 2009, and has been overwhelmingly re-elected to that position by the voters of Franklin County in elections held in  2010, 2016, and 2022.

3.      Judge Cocroft is a lifelong resident of Columbus, Ohio having graduated from Bishop Hartley High School in 1991 and The Ohio State University in 1995, 1997 and 2000.

4.      Defendants Frye, O'Donnell, K. Brown, McIntosh, Holbrook Lynch, Serrott, J. Brown, C. Brown, Young, Held Phipps, Hawkins, Aveni, and Munson are individuals who acted as agents for FCCP-Gen through their election as a judge and condoned, ignored, ratified, and/or engaged in discriminatory, retaliatory, and hostile conduct and a pattern of corrupt activity in their capacity as managers of FCCP-Gen protocols, policies, and procedures, including procedures to address bad faith complaints filed by employees.

5.      Defendant Goodman was  promoted to the position of Court Administrator for FCCP-Gen in or around 2015.

6.      Defendant Bedsole was hired as Deputy Court Administrator for FCCP-Gen and served in that capacity from in or around 2016 through October 4, 2024.

7.      Defendant Davis is the Director of  Human Resources for FCCP-Gen.

8.      Defendant Worthington is the  Director of Court Support Services for FCCP-Gen.

9.      Defendant Hummer is First Assistant Prosecuting Attorney and Chief Counsel, Civil Division in the Office of Franklin County Prosecuting Attorney Gary Tyack.

10.     Defendant Dean is Deputy Director Labor and Employment, Civil Division, in the Office of Franklin County Prosecuting Attorney Gary Tyack.

11.     At all relevant times, Hummer and Dean served as counsel for FCCP-Gen Judges in their official capacity, which includes Plaintiff.

### Jurisdiction and Venue

12.     This suit is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., providing for relief from discrimination in employment on the basis of race and gender. The Ohio Revised Code §4112.02 *et seq*., prohibits discrimination in employment on the basis of race and sex.

13.     This Court has general federal question jurisdiction pursuant to 28 U.S.C.A. §§ 1331, 1343 and 1367.

14.     Venue is proper in the Southern District of Ohio under 28 U.S.C. §1391(b) because Judge Cocroft is a resident within the Southern District of Ohio, Defendant Franklin County is located within the Southern District of Ohio and the claims arose within the Southern District of Ohio.

### Administrative Process

15.     Judge Cocroft filed an administrative charge with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about May 23, 2024, which charge was docketed as 532-2024-03163.

16.     Judge Cocroft requested a "Right to Sue" letter on September 17, 2024 and the EEOC issued a "Right to Sue" notice, through the United States Department of Justice, to Judge Cocroft on or about October 2, 2024.

**Factual Background**

**A. An Election And The Immediate Consequences**

17.     In July 2021, Judge Cocroft was unanimously elected to serve as Administrative Judge of FCCP-Gen, beginning January 1, 2022. She was the first woman and first African American woman to serve in that role in the history of FCCP-Gen.

18.     The authority and responsibilities of an administrative judge are outlined in Rule of Superintendence 4.01, promulgated by the Supreme Court of Ohio.

19.     Sup. R. 4.01 states in part, "An administrative judge of a court or a division of a court *shall* do all of the following: Be responsible for and exercise control over the administration, docket, and calendar of the court or division; Be responsible to the Chief Justice of the Supreme Court in the discharge of the administrative judge's duties, for the observance of the Rules of Superintendence for the Courts of Ohio (* * *); Administer personnel policies established by the court of division; (* * *); Perform any other duties in furtherance of the responsibilities of the administrative judge." (Exhibit 1) (Emphasis added.)

20.     As Administrative Judge for FCCP-Gen, Judge Cocroft was also the supervisor for Goodman, in her capacity as Court Administrator. (Exhibit 2, Table of Organization)

21.     The election for Administrative Judge takes place the July preceding the year of service so that, if a new Administrative Judge is elected, the outgoing Administrative Judge, Court Administrator and Deputy Court Administrator can provide the incoming Administrative Judge with information about outstanding issues and training on Administrative Judge responsibilities.

22.     In 2021, McIntosh was the outgoing Administrative Judge.

23.     Beginning shortly after her election in July 2021, Judge Cocroft attempted to schedule a meeting with McIntosh, Goodman, and Bedsole on several occasions, to no avail.

24.     On November 4, 2021, Judge Cocroft sent an email to McIntosh's assistant, "A.S.", requesting a meeting with McIntosh "to discuss responsibilities that I will take on next year as Administrative Judge." (Exhibit 3)

25.     A.S. responded that she had asked McIntosh for a few dates and would "forward them when I have them." (Exhibit 3)

26.     On November 5, 2021, Bedsole sent a calendar invitation to Judge Cocroft titled, "AJ Transition" to schedule a meeting that would occur on November 10, 2021.

27.     Because Judge Cocroft had received no information regarding her duties as Administrative judge, and in an effort to learn more about the organization of FCCP-Gen and the responsibilities of its administrators, Judge Cocroft requested a copy of the FCCP-Gen Table of Organization and position descriptions for FCCP-Gen Directors and Probation Managers.

28.     Judge Cocroft received this information on November 8, 2021. It was the only information provided up to that point. (Exhibit 4)

29.     Judge Cocroft was scheduled to begin her service as Administrative Judge for FCCP-Gen on January 3, 2022.

30.     The November 10, 2021 meeting took place in the FCCP-Gen Judges' Conference Room.

31.     Before providing Judge Cocroft with information that should have been provided in July 2021, McIntosh began the meeting by stating, "Before I start, I want to tell you that Jen (Goodman) and Susan (Bedsole) are going to be your best friends."

32.     Though Judge Cocroft thought this was a strange way to introduce a meeting about her responsibilities as Administrative Judge, she said nothing.

33.     Thereafter, McIntosh provided her with a few pieces of paper with information that included: a.) a laminated sheet with names and telephone numbers of persons to call in case of a

weather emergency; b.) a sheet regarding the management of auto title requests; and c.) a sheet regarding the management of requests for prospective jurors.

34.    McIntosh then explained that there were several matters he would continue to manage even beyond his time of service as Administrative Judge, though any administrative matters should have been passed on to Judge Cocroft.

35.    Beyond these sheets of paper, there was very limited information that Judge Cocroft received about her duties as Administrative Judge. To Judge Cocroft's knowledge, no other Administrative Judge failed to receive training and information about outstanding issues.

36.    As a part of their job responsibilities, Goodman and Bedsole were required to inform the Ohio Supreme Court, other officeholders (e.g. Ohio Attorney General, Franklin County Prosecuting Attorney), and county agencies of the change in Administrative Judge. Neither Goodman nor Bedsole sent notifications to all FCCP-Gen partners regarding Judge Cocroft's election as Administrative Judge.

37.    Internal FCCP-Gen documents that should have included Judge Cocroft's name as the new Administrative Judge for 2022 were not created initially.

38.    Many documents that Judge Cocroft signed in the first two months of her service still included the name of outgoing Administrative Judge McIntosh.

39.    Historically, the picture of the Administrative Judge is hung in the lobby of the courthouse no later than the first day of the year in which the new term begins.

40.    Judge Cocroft's picture as Administrative Judge was not placed in the courthouse lobby until January 7, 2022.

41.    In December 2021, and prior to the start of Judge Cocroft's term as Administrative Judge, McIntosh's secretary delivered dozens of auto title applications that had been pending since 2020

8

and 2021. Shortly thereafter, Judge Cocroft and her staff received numerous calls on a daily basis from auto title applicants regarding why their documents had not been reviewed and when they could expect a final decision.

42.     McIntosh did not inform Judge Cocroft that he had not reviewed dozens of auto titles submitted in 2020 and 2021 during the meeting on November 10, 2021.

### B.  Be More Like Them

43.     On or around December 7 or 8, 2021, J. Brown and Serrott came to Judge Cocroft's office to inquire about why an employee on Judge Cocroft's staff was terminated.

44.     In Judge Cocroft's fifteen years of service as Judge, she is not aware of any circumstance in which a Caucasian judge was questioned by other judges about a personnel decision regarding their staff.

45.     J. Brown and Serrott began the conversation by stating that they came to find out why Judge Cocroft's employee quit because they had heard she quit.

46.     Judge Cocroft told J. Brown and Serrott that she owed them no explanation about her personnel decisions, just as Serrott had not been required to explain to her why his entire staff quit and joined the staff of a recently elected judge (Held Phipps).

47.     J. Brown and Serrott then told Judge Cocroft that, as Administrative Judge, she needed to be more approachable because "people" had said that she was not approachable or easy to get along with. J. Brown and Serrott then stated that they heard Judge Cocroft was unfriendly, did not talk to people, and was aggressive.

48.     Judge Cocroft responded that she had never heard those descriptions from anyone.

49. Thereafter, J. Brown gave Judge Cocroft a list of Black women whom she should be more like. Specifically, he said, "You ever heard of Joyce Beatty? Janet Jackson? Yvette McGee Brown? Laurel Beatty Blunt? Toshia Safford? You need to be more like them."

50. Serrott said nothing and did not disagree with J. Brown's statement and "list".

51. Judge Cocroft told J. Brown and Serrott that they did not have the right or her permission, in their paternalism and privilege, to come to her office, question her character and then give her a list of Black women whom she should be more like.

52. Judge Cocroft told them they would not accept her coming to their offices with a list of Caucasian men they should be more like and that, since they did not understand what it was or how it felt to be a Black person, let alone a Black woman, their comments were offensive.

53. Serrott then told Judge Cocroft that he would not want to be Black in America.

54. After J. Brown and Serrott left Judge Cocroft's office, she went to the office of McIntosh, who was still Administrative Judge, to tell him what happened. She was also scheduled to meet with him about administrative judge duties.

55. J. Brown is the suitemate of McIntosh and shares office space with him.

56. When Judge Cocroft arrived in McIntosh's office, she almost instantly began to cry and told McIntosh what J. Brown and Serrott said to her.

57. McIntosh responded that he worked with J. Brown at a local law firm prior to being elected to the bench and "that's just how he is."

58. McIntosh did not state that he would counsel Brown or Serrott about the inappropriate nature of their commentary to Judge Cocroft.

59. As of the filing of this complaint, Judge Cocroft has never been advised by McIntosh that he counseled with either J. Brown or Serrott and neither has ever apologized for their statements

about what kind of Black woman Judge Cocroft should be or for asking her to explain her personnel decisions.

### C. A New Year With the Same Old Hostility

60. Judge Cocroft began her term as Administrative Judge on January 3, 2022.

61. One of her first initiatives was to meet with Court Reporters regarding a work protocol adopted unanimously by the judges in December 2021.

62. The protocol was developed and approved after J. Brown, Serrott, Phipps, Hawkins, Aveni, and Munson pushed for the creation of a subcommittee to investigate complaints by Court Reporters against Bedsole, as well as a shortage of Reporters during a FCCP-Gen Judges meeting in or around September 2021.

63. In discussing the employment roles of Goodman, Bedsole, Davis, and Worthington regarding the management of complaints by staff assigned to FCCP-Gen Judges and efforts to hire new Court Reporters, Hawkins wrote in an email dated September 1, 2021, "To be blunt, I believe there are a number of us judges who feel that our belief in the importance and necessity of using a live court reporter is not shared by those on the second floor who work for us ( * * *) I am dismayed [with] how things operate here given the higher stakes of the cases we deal with (* * *)." (Exhibit 5) (Emphasis added.)

64. At the time of this September 2021 FCCP-Gen Judges' meeting, Judge Cocroft was Chair of the Personnel Committee but none of the judges who wanted an investigation discussed this matter with her prior to the meeting.

65. As J. Brown requested the formation of a subcommittee during the meeting to investigate claims against Bedsole, Goodman sent a message to Judge Cocroft that said, "I'm aware of some proposed actions but no one is communicated outwardly. All is behind the scenes and secretive.

Phipps/Hawkins/JBrown proposing something. So others have said. Again no one ever picked up the phone to talk. That what frustrates me. It's apparently a big conspiracy...I can't help if folks won't talk to me. A lot of misinformation. I guess they are not happy with us. Would be nice to be able to be made aware and not blind sided. An attack for sure. Blind side attack. Hard not to feel attacked. To have so many come at us the way they did <u>with no opportunity to even be made aware of what we are accused of is disheartening. And sad.</u>" (Emphasis added.)

66.     But instead of the creation of a subcommittee, Judge Cocroft, in her role as Chair of the Personnel Committee, was directed by McIntosh, in his capacity as Administrative Judge, to investigate the claims and to make recommendations.

67.     Judge Cocroft's investigation took two months to complete and the recommendations were adopted unanimously by FCCP-Gen Judges.

68.     Prior to Judge Cocroft's meeting with Court Reporters, no previous Administrative Judge had ever met with them as a group.

69.     The meeting was led by the Reporters assigned to J. Brown and Serrott. The Reporter who is now assigned to Aveni also helped to lead the discussion.

70.     When the meeting started, the Reporters assigned to J. Brown, Serrott, and Aveni began to question Judge Cocroft about when the Protocol was adopted, who approved it, why it was approved, and whether it could be changed.

71.      The Reporters for J. Brown, Serrott, Hawkins, Munson, and Aveni then said their judges told them that they were not aware of what was in the Protocol and that Judge Cocroft had created it without their input.

72.     Judge Cocroft explained the process that led to the creation of the protocol.

73. Further, Judge Cocroft told the Reporters that she completed the investigation, presented findings, and made recommendations that were adopted unanimously by FCCP-Gen Judges, including those who requested the investigation in the first place.

74. Judge Cocroft told the Reporters that, unless FCCP-Gen Judges voted to amend it, the Protocol would remain unchanged.

75. During the January 2021 meeting, Judge Cocroft observed the Reporters for J. Brown, Serrott, and Aveni rolling their eyes at her, making audible sighs and other noises, interrupting Judge Cocroft while she was speaking and signaling to one another when she said something with which they did not agree. None of the other Reporters said anything about this behavior during the meeting.

76. After the meeting, two of the unassigned Reporters, as well as the Reporters for C. Brown and Held Phipps apologized for how the Reporters addressed and treated Judge Cocroft.

77. The Chief Reporter for 2022 was assigned to and supervised by J. Brown.

78. After the January meeting with Reporters, J. Brown asked to meet with Judge Cocroft and Bedsole regarding the Court Reporter Protocol.

79. The meeting was held in the Judges' Conference Room on the second floor of the FCCP-Gen building.

80. During the meeting, J. Brown, who voted in favor of the Protocol, began to complain about it. As the issues were discussed, J. Brown said to Judge Cocroft (in the presence of Bedsole), "Well if I ever decided to fuck you over, I'd let you know before I did it."

81. Judge Cocroft told J. Brown that he would never have the opportunity to do that either professionally or personally. Bedsole said nothing.

82.     The conversation continued and J. Brown made a reference to women wearing skirts and doing work.

83.     Judge Cocroft told J. Brown that his comments throughout the meeting were inappropriate and insensitive. Bedsole said nothing. Both Bedsole and J. Brown are Caucasian.

### D.  Public Humiliation

84.     On June 6, 2022, a Data Board meeting was held. The Data Board is comprised of various county justice partners, including the Franklin County Clerk of Courts, the Chair of FCCP-Gen's Technology Committee (K. Brown), the Franklin County Auditor, and others.

85.     After the meeting, K. Brown contacted Bedsole to ask if there was any issue with Judge Cocroft, as Administrative Judge, and how the Court manages documents filed with the Franklin County Clerk of Courts. Bedsole told her there was no problem.

86.     K. Brown then relayed to Bedsole that the Clerk of Courts stated at the June 6, 2022 meeting that the "Common Pleas Administrative Judge" made the decision to facilitate a cybersecurity risk by allowing use of generic accounts for purposes of electronic filing and that the Clerk would be disabling those accounts unless and until she received an Order from the Court allowing the practice to continue.

87.     Judge Cocroft never ordered the creation of, nor does FCCP-Gen have the power to create, generic accounts for purposes of electronic filing.

88.     That work is assigned to the Franklin County Clerk of Courts, and it was the Clerk's staff that both implemented the process and then eliminated it with no notice to FCCP-Gen.

90.     The collateral consequences of the Clerk's decision were that filings from the Franklin County Public Defender's Office were being rejected, FCCP-Gen was not made aware of this decision and practice by the Clerk, and Judge Cocroft was blamed for the issue in a public meeting.

91.     K. Brown never reached out to Judge Cocroft directly to ask about these allegations or to share with her what was said at the public meeting.

92.     On June 7, 2022, Judge Cocroft wrote a detailed letter to the Clerk, explaining the decisions that her staff made (Exhibit 6 ).

93.     Judge Cocroft copied every stakeholder who attended the meeting when the Clerk made the unfounded allegations against her.

94.     As of the filing of this complaint, Judge Cocroft has never heard from the Clerk about this issue after the letter was sent and no public retraction has ever been made.

### E.  Judge Cocroft's Hires Ethnically Diverse Staff

95.     Judge Cocroft hired "S.C." as Bailiff in September 2021. S.C. is a Black woman.

96.     There was one other candidate who was interested in the position with Judge Cocroft and she was a Caucasian Probation Officer.

97.     The Caucasian Probation Officer was interested in going to law school and becoming a judge. During her interview with Judge Cocroft, she said that she wanted to work with her because she thought she would be able to help her with her decision-making process.

98.     Conversely, during S.C.'s interview, she stated she wanted to work with Judge Cocroft because she was interested in helping her  better manage her work and because she believed her experience as an Administrative Probation Officer gave her a unique skill set that would translate well to the bailiff position.

99.     Davis, in her employment capacity as Director of Human Resources, participated in both interviews.

100.    At the conclusion of both, Judge Cocroft asked Davis whom she thought was the better candidate. Davis said that the Caucasian candidate was better. She also mentioned that the Director

of Court Support Services, Worthington, was friends with the Caucasian candidate and also liked her better.

101.    Davis and Worthington work together on a daily basis.

102.    Judge Cocroft told Davis that she was not interested in hiring a candidate who would view the bailiff position as a steppingstone to the practice of law and, ultimately, the bench.

103.    Judge Cocroft told Davis that she needed someone who was fully committed to the position. Judge Cocroft also believed that S.C.'s skill set and experience was stronger than that of the Caucasian candidate. As such, Judge Cocroft told Davis that she would be selecting S.C. for the position.

104.    Because S.C. was an Administrative Probation Officer at the time of her hiring, Judge Cocroft allowed her, with Goodman's, Bedsole's and Davis's knowledge and agreement, to "wrap up" her work in the FCCP-Gen Probation Department.

105.    The reason that Judge Cocroft needed S.C. to start so quickly was because her prior bailiff, about whom J. Brown and Serrott attempted to question Judge Cocroft in December 2021, had left Judge Cocroft's criminal docket in complete disarray.

106.    Davis was aware of all the issues created by the former bailiff, as Davis had drafted her Performance Improvement Plan/Training Plan at Judge Cocroft's request. (Exhibit 7)

107.    For the first few weeks of her employment with Judge Cocroft, S.C. would work mornings until the criminal docket was completed and then work in the FCCP-Gen Probation Department in the afternoon.

108.    S.C.'s work in the Probation Department necessitated her use of the Ohio Community Supervision System (OCSS).

109.    Goodman, Bedsole, and Davis were aware of the fact that S.C. was accessing the OCSS.

110.   At some point in the early part of S.C.'s employment with Judge Cocroft, Bedsole contacted Judge Cocroft to tell her that "Administration" was checking employee use of certain systems, and it was noted that S.C. was accessing the OCSS.

111.   Judge Cocroft never received a complaint questioning the use of technology by her two prior bailiffs, who were Caucasian.

112.   Judge Cocroft had never received a complaint from anyone regarding S.C.'s alleged improper or unauthorized use of FCCP-Gen technology.

113.   Judge Cocroft again explained to Bedsole that S.C. left her employment with FCCP-Gen Probation without any notice in order to assist with getting her criminal docket back in shape after the prior bailiff's termination. To that end, S.C. was using the OCSS to wind up her probation work.

114.   At some point after that conversation, and without notice to Judge Cocroft, Bedsole, Goodman, Davis, or someone at their direction eliminated S.C.'s ability to access the OCSS.

115.   No one notified Judge Cocroft prior to terminating S.C.'s access to the OCSS.

116.   S.C.'s acceptance of the position with Judge Cocroft was predicated on Judge Cocroft's agreement with S.C. and her prior supervisor to allow S.C. to wrap up her work, including use of the OCSS, until a replacement was hired.

117.   Davis, Goodman, and Bedsole were aware of this agreement and understanding.

118..   Upon information and belief, Davis, Goodman, and Bedsole have made accommodations for Caucasian staff of FCCP-Gen Judges regarding use of leave time and other privileges of employment without question.

119.   Worthington, who is Director of Court Support Services, is responsible for training personal staff of FCCP-Gen Judges.

120. Prior to Judge Cocroft hiring S.C., Worthington provided comprehensive training to all Judge Cocroft's personal staff.

121. From 2009 through September 2021, all of Judge Cocroft's personal staff were Caucasian.

122. Judge Cocroft's current Bailiff, S.C., received limited training from Worthington.

123. Judge Cocroft overheard and witnessed the limited training and also overheard Worthington speaking to S.C. in a hostile and abrasive manner.

124. In one instance, when Judge Cocroft overheard Worthington speaking to S.C. in an elevated and abrupt tone, she walked out of her office and into S.C.'s adjacent office to ask if everything was alright.

125. Judge Cocroft never heard Worthington speak to her Caucasian staff in an abrupt and hostile manner.

126. Judge Cocroft witnessed Worthington training the bailiff and other staff of the judge with whom Cocroft shares office space for over a month.

127. The majority of S.C.'s training was provided by a Court Support Specialist. However, the Specialist was not able to answer all of S.C.'s questions. So, Judge Cocroft was required to provide training.

128. Judge Cocroft was never required to provide training to her Caucasian personal staff.

129. Judge Cocroft is required to provide monthly statistics reports to the Supreme Court of Ohio so that it has information on the number of cases pending on Judge Cocroft's docket.

130. It is the responsibility of the bailiff of every FCCP-Gen Judge to prepare the monthly reports.

131. Worthington did not train S.C. on how to prepare monthly statistics reports until November 2021, which was two months after S.C. began employment with Judge Cocroft.

132.    Monthly statistics reports are required to be submitted to the Supreme Court of Ohio at the end of every month.

133.    On May 16, 2022 and May 17, 2022, a Caucasian female Probation Officer demanded that Judge Cocroft explain to her why she issued an arrest warrant for a defendant on her docket and assigned to the Probation Officer for supervision. (Exhibit 8)

134.    The Probation Officer wrote:

> I made note after the 5/5/22 date that this hearing was scheduled for 5/20. I was not made aware that the disposition date had changed. The Clerk's Office has the incorrect address for the defendant as well so he would not have received notice. Is there any way the capias can be set aside and a new date scheduled since we were not made aware of the court date change?

135.    After Judge Cocroft replied and asked what the Officer meant by "We were not made aware ( * * *)" since the defendant's counsel appeared for the originally scheduled hearing, the Probation Officer stated, "Neither Mr. Kidwell or I was made aware of the date change. (* * *) I was not made aware of the change. (* * *) Again, probation was not made aware of this change. (* * *) I was not made aware that he did not appear for the 5/6 hearing. If I had been made aware, I could have communicated this directly to Mr. Kidwell."

136.    Judge Cocroft sent an email and advised the Probation Officer that two other Probation Officers had covered the hearing that the defendant failed to attend and were obligated to provide that information to her. Judge Cocroft also informed the Officer that the defendant himself had requested the date change. Finally, Judge Cocroft advised the Officer that her tone was off-putting and seemed to suggest that Judge Cocroft intentionally did not provide her with information. So, Judge Cocroft requested a meeting with the Officer, and the Chief Probation Officer.

137.    During the meeting, the Officer apologized for her behavior and said that she would be more thoughtful in her communications.

138. To Judge Cocroft's knowledge, the Officer has never communicated with a Caucasian-FCCP-Gen Judge in the way she communicated with Judge Cocroft.

139. On July 5, 2022, Judge Cocroft's new Staff Attorney, "D.H.", began her employment. D.H. is a Black woman.

140. Judge Cocroft advised Goodman, Bedsole and Davis more than a month before D.H.'s start date that she would be joining Judge Cocroft's staff so that preparations could be made regarding her technology and any other needs.

141. Judge Cocroft provided this notice because Goodman, Bedsole and/or Davis inquired repeatedly about information related to D.H.'s employment. Each had actual notice of D.H.'s start date.

142. Judge Cocroft was not in the office on D.H.'s first day of employment due to a previously scheduled commitment.

143. On D.H.'s first day, Goodman, Bedsole, or Davis sent an IT person who had no familiarity with the FCCP-Gen technology to assist D.H. with set-up.

144. For her first day of employment, D.H. had no access to email, voicemail, her calendar, Judge Cocroft's calendar, the electronic filing system, or any other technology needed to do her job.

145. D.H. advised Judge Cocroft of her challenges at the end of her first day.

146. Judge Cocroft apologized to D.H. for the lack of preparedness for her first day and attempted to ensure her that things would be corrected quickly.

147. Judge Cocroft was embarrassed and surprised by the lack of preparation associated with D.H.'s first day because there had never been an issue when Judge Cocroft's prior Staff Attorneys, who were all Caucasian, began employment.

148.    Judge Cocroft was concerned that D.H. may want to leave her employment based on the lack of organization associated with the beginning of her employment. Judge Cocroft expressed that concern to S.C and once again sent a communication to D.H. to assure her that things would get better.

149.    On July 6, 2022, at approximately 10:19am, Judge Cocroft sent an email to Goodman and Bedsole to inquire about D.H.'s issues and to request an update on when all the problems would be fixed. (Exhibit 9)

150.    Judge Cocroft did not receive a response from anyone until approximately 3:30pm on July 6, 2022 when Bedsole replied with partial answers and no update on when the problems would be fixed. (Exhibit 9)

151.    At approximately 4:30pm, Goodman came to Judge Cocroft's office to meet with her and to ask what was going on with D.H., even though the July 6, 2024 email was sent to her.

152.    The door to Judge Cocroft's chambers remained open during her meeting with Goodman.

153.    Judge Cocroft expressed her embarrassment, disappointment and frustration that D.H. had no access to any of the technology she needed to do her job.

154.    Judge Cocroft told Goodman that this circumstance was a continuation of the lack of institutional support that she and her staff received, as S.C. went through the same experience during her onboarding as a bailiff in September 2021.

155.    Judge Cocroft told Goodman that she worked hard to ensure that everyone received the support they needed to do their jobs, and that she would appreciate the same consideration and support for herself and her staff.

156.    Judge Cocroft told Goodman that the issues needed to be corrected by the next business day. Judge Cocroft made this statement outside of her office and across from S.C.'s office who heard the conversation.

157.    Even after this conversation between Judge Cocroft and Goodman, it took a few weeks for D.H.'s technology to be fully functional.

158.    D.H. did not receive a printer for her office (standard for all FCCP-Gen Judges' staff) until December 2022 and it was not fully operational until February 2023.

159.    None of Judge Cocroft's prior Caucasian Staff Attorneys had ever begun employment without being provided with a printer for their office.

160.    Judge Cocroft hired "T.M." as her Assistant in October 2022. T.M. is a Black woman with more than 30 years of experience working in various capacities in Franklin County, including its justice system.

161.    As one of her job responsibilities, Worthington is responsible for training the assistants of FCCP-Gen Judges.

162.    T.M. received limited training from Worthington and/or her staff.

163.    There was never an issue with training for Judge Cocroft's prior assistants, who were Caucasian.

164.    When Judge Cocroft hired T.M., and similar to her other recently hired Black staff, T.M. did not have full access to and use of the Court Forms technology which T.M. needed to prepare Judgment Entries, a central component of Judge Cocroft's work. Judge Cocroft had to request that T.M. be provided with full access to Court Forms technology.

165.     Neither Goodman, Bedsole, Davis, or Worthington ever told T.M. that she could bring in her laptop and have applications installed, in the event that she needed to do work while at home. T.M. did not learn of this until a chance conversation with Judge Cocroft in early 2024.

166.     To Judge Cocroft's knowledge, every Assistant is made aware that applications can be installed on laptops to allow the ability to work from home.

167.     Beginning July 26, 2022 and at various points thereafter, Davis began asking Judge Cocroft's Black staff (S.C., D.H., and T.M.) to provide additional copies of approved leave slips signed by Judge Cocroft.

168.     Davis told Judge Cocroft's staff that they did not have record of the leave slips and needed to confirm that the time was approved by Judge Cocroft.

169.     Judge Cocroft's Caucasian staff had never been asked to verify that they had submitted leave slips that were approved and signed by Judge Cocroft.

170.     In May 2022, J. Brown, Serrott, Frye, and several other FCCP-Gen Judges complained about the inability of their personal staff to get coverage when they took leave from the office.

171.     In investigating this concern in her capacity as Administrative Judge, Judge Cocroft directed Goodman, Bedsole, and Davis to review the use of leave time by FCCP-Gen Judges personal and assigned staff.

172.     Through that inquiry, Judge Cocroft learned that FCCP-Gen had provided more than a year's worth of coverage for employees who either had no leave time available or never submitted a leave slip. (Exhibit 10)

173.     Additionally, Judge Cocroft learned that the employees who chronically violated this policy were Caucasian and were never required to provide Davis with proof of submitted leave slips or available leave time.

### F. An Avalanche of Hostilities

174.    At the first FCCP-Gen Judges' Meeting of her service as Administrative Judge in January 2022, Judge Cocroft shared with all judges that she wanted to implement several initiatives during her tenure: a.) the adoption of a local rule that outlined the role and responsibilities of the Administrative Judge (prior to 2022, there was no FCCP-Gen Local Rule that explained this position); b.) the implementation of an online payment portal for the payment of court, costs, fines, restitution and other money sanctions; c.) the translation of all criminal and probation forms into Spanish, Nepali and Somali; d.) the creation of an Access to Justice committee to address gaps in the delivery of services to various populations; e.) the implementation of a Diversity, Equity and Inclusion Director position for FCCP Gen; and f.) a review of Judge Cocroft's guiding principles to R.A.I.S.E. (Respect, Accountability, Intentionality, Success, Excellence) The Bar.

175.    During the meeting, no FCCP-Gen Judge expressed any objection to Judge Cocroft's initiatives. But that lack of objection would dissipate over the course of ensuing months.

177.    On July 11, 2022, Judge Cocroft received an email from Aveni, a Caucasian male FCCP-Gen Judge, complaining about the fact that he did not receive the number of jurors he requested for a criminal trial. (Exhibit 11).

178.    As the Administrative Judge for 2022, it was Judge Cocroft's responsibility to make assignment of juror panels for both criminal and civil matters.

179.    In this instance, it was not the case that Aveni did not receive a panel; rather, he received two fewer prospective jurors than he requested.

180.    On this particular day, there were four (4) requests for jury panels - three for criminal cases and one for a civil case - and all requests were filled.

181. Judge Cocroft explained to Aveni that her efforts were to fulfill all four requests so that no FCCP-Gen Judge who requested a panel would have to wait to start trial.

182. Judge Cocroft further explained that, prior to the day of trial, Aveni could have advised her of any extenuating concerns that would have prioritized his request or he could have summoned a special panel that would have been for his case only.

183. Aveni then attempted to lecture Judge Cocroft about the assignment of jurors for civil cases and said, "One of the civil cases going today is before a Visiting Judge. I am surprised they are pulling 21 jurors under the circumstances and given that measure of priority against the exigencies of this matter. Having been on the receiving end of that dynamic many times during my time in private practice on civil cases, I knew how that issue traditionally broke out, when a VJ was involved."

184. The only way that Aveni would have known the number of jurors assigned in a civil matter is by getting the information from a Jury Manager, who is only supposed to provide that information to the Administrative Judge.

185. To Judge Cocroft's knowledge, no Jury Manager had ever provided a FCCP-Gen Judge with the number of prospective jurors assigned to a case by the Administrative Judge.

186. Thereafter, Judge Cocroft told Aveni that the judge for the civil matter requested 24 jurors and that every judge had gotten fewer than requested. Judge Cocroft explained the nuances of juror assignment are based on the number of persons who answer summons and that her responsibility was to every judge who requested a panel.

187. Judge Cocroft learned later that the matter before Aveni could not even proceed to trial because there was an unresolved evidentiary issue.

188.    To Judge Cocroft's knowledge and as of the filing of this complaint, Aveni has never sent an email questioning the juror assignment decision of any Administrative Judge since Judge Cocroft's service in that position ended in November 2022.

189.    After the conversation with Aveni, Judge Cocroft received an email from Serrott's Staff Attorney.  (Exhibit 12). Serrott's Staff Attorney is a Caucasian woman.

190.    The email included all the specific language that Judge Cocroft had just advised Aveni would be necessary in order to indicate that a matter should be a higher priority in the assignment of jurors.

191.    Based on this identical language, Judge Cocroft believed that Aveni and Serrott had discussed Aveni's complaint.

192.    Consequently, Judge Cocroft went to Serrott's office and told him that she had received the email from his Staff Attorney and, based on the language in the email, it appeared Serrott had a conversation with Aveni about Judge Cocroft and her decision. Serrott confirmed that Judge Cocroft's belief was correct.

193.    Judge Cocroft also told Serrott it was clear, based on the tone of his Staff Attorney's email, Aveni had not given Serrott the entire story.

194.    To that end, Judge Cocroft read the series of communications between Aveni and her to Serrott who was surprised by the details that had been left out. Specifically, Serrott said that Aveni led him to believe that he had not received a jury panel at all. Judge Cocroft clarified for Serrott that Aveni received a panel but with two fewer prospective jurors than requested.

195.    To Judge Cocroft's knowledge, there is no Caucasian or male Administrative Judge who has had to justify their decision-making process regarding the assignment of jurors.

196.    In Summer 2022, Judge Cocroft implemented a plan to translate all of the Court's criminal forms into Spanish, Nepali, and Somali as a recognition of the diverse communities the Court serves.

197.    The Language Access Coordinator at the time, "C.K.", led this effort and the FCCP-Gen Judges, Goodman, Bedsole, Davis, and Worthington were aware of this initiative, as Judge Cocroft announced it at the first Judges' Meeting of the year in January 2022.

198.    While the forms which would have been used by all FCCP-Gen Judges and probation staff were being finalized, C.K. sent Judge Cocroft a communication, informing her that Munson, a Caucasian woman, asked C.K. to translate criminal forms into Spanish but _only_ for use in her courtroom. (Exhibit 13)

199.    C.K. was concerned about ignoring Munson's request but understood that Judge Cocroft had requested that she lead the process for translating all forms for _all_ FCCP-Gen Judges.

200.    After being advised of this request, Judge Cocroft sent Munson an email and reminded her of the courtwide effort to translate all forms and informed her that the process was almost complete. (Exhibit 14).

201.    Judge Cocroft shared with Munson that, while C.K. was a high-level professional, FCCP-Gen was required to use the Supreme Court of Ohio's Language Services Program to translate forms and that those rules must be followed.

202.    Munson continued to send communications to Judge Cocroft that were argumentative in tone, stating that, based on her many years of experience as a Public Defender, she understood what needed to be done and that the lack of translated forms was a significant concern to her both as a former Public Defender and as a judge. (Exhibit 14)

203.    Prior to her effort and initiative to translate all criminal forms during her tenure as Administrative Judge in 2022, there had never been any effort by any FCCP-Gen Administrative Judge, FCCP-Gen Judge, or attorney in the Public Defender's Office or elsewhere who conferred with the Court about translating forms.

204.    Judge Cocroft told  Munson that, based on her commitment to making FCCP-Gen more accessible to our diverse communities, Judge Cocroft would be happy to assign her to the Court's Access to Justice standing committee. Judge Cocroft sent the offer email on or about Augst 29, 2022. (Exhibit 14)

205.    Judge Cocroft carbon copied Goodman and Bedsole on her emails with Munson and each was aware of Judge Cocroft's offer to Munson regarding service on the Access to Justice Committee.

206.    As of the filing of this complaint, Munson has never responded to that offer. However, when committee assignments were made for 2023, Goodman and/or Bedsole proposed to McIntosh, in his capacity as Administrative Judge, that Munson serve as Co-Chair of the Access to Justice Committee, while making Judge Cocroft a standard member of the committee she created.

207.    Although the translation process was completed in 2022, Goodman did not release the forms for use until mid-2023.

208.    Judge Cocroft later learned through speaking with interpreters, who appeared in court to assist in certain hearings, that many of them were not even aware that the forms existed and were not given access to them.

209.    In July 2022, Judge Cocroft developed an idea to institute criminal settlement weeks to help address the backlog of cases created by the COVID-19 pandemic. She contacted the Franklin

County Prosecuting Attorney, Franklin County Public Defender, and private defense counsel about this initiative in an effort to develop a working group, and all were on board to discuss the idea.

210.    In Judge Cocroft's first meeting with the representatives of the Franklin County Prosecuting Attorney on July 27, 2022, the First Assistant for Criminal Cases, "J.G.", was visibly disinterested. Eventually, she said, "Have you talked with the other judges about this? I don't think they know about this." J.G. is a Caucasian woman and the former law partner of J. Brown.

211.    Judge Cocroft explained that she wanted to gauge the interest of FCCP-Gen justice partners and formulate an idea before taking it to the Court. Judge Cocroft also explained that Sup. R. 4.01, which outlines the authority of the Administrative Judge, permitted her to have a conversation, at the very least.

212.    After the meeting, a senior member of the Franklin County Prosecuting Attorney's Office who participated in the meeting came to Judge Cocroft's office to apologize for J.G.'s behavior.

213.    This senior member said that during the meeting, which was held via Zoom, they noticed that J.G. was rolling her eyes, not paying attention and was disrespectful in every comment she made to Judge Cocroft. The senior member said they did not know why J.G. was behaving that way, but they were embarrassed and wanted to apologize.

214.    The senior member then advised Judge Cocroft that she should work with another senior member of the Franklin County Prosecuting Attorney's Office moving forward.

215.    To Judge Cocroft's knowledge, J.G. has never interacted with a Caucasian FCCP-Gen Judge in a hostile or dismissive way.

216.    Eventually, the working committee developed several options for the implementation of criminal settlement weeks. (Exhibit 15)

217. The Supreme Court of Ohio asked all courts to come up with ideas for reducing the number of overage cases.

218. As of the date of the filing of this complaint, the pilot program for criminal settlement weeks has never been approved or implemented by FCCP-Gen Judges.

219. In July 2022 at an Access to Justice Committee meeting, Judge Cocroft led a discussion about the position of DEI Director that she introduced initially at the January 2022 FCCP-Gen Judges' Meeting.

220. Specifically, Judge Cocroft shared that she wanted to explore the idea of elevating the Services, Equity and Inclusions (SEI) Manager position to a DEI Director position for FCCP-Gen.

221. During the meeting, McIntosh said that he believed it was a good idea to have a DEI Director position and to consider elevating the SEI Manager position. Other FCCP-Gen Judges who were members of the Access to Justice Committee in 2022 agreed.

222. After the meeting, Goodman and Bedsole told Judge Cocroft they were annoyed that she did not share her thought about the SEI Manger/DEI Director positions with them, and she told them that she did not share her thought with anyone.

223. Judge Cocroft also explained that Sup R. 4.01 gives the Administrative Judge the authority to manage the administration, docket and calendar of the court, and to administer personnel policies.

224. Judge Cocroft also reminded Goodman and Bedsole that, during the meeting, McIntosh said Judge Cocroft's proposal was a necessary and good idea, particularly given the fact that FCCP-Gen would not have to find budget money to support a completely new position.

225.    On or around September 8, 2022, Aveni notified Judge Cocroft that he had committed FCCP-Gen to participate in an expungement clinic that was occurring on Saturday, September 10, 2022. (Exhibit 16)

226.    Participation in the expungement clinic required FCCP-Gen to submit an order to the Clerk of Courts, allowing all filing fees to be waived.

227.    The only person who is permitted to prepare such an order is the FCCP-Gen Administrative Judge.

228.    Aveni did not talk with Judge Cocroft about this initiative or what would be necessary to ensure participation and protect the operational integrity of FCCP-Gen before making the commitment to participate.

229.    Because Judge Cocroft did not want to be blamed for failing to do what was necessary to ensure participation in the expungement clinic, she prepared and filed the Order one day before the event was scheduled.

230.    Beyond committing FCCP-Gen to participate in the event, Aveni also invited certain judges (Serrott, C. Brown and Holbrook) to attend the event.

231.    Judge Cocroft told Aveni that she would appreciate receiving a copy of the flyer so that she could give all FCCP-Gen Judges the opportunity to participate and so that  the Court could avoid the appearance of selective invitations. (Exhibit 17)

232.    In September 2022, Bedsole requested a meeting with Judge Cocroft to discuss various issues associated with her service as Administrative Judge.

233.    During this meeting, Judge Cocroft asked Bedsole for an update regarding the DEI Director position, since the budget presentation was scheduled for October 2022.

234.   Bedsole said, "I knew you were going to ask about that. Cameo (Davis) just said to me last week, 'You know Judge Cocroft is going to ask about this soon.'"

235.   Bedsole then shared with Judge Cocroft that Goodman told Bedsole, Davis, Worthington and another FCCP-Gen Director to stop working on the budget submission for a DEI Director position.

236.   Bedsole told Judge Cocroft that Goodman had discussed the necessity of the position with the other FCCP Gen Directors and some of them did not think it was necessary.

237.   Bedsole also told Judge Cocroft that Goodman's idea was to move the position so that it would be a direct report to the HR Director (Davis). Judge Cocroft told Bedsole that plan was unacceptable because DEI is different from HR.

238.   Judge Cocroft told Bedsole that she was disappointed that the FCCP-Gen Directors decided to have a conversation about this among themselves, but no one thought enough of Judge Cocroft, as Administrative Judge, to bring the issue to her, until she happened to mention it in a meeting on wholly unrelated topics.

239.   Judge Cocroft told Bedsole that she would convene a meeting with the FCCP-Gen administrative team to discuss this development.

240.   Between the time of the initial conversation with Bedsole and Judge Cocroft's attempt to set up a meeting regarding this issue, Judge Cocroft's uncle died unexpectedly on Monday, September 26, 2022.

241.   Judge Cocroft's father asked her to assist with transport of her uncle's body from his home and other matters associated with his final service and winding up his affairs.

242.    On the day that Judge Cocroft's uncle died, Goodman was out of the office, so she informed Bedsole that she needed to leave due to the circumstance. Bedsole shared the information about the death of Judge Cocroft's uncle with Goodman.

243.    On Friday, September 30, Judge Cocroft planned to leave the office during the lunch period when the Court was closed so that she could purchase her uncle's burial clothes.

244.    As Judge Cocroft was preparing to leave, Goodman and Bedsole came to her office and asked her bailiff, S.C., if she was available to talk.

245.    Judge Cocroft could hear S.C. telling Goodman and Bedsole that Judge Cocroft was about to leave to buy burial clothes for her uncle. Goodman then replied, "This won't take long."

246.    Judge Cocroft asked S.C. to send Goodman and Bedsole into her office.

247.    When Goodman came in, she started by saying Bedsole told her what was relayed to Judge Cocroft about work being halted on the DEI Director position.

248.    Goodman then stated that the work had not actually stopped but that she was attempting to come up with alternatives and that the position would be in the budget.

249.    Judge Cocroft thanked Goodman and Bedsole for stopping by but told Goodman that she did not have the emotional bandwidth to have the conversation with them that day because she was going to buy burial clothes for her uncle, which S.C. had stated to them.

250.    Judge Cocroft told Goodman that she planned to meet with the administrative team about the issue because she had some concerns based on what Bedsole shared.

251.    Goodman continued to try to explain her position to Judge Cocroft who told her that she needed to leave so that she could handle family business and get back by 1:30pm when the Court reopened after lunch.

252.    Goodman continued to talk and Judge Cocroft finally told her that she needed to leave.

253. Goodman never offered condolences or expressed concern to Judge Cocroft about the death of her uncle.

254. On October 4, 2022, Judge Cocroft addressed Goodman, Bedsole, Davis, Worthington, one additional FCCP-Gen Director , and the Chief Probation Officer regarding the DEI Director issue.

255. Judge Cocroft said that she was disappointed in the administrative team's decision to have conversations without involving her, to cease work on the initiative, to take an internal poll about who thought the position was even necessary and to lead Judge Cocroft to believe that the work was going forward when it was not.

256. Judge Cocroft told Goodman that, as her direct report based on the Court's table of organization, it was Goodman's responsibility to come to Judge Cocroft first with any issues and that was her expectation moving forward.

257. Judge Cocroft told everyone in attendance that she did not want to answer questions during the meeting because she wanted to maintain a calm demeanor, as she was still trying to finalize her uncle's funeral and was already very emotional.

258. However, because there had been references to the quality of work from the SEI Manager and her ability to potentially be responsible for the work of a DEI Director, Judge Cocroft told the administrative team that she would hold a meeting with them and the SEI Manager to address any concerns.

259. Thereafter, Judge Cocroft scheduled a meeting with Goodman, Bedsole, Davis, the Chief Probation Officer, and the SEI Manager for October 13, 2022. Based on the potential elimination of the SEI Manager position, that person planned to apply for any DEI Director position with FCCP-Gen.

260.    Judge Cocroft clearly expressed to the SEI Manager that, while she believed the Manager was best suited for the position, it would be posted publicly, she would have to apply and, if she was not selected, then she would no longer be employed by FCCP-Gen. The SEI Manager understood and was excited about the possibility.

261.    The purpose of the October 13, 2022 meeting was to give the SEI Manager an opportunity to discuss any initiatives she had implemented and whether she was achieving goals identified by Goodman and Bedsole, as they had both indicated  that the SEI Manager was not doing what she was asked to do. The SEI Manager is a Black woman.

262.    During the meeting, the SEI Manager highlighted those things she was permitted to do. When Judge Cocroft asked Goodman why the SEI Manager was not able to do what she was hired by FCCP-Gen Judges to do, Goodman said that she had to figure out if "I can trust her." Judge Cocroft told Goodman that her perspective sounded strange for a group of professionals, especially given the fact that the SEI Manager had been hired for the position in 2017 or 2018 and the meeting was occurring in 2022.

263.    The Chief Probation Officer participated in the meeting via Zoom and his wife could hear what was being said. Later, the Chief Probation Officer told Judge Cocroft that both the Chief and his wife thought that Goodman's and Bedsole's remarks had racist undertones toward Judge Cocroft and the SEI Manager.

264.    On August 16, 2022, Judge Cocroft received an email from Frye, regarding whether enough prospective jurors were being summoned. (Exhibit 18) Frye, a Caucasian man, served as Presiding Judge in 2022. The Presiding Judge is elected by all General Division Judges.

265.    During the week of August 16, 2022, only 56 people responded to summons; however, the low rate was based, in part, on several districts and universities returning to school during that week.

266.    Judge Cocroft shared this and other information with Frye and also informed him that she and her staff had been subjected to a barrage of cynical remarks and innuendos from other judges, staff and lawyers because she assigned a jury panel to her courtroom in order to conclude a two-year old murder case for which the defendant was not waiving his constitutional right to speedy trial.

267.    Judge Cocroft told Frye that she was contemplating assigning the panel to another judge to avoid the remarks to which she and her staff were subjected.

268.    Frye responded, "[Don't let the critics or cynics, get you sidetracked. AJ is a huge responsibility and you're doing it well but the position does bring with it gossip. And you made the right choice to push ahead with your trial before a murderer walked." (Exhibit 18) (Emphasis added.)

269.    On September 16, 2022, Judge Cocroft received a letter dated September 15, 2022 from J.G., First Assistant Prosecuting Attorney for Criminal Matters, regarding a request to summon more jurors. J.G. is the same person who questioned Judge Cocroft about the idea of criminal settlement weeks to address the backlog of criminal cases created by the COVID-19 pandemic. (Exhibit 19)

270.    In her September 15, 2022 letter, J.G. wrote, "I know that you, as Administrative Judge, are aware of the backlog of criminal cases. We are anxious to bring them to resolution but require the realistic expectation of trial in order to resolve the vast majority of them." (Emphasis added.)

271.    On September 16, 2022, Judge Cocroft sent a response letter to J.G., explaining that in the nine months during which Judge Cocroft served as Administrative Judge, there were two weeks for which an insufficient number of prospective jurors responded and that, in many instances, the State's inability to provide timely discovery was the bigger cause of delay. (Exhibit 20)

272.    As of the filing of this complaint, J.G. has never responded to Judge Cocroft's letter of response or discussed it with her.

273.    Beyond Frye and J.G., Judge Cocroft received several other emails from judges complaining about the lack of prospective jurors. The complaints were from Caucasian judges who were not even in trial on a consistent basis. Those judges also questioned Judge Cocroft about how she assigned jurors to judges and complained among themselves about her assignment process. In response, Judge Cocroft sent an email to all FCCP-Gen Judges on August 16, 2022, addressing their concerns and advising of potential solutions to address prospective juror concerns. (Exhibit 21)

274.    Beyond his service as Presiding Judge in 2022, Frye also served as Co-Chair of the FCCP-Gen Finance Committee.

275.    In October 2022, Frye wanted to discuss the FCCP-Gen budget submission with Judge Cocroft in her capacity as Administrative Judge. Lynch who served as Chair of Finance, was unavailable to give the budget presentation.

276.    During Judge Cocroft's meeting with Frye, he told her that he didn't understand why FCCP-Gen needed a DEI Director and that a proposed Public Relations position was a "stupid idea".

277.    Judge Cocroft told Frye that the Public Relations position was Goodman's idea, not Judge Cocroft's, and explained the importance of the DEI Director from her perspective.

278.    Frye continued to disagree with the necessity of the DEI position only and, in support of his position, he noted that the FCCP-Gen had previously elected two Black male judges and Judge Cocroft. as Administrative Judge.

279.    Judge Cocroft attempted to explain why electing Judge Cocroft or the Black judges as Administrative Judge was not necessarily a reflection of a commitment to DEI but, instead, was a demonstration of the people who were willing to take on the responsibilities of the position.

280.    Frye then told Judge Cocroft that, instead of creating a DEI position, FCCP-Gen needed to increase the juror fee so that the Court could get more poor and Black people to serve as jurors.

281.    Stunned by his statement, Judge Cocroft told Frye that the juror fee was not the reason that Black people were not serving and that being poor and Black were not synonymous.

282.    Frye never challenged the Public Relations position once Judge Cocroft told him that the idea came from Goodman.

283.    Judge Cocroft told Frye that the Court would proceed with its attempt to create a DEI Director position, as discussed in the January 2022 Judges' meeting.

284.    In October 2022, every FCCP-Gen Judge received a letter from a former employee titled, "Why I Quit". The letter highlighted mistreatment of and abusive behavior toward staff by Goodman, Bedsole, and, upon information and belief, Davis. (Exhibit 22)

285.    Several of the FCCP-Gen judges came to Judge Cocroft regarding the letter and wanted to discuss the issues raised.

286.    Judge Cocroft approached all FCCP-Gen Judges to schedule a meeting. Frye, neither in his official capacity as Presiding Judge nor as a FCCP-Gen Judge, wanted to discuss the letter that alleged mistreatment and abusive behavior by three FCCP-Gen administrators.

287.	Because not all judges wanted to be involved in the discussion, Judge Cocroft could not convene an official Judges' Meeting to discuss a matter that was a personnel issue.

288.	Because the "Why I Quit" letter named Goodman and Bedsole specifically, Judge Cocroft gave each of them a copy of the complaint letter, consistent with the FCCP-Gen historical practice of advising of a complaint and providing a copy of the same to the employee against whom allegations are made. Judge Cocroft also told Goodman and Bedsole that some of the FCCP-Gen Judges wanted to discuss it.

289.	As Administrative Judge, Judge Cocroft had an obligation under FCCP-Gen policies and procedures to inform Goodman and Bedsole of allegations made, even by former employees. Judge Cocroft told Goodman and Bedsole she would keep them advised of developments or requests from the FCCP-Gen Judges who chose to discuss the matter.

290.	The meeting was attended by Judge Cocroft, J. Brown, Serrott, Hawkins, Aveni, Held Phipps, Munson, McIntosh, and one other FCCP-Gen Judge.

291.	During the meeting, Judge Cocroft explained her concerns about the letter (the employee did not self-identify, though every judge in attendance believed they knew the employee in question).

292.	J. Brown shared that this employee and another employee had come to him to complain about Goodman and Bedsole but that his focus was on terminating Bedsole based on her prior supervision of his assigned Court Reporter.

293.	Other judges, including Serrott, Hawkins, Phipps, Munson, and Aveni echoed similar thoughts about terminating Bedsole.

294.	Judge Cocroft told the judges that, in her experience as Administrative Judge, Bedsole did not have the ability to make any decision or to advise any employee without Goodman's direction,

input, and permission and that, if Bedsole had done anything, then Goodman was aware and had approved whatever was done.

295.    Judge Cocroft also said that, because all FCCP-Gen Judges decided not to participate in the meeting and had expressed a desire not to involve themselves in managing an anonymous letter (including but not limited to Frye), and because the former employee did not make any specific allegations, then it would be difficult for the Court to take any affirmative steps without the risk of undertaking what could be alleged by Goodman and Bedsole to be an unfair and biased investigation.

296.    Judge Cocroft also told the judges present that she was aware of and was attempting to manage some allegations brought to her attention that occurred as many as four years prior to her term as Administrative Judge but that the Court needed to be thoughtful in how it handled the matters.

297.    Specifically, Judge Cocroft was managing allegations from FCCP-Gen Probation Officers regarding racism and racist practices that were ignored by Goodman, Bedsole, Davis, a former Chief Probation Officer, "L.F.", and several FCCP-Gen Judges who were notified about the claims before Judge Cocroft was notified including, but not limited to, Serrott, J. Brown, Held Phipps, and Munson. (Exhibit 23) Additionally, C.K., the Language Access Coordinator, alleged that she was held against her will in the office of a FCCP-Gen Director in 2018 and that Goodman, Bedsole and Davis did not investigate or take any corrective action.

298.    After Judge Cocroft provided this information, Hawkins accused her of getting talking points from Goodman and Bedsole before the meeting because she had captured her thoughts on a notepad from which she was reading.

299. Judge Cocroft told Hawkins that she was offended by the suggestion and that she did not need to confer with anyone about things she had witnessed firsthand.

300. During that same meeting, Judge Cocroft raised the issue of implementing a communications seminar for all FCCP-Gen employees and Judges so that each could be more cognizant of how to address one another.

301. At that point, Judge Cocroft told J. Brown how offended she was by his decision to give her a list of Black women whom she should be more like. J. Brown told Judge Cocroft she needed to move on and get over it. None of the FCCP-Gen Judges present said anything.

302. Shortly thereafter, Serrott told Judge Cocroft that, during the December 2021 meeting at which he told her that he would not want to be Black in America, Judge Cocroft called him a racist.

303. Judge Cocroft told Serrott she never spoke that word and, instead, told him and J. Brown that they did not get to come to her office, in paternalism and privilege, and tell her what kind of Black woman she should be. Serrott then apologized for making up that statement.

304. Hawkins came to Judge Cocroft's office later that afternoon so that she could provide more detail regarding the complaints about which she had become aware involving Goodman, Bedsole, and Davis that occurred prior to her term as Administrative Judge.

305. Hawkins was shocked by the information.

306. Judge Cocroft told Hawkins that when she asked Davis about the allegation of an employee held against her will, Davis initially pretended not to know what she was referencing. Eventually, however, Davis admitted that C.K. reported the incident but did not state that she investigated, as she is required to do as Director of Human Resources.

307. Judge Cocroft also allowed Hawkins to review S.W.O.T. analyses submitted by every FCCP-Gen Director that included concerns about Goodman and other issues.

308.    Hawkins apologized to Judge Cocroft for his accusation and said that he made the statement because he was tired and had only three hours of sleep the night before.

309.    At the conclusion of the meeting, Judge Cocroft received multiple messages from Goodman asking about what happened. Bedsole was copied on those communications.

310.    Judge Cocroft responded, "All is well. Rest your minds. I will share more tomorrow. No bad outcomes. There was a little dust-up but not about you…as is custom, I was thrown under the bus." Goodman responded, "How in the world could this be turned around to be negative to you. We can talk tomorrow, just surprised."

## G.  The Setup, Shakedown, and Takedown

311.    On Friday, November 4, 2022, Frye scheduled an Assigned Counsel Board meeting to discuss concerns related to a lawyer. Frye insisted that the meeting occur in person.

312.    The Assigned Counsel Board is comprised of the Administrative Judge, Presiding Judge (Frye), and most senior Judge of the Court. Goodman, as Court Administrator, also participates in these meetings.

313.    Judge Cocroft sat next to Goodman during the meeting.

314.    During the meeting, Judge Cocroft discussed a concern regarding a lawyer on the Appointed Counsel List. Other courts were asking FCCP-Gen to remove the lawyer from its list.

315.    Goodman brought the concern to Judge Cocroft's attention, so Judge Cocroft deferred to Goodman to explain the concern in more detail.

316.    At the conclusion of the meeting, Frye said that he needed to talk to Judge Cocroft. As Goodman left the room, Judge Cocroft said, "Have a great weekend!"

317.     Once Goodman left, Frye told Judge Cocroft there was a serious situation and that someone had filed a complaint. Frye then informed Judge Cocroft that Goodman filed the complaint, it was against Judge Cocroft, and it was serious. (Exhibit 24)

318.     Judge Cocroft asked Frye for a copy of the complaint. Frye said that he did not have it and that, while he had not reviewed it, it was very long and had a lot of detail. Frye then provided much of the detail and then informed Judge Cocroft that Goodman had "lawyered up."

319.     Frye then said Goodman informed him that, if Judge Cocroft agreed to resign as Administrative Judge for 2023, consistent with the FCCP-Gen Anti-Harassment Policy (Exhibit 25), then she would withdraw her allegations.

320.     Judge Cocroft told Frye that, perhaps, she should lawyer up, as well and that she wanted to take the weekend to consider his "offer" on Goodman's behalf to resign as Administrative Judge for 2023.

321.     Frye continued to repeat that Goodman's complaint was "very serious" but that if Judge Cocroft would resign, then the issue would go away.

322.     On Monday, November 7, 2022, Frye delivered the complaint to Judge Cocroft's office and they had an approximately 35-minute conversation wherein Frye repeated Goodman's offer. (Recording 22, Exhibit 26)

323.     At the beginning of the conversation, Cocroft told Frye that she had thought about his offer to resign over the weekend and believed that the offer amounted to blackmail.

324.      Frye said that it wasn't blackmail and Cocroft asked what his offer was, if it wasn't blackmail.

325.     Frye said that his offer was a way for both parties to walk away from the situation and that Judge Cocroft could just say she was too busy to do the work of Administrative Judge.

326. Judge Cocroft replied that his offer was the classic definition of blackmail – that is, if she did not do what Goodman and Frye wanted her to do, then this allegedly disparaging information would be made public.

327. Frye said that it wasn't that.

328. Frye further stated that, beyond the allegations Goodman made against Judge Cocroft, there were things that Cocroft had done about which she did not notify the FCCP-Gen Judges.

329. Judge Cocroft asked Frye what she had done about which she did not notify the FCCP-Gen Judges. Frye said, that the "DEI stuff came to me cold" during the budget review process and that there should have been monthly budget meetings prior to the budget submission in October 2022.

330. Judge Cocroft reminded Frye that there had never been monthly budget meetings in her fifteen years of service and that the decision on when the Finance Committee meets is within the discretion of the Committee Chair who was Lynch.

331. Frye then said that he had been trying to convince Goodman and Lynch to have monthly meetings and Judge Cocroft asked how the lack of meetings was her fault when she was following the process that had been in place for years.

332. Frye also stated that he did not know about a Public Relations position that was in the budget and Judge Cocroft told him that she didn't know about the position, either, because it was Goodman's idea.

333. Frye stopped discussing the Public Relations position once Cocroft once again informed him that it was Goodman's idea.

334. Cocroft then told Frye that she had discussed the DEI Director position with the FCCP-Gen Judges during the January 2022 meeting and asked if he attended (though she knew the meeting minutes reflected that Frye had attended).

335.    Frye said that he didn't know if he was there and he wasn't going to go back and check the meeting minutes.

336.    Judge Cocroft had also discussed the DEI Director position at a July 2022 meeting of the FCCP-Gen Access to Justice Committee.

337.    Frye admitted that he and O' Donnell, a Caucasian woman who was appointed by Judge Cocroft to serve as Chair of the FCCP-Gen Personnel Committee for 2022 and shared office space with Judge Cocroft, had actually created and proposed the resignation resolution to Goodman.

338.    Judge Cocroft noted she was intrigued by O'Donnell's participation in any discussions since O'Donnell had spent a large majority of her workdays campaigning to maintain her position as a FCCP-Gen Judge in 2022.

339.    Judge Cocroft asked Frye if he or O'Donnell thought it necessary or prudent to speak with Judge Cocroft before developing a plan of action.

340.    Frye said that they did not feel it was necessary to talk with Judge Cocroft about Goodman's allegations because they knew Judge Cocroft "would deny everything." This decision is in violation of the FCCP-Gen Anti-Harassment Policy.

341.    Further, Frye said that the FCCP-Gen couldn't lose the "longtime Executive Director of the Court" and that Goodman had threatened to quit if Judge Cocroft didn't resign as Administrative Judge.

342.    Goodman had been Court Administrator since 2014. Judge Cocroft was appointed to an open seat as FCCP-Gen as Judge in 2009 and was then elected for the first time in 2010.

343.    Judge Cocroft stated that it appeared that he was willing to get rid of a judge to accommodate Goodman. Frye said nothing.

344.    Frye said that Judge Cocroft needed to manage this in a "humane" way.

345.    Judge Cocroft told Frye that the Anti-Harassment Policy required that he and anyone else notified of the allegations give her the same consideration and opportunity to share her version of events as they had given to Goodman.

346.    Frye reemphasized that he knew that Judge Cocroft would just deny everything so it really wasn't necessary to speak with her.

347.    Frye attempted to explain his position and then stated that his offer was "not blackmail, it's not greenmail – it's not any of those things."

348.    During the conversation, Frye told Judge Cocroft that she should just do the job of Administrative Judge the way that others before her had done, so that Goodman would not be upset by Judge Cocroft's requests.

349.    Judge Cocroft told Frye she did not have to do the job the way Goodman wanted her to do it and that Rule of Superintendence 4 provided her authority. Frye said he didn't want to hear about that rule.

350.    During the conversation, Frye told Judge Cocroft that she was being "defensive." Judge Cocroft remarked that his characterization was offensive.

351.    At the end of the conversation, Judge Cocroft suggested to Frye that he facilitate a conversation between Goodman and Judge Cocroft because that is what professionals do.

352.    At the time Judge Cocroft suggested a conversation, she had no idea what was in the complaint because she did not receive a copy until the November 7, 2022 meeting, despite the fact she was notified of the complaint on November 4, 2022.

353.    Frye said that he would take the idea of a conversation to Goodman and then get back to Judge Cocroft.

354.    Later that same day, and after finally providing Judge Cocroft with a copy of the complaint, Frye sent an email to Goodman and her regarding an opportunity for probationers. Frye asked either Goodman or Judge Cocroft to send the communication to the Chief Probation Officer. (Exhibit 27)

355.    Judge Cocroft was anxious and confused about why Frye would send this communication to her and to the person (Goodman) who had just filed an unjust and unfounded complaint against her wherein Goodman alleged that she was fearful of Judge Cocroft.

356.    Judge Cocroft replied to Frye's communication and asked Goodman if she wanted to forward the communication or would prefer that Judge Cocroft send it. Goodman stated that she would send it.

357.    At the time Frye sent the email to Judge Cocroft and Goodman, Judge Cocroft still had no idea what was in Goodman's complaint because she was managing her docket for the day.

358.    Judge Cocroft was not able to review Goodman's complaint until she got home from work at 7:00pm.

359.    Goodman's complaint was not supported by any documentation.

360.    Judge Cocroft began drafting her reply at around 8:00pm on November 7, 2022 and stayed up until 7:00am on November 8, 2022 writing a 31-page response, which was supported by documentation. (Exhibit 28)

361.    As of the filing of this complaint, no one with FCCP-Gen has asked for a copy of Judge Cocroft's reply to Goodman's bad faith complaint.

362.    On Tuesday, November 8, 2022, Frye dropped off a copy of a letter he sent to all FCCP-Gen Judges by email. In the letter, he stated that the judges needed to discuss a "corrective plan of

action" to address the allegations made by Goodman against Judge Cocroft. Frye sent the letter at approximately 4:30pm and scheduled a meeting for November 14, 2022. (Exhibit 29)

363.    When Judge Cocroft received the letter, she called Frye and asked what happened to the idea of a guided conversation between Goodman and her. Frye responded that Goodman did not want to meet so he had to do something else and sent the letter.

364.    The letter was sent to FCCP-Gen Judges on the Court's Outlook system before Judge Cocroft was notified that it was being sent or received a paper copy.

365.    Judge Cocroft was on the November 2022 ballot as an unopposed candidate and was scheduled to attend the Election Night party on the day the letter was sent. However, she did not attend because she was both embarrassed and humiliated by the events of the day.

366.    Judge Cocroft later learned that Frye's letter was a topic of discussion at the Election Night Party.

367.    As of the filing of this complaint, Judge Cocroft has never celebrated her unopposed 2022 election.

368.    After Judge Cocroft was notified of Goodman's complaint on November 4, 2022, she began to have problems with sleeping, loss of appetite and anxiety. These problems are documented in text communications between Judge Cocroft and her staff. Later, Judge Cocroft's hair began to fall out, as documented in a photo taken by her hairstylist.

369.    Neither Frye nor O'Donnell notified Judge Cocroft that she was entitled to representation from the Office of the Franklin County Prosecuting Attorney regarding Goodman's bad faith complaint.

370.    While Hummer and Dean had a statutory duty to represent Judge Cocroft regarding Goodman's complaint, they never contacted her regarding the matter. Additionally, upon

information and belief, Hummer, Dean, or other lawyers in their office provided advice to Frye regarding his and O'Donnell's decision to attempt to remove Judge Cocroft from the Administrative Judge position and Goodman's bad faith complaint.

371.    So, in determining what steps Judge Cocroft should take regarding Goodman's complaint, she contacted and engaged with private counsel.

372.    On or around November 10, 2022, Judge Cocroft's private counsel was advised by Frye and/or Serrott that, without hearing Judge Cocroft's version of events, every judge of the Court, with the exception of one FCCP-Gen Judge, was prepared to vote Judge Cocroft out of the position as Administrative Judge without an investigation.

373.    Because Judge Cocroft was led to believe that only one FCCP-Gen Judge would not vote to remove her, Judge Cocroft did not believe that she would receive a fair investigation of Goodman's complaint.

374.    After consulting with counsel, Judge Cocroft decided to prepare a letter of resignation to be read at the November 14, 2022 meeting.

375.    After the resignation letter was read, McIntosh was re-elected to the position of Administrative Judge for the balance of 2022 and 2023.

376.    Once McIntosh was re-elected, J. Brown said, "Welcome back, Mac."

377.    The day following the November 14, 2022 meeting, Goodman was permitted to send notice to all FCCP-Gen employees and all of its justice partners, indicating that, effective immediately, McIntosh would be the Administrative Judge. (Exhibit 30)

378.    Shortly thereafter, Judge Cocroft began to receive phone calls, visits from court staff and other email communications in support of Judge Cocroft.

379. To Judge Cocroft's knowledge, there has never been any other circumstance where the person who filed a complaint was given the authority to notify justice partners that the person against whom they made a complaint would no longer be in a position.

380. On November 15, 2022, Judge Cocroft went to her courtroom bench to use the computer and noticed that a member of the Court's IT staff had logged into her computer. (Exhibit 31)

381. Judge Cocroft did not submit a request to IT to service her computer and the IT employee in question never mentioned to Judge Cocroft that they had logged in to her computer.

382. On November 22, 2022, FCCP-Gen received a public records request for "any and all documents related to the change in administrative judge this month as well as any documents detailing concerns or complaints regarding former Administrative Judge Kimberly Cocroft." (Exhibit 32)

383. It is the standard practice of the FCCP-Gen to notify a judge if they are the subject of a public record request.

384. This practice was confirmed in a May 20, 2024 communication from Davis in which she informed Judge Cocroft that it is the FCCP-Gen policy to notify people who are impacted by a public records request as quickly as possible. (Exhibit 33)

385. No one notified Judge Cocroft of the November 22, 2022 request until after it had been sent to FCCP-Gen Directors and all FCCP-Gen Judges.

386. Neither Hummer nor Dean notified Judge Cocroft's counsel of the public record request. Hummer and Dean, whose office reviews public record requests, discussed the sum and substance of the request with Goodman, Bedsole, Davis, Worthington, and McIntosh.

387. Hummer and Dean did not discuss the request with Judge Cocroft or her counsel. Judge Cocroft informed her counsel of the record request when she was notified.

388.    After the public records were collected, Judge Cocroft was notified on the day of the scheduled release, January 27, 2023, that if she wanted to include a statement with the release, then it had to be submitted by 4:00pm, as the records were going to be released on the same date at 5:00pm.

389.    Judge Cocroft and counsel were notified of this deadline at approximately 2:27pm.

390.    Judge Cocroft submitted her statement by 3:03pm. (Exhibit 34 ) While Judge Cocroft and her counsel were advised that Goodman withdrew her bad faith complaint, there is no formal written statement from Goodman, affirming that her bad faith complaint was withdrawn and neither Frye, O'Donnell, McIntosh, Hummer, or Dean required Goodman to submit the same.

391.    On January 27, 2023 at 6:34pm, Judge Cocroft was contacted by her private counsel and notified that, when Ms. Goodman saw her statement, she decided that she may want to add additional public records. Goodman was given until January 31, 2023 to add records.

392.    Specifically, the message from Judge Cocroft's counsel said, "Got a call * * * about a half hour ago that once [Goodman] saw our addition she may wish to weigh in with some public records submission of her own. Nobody is really sure but suddenly the 5:00 deadline is no longer applicable and nothing is going out probably until next week."

393.    On April 10, 2024, Judge Cocroft sent an email to Hummer and another lawyer in her office, reminding them that Goodman received an extension to provide additional documents and that she never received a copy of those documents .

394.    As such, Judge Cocroft requested that she receive a copy of any additional documents Goodman was given time to review and, potentially, submit. (Exhibit 35)[2]

---

[2] To the extent that an attorney-client privilege exists regarding communications between Hummer, Dean, any lawyer under Hummer's supervision and/or Judge Cocroft, Judge Cocroft hereby waives the privilege relative to the

395.    Hummer responded that she would look into the circumstance and get back to Judge Cocroft.

396.    As of the filing of this complaint, Judge Cocroft has never received an explanation regarding why the intractable deadline was extended for Goodman.

397.    As of the filing of this complaint, Judge Cocroft has never received copies of the additional public records Goodman contemplated submitting with the public record request. In addition, there has never been any sort of investigation regarding Goodman's false and bad faith complaint against Judge Cocroft.

398.    Between November 4, 2022 and November 14, 2022, Goodman, Bedsole, Davis and Worthington permanently deleted all internal Teams messages between Judge Cocroft and them as well as Judge Cocroft's Black staff and them. These messages related to the administrative work of the Court and, under Rule of Superintendence 26.01, should have been maintained permanently. (Exhibit 36)

399.    As of the filing of this complaint, K. Brown, as current Administrative Judge, has done nothing to address this violation of Rule of Superintendence 26.

400.    In 2022, Judge Cocroft was selected to serve as Adjunct Faculty at the Moritz College of Law at The Ohio State University.

401.    Because of the volatile nature of Goodman's bad faith complaint, Judge Cocroft had to notify the hiring Dean at Moritz of the situation and her inability to teach during Fall Semester 2023.

402.    Judge Cocroft did not want to potentially damage the school's reputation and did not know if or how Goodman's bad faith complaint would be used against her in the future

---

filing of her complaint, the inclusion of any documents between Judge Cocroft, Hummer, Dean, and/or any lawyer under Hummer's supervision in support of the same, and all future pleadings and proceedings in the instant matter.

403.    In  July 2022, Judge Cocroft was notified that she would receive the William K. Thomas Distinguished Jurist Award from the Moritz College of Law and The Ohio State University.

404.    Judge Cocroft sent an email to Goodman and Bedsole on or around July 13, 2022, notifying them that she was receiving the Award. (Exhibit 37)

405.    Historically, Goodman, Bedsole, or Davis prepare an immediate press release if a FCCP-Gen Judge or other employee receives an award or is recognized by the public.

406.    Judge Cocroft received the Award in September 2022. On September 13, 2022, two months after being notified initially, Goodman sent an email to Cocroft asking for information about the Award. (Exhibit 38)

407.    After receiving the Distinguished Jurist Award, Judge Cocroft received a communication from Goodman stating that she was trying to prepare a press release but could not find information and hoped that I wasn't mad or upset with her because the press release had not been prepared. Judge Cocroft told her she was not mad or upset.

408.    In 2022, Judge Cocroft was notified that she would receive an Honorary Doctorate from Franklin University at its May 2023 Commencement Ceremony.

409.    Judge Cocroft did not share this achievement with FCCP-Gen Judges, Goodman, Bedsole, Davis, or Worthington because, given the conspiratorial nature of their actions, Cocroft did not want them to sabotage her receipt of the Honorary Doctorate.

### H.  Not A Happy New Year: More Discrimination, Hostility, and Retaliation

410.    In January 2023, McIntosh, with the assistance and input of Goodman and Bedsole, made assignments for the FCCP-Gen standing committees.

411.    For most of Judge Cocroft's fifteen years of service, she was a member of the FCCP-Gen Personnel and Finance Committees, which are central to the operations of the Court.

412.     In 2022, Judge Cocroft created the Access to Justice Committee to address gaps in FCCP-Gen's delivery of services to marginalized, ethnically diverse and underserved populations.

413.     As a general historical practice, FCCP-Gen Judges who serve as Administrative Judge are selected as members of the Committees on which they served prior to their term as Administrative Judge.

414.     Judge Cocroft was not selected to serve on either the Finance or Personnel Committees for 2023. Additionally, Munson, who never responded to Judge Cocroft's request to participate as a member of the Access to Justice Committee in 2022, was selected to serve as Co-Chair of the Committee in 2023 and Judge Cocroft was selected as a standard member of the committee she created.

415.     McIntosh sent committee assignments to the FCCP-Gen Judges on January 18, 2023, On the same date, Judge Cocroft sent an email to McIntosh, the FCCP-Gen Directors and Judges, asking to be informed of all committee meetings, so that she could participate in the meetings. (Exhibit 39)

416.     Judge Cocroft acknowledged that she could not vote at committee level but emphasized that there was historical precedent for judges participating in meetings for committees to which they were not assigned.

417.     After her request, Judge Cocroft learned that McIntosh sent an email to all Committee chairs, reminding them that all judges had the right to participate in committee meetings.

418.     Specifically, the January 24, 2023 email stated, "Judges there is not a policy in place that prevents a judge from sitting in a committee meeting that they are not a member. We have allowed judges to do so in the past. They cannot vote and it would be up to the chair if they would allow them to participate in committee discussions. All committees need to be consistent <u>unless the court</u>

<u>decides to adopt a procedure that only committee members may attend committee meetings</u>."
(Emphasis added.)

419.    To Judge Cocroft's knowledge and, consistent with the McIntosh from email, the FCCP-Gen Judges had never questioned a judge attending a committee meeting until Cocroft requested notification of committee meetings, and that, unless there was a vote to change this practice, Judge Cocroft would have to be allowed to participate in meetings.

420.    To Judge Cocroft's knowledge, there has never been communication sent to judges reminding them of the ability of any judge to attend committee meetings and, in Judge Cocroft's fifteen years of service, she has never received such a letter.

421.    As a general practice, the Chair of every Committee schedules meetings after speaking with the FCCP-Gen Director whose daily work most closely aligns with the work of the Committee.

422.    In 2023, Held Phipps was the Chair of Personnel and Lynch was Chair of Finance.

423.    In 2023, there were five or six Personnel Committee meetings and Judge Cocroft was only notified of three.

424.    In 2023, Judge Cocroft was not notified of any Finance Committee meetings though there were at least two to her knowledge.

425.    In February 2023, Judge Cocroft presided over a high-profile rape and kidnapping trial that required a special panel to be summoned.

426.    During her abbreviated tenure as Administrative Judge, Judge Cocroft developed a new form to help with the management of and requests for special jury panels.

427.    When Judge Cocroft requested a special panel in July 2022, all counsel were available to conduct jury selection on the Friday prior to the February trial date. However, due to the changing

nature of trial schedules, neither counsel nor Judge Cocroft were available; Judge Cocroft was presiding over a murder trial.

428. Judge Cocroft notified the Jury Managers of this change in schedule and told them that she would greet the jurors on the Friday before trial as anticipated but would ask them to come back on the first day of trial for jury selection. Judge Cocroft told them that she would not be able to greet the jurors until about 9:30am because she was presiding over a murder trial.

429. Shortly thereafter, Judge Cocroft's bailiff, S.C., received an email from the Director of Court Support Services, Worthington.

430. Worthington and the Jury Manager stated that they expected Judge Cocroft to conduct jury selection on the Friday prior to trial and that, since jurors would be there early, Judge Cocroft needed to arrive no later than 8:30am.

431. Worthington and the Jury Manager also stated that jurors were going to be frustrated with not going through selection because many of them expected to learn whether they would have to serve.

432. In 2015, Judge Cocroft summoned a special panel for a four-co-defendant trial and the lawyers did not select jurors on the Friday before the trial began. In that circumstance, Judge Cocroft used the Friday before the trial date to introduce herself and to give an overview of what the prospective jurors would experience when trial started the following Monday.

433. Worthington never expressed concern to Judge Cocroft about that process.

434. Judge Cocroft responded to the email from Worthington and the Jury Manager and gave them this information regarding her 2015 special panel. (Exhibit 40)

435. Judge Cocroft also told them that while she and counsel had hoped to be able to start on Friday, their respective trial schedules did not allow that to happen.

436. Judge Cocroft informed Worthington and the Jury Manager that she would adjust her murder trial so that she and her staff could appear on Friday at 8:30am as requested.

437. To Judge Cocroft's knowledge, Worthington has never asked a Caucasian judge to adjust their schedule for any reason.

438. On the day that the special panel arrived, Judge Cocroft and her staff left her chambers at 8:15am to meet the special panel.

439. As Judge Cocroft was walking down the hall toward the Jury Commission Office, Worthington walked quickly toward Judge Cocroft and asked, "Did you get my text?"

440. Judge Cocroft told her that she had not and then checked her phone.

441. While Judge Cocroft checked her phone, Worthington stated that there was a problem with juror check-in and they would not be able to start at 8:30am. Worthington stated that they would not be ready until closer to 9:00am.

442. Worthington and the Jury Manager staff did not complete their work until around 10:00am.

443. Judge Cocroft introduced herself to jurors and explained that the lawyers were not present because of other trials but that she could hear excuses.

444. Contrary to representation from Worthington and a jury manager, no jurors complained or expressed frustration.

445. After completing excuses and identifying the remaining prospective jurors, the Jury Manager staff told Judge Cocroft that they would not be able to assist her with juror check-in on Monday and with helping her to manage the more than 100 prospective jurors who would appear.

446. Judge Cocroft was also informed that her special panel would not be permitted to be in the Jury Commission area because there was no room for them, as the Jury Manager staff could not manage the special panel and petit jurors.

447.     During a high-profile trial assigned to Holbrook, the Jury Managers and Administration provided support to him in managing the special panel. Holbrook is a Caucasian man.

448.     Upon information and belief , during a high-profile trial assigned to Young, Jury Managers allowed his special panel to be seated in the Jury Commission Office during the petit juror orientation. Jury Managers also helped manage Young's special panel. Young is a Caucasian man.

449.     Because Judge Cocroft received no support from FCCP-Gen staff employed to assist with any jurors, Judge Cocroft and her assistant, bailiff, court reporter, and staff attorney checked in and managed 135 jurors. This work pulled Judge Cocroft's staff away from their regular job duties.

450.     At the beginning of February 2023 trial, Worthington would not provide Judge Cocroft's bailiff with a key to the special proceedings courtroom where the trial was held, though she indicated she could not be available to provide us with assistance. After some effort, Worthington provided Judge Cocroft with a key to the courtroom.

451.     Upon information and belief, no Caucasian judge who has used the special proceedings courtroom has been denied a key to that courtroom while they were in trial.

452.     During the same February 2023 trial, Judge Cocroft's Court Reporter was scheduled for approved leave time and had notified Bedsole that Judge Cocroft would need coverage for two days of the trial. (Exhibit 41)

453.     Bedsole was responsible for making Reporter assignments.

454.     At the time Judge Cocroft's Reporter requested coverage, no other Reporters had requested leave time or coverage.

455.     By the time the trial was in session, several other Reporters decided to take time off.

456.     When Judge Cocroft followed up with Bedsole regarding her assignment request, Bedsole first indicated that she did not have any information regarding the request from Judge Cocroft's Reporter and that there were several judges who needed Reporters.  (Exhibit 41).

457.     Judge Cocroft's Reporter reminded Bedsole that she requested coverage for Judge Cocroft in October 2022, at which time no other Reporters had requested time and that Judge Cocroft was in a high-profile trial. (Exhibit 41)

458.     Shortly thereafter, Bedsole sent an email to several FCCP-Gen Judges who needed a Reporter (including Judge Cocroft) and indicated that each judge would have to contact Bedsole ten minutes before an assignment was needed and she would send a Reporter, if one was available. (Exhibit 41)

459.     Judge Cocroft then replied to Bedsole to confirm that she would have to follow this protocol while being in a high-profile trial and with her Reporter having provided notice in October 2022. (Exhibit 41)

460.     Bedsole eventually made an assignment for the trial and, fortunately, Judge Cocroft only needed a Reporter to take the verdict. (Exhibit 41)

461.     During her service as Administrative Judge, Judge Cocroft witnessed Bedsole do whatever was necessary to ensure that Caucasian Judges had Reporter coverage when requested with little to no follow-up or explanation. This was especially true since several of the FCCP-Gen Judges had threatened to terminate Bedsole.

462.     On March 17, 2023, "G.C.", a former Assignment Commissioner, sent an email to Judge Cocroft's staff regarding vacation time scheduled by Judge Cocroft. (Exhibit 42).

463.     For any FCCP-Gen Judge who requests time out of the office, there is a specific form that bailiffs are told to complete and to submit to Assignment so that cases can be moved.

464. Judge Cocroft completed the form used universally by all bailiffs.

465. While the requested dates were blocked, G.C. sent Judge Cocroft's staff the following email: "Please note, that if the judge wants there to be a 'waiver of time' for the criminal cases, you would need to reach out to counsel on the cases currently set on these dates and request for them to come in and execute a continuance entry so that there is a waiver of time in place. Our office is only able to execute a Court Unavailable entry to move the attached cases (excluding sentencing hearings), which requires us to set these cases in on the judges 'first available' date since there will not be a waiver of time on the entry."

466. When Judge Cocroft's bailiff told her about this request, she informed the bailiff that she had never heard of or been requested to comply with this process.

467. Judge Cocroft then sent an email to Worthington, who supervises the Assignment staff, with a copy to McIntosh, in his capacity as Administrative Judge, to inquire about what appeared to be a new policy. (Exhibit 42)

468. Judge Cocroft explained that this email to her bailiff and the policy were new and that neither she nor any prior bailiff had ever been asked to manage Judge Cocroft's time out of office in this way. Both of Judge Cocroft's prior bailiffs were Caucasian.

469. Judge Cocroft concluded that she would appreciate a meeting so that she and her bailiff could better understand the policy and said, "While we will adhere to whatever processes are universally implemented and necessary (***), we would like to have clarity on what triggers this rule and when it becomes necessary to secure executed time-waived entries from counsel. Moreover, if it is the historical practice of the court to move cases to that next business day after a judge returns, then it seems as if the form that bailiffs complete to continue cases is neither helpful nor necessary and that, in every instance, a continuance entry from counsel would be required."

470.   Worthington responded on March 28, 2023 and stated, "In reading through the emails and speaking with Giuseppe, his email didn't articulate well what had been discussed between myself and the assignment office recently." She then discussed staff turnover and the impact of the pandemic on operations. She further explained that the policy was not new but had been emphasized by the Chief of Staff with the Prosecutor's Office in <u>2005</u>. (Exhibit 42) (Emphasis added.)

471.   When Judge Cocroft sent a separate email to McIntosh to ask about the issue, she learned that he was not aware of this policy or practice  and was surprised by its implementation. (Exhibit 43)

472.   Judge Cocroft advised Worthington that her staff was never made aware of an issue raised in <u>2005</u> and that, if there was a concern about a time waiver, then the form given to all bailiffs to secure time out of office for a judge should be eliminated.

473.   As of the filing of this complaint, Worthington has never met with Judge Cocroft about this issue.

474.   As of the filing of this complaint, the forms used to secure time out of the office are still being used and there was no broad email sent to all FCCP-Gen Judges regarding Worthington's concern.

475.   However, to avoid the circumstance of all cases that are continued being set on the same day based on Judge Cocroft's time out of office, Judge Cocroft now has counsel and litigants sign individual continuance entries so that cases can be spread out over various days.

476.   Upon information and belief,  no Caucasian judges have ever been asked to account for time in the way Judge Cocroft was requested to manage time in the March 2023 correspondence from Worthington.

477.    On March 28, 2023, Judge Cocroft's bailiff received an email from an Assistant Assignment Commissioner, asking her to "start sending 4E daily dockets to our 'GEN_Assignment email.'" The basis for the request was that having Judge Cocroft's daily dockets would make it "easier and quicker for us to do monthly audits by keeping track of the capiases, inactive and closed cases." (Exhibit 44)

478.    When Judge Cocroft was advised of this email, she told her bailiff that neither she nor her prior Caucasian bailiffs had ever been asked for this information.

479.    Thereafter, Judge Cocroft asked her bailiff to find out whether this request was a new policy for all bailiffs and to copy her on the email.

480.    Once copied, Judge Cocroft asked the Assistant Assignment Commissioner to explain the necessity and origin of this request because her bailiffs had never been required to provide this information in the past.

481.    After Judge Cocroft sent an email to the Assistant Assignment Commissioner, Worthington sent an email to several groups of people responding to the questions Judge Cocroft posed to the Assistant Assignment Commissioner; but Worthington never replied directly to Judge Cocroft (Exhibit 44)

482.    Worthington's email attempted to explain why the daily dockets were necessary – due to staff turnover and to assist Assignment with ensuring that continuances are accounted for.

483.    In response, Judge Cocroft shared that this practice never existed during her time as judge and that her current bailiff was never trained by anyone on this practice.

484.    When the Assistant Assignment Commissioner replied to Judge Cocroft on March 29, 2023, he stated that he had to talk with his supervisor, Worthington, before he could respond to her questions. He then stated, "This is also a new practice for me as I have held this position for a few

months and the importance of daily dockets sheets was not emphasized enough until recently being short-staffed." (Exhibit 44)

485.    Upon information and belief, no Caucasian judges or their staff received the request for daily dockets.

486.    As of the filing of this complaint, Judge Cocroft has not sent her Daily Docket Sheets to Worthington or any member of her staff. To Judge Cocroft's knowledge, no bailiff has sent these sheets and there have been no further requests for the Daily Docket Sheets.

487.    On April 19, 2023, Judge Cocroft's magistrate informed her of an issue regarding security during arraignments.

488.    Judge Cocroft's magistrate raised the issue with other magistrates on April 17, 2023. Judge Cocroft's magistrate copied Goodman on her first communication but received no response.

489.    The magistrate then forwarded her email to Judge Cocroft on April 19, 2023, and she then forwarded it to McIntosh, as Administrative Judge. (Exhibit 45)

490.    She stated that a copy of the communication was sent to Goodman, though the magistrate was unclear whether Goodman had a discussion with McIntosh.

491.    McIntosh replied in part, "Jen [Goodman] already discussed it with me and she is going to have a conversation with [Court security personnel] about this." Goodman never responded to the magistrate's email and, while McIntosh promised to provide an update to Judge Cocroft regarding her staff's security concern, she never received an update.

492.    On April 25, 2023, the FCCP-Gen Personnel Committee met to discuss the DEI Director position description.

493.    This initiative was implemented by Judge Cocroft in January 2022 but was delayed after Judge Cocroft was forced to resign as Administrative Judge in November 2022.

494. During the meeting, McIntosh discussed the importance of DEI initiatives and how he was not completely familiar with the language that should be used in addressing certain diverse communities. McIntosh said that it would be important to be exposed through education regarding how to approach, understand or treat people that may be different. (Exhibit 46, Recording 48)

494. Lynch responded that she did not believe there were any of us who were judges who didn't know how to properly address other people.

495. Lynch then stated that McIntosh should feel free to go to a training class but that she would not accept such training being mandatory for her.

496. Lynch replied that when you start getting into lists, then there is someone who is always going to be offended.

497. Serrott then asked whether the DEI training would be mandatory for FCCP-Gen Judges and their staffs.

498. Lynch then said that her staff would not be mandated to attend DEI training. Serrott agreed that "personal staff" of FCCP-Gen Judges should not be required to attend.

499. Lynch then said that "any other staff" who were required to attend was not the same as "our staff".

500. Lynch then said that "diversity is not just skin color. And I am tired of it being about skin color."

501. Lynch stated that "someone in this room picked out somebody for this position and then developed this around that person."

502. Lynch remarked that she obtained this information from Goodman.

503.     Judge Cocroft was the person who developed the idea for a DEI Director position and advised the Court that the SEI manager position in FCCP-Gen Probation Department would be changed to courtwide.

504.     As such, Judge Cocroft realized that she was the "someone" whom Lynch was referencing.

505.     Judge Cocroft then addressed Lynch and told her she could speak to the issue and Lynch replied, "It wasn't you, Kim, so you're gonna open your mouth." Judge Cocroft said that she was going to "open my mouth" and correct the misinformation.

506.     Judge Cocroft explained that she understood that DEI initiatives exceeded conversations beyond that of race.

507.     Judge Cocroft also explained that the person who was serving as SEI Manager had not been given latitude to do her job since she was hired in 2018 and had spent much of her time passing out PPE supplies and/or supervising the urine lab after Goodman and the former Chief Probation Officer eliminated the DEI Committee in the FCCP-Gen Probation Department, such that her work did not exist.

508.     Lynch said that she talked to Goodman about the DEI Director position and asked what the "need" was for the position, as she had talked to "many others" who didn't "have the need" for a DEI Director.

509.     Lynch said that, when she talked to Goodman, she told Lynch that the need only existed in FCCP-Gen Probation. Goodman quickly tried to deflect from Lynch's statement.

510.     Lynch then stated that Goodman told her the need started based on allegations of racist behavior in the FCCP-Gen Probation Department about which Goodman was aware.

511.     Lynch further stated, "Whatever was going on in Probation, we don't even know if it's fixed yet because they yet again have another new Director." (Emphasis added.) The "Whatever"

Lynch referenced were the allegations of racism asserted by FCCP-Gen Probation Officers about which several judges were notified.

512.    Lynch said that the salary for the position needed to be lowered and that, when she discussed the salary with Holbrook and Serrott, they said the salary was the same as when they started as FCCP-Gen Judges.

513.    The salary for the DEI Director Position was the same as the salary of other Directors, if not lower.

514.    Upon information and belief, neither Lynch, Holbrook, nor Serrott ever articulated a complaint to all FCCP-Gen Judges about the salaries of other Director positions.

515.    On April 28, 2023, McIntosh sent an email to all judges regarding the efforts of the Ohio Supreme Court's Chief Justice to develop case management strategies. (Exhibit 47)

516.    Beyond Judge Cocroft's idea and creation of a criminal settlement week pilot program, she is also a member of the Supreme Court of Ohio's Case Management Advisory Committee.

517.    In his email, McIntosh stated that he was implementing a FCCP-Gen ad hoc case management committee and named four judges (all Caucasian).

518.    At the time of their selection, three of the four judges had more overage cases on their dockets than Judge Cocroft.

519.    McIntosh was aware of Judge Cocroft's service on the Advisory Committee for Case Management but did not ask her to participate on the ad hoc case management committee for FCCP-Gen.

520.    The FCCP-Gen ad hoc committee took Judge Cocroft's criminal settlement week pilot program as a foundation for this initiative and did not give her credit for its creation.

521.    Upon information and belief and as of the filing of this complaint, there has been no further action regarding this ad hoc committee.

522.    On May 22, 2023, Judge Cocroft had a few cases that required the use of interpreter services, consistent with the requirements of Rule of Superintendence 88.

523.    On that same date (May 22, 2023), Judge Cocroft learned for the first time that the employee who coordinated the assignment of interpreters was on extended leave, that there were no Spanish interpreters, and that there were three people whom counsel and/or the FCCP-Gen Judges could contact in order to request an interpreter.

524.    Judge Cocroft sent an email to McIntosh on May 22, 2023 and said, "I do not recall receiving a communication regarding the change in procedure regarding how an interpreter is requested, though I could have missed that email. Was anything sent to the judges? Is there an issue with interpreter shortages or is this just an anomalous circumstance this week? Should judges advise counsel to request an interpreter within a certain timeframe?" (Exhibit 48)

525.    McIntosh responded the same date and wrote, "There has not been a change in procedure. [The employee's] responsibilities have been picked up in her absence. We still need sufficient lead time to get interpreters and there is a shortage. On your Monday case I know the PD was made aware last week that we did not have an interpreter available for Monday." (Exhibit 48)

526.    Judge Cocroft replied, "I will agree that [the Public Defender] was notified on last Thursday at 4:50pm that he would not have an interpreter on yesterday. But I wasn't made aware of the fact until yesterday and that matter was set for resolution through plea. So I believe that it would be helpful for the judges to know of any issue relating to interpreter services. Additionally, it was my understanding that persons who needed interpreters contact [the employee] directly; I

was not aware that other Court staff were contacted about requests." (Emphasis added.) (Exhibit 48)

527.    To Judge Cocroft's knowledge, she is the only FCCP-Gen Judge who was not aware of changes made in how interpreters were requested and assigned.

528.    Rule of Superintendence 88 mandates strict compliance and the decision of FCCP-Gen not to advise Judge Cocroft of any changes jeopardized her ability to comply with the rule.

529.    On June 1, 2023, Judge Cocroft received an email from Bedsole regarding upgrades to her courtroom's audio-visual system. (Exhibit 49)

530.    Bedsole requested that Judge Cocroft select preferred dates for scheduling the upgrades. At the time that Bedsole sent the communication, two dates were marked as unavailable and noted the FCCP-Gen Judges who were given certain dates.

531.    The dates of June 26-July 14 were assigned to K. Brown.

532.    Judge Cocroft provided date preferences and sent the information to Bedsole on June 5, 2023. (Exhibit 49)

533.    On June 25, 2023, Bedsole sent an email to the FCCP-Gen Judges with the finalized schedule for audio-visual upgrades. (Exhibit 50)

534.    In part, Bedsole's communication stated, "Based upon the requested preferences, and seniority, below is the schedule."

535.    Judge Cocroft noted that K. Brown, who does not have seniority over Judge Cocroft, was scheduled for audio-visual upgrades four months prior to Judge Cocroft.

534.    Judge Cocroft was given her last preference in the upgrade schedule.

535.    The June 25, 2023 email from Bedsole was the first time that seniority was mentioned, though Bedsole did not apply seniority when making the schedule.

536.     On June 25, 2023, Judge Cocroft sent an email to Bedsole, advising that she had an intractable two-week wrongful death/medical malpractice trial that would conflict with a move to another courtroom while upgrades occurred in her courtroom (Exhibit 50)

537.     Judge Cocroft further stated that she would be willing to allow her chamber mate to proceed with her upgrade and that she would pick another date.

538.     On June 26, 2023, Judge Cocroft sent an email to Bedsole and stated, "As a follow-up to my communication from yesterday, I looked at the original email you sent and it indicated that Chambers 5E (K. Brown)/5F were already slotted for June 26 installation. Neither of those judges has more seniority than I do, so I remain confused about how the assignments were made." (Exhibit 51)

539.     Bedsole responded on June 26, 2023 and stated,  "As to seniority, I did not mention it initially because I never expected all 17 judges would want to go first! LOL After the results were in, I used it since ties in our Court are always decided by seniority. As to 5E/F, with the departure of Judge K Brown's court reporter, she needed the recording equipment in her courtroom immediately; therefore, her courtroom was scheduled first (* * *)." (Exhibit 51)

540.     As an additional explanation, Judge Cocroft was told that K. Brown was given priority because, at the time of the updates, she was chair of the Technology Committee.

541.     Historically and as a matter of course, FCCP-Gen employs at least two "float" Court Reporters who assist judges who are without their assigned Court Reporter for any period of time.

542.     On Friday June 9, 2023 at around 12:00pm, Young's staff attorney sent an email to Judge Cocroft's staff attorney, advising that Judge Cocroft would be required to handle a hearing on a motion for temporary restraining order that was assigned to Young's docket.

543. The FCCP-Gen Local Rules require the judge assigned to a case to hear all motions unless the judge is unavailable.

544. If the FCCP-Gen Judge is unavailable, then the matter is heard by the Duty Judge.

545. Young was notified of the motion for temporary restraining order on June 8, 2023.

546. At the time that Young was notified of the motion for temporary restraining order, he was available and in his office.

547. At the time that the motion for temporary restraining order was filed, Judge Cocroft was not the Duty Judge.

548. Despite this, all counsel contacted Judge Cocroft's staff to schedule a hearing on the motion for temporary restraining order for the week of June 12, during which she was the scheduled Duty Judge.

549. On March 14, 2023, Judge Cocroft requested Court Reporter coverage for June 15, 2023.

550. Bedsole is responsible for providing Court Reporter coverage using "float" Reporters.

551. By June 12, 2023, Bedsole had not provided any update to Judge Cocroft regarding Court Reporter coverage.

552. As Duty Judge, a FCCP-Gen Judge is required to handle extradition hearings, which require the presence of a Court Reporter.

553. Because Judge Cocroft had not received an assignment from Bedsole, she requested the assistance of another Court Reporter whom she knew would be available, as the Reporter's assigned judge was out of the office.

554. The Court Reporter agreed to assist Judge Cocroft.

555.     Shortly after the Court Reporter contacted Judge Cocroft and agreed to assist, Bedsole sent a message to Judge Cocroft's bailiff, indicating that the Court Reporter secured by Judge Cocroft was being assigned to K. Brown.

556.     On June 14, 2023, Judge Cocroft sent an email to McIntosh outlining the concerns related to the Young and Court Reporter matters. (Exhibit 52)

557.     In reference to the Young matter, Judge Cocroft wrote, "I am concerned by what seems to be an attempt to avoid handling a matter that has already been assigned. I am also concerned by the fact that, despite having received notice of the TRO filing on Thursday, my staff was not notified until noon on Friday, after Judge Young was out of the office when my staff and I had no opportunity to confer with [Young] and his staff. Instead, an expectation was established that we would resolve the matter, and, though I am willing to meet the expectation established without my input, I am concerned by the approach."

558.     Regarding the lack of Court Reporter assignment by Bedsole, Judge Cocroft said in her June 14, 2023 email, "At this point, I don't know what my reporter and I need to do to get assistance with coverage. We have followed the protocol adopted by the Court. We also followed the additional guidance you provided in your June 1 communication (Exhibit 53), which is the reason I reached out to [another judge's] reporter directly since my reporter had not received any response from other reporters or administration regarding assistance. But even when we attempt to facilitate a resolution using the protocol or through our own efforts, we do not end up with a favorable result. (* * *) I am unclear on how or why one judge's docket is prioritized over another judge's docket, particularly when the staff person who is requesting coverage and has done everything required in a timely way."

559. Because Judge Cocroft was never provided with a Court Reporter assignment for June 15, 2023, she made the decision to cancel her docket on June 14, 2023 so that counsel and clients would not be required to be in court when Judge Cocroft would not have the ability to handle any cases on the record.

560. When Judge Cocroft went into her courtroom on June 15, 2023, there was a woman seated with stenographer equipment. Judge Cocroft had never seen this woman and asked whom she was.

561. The woman gave her name and said that she was the assigned Court Reporter. Judge Cocroft informed the Reporter that she had canceled her docket because she was never told that someone would be assisting her.

562. Shortly thereafter, Judge Cocroft sent an email to Bedsole regarding this situation. (Exhibit 54)

563. Judge Cocroft explained that the Reporter was in her courtroom, that she had canceled her docket because she did not know she would have coverage, and that she was frustrated by the inability to get assistance and/or information when she followed the rules in place.

564. Bedsole replied and stated she was "perplexed" by Judge Cocroft's email until she realized that, on June 13, 2023, she sent an email with Court Reporter assignments to every FCCP-Gen Judge who requested coverage except for Judge Cocroft. (Exhibit 55)

565. Every FCCP-Gen Judge who was notified of Court Reporter coverage is Caucasian.

566. Bedsole wrote, "I failed to include yourself and your bailiff on the email."

567. On June 5, 2023, Judge Cocroft sent an email to Goodman, notifying her that the Chief Reporter refused to provide her Reporter with the information needed to prepare the record and transcript for appellate review in a matter assigned to Judge Cocroft's docket. In 2023, the Chief Reporter was a Caucasian woman. (Exhibit 56)

568.   Goodman did not reply to Judge Cocroft until July 12, 2023. (Exhibit 56)

569.   Appellate review of trial matters are time sensitive issues.

570.   Goodman did not meet with Judge Cocroft and her Court Reporter about the issue until August 8, 2023 and the information was not provided to Judge Cocroft's Reporter until after the August 8 meeting.

571.   Upon information and belief no other judge has been required to wait more than sixty days for their assigned Court Reporters to receive recordings and other information necessary to complete a record for appellate review.

572.   On July 12, 2023, an employee from the FCCP-Gen Technology department came into the office of Judge Cocroft's staff attorney without her knowledge or permission. The employee was found taking pictures of the staff attorney's printer.

573.   The employee entered Judge Cocroft's work area while she was in her courtroom.

574.   Shortly thereafter, Judge Cocroft sent an email to the Director of the Information Technology Department to advise of this situation (Exhibit 57)

575.   Judge Cocroft copied McIntosh, Goodman and Bedsole on the email.

576.   The Director replied that the employee was in Judge Cocroft's area because IT "received a message concerning 4 printers on our printer server" and that FCCP-Gen was "hyper sensitive to printers on our print server because one recently caused the server to crash (* * *)." (Exhibit 57)

577.   The IT Director, who was out of the office when this happened and indicated that he did not give the instruction for the employee to go into an office in Judge Cocroft's suite, stated, "The bigger issue is staff entering offices without notification."

578.   Judge Cocroft responded and stated that neither she nor her staff were ever notified of any printer server crash and wrote, "I am not aware of any court employee who has the independent

latitude to make a decision to enter anyone's office, and certainly not the office of any judge's staff, without direction from someone serving in a supervisory or administrative capacity. So I am definitely interested in learning as soon as possible who gave [the employee] that direction."

579.    The IT Director confirmed that he did not give the direction.

580.    Neither Goodman nor Bedsole denied that they ordered this and, based on the FCCP-Gen Table of Organization, they are the only other two employees who could have made the order.

581.    Thereafter, Judge Cocroft asked that she and her staff receive notice to access our offices in the same way that the employee who had entered in the recent incident would normally provide notice.

582.    Judge Cocroft stated that this staff person was not the kind of employee who would make this choice unless they believed they were required to do so, because FCCP-Gen employees do not have the latitude to make that kind of executive decision.

583.    Judge Cocroft asked to be informed of who made the order to enter her suite area and staff's office.

584.    As of the filing of this complaint, Judge Cocroft has never been told who gave the employee an instruction to enter the work area of Judge Cocroft's staff without her knowledge or permission.

585.    In the Court's Table of Organization, the Deputy Court Administrator, who was Bedsole when the July 2023 event occurred, supervises the Director of Information Technology, and oversees and instructs the Information Technology employees.

586.    In the court's Table of Organization, the Deputy Court Administrator is supervised by the Court Administrator. Goodman was Court Administrator when the July 2023 event occurred.

587. Judge Cocroft learned that two of the printers which created the concern were located on the second floor of the FCCP-Gen courthouse. Goodman's, Bedsole's, Davis's and Worthington's offices are or were located on the second floor.

588. Upon information and belief, no employee took pictures of the printers located on the second floor.

589. As of the filing of this complaint, there have been no additional notifications regarding the crash of a printer assigned to Judge Cocroft or her staff.

590. On August 24, 2023, Judge Cocroft received an email from a Probation Officer assigned to supervise probationers on her docket. (Exhibit 58)

591. The email related to a defendant whom Judge Cocroft placed on non-reporting probation supervision based on her authority and understanding of the case.

592. The probation officer wrote, "I understand you made this decision to make the order above, but can you provide me and the Department the reason how he could be placed on non-reporting. Please and thank you." (Emphasis added.)

593. Judge Cocroft replied that she was stunned to receive an email where she was asked to explain why she made a decision she is permitted to make and requested to meet with the probation officer, the officer's manager and the Chief Probation Officer. (Exhibit 58)

594. During the meeting on August 28, 2023, both the manager and Chief Probation Officer continued to ask Judge Cocroft to explain her decision. (Exhibit 59, Recording 74)

595. During the meeting, the probation officer, manager and Chief Probation Officer all admitted that they have never asked a Caucasian FCCP-Gen Judge or any judge to explain their decision. However, the manager continued to ask Judge Cocroft to provide an explanation regarding her decision. She told him that she would not.

596. In July 2023, the FCCP-Gen Judges were scheduled to vote on maintaining video arraignments.

597. On Friday, July 14, 2023, at 6:02pm, McIntosh sent an email to judges regarding the process for the vote and said that, in order to encourage in-person attendance at the meeting, he decided that judges would be able to vote by secret ballot. He further stated that judges who participated in the meeting by Zoom would have to provide a voice vote. (Exhibit 60)

598. Because Judge Cocroft believed that this procedure may be violative of Sunshine Laws, including the Open Meetings Act, she sent an email to McIntosh on Saturday, July 15, 2023. (Exhibit 60) She then forwarded the July 15, 2023 email on Monday, July 17, 2023. McIntosh did not respond.

599. At the meeting held on July 18, 2023, McIntosh referred to Judge Cocroft's emails and explained that his decision was based on a concern about judges being "outed" regarding a vote in 2010 related to maintaining the commercial docket. (Exhibit 61, Recording 61)

600. Judge Cocroft was the only judge who expressed a concern in 2010 but that concern had nothing to do with be "outed" regarding a vote.

601. During the July 18, 2023 meeting, McIntosh then asked if there were concerns with the process. Judge Cocroft referenced the fact that she had sent two emails expressing her concerns.

602. McIntosh then explained why he believed the Court was not considered a public body. Then Lynch and Serrott provided opinions regarding why the meeting was not subject to the Open Meetings Act.

603. Lynch and Serrott referenced most of the information Judge Cocroft provided to McIntosh in her emails to him only and it was clear that McIntosh had either discussed Judge Cocroft's emails with Lynch and Serrott or provided them with copies of the emails.

604.    Despite Judge Cocroft's concerns, the vote proceeded with four judges being required to provide a voice vote and thirteen voting by secret ballot. Judge Cocroft was required to provide a voice vote.

605.    At the conclusion of the vote, Judge Cocroft restated her belief that a secret voice related to funding issue may be a violation of Rule of Superintendence 46(G)(1), which defines "Administrative Document" as "a document and information in a document created, received, or maintained by a court that serves to record the administrative, fiscal, personnel, or management functions, policies, decisions, procedures, operations, organization, or other activities of the court, subject to the exclusions in division (G)(2) of this rule."

606.    McIntosh continued with the meeting.

607.    On August 28, 2023, Judge Cocroft sent an email to Worthington regarding the number of temporary restraining order motions that were being assigned to Judge Cocroft's docket (Exhibit 62)

608.    As a general rule, each of the 17 FCCP-Gen Judges gets no more than a handful of these motions in a year.

609.    Between June 2023 and April 2024, Judge Cocroft received no less than eight (8) temporary restraining order motions.

610.    In 2022, J. Brown and Aveni (Caucasian male judges) raised the issue of receiving a high number of these cases and the issue was resolved immediately. During 2022, Judge Cocroft served as Administrative Judge and responded to the concerns raised.

611.    When Judge Cocroft raised the issue with Worthington for the first time in 2023, Worthington stated that nothing could be done and that Judge Cocroft was receiving assignments under the random draw system.

612.    When Judge Cocroft raised the issue again in March 2024, she asked Worthington to meet with her and her bailiff to explain the system in more detail.

613.    Worthington explained specifically that each civil case is filed with an informational summary sheet and that, if counsel mark "Yes" for the filing of a temporary restraining order motion, then that case is not assigned through the random draw system but through another process.

614.    Immediately after the meeting, Judge Cocroft received two to three additional temporary restraining order cases. However, since Judge Cocroft and her staff had just learned about the informational summary sheet, Judge Cocroft's bailiff printed that documentation and noted that the cases should not have been assigned to Judge Cocroft.

615.    Judge Cocroft provided that information to Bedsole and Worthington (who was out of the office when the issue arose) on March 27, 2024. (Exhibit 63)

616.    At first, Bedsole agreed with Judge Cocroft's assessment and informed her the cases would be reassigned. (Exhibit 63)

617.    The very next day, Bedsole told Judge Cocroft and her bailiff that their assessment was incorrect and that the cases were properly assigned. Judge Cocroft was also told that the informational summary sheets were being eliminated from use. (Exhibit 63)

618.    After Judge Cocroft and her staff provided additional proof, Bedsole conceded that the assignment process was incorrect and reassigned the cases. (Exhibit 63)

619.    On April 10, 2024, Judge Cocroft sent an email to the Clerk of Court's staff regarding the TRO assignment process. Judge Cocroft sent a carbon copy email to K. Brown, C. Brown, who served as Chair of the FCCP-Gen Technology Committee, Goodman, Bedsole, and Worthington. (Exhibit 64)

620.    Judge Cocroft reiterated her concern regarding how cases were being assigned and noted that she had not received documentation demonstrating how many FCCP-Gen judges had received seven TRO matters in three months.

621.    On April 11, 2024, Worthington assigned the 8th TRO matter to Serrott, as required by the assignment policy.

622.    Surprisingly, Worthington told Judge Cocroft's bailiff that she wanted to give Serrott a "heads up" about the assignment since it was likely that he would receive back-to-back TRO cases and she did not want Serrott to be caught off guard (Exhibit 64).

623.    When Judge Cocroft raised a concern regarding 8 consecutive TRO cases, Worthington told her initially that nothing could be done and no "heads up" was given to Judge Cocroft.

624.    To Judge Cocroft's knowledge, no other FCCP-Gen Judge has been assigned eight temporary restraining order motions in a compressed timeframe.

625.    On September 20, 2023, McIntosh asked Judge Cocroft to be a part of a small working group to discuss the continued use of video arraignments and to represent the position of FCCP-Gen in discussions with the Franklin County Sheriff and Franklin County Administrator and Deputy Administrator.

626.    McIntosh, Holbrook and Serrott were the other members of the small working group.

627.    Holbrook and Serrott were in favor of eliminating video arraignments. Judge Cocroft was in favor of keeping video arraignments.

628.    During the only meeting of the working group on September 25, 2023, Serrott said that "I'd like to see the Court unified and we're not. So I think the Commissioners are getting mixed signals from us. It certainly does not help if half the judges are like 'we're not behind this.' We took a vote and when we take a vote, we live by it."

629. While the vote regarding arraignments was supposed to be a secret ballot, both Holbrook and Serrott knew how each judge voted. During the working group meeting, Holbrook said that he would lose the vote of "Phipps and Miller" if the "Commissioners get their act together" to correct issues relating to video arraignments.

630. Serrott them emphasized that he has the idea that the FCCP-Gen Court "is not united" and, as such, the Commissioners weren't taking the matter seriously and that the challenges were only caused by "two rebels" (Holbrook and Serrott).

631. When Judge Cocroft asked Serrott for any proof that the Court was not united, he said that he did not have any.

632. Serrott then said that "people" were talking about losing money and Judge Cocroft told him that she was the "person" who mentioned the potential financial consequences of eliminating video arraignments.

633. When the working group met with representatives from the Franklin County Sheriff's Office, as well as the Franklin County Administrator and Deputy Administrator, Holbrook and Serrott spoke primarily on behalf of FCCP-Gen, and Judge Cocroft had to interject repeatedly in order to literally be heard.

634. Close to the end of the meeting, Holbrook once again stated that he and Serrott were willing to go back and talk to the FCCP-Gen Judges "who voted yes" in favor of eliminating video arraignments and Judge Cocroft asked how he knew who voted "yes" because it was a secret ballot vote.

635. Serrott said, "Of course we know" and Judge Cocroft said, "I don't."

636. Holbrook then said, "You had an issue from day one, so we weren't talking to you at all."

637.    Judge Cocroft replied, "I know you don't. You don't talk to me about a lot of things but I'm still here. Imagine that."

638.    Judge Cocroft was embarrassed and humiliated by Holbrook's comment that he, Serrott and other FCCP-Gen Judges were not going to talk to Judge Cocroft "at all" about an issue that was a matter for <u>all</u> judges to decide.

639.    Upon hearing Holbrook's statement, Judge Cocroft recalled that Serrott suggested that some judges were not united regarding the current position and believed that his statement related to her.

640.    Holbrook then began to list the judges who voted in favor of eliminating video arraignments and mentioned that it would be "easy" to get his chamber mate (Miller) to change his position, if Holbrook instructed him to do so.

641.    Beyond those issues identified for future discussion, Judge Cocroft told the attendees at the meeting that, before the next meeting, we would also work on finding a way for Holbrook to speak to her more respectfully. Holbrook replied, "We will?" and Cocroft responded, "Yeah, we will or we won't be saying anything to each other."

642.    On September 26, 2023, Judge Cocroft sent an email to McIntosh and resigned from participation in the working group. Judge Cocroft wrote,

> To have one judge [Holbrook] state to our county justice partners that I was intentionally disregarded as the Court attempted to work through this issue initially is both disrespectful and unacceptable and is a clear indication that the "unity" that has been discussed consistently is an illusion. Moreover, to have another judge [Serrott] state that there have already been preliminary conversations with other judges regarding what has been discussed over the last two days about which I, as a committee member, was not made aware until today's meeting (because everyone knew where I stood) is dismissive, at best, particularly given the fact that I have witnessed an attempt to persuade an individual to support a certain position. But for judges, who seemed to suggest that they 'control' the thoughts and positions of other judges, to be summarily dismissive and then to vocalize the behavior and decisions publicly is beyond what I will tolerate. My service as a judge of this court is no less important, necessary and valued than any other judge who serves. What

transpired today was both embarrassing and uncalled for and I will not subject myself to that behavior for the good of the Court and at the sacrifice of my own well-being and professional integrity.

(Exhibit 65)

643.    McIntosh responded, noting that Judge Cocroft "had and [has] so much to offer" and that, "[u]nfortunately, there has developed within our court a "[clique] of judges that routinely discuss issues among themselves and come to meetings with an agenda." (Emphasis added.) (Exhibit 64)

644.    The issue of video arraignments is associated with the work of the FCCP-Gen Criminal Committee for which Holbrook served as Chair in 2023.

645.    The Criminal Committee met on September 27, 2023 to discuss the working group's meeting with the Franklin County Sheriff's representatives, as well as the Franklin County Administrator and Deputy Administrator.

646.    Goodman and Bedsole were present during the meeting, as were Phipps, K. Brown and the Chief Probation Officer.

647.    During the Criminal Committee meeting, Holbrook stated that he and Serrott represented that they would talk to the "yes votes" about potentially changing their positions. Chris Brown then asked how they would do that since the vote was by secret ballot, excluding those judges who were required to provide a voice vote.

(Exhibit 66, Recording 94)

648.    Serrott said that he knew he voted yes because he was trying to get the votes to win and he talked to most of the FCCP-Gen Judges.

649.    Thereafter, a verbal altercation ensued between C. Brown and Serrott regarding how the judges voted.

650.    C. Brown said that for everyone who talks about principles, we hid the vote behind a secret ballot and that Serrott was "not being honest".

651.    Serrott then began to yell and told C. Brown, "Don't accuse me of not being honest. You do not want any problems with me." Holbrook then told C. Brown and Serrott to "Shut up."

652.    Serrott and C. Brown continued to argue and then Holbrook then said, "You guys can just go out in the hallway."

653.    Phipps then added that the FCCP-Gen Judges did not hide behind a "secret ballot".

654.    C. Brown continued to ask which judges voted for or against video arraignments and then stated that it was "fucking cowardly" to discuss principles and values while being unwilling to take a public vote. C. Brown also described the behavior of some of the judges as "chicken shit".

655.    During this entire exchange neither Goodman nor Bedsole said or did anything.

656.    While Judge Cocroft had thoughts about everything that transpired and how Holbrook treated her during the September 26 meeting, she told the Committee that she would wait until the October FCCP-Gen Judges' meeting to share her thoughts.

657.    Serrott then said to her, "Well that's cryptic." Judge Cocroft replied that it was an attempt to diffuse a tense situation and that she wasn't afraid to share anything she was thinking.

658.    Judge Cocroft advised the Criminal Committee that she had resigned from the small working group based on Holbrook's comments and began to address the FCCP-Gen Judges cliques and mistreatment she endured during the September 26, 2023 meeting. Judge Cocroft stated that she would restate her sentiments at the October FCCP-Gen Judges' Meeting.

659.    At the October 24, 2023 FCCP-Gen Judges' meeting, Judge Cocroft was not given full opportunity to state her position but did notify all the FCCP-Gen Judges that she had resigned from the working group and the reason for her resignation.

670.     Judge Cocroft also stated that there needed to be a larger conversation about how persons and votes are respected and that representations were made (by Holbrook and Serrott) that they could persuade judges to change their votes. Judge Cocroft further stated that she was attempting to be respectful in her remarks, despite the fact that she was disrespected in front of the FCCP-Gen justice partners and that, hopefully, her attempts to be respectful weren't again deemed "cryptic."

671.     On October 24, 2023, C. Brown sent an email to Judge Cocroft and stated,

> I just wanted to say I appreciated your comments at today's meeting. I know it was difficult for you, because I know the backstory behind your remarks. You walked a tight line between being respectful while being righteously upset at how you were treated by certain members of the ad hoc committee. I thought you did a great job expressing your experience to everyone at the meeting.
>
> You don't need my approval, but I just want you to know I saw you, I understood the context, and I admire your courage for speaking about your experience. You shouldn't be put in that position, but I thought you did a great job in handling it and expressing yourself.

(Exhibit 67)

672.     In September 2023, a FCCP-Gen Probation Officer (Caucasian female) came to Judge Cocroft's office prior to her sentencing hearings and told her that she wanted to speak with Judge Cocroft "just to make sure that [Judge Cocroft] was going to follow her recommendation."

673.     Judge Cocroft told her that she will never be able to "make sure" that Judge Cocroft does anything, because Judge Cocroft was solely responsible for decision-making and outcomes.

674.     Later that day, Judge Cocroft sent an email to the Probation Officer and her immediate supervisor and asked them to come to her office and meet with her. (Exhibit 68) Only the Supervisor, with whom Judge Cocroft has had an amiable relationship, appeared.

675.     When Judge Cocroft asked the Supervisor where the Probation Officer was, the Supervisor replied she thought Judge Cocroft only wanted to see her.  Judge Cocroft stated the communication made clear that she wanted to speak with both of them.

676. On September 25, 2023, the Probation Officer and Supervisor came to Judge Cocroft's office so that she could explain her concerns. The Probation Officer apologized and said that she would do better moving forward.

677. On October 18, 2023, Judge Cocroft's bailiff was the victim of a road rage incident involving Serrott's bailiff, a Caucasian woman.

678. The incident occurred while Judge Cocroft's bailiff was attempting to park in the employee garage.

679. When Judge Cocroft arrived in the office on that day, her bailiff was visibly shaken and was having a difficult time focusing on her work.

680. The inability of Judge Cocroft's bailiff to focus on her work impacts Judge Cocroft's ability to manage cases efficiently.

681. Judge Cocroft asked her bailiff what happened and she recounted that Serrott's bailiff exited her vehicle and approached her while yelling as both were at the employee garage.

682. Judge Cocroft advised her bailiff to send light-hearted communication about what happened and suggest that the person who did this looked a lot like Serrott's bailiff.

683. Serrott's bailiff wrote back and said that she was not going to discuss the event on a government computer but that Judge Cocroft's bailiff could come to her office and they could talk about the incident.

684. Judge Cocroft's bailiff did not respond and was unsettled and concerned for the rest of the day.

685. The following day, October 19, 2023, Serrott's bailiff came into Judge Cocroft's office space and approached her bailiff's work area. Serrott's bailiff then said, "Oh, I didn't realize I was on the wrong floor."

686.    Judge Cocroft's office is on the fourth floor; Serrott's office is on the sixth floor.

687.    Judge Cocroft and her staff took the actions of Serrott's bailiff as an act of aggression and intimidation.

688.    On November 14, 2023, Judge Cocroft and an unidentified group of FCCP-Gen employees received an email from Davis regarding the impact of the passage of Issue 2 to legalize adult use and purchase of recreational marijuana on the FCCP-Gen Drug Policy. (Exhibit 69)

689.    Judge Cocroft replied to Davis on November 14, with a carbon copy communication to Goodman and Bedsole, and asked a series of questions including to whom the message was sent, whether the new policy position was vetted by the Court's Personnel Committee, which is responsible for changes to every policy, and whether the position was approved solely by McIntosh in his capacity as Administrative Judge and pursuant to Sup. R. 4.01 and the FCCP-Gen Local Rules. (Exhibit 69)

690.    Judge Cocroft then forwarded a copy of her communication and questions to Phipps who served as Chair of the FCCP-Gen Personnel Committee.

691.    On November 15, 2023, McIntosh sent an email to Judge Cocroft in response to her November 14 email to Davis, Goodman, and Bedsole and stated, "Judge Cocroft, I asked Cameo to send an email to all employees reminding them of the court's drug-free work policy (* * *). I did not wish to wait until Issue Two was to officially go into effect. I wanted our staff to know that currently it does not change court policy (* * *). Obviously, we as a court can change current policy after vetting it through personnel and a vote of the judges." (Exhibit 69)

692.    Judge Cocroft responded, "I have no issue with the Administrative Judge of this Court making an executive decision and requesting that a communication is sent, consistent with the authority contemplated under our Local Rules or Rule of Superintendence 4. And I'm grateful to

know that your purview is acknowledged and respected by our administrative team in that regard."
(Exhibit 69)

693.    Judge Cocroft then explained the concerns she had with the statement. Specifically, she shared that the announcement ignored the impact of the Issue 2's passage on persons supervised by the Court. Judge Cocroft also advised that she expressed concerns to the leadership of the Personnel Committee.

694.    As of the filing of this complaint, no further action has been taken by the Personnel Committee to address the concerns Judge Cocroft raised in her November 15, 2023 email.

695.    As of the filing of this Complaint, neither Goodman, Davis, Bedsole, Worthington, or the FCCP-Gen Judges have questioned McIntosh about his authority under Sup. R. 4.01 to make a decision or to direct staff to send a communication without first getting approval from Goodman or the FCCP-Gen Judges.

696.    Upon information and belief, the suggestions and concerns of Caucasian judges have not been ignored by Goodman, Bedsole, Davis, and/or Worthington.

697.    On December 19, 2023, the same probation officer who stated that she wanted to make sure that Judge Cocroft was going to do what she wanted me to do in managing a case made another demand regarding Judge Cocroft's management of a different case.

698.    More specifically, this probation officer called and sent emails and other communications to Judge Cocroft's staff, demanding that Judge Cocroft sign an entry to transport a defendant to a treatment program.

699.    Prior to the current recommended program, this defendant had been given multiple opportunities to engage in treatment but failed to participate.

700. The probation officer was aware of these failures but was incessant in her insistence that Judge Cocroft sign another entry.

701. Judge Cocroft sent an email to the probation officer, with a carbon copy communication to her supervisor and the Chief Probation Officer, advising of the circumstances that prevented her from signing the entry immediately, though Judge Cocroft had no obligation to explain the timing. (Exhibit 70)

702. On January 5, 2024, while Judge Cocroft was out of the office after the holiday season, Judge Cocroft received an email from the Chief Probation Officer regarding her December 19, 2023 communication. In it, the Chief Probation Officer stated,

> I spoke with [the probation officer] before the holiday and she is very apologetic and remains anxiety ridden. I explained that your courtroom was very efficient and there was no need to make several calls once she sent the initial Teams message. I could give you her explanation but don't want to give the appearance of excuses.

(Exhibit 70)

703. When Judge Cocroft returned to the office, she replied to the Chief Probation Officer noted,

> "I just had this same conversation with [the probation officer and her supervisor] not even three months ago and, yet, I am having to address a similar circumstance once again.
>
> Additionally, I am unclear about why you are sharing with me that [the probation officer] may be anxiety ridden. Is that to suggest that I don't have the ability to request that she allow me to do the job I was elected to do? Is that to imply that I cannot provide contextual information to an employee who has exceeded yet again [their] professional boundaries with a judge, when I am unaware of her challenging another judge in the way [they have] felt comfortable with questioning me? What was your purpose in sharing that? I have been subjected to [numerous probation officers] demanding that I explain to them why I have made decision I am permitted to make as Judge. I have been subjected to having members of the Probation Department review records and other documents I have not asked them to review in order to assess whether a decision I have made has a basis in fact. Ther are few circumstances what could and have created the level of anxiety, concern, disappointment, and frustration that I have been made to endure based on circumstances I have not created. And that anxiety, concern, and frustration has been heightened through this communication, which almost feels like an attempt to blame me for a situation that I did not create.

(Exhibit 70)

704.  On January 3, 2024, the FCCP-Gen Personnel Committee held its first meeting of the year. While Judge Cocroft was not selected as a member of the Committee for the second year in a row, she once again requested notification of all committee meetings. (Exhibit 71, Recording 110)

705.  At the end of the meeting, Phipps, who continued her service as Chair of the committee, discussed FCCP-Gen's decision to update the Employee Handbook.

706.  Phipps noted that it was important for the FCCP-Gen Judges to enforce the Handbook. Specifically, Phipps noted that employees may come to the judges with their legitimate complaints and those complaints are not handled properly.

707.  Phipps said that when a judge doesn't do anything about a complaint, that judge is encouraging a hostile work environment, which is not something that any judge wants to do.

708.  Phipps said that things need to be handled properly because she has had employees come to her expressing that when they went to FCCP-Gen Judges with complaints, nothing was done.

709.  Phipps stated that when she would ask employees if they filed a formal complaint, they would say "No" because employees don't feel like they can, based on fear of retribution.

710.  Phipps closed by remarking that judges have to ensure that things actually get done because, "Someone complaining to six judges they *feel* are their superiors and nothing gets done and then we've basically enforced the hostile work environment."

711.  Goodman, who has a primary role in the management of complaints under the FCCP-Gen Anti-Harassment Policy, responded, "Absolutely." Upon information and belief, Goodman, Bedsole, and Davis have received numerous complaints from FCCP-Gen employees and have taken no action to address those complaints.

**I. Goodman**

712.  Goodman has served as Court Administrator since approximately 2015.

713.  Since that time, Goodman has become accustomed to doing her work, and expects the right to do her work, without the supervision or input of the Administrative Judge. This was confirmed by Frye in 2022 when he told Judge Cocroft that she should do the job of Administrative Judge the way that other Administrative Judges had done the job, which would give complete autonomy to Goodman.

714.  When Judge Cocroft was elected Administrative Judge in 2022, she told Goodman and Bedsole that she would take a more active role in the position because, based on the novelty of her service as the first woman who also happened to be Black, she believed there would be a level of scrutiny regarding her service. The positions descriptions for Goodman, Bedsole, Davis, and Worthington do not give any of them authority over a FCCP-Gen Judge or Administrative Judge.

715.  Judge Cocroft was excited to serve as Administrative Judge and had a vision for how FCCP-Gen could build on the solid foundation already existing, while addressing gaps in our delivery of services to justice-involved individuals.

716.  Judge Cocroft also had vision for enhancing FCCP-Gen's relationship with justice partners and opening lines of communication that even Goodman acknowledged were challenging relative to the Court's relationship with justice partners like the Clerk of Courts, the Franklin County Sheriff's Office, the Franklin County Prosecuting Attorney's Office, and the Franklin County Public Defender's Office.

717.  Judge Cocroft shared her vision with Goodman and other administrative leaders through her guiding theme of continuing to "R.A.I.S.E. The Bar" (Respect, Accountability, Intentionality,

Success, Excellence) and the administrative leaders were openly enthusiastic about the opportunity for growth.

718.   Goodman, however, expressed an immediate concern about the guiding theme and became defensive about her perception that the guiding theme suggested that FCCP-Gen was not a good place to work.

719.   Judge Cocroft told Goodman that her goal was to enhance what existed currently and to build on the foundation to make FCCP-Gen even stronger. From that moment, Judge Cocroft understood that she would have to be thoughtful and careful in how she interacted with Goodman.

720.   As a part of FCCP-Gen's daily practices in 2022 and in the preceding years, Judges received a daily staffing email regarding deputies assigned to each courtroom.

721.   Initially, Judge Cocroft asked Goodman to send the staffing reports to Judges. However, although Goodman was copied on the reports, she was not sending them upon receipt.

722.   As such, Judge Cocroft began sending the reports so that the FCCP-Gen Judges were aware of any security issues before the majority of lawyers and litigants arrived. Both McIntosh and the Administrative Judge who served prior to McIntosh sent deputy staffing reports, not Goodman.

723.   Early in January 2022, Goodman notified Judge Cocroft that she would need to be out of the office. As Goodman's supervisor under the FCCP-Gen Table of Organization, Judge Cocroft had the responsibility of approving Goodman's leave time and signing a leave slip.

724.   In March 2022, Judge Cocroft met with the entire Probation Department. It was the first time that an administrative judge met with the Department in person.

725.   In March 2022, Goodman was out of the office on approved leave.

726.   During this time, Goodman sent a text message to Judge Cocroft on March 5, 2022, Goodman wrote, "With the Judges, I always feel like some will see this as a crack in the armor (*

* *). Thanks for being so supportive I truly appreciate it." On March 6, 2022, Goodman sent another text expressing gratitude for the assistance that Judge Cocroft provided to her. Goodman wrote:

"I know we have not worked this closely together for a long time but you have impacted me in so many ways in this short time. (* * *)
From the bottom of my heart, thank you."

727.    During Goodman's absence, Judge Cocroft asked Bedsole, Davis, Worthington and two other Directors about how things were going administratively.

728.    Every Administrator expressed to Judge Cocroft that Goodman micromanaged their work, second-guessed their work product, interrogated them about time out of the office, contacted them incessantly when they were on approved leave from the office, and hindered almost completely their ability to make any decisions consistent with the positions to which they were hired.

729.    Every Administrator also expressed to Judge Cocroft that each was afraid to raise these issues with Goodman because, historically, there had been swift backlash and repercussions, and each was fearful that collateral consequences would result from any attempt to speak up for themselves either directly to Goodman or to the FCCP-Gen Judges.

730.    During Goodman's absence, however, Bedsole noted that the Administrators were working well together and they were accomplishing a lot. Bedsole also stated that people were enthusiastic and felt less nervous with Goodman out of the office.

731.    One Administrator told Judge Cocroft that she could laugh freely and did not feel that she would get into trouble.

732.    As a part of Judge Cocroft's term as Administrative Judge, she told Goodman that she wanted every Administrator to have an *ex officio* assignment to a FCCP-Gen Court committee.

733. Prior to Judge Cocroft's service, Goodman did not permit Worthington to serve as an *ex officio* member of a committee. When Judge Cocroft advised Goodman and Bedsole of her decision to add Worthington to a committee, Goodman complained but eventually accepted Judge Cocroft's decision.

734. When Goodman returned to FCCP-Gen at the end of the second quarter of 2022, Judge Cocroft noticed that the energy and enthusiasm among the FCCP-Gen Administrators disappeared and Bedsole, Davis and other Administrators told Judge Cocroft how they once again felt constrained in their ability to do the work they were hired to do.

735. Because Judge Cocroft was concerned about what Administrators shared and wanted to improve morale, she decided to implement quarterly leadership meetings with FCCP-Gen Administrators.

736. Judge Cocroft initially scheduled the first leadership meeting for June 27 2022, with a focus on personal and corporate S.W.O.T. (Strengths, Weaknesses, Opportunities, Threats) analyses.

737. In addition to the analyses, Judge Cocroft posed the following questions:

1. How do I define the culture of FCCP-GEN?

2. How do I believe that others define the culture of FCCP-GEN?

3. What am I doing that impacts positively the culture of FCCP-GEN?

4. What am I doing that impacts negatively the culture of FCCP-GEN?

5. Am I the best Leadership Team member that I can be? If yes, then why? If no, then why?

6. Do I trust my Leadership Team members? If yes, then why? If no, then why

7. Do you trust your leadership team members? If yes, then why? If no, then why?

738. Judge Cocroft told every Administrator that she would hold their responses in confidence and without attribution in her continuing effort to protect the integrity of every Administrator, including Goodman. Judge Cocroft received the following responses from Administrators (Exhibit 72):

- (Executive Team) Restrictive, fosters a "status quo mentality. I.E. Why change things; why do things differently, why look at new or progressive options. Why invest in our employees over what is required by status. Micromanaging of day-to-day operations and areas that are very deep in the weeds. Very untrusting within the group of Directors, mistrust based upon past behaviors.
- FCCP-Gen culture - controlling, untrusting, dismissive, "old school", unconnected. Have very little faith in Executive Directors as voiced to me by virtually every level in the [Probation] department and 90% of employees with 2 or more years. Negative. Uncaring.
- Difficult to trust leaders who are distrustful, negative, look for the worst in subordinates that are in their division.
- Frustrations with old ineffective leadership style; Culture as a threat
- Lack of trust between Court Administrator and Deputy Court Administrator; Court Administrator failure to empower Directors; Dysfunctional leadership from Administrators
- Working tirelessly to avoid mistakes simply out of fear of losing job or acceptance by leadership; Not trusting other Administrator colleagues
- Fear and lack of support
- Leadership managed by fear; Some things are micromanaged, which does not foster an environment for inclusion
- Threat related to lack of support for directors and diversity and inclusion issues
- FCCP-Gen Culture as disappointing; Cliques; racism and biases that no amount training can change in some individuals
- People that speak up against injustices become labeled as difficult people; There are people who want those type of staff to be quiet.
- Personal business is shared with other employees.
- Individuals who go against the grain find themselves in a negative work environment or forced out of the Court. This creates a sense of fear and results in silence.
- One Administrator said that what happened to George Floyd was "unfortunate" but why should they feel about it.
- Persons who discuss their dislikes become participants in their own demise
- No trust for other Administrators because they lie, manipulate, sabotage, hurt individuals because they have the power to do so.
- Being excluded from conversations related specifically to position for which they were hired.

Worthington, the current Director of Court Support Services, provided the following responses:

- Threats of constant competition amongst executive team for recognition/validation; less opportunity to be at the table with Judges; Staff turnover; Lack of united front between Judges and Administration; Staff with expertise not always brought to the table before decision making; loss of historical knowledge due to turnover and retirement
- Opportunity with new Administrative Judge (Judge Cocroft) with new philosophy; New initiatives for the communities served

Bedsole, former Deputy Administrator, provided the following responses:

- Non-progressive culture; Distrust and lack of support; Death by meetings/not focused
- Not connected to the organization or most of the people; Environment that is replete with selfishness and inability to express empathy
- Too much pettiness among Administrators that creates distrust
- Constant competition among Administrators for recognition/validation; Less opportunity to be at the table with FCCP-Gen Judges
- Staff with expertise in specific areas are not brought to the table; Lack of united front between Judges and Administration

Davis, the current Director of Human Resources, noted the following:

- Leadership morale; Unsupported allegations are not managed; Micromanagement; Civility or lack thereof; Diversity as a challenge; Lack of compliance with policies and timekeeping
- Culture defined as fearful within the leadership circle as it is not safe to offer ideas and risk failure; Better to keep tried and true techniques; Political meaning a group of employees can influence the Court; Irrational meaning that policies can be suggested to the Court, but not adopted to please a group of employees
- Admission to participating in commiseration and witnessing others treated in a manner that is not respectful with no intervention.
- Successes are not celebrated and failures are painful and public. Could be targeted depending on the day, which is frustrating, humiliating and demoralizing.
- Each Administrator is micromanaged, examined, questioned, not given the benefit of the doubt.
- Unable to change/influence the culture and creating work arounds to navigate the culture to attain a desirable outcome, which does not reflect leadership behavior

739.    Though Goodman has served as Court Administrator for almost ten years, she wrote the following in response to the same questions posed to the other FCCP-Gen Administrators:

- Team player, Financially responsible; Effective leadership of change management; Empathetic; Patient; Kind; and Honest
- Weaknesses as striving for perfection; sense of urgency to complete tasks or solve problems; Desire for information to be received positively

- Opportunities to obtain education regarding specific court processes in order to better develop solutions and efficiencies as Court Administrator; further develop relationships with Judges and staff to ensure connection to the culture and needs of the Court and staff
- Threats of maintaining positive and productive relationship with leadership of funders and justice partners; requiring changes to business processes
- Organizational strengths of effective management of largest caseload in the State; Effectively utilizing technology to a great extent in a non-traditional environment; knowledgeable and responsible staff
- Weaknesses as being open minded to change proposed and desire by justice partners; Ability to see what is best for the Court versus what is desired by one or a few
- Opportunities to embrace technology and embracing new practices
- Threats of limited ability to provide some of the desired benefits, which could result in a loss of the caliber of staff maintained
- Culture defined as multifaceted but more engaging and transparent than other work environments, Improving on a daily basis
- Extreme sense of urgency or importance when the Court identifies a problem or a matter needs to be addressed.
- Making herself available to discuss matters with Directors and staff; Effort to recognize staff and Directors and their accomplishments
- Intent to impact the culture positively; Team members interpret her intent to be informed as a lack of trusting Directors to accomplish an issue independently.
- Trusting and supporting team members are important aspect of being a good leadership team member
- Ask team members about their lives to make sure they are doing well.
- Responsibility to bring team members together to build trust
- Efforts to be supportive and inclusive

740. Prior to the originally scheduled June 27, 2022 leadership team meeting and after Judge Cocroft received responses from all FCCP-Gen Administrators, Goodman began asking Judge Cocroft repeatedly what the meeting was going to be about and what, if anything, Judge Cocroft needed her to do.

741. Judge Cocroft told Goodman that, consistent with her emails, she was going to discuss the S.W.O.T. analyses but that she had no idea how the meeting would go because, to her knowledge, there had never been leadership team meetings between a FCCP-Gen Administrative Judge and Administrators. Judge Cocroft told Goodman she did not need to do anything.

742.    Goodman asked Judge Cocroft a few more times about the substance of the meeting and if she needed to do anything to prepare. Judge Cocroft gave the same responses as previously given.

743.    Sup. R. 4.01 does not require an administrative judge to get the approval of a court's administrator before taking any action, nor is an administrative judge required to review information to be discussed in a meeting called by an administrative judge with a court administrator.

744.    Due to various schedule conflicts, the leadership team meeting was not held until August 2022.

745.    Judge Cocroft prepared a PowerPoint presentation to synthesize the findings (Exhibit 73).

746.    During the meeting, Judge Cocroft was intentional about not identifying who believed or said what. However, whenever she would review something that Goodman perceived as a negative, Goodman would offer a comment to demonstrate how what was shared was not true and that the Directors worked well together and were supportive of one another.

747.    Judge Cocroft reminded everyone in attendance that her goal was not to undermine any of the hard work that anyone had done, but to give everyone an opportunity to speak freely so that the Team could grow and move forward in an even more positive way.

748.    Prior to discussing the S.W.O.T. analyses information, there was an icebreaker exercise so that the Directors could learn more about each other. Judge Cocroft asked if someone would volunteer to start the conversation after she did her own abbreviated introduction. Judge Cocroft was hopeful that Goodman, as the Court Administrator and, in the words she chose in her bad-faith complaint against Judge Cocroft, the supervisor for "all my subordinates," would begin the icebreaker.

749.    Every Director looked to Goodman and waited for her to begin. Instead, Goodman sat in silence and another team member started the conversation. Goodman was the last person to speak and Judge Cocroft observed nervousness and tension from other Directors based on Goodman's lack of engagement.

750.    At the end of the meeting all Directors told Judge Cocroft that they learned things they never knew about the Directors with whom they've worked for years, and that they appreciated the opportunity to get to learn more about their co-workers' personal and professional journeys.

751.    This was confirmed in emails that several Directors, including Goodman, sent to Judge Cocroft on August 3, 2022 and August 4, 2022. (Exhibit 74)

752.    Ater the meeting, Judge Cocroft talked with Goodman in the presence of Bedsole and told Goodman she was surprised that she did not start the icebreaker session because, in watching the other Directors, Judge Cocroft could see that they were waiting for her to lead the conversation and were attempting to take cues from her.

753.    Goodman said that she was trying to give the others an opportunity to speak, and Judge Cocroft encouraged her to lean into her role as Court Administrator and to set an example for active and open engagement.

754.    Judge Cocroft shared that Goodman's body language seemed closed off to the conversation and that, when Directors would share their concerns, Goodman would frequently undercut what they were saying and reframe their thoughts in a way that she deemed more favorable. Bedsole confirmed Judge Cocroft's perception in a text communication wherein Bedsole said that Judge Cocroft "hit the nail on the head!"

755.    Judge Cocroft, Goodman and Bedsole exchanged more thoughts and took the elevator to the parking garage. After exchanging small pleasantries, all three departed.

756.    The next day in the office, Judge Cocroft sent Goodman several email and Teams communications to which she did not respond.

757.    Judge Cocroft continued to do work and presumed Goodman would respond to her eventually.

758.    Goodman remained so quiet that, in one text exchange, Judge Cocroft asked Bedsole, "Is Jen here today?"

759.    About three days after the leadership team meeting, Goodman and Bedsole came to Judge Cocroft's office. Goodman admitted that she was upset because she perceived that Judge Cocroft was unhappy with her in some way.

760.    Goodman further stated that, after talking to Bedsole, she realized that she was allowing her insecurities to get the best of her and that she understood Judge Cocroft was just trying to grow the FCCP-Gen Directors. Goodman committed to being open to learning more and again commented that, while she and Judge Cocroft had not worked together for a long period of time, she had learned so much from her and wanted to learn to become a stronger manager and leader.

761.    Based on the bad-faith complaint filed against her, Judge Cocroft learned that Goodman began compiling her false allegations on July 6, 2022, which was less than a month after Judge Cocroft received confidential S.W.O.T. analyses from all FCCP-Gen Directors and about which Judge Cocroft did not share information with Goodman.

762.    From July 6, 2022 until November 4, 2022, Goodman attempted to manufacture a series of encounters to bolster and substantiate her bad-faith complaint.

763.    As Court Administrator, Goodman has a significant role in the investigations of all complaints filed by FCCP-Gen employees.

764. As Director of Human Resources, Davis is primarily responsible for the investigation of all complaints filed under the FCCP-Gen Anti-Harassment Policy.

765. Prior to 2015, FCCP-Gen had no policy to address complaints filed by FCCP-Gen employees.

766. Upon information and belief, Davis drafted the Anti-Harassment Policy and Goodman also made suggestions to be included in the Policy

767. In a December 5, 2014 communication regarding a draft of the Anti-Harassment Policy, the Administrative Judge at the time wrote to Goodman and Davis (Exhibit 75):

1. Paragraph 2, lines 1-2: "The court will not tolerate a hostile environment created by co-workers." First thought: I hope we won't tolerate one created by judges, either. Proposed solution: "The Court will not tolerate a hostile work environment created or maintained in the workplace." The rest of the paragraph will remain the same.

2. Page 2 Section II. Investigation. As written, it is fine. I am concerned about possible frivolous or completely unfounded allegations. Do we have – I think we should—any policy about such allegations? I understand not wanting to creating a chilling effect on reporting complaints, but I am also deeply concerned about vindictive employees (over some perceived slight by a supervisor, co-worker, etc.) making a truly "phony" complaint. (Emphasis added.)

3. Page 2, Section II, Paragraph D. I am concerned about the use of the word "accused" here. I would substitute language used elsewhere (see Section III): "alleged wrongdoer." "Accused" implies a formal accusation, which I don't think a report actually is. It is a complaint by an employee, but prior to an inquiry, we have no idea whether it is valid or just plain wrong." (Emphasis added.)

4. Page 2, Section IV, B: I would have it read, "All complaints are treated seriously and, unless the complainant is satisfied with an agreed upon correction action, shall be thoroughly investigated. (Emphasis added.)

768. The Anti-Harassment Policy was adopted by the Court and became effective on December 10, 2014. The Policy was revised on February 23, 2016 and again in 2020.

769. Beginning in 2017, a Caucasian male FCCP-Gen Judge was accused by four employees of violating the Anti-Harassment Policy.

770.    Instead of Davis conducting most of the interviews related to the complaints, as contemplated by the position description for Director of Human Resources and her day-to-day responsibilities, the majority of interviews were managed by Goodman who does not have a Human Resources education or background.

771.    During the interview process, Goodman wrote the following notes:

> In summary,
>
> Would consider hostile working environment situation.
>
> Concerned about placing another staff in this role. Suggest [offering a solution] to avoid future liability to the Court.
>
> **Need to discuss course of action re: any further investigative interviews. <u>To what extent do we want to pursue investigation of a Judge *important to discuss*.</u>**
>
> <u>Need to consider communication to/with other Judges – None? ( * * *)</u>

(Exhibit 76) (Emphasis added.)

772.    None of the allegations against a Caucasian male FCCP-Gen Judge were ever discussed during a Judges' Meeting and no communication was sent to all FCCP-Gen Judges alerting them of the allegations and the need to determine a "corrective course of action."

773.    Based on her notes, Goodman developed a corrective course of action as an initial matter regarding the allegations involving the Caucasian male FCCP-Gen Judge. As of the filing of this complaint, no further action has been taken. As of the filing of this complaint and, upon information and belief, Goodman has never publicly questioned the authority of a Caucasian or male FCCP-Gen Administrative Judge or filed a bad faith complaint against them for decisions they were permitted to make pursuant to Sup. R. 4.01.

## J. Final Attempt at Resolution

774. On January 18, 2024, Cocroft met with Hummer to address the years of discriminatory and hostile behavior she had endured. (Exhibit 77, Recording 116)

775. Hummer said that she was not going to take notes but just listen.

776. Judge Cocroft expressed that she was exhausted from the mistreatment and did not believe that she would continue to serve as a FCCP-Gen Judge once her current six-year term expired.

777. Judge Cocroft also explained that her Black staff had been subject to discriminatory treatment based on race and she did not know if their treatment was based on an independent animus toward them or if her staff was being attacked to "get back" at Judge Cocroft.

778. Hummer said that she was sorry for what Judge Cocroft had experienced and that she knew "a little bit" about the circumstance.

779. Hummer said that the Court likes to govern and control its own issues and processes and that the Prosecuting Attorney's Office didn't know whether it was "in or out".

780. Judge Cocroft showed Hummer the documentation and evidence she had compiled that supported her position.

781. Hummer indicated that she needed to look at the Supreme Court of Ohio's rules and that, because her office had advised on Goodman's bad-faith complaint, there may be a conflict with her office taking any action regarding Judge Cocroft's claims. (Emphasis added.)

782. Hummer also said that she cared about fairness and fairness in the treatment of a judge and a woman of color who serves in an authoritative role.

784. Further, Hummer said that she wanted to ensure that Judge Cocroft was protected, including protection from the Prosecuting Attorney's Office. Hummer said that she had no hesitation about appointing special counsel. (Emphasis added.)

785. Hummer then suggested alternatives to resolve Judge Cocroft's claims, including the engagement of a Black, female investigator who was under contract with her office. Hummer indicated that Judge Cocroft could gather more information about the investigator and then let her know if she agreed to her engagement.

786. Hummer agreed to meet with Judge Cocroft on January 22, 2024.

787. While Judge Cocroft had only limited information about the investigator, she located her curriculum vitae and was prepared to agree to her engagement at the January 22, 2024 meeting.

788. On January 21, 2024, Hummer sent an email to Judge Cocroft, indicating that she had consecutive meetings and would only be able to meet for 15 minutes. (Exhibit 78)

789. Hummer also asked if Judge Cocroft would be "comfortable" with Dean attending the meeting.

790. Judge Cocroft replied that 15 minutes would be sufficient time and she had no objection to Dean attending.

791. Judge Cocroft met with Hummer and Dean on January 22, 2024. (Exhibit 79, Recording 117)

792. Despite Hummer's initial representations regarding the engagement of an investigator, Hummer and Dean told Judge Cocroft that they had to figure out "how to do this" because they could not tell FCCP-Gen to engage an investigator.

793. Hummer said that "everybody was weird when it comes to the Court inputting their hands in the Court's business."

794. Hummer also said that her office would need to determine whether the investigator would want to be involved.

795.    Thereafter, Hummer and Dean began to propose alternatives to an investigation. Specifically, Hummer and Dean proposed a mediation with a local attorney or through the Supreme Court of Ohio.

796.    Dean then commented that, given the bases of Judge Cocroft's complaint, the Supreme Court of Ohio may not be the best option because the Court is comprised of "Caucasian men who tend conservative."

797.    Hummer said that mediation through the Supreme Court of Ohio would not be a good idea because the process would become "too political."

798.    Hummer and Dean said that any decision about how the Court would proceed would first have to be discussed with the FCCP-Gen Administrative Judge, K. Brown.

799.    Judge Cocroft said that she would call K. Brown to discuss the circumstance on January 22, 2024.

800.    During the meeting with Dean, K. Brown, and Judge Cocroft, Dean said that neither she, Hummer, nor their office could order an independent investigation for the Court. Dean noted, however, that she and Hummer were the FCCP-Gen legal advisers and that their legal advice, generally, is that "if an employee makes a complaint and is willing to go a third-party investigator route rather than immediately going to file with EEOC or OCRC, it is appropriate to have an investigation." (Emphasis added.)

801.    As Judge Cocroft provided minimal details to K. Brown about her allegation of a bad-faith complaint filed by Goodman, Dean responded, "And my point with asking that question is that we did give some advice at that point to the Court so that is one of the other reasons we would end up recusing ourselves because that advice could be at issue, as well." (Emphasis added.)

802. On January 26, 2024, Judge Cocroft requested an update on the status of the FCCP-Gen position regarding her complaint.

803. Dean replied on the same date and said that the request was "moving forward".

804. On January 31, 2024, Dean and Hummer were sent a communication, reminding them of an instance in 2022 wherein Judge Cocroft, on behalf of FCCP-Gen, engaged an outside investigator when the complainant did not want Judge Cocroft, Goodman, or Bedsole to investigate their claims under the Anti-Harassment Policy. In that instance, the full investigation was completed without incident.

805. On February 1, 2024, Dean responded and seemingly appeared to change the initial position taken by Dean, Hummer and K. Brown. (Exhibit 80) Dean wrote:

> Judge [K.] Brown has requested and authorized that we communicate the following information to Judge Cocroft. Initially, by the rule's own terms, it's not clear it was meant to apply to a complaint from one judge against another (or against the court as a whole). Through the test of the rules, when there is an intent to apply to judges or the court usage of the words "judge" or "Court" are used. As you are aware, there are numerous contexts in which an elected official is not deemed to be an employee for purposes of various laws like unemployment and Title VII. Then, even if we read the policy to apply to complaints made by judges, it only says that the information will be reported to the "Administrative Judge in order to initiate an investigation." The rule does not speak to any process. In many cases, this could refer to having HR begin an investigation – obviously that won't happen here. However, it's entirely unclear that the AJ has authority (as set forth in Rule 4.01 of the Rules of Superintendence) to institute an outside investigation of other judges without any notice or discussion with those judges. In other words, Judge Brown, as AJ, does not find a prohibition to having this request reviewed by the Court.
>
> We are dealing with a client made up of 17 independently elected officials. (* * *) Judge Brown is trying to make this process as efficient as possible, as well as being fair to Judge Cocroft's request and the concerns raised. To that end, [K. Brown] would like to approach the court with a recommendation that they contract with an independent investigator (* * *) who can look at the court's policies and procedures as they relate to claims by and against judges, determine if there are deficiencies, identify best practices, and make a recommendation for moving forward in a way that benefits everyone at the Court. Again, Judge Brown wants Judge Cocroft to know that her recommendation to the Court to move in this direction is to make clear that Judge Cocroft's concerns are not being dismissed but are rather being heard.

806. Nothing in Dean's response on behalf of K. Brown indicated that the claims of discrimination and hostile work environment asserted by Judge Cocroft on January 18, 2024 would be investigated.

807. Based on Dean's February 1, 2024 response, an email was sent to Dean and Hummer on February 5, 2024, notifying them of Judge Cocroft's complaint under Section II(F) of the FCCP-Gen Anti-Harassment Policy based on the filing of a bad faith complaint against her by Goodman on or about November 1, 2022. (Exhibit 80). On February 6, 2024, Judge Cocroft asserted a claim of retaliation based on statements made by Dean that were wholly inconsistent with the position taken by Hummer initially. (Exhibit 81)

808. On February 7, 2024, Dean sent an email to Judge Cocroft, stating in part, "Judge [K.] Brown has requested that you provide her with specifics on the complaint against Ms. Goodman, and it is her plan to provide that to the Court for their review and determination as to whether and how to move forward. Judge Brown indicated you will have an opportunity to be fully heard by the court concerning your complaint." (Exhibit 81) (Emphasis added.)

809. Judge Cocroft was confused by how the original position was evolving and took time to reply to the February 7, 2024 email.

810. Judge Cocroft sent a response on February 20, 2024 and discussed: a.) her confusion with the distinction Dean attempted to create regarding when she, Hummer and their office represented the Court and individual judges based on the mandates of R.C. 309.09; b.) the lack of forthrightness regarding when Judge Cocroft provided notice and specificity regarding her claims and those of her Black staff; c.) meetings that Dean, Hummer and another lawyer in their office had with FCCP-Gen Judges regarding the November 2022 public record request before Judge Cocroft and her counsel at the time had notice that the request existed. (Exhibit 82)

811.    Judge Cocroft also restated the language of Sup R. 4.01, which permitted K. Brown to act related to Judge Cocroft's claims without having to have my claims reviewed by FCCP-Gen Judges. On February 21, 2024, Hummer replied, "[W]e sincerely recommend that you agree to this first step and allow [the investigator] to look at the court's processes and procedures. This investigation may open the door for your specific concerns to be addressed. (Exhibit 82)

812.    After notifying K. Brown, Hummer and Dean of her claims of discrimination and hostile work environment, Judge Cocroft received an email from Aveni on February 13, 2024 requesting to meet for lunch based on Judge Cocroft's statements at the October 2023 FCCP-Gen Judges' meeting that some judges are alienated from certain conversations and information. (Exhibit 83)

813.    Judge Cocroft told Aveni that she did not believe it would be beneficial or healthy to accept his offer, as she was both mentally exhausted and emotionally drained, and leery of having a private conversation as a remedy for a dynamic about which every judge was aware.

814.    On February 14, 2024, Judge Cocroft had a criminal matter set with a defendant who also had a matter set on the docket of Serrott.

815.    Unbeknownst to Judge Cocroft, counsel conferred with Serrott regarding a mechanism to resolve both his case and Judge Cocroft's case.

816.    Shortly after conferring with Serrott, counsel came to Judge Cocroft's courtroom and advised her of the plan that was developed.

817.    Given the defendant's history, Judge Cocroft was unwilling to go along with Serrott's proposed plan of action.

818.    Because Serrott, for all intents and purposes, made a promise to counsel that impacted Judge Cocroft's management of her case, she sent an email to Worthington and K. Brown, asking that the matter be transferred to Serrott because counsel in the case "already had extensive

conversations with [Serrott] and his staff regarding a universal plan of action" to resolve both cases and neither Judge Cocroft nor her staff were involved in those discussions. (Exhibit 84)

819.    K. Brown, as Administrative Judge, is responsible for signing an entry of transfer. She agreed to sign the entry in this case and Serrott accepted the case.

820.    Upon information and belief, Serrott has not developed a plan of action for a case on another FCCP-Gen Judges' docket without first talking to the assigned judge.

821.    On February 15, 2024 at 9:27pm, Judge Cocroft's staff received an email from a prosecutor regarding a criminal case assigned to Judge Cocroft's docket.

822.    The email stated that the prosecutor received an email from another county, indicated that the defendant "was released this past week on his case in front of Judge Cocroft, only to head up to [the other county] to break into the victim's home (this is the same victim in [Judge Cocroft's]) case." The prosecutor's request was to revoke the defendant's bond.

823.    The FCCP-Gen local rules state that the Court and the Clerk's Office close at 5:00pm. As such, Judge Cocroft had no way of filing the request to revoke bond at 9:27pm.

824.    The prosecutor was notified at 8:53am on February 14, 2024 about the case but did not notify Judge Cocroft until 1 ½ days later.

825.    As a matter of course, Judge Cocroft does not set bonds in criminal matters and did not set the bond that allowed this defendant to "head up" to another county to break into an alleged victim's home.

826.    Judge Cocroft sent an email to the prosecutor on February 16, 2024, requesting that she receive notice during regular business hours so that she can respond appropriately or that notice is provided to the Duty Judge after hours, as contemplated by the FCCP-Gen Local Rules.

827.    Judge Cocroft copied defense counsel on her email, who was not included on the prosecutor's February 15, 2024 communication.

828.    During the week of February 19, 2024, Judge Cocroft was the scheduled Duty Judge, which required her to be on call 24 hours a day, seven days a week to sign warrants and handle emergency issues.

829.    February 19, 2024 was a federal holiday and, as such, the duty phone was in the possession of the Duty Judge from the preceding week (Lynch).

830.    On February 22, 2024, Judge Cocroft noticed that she received a call and voicemail on her private cell phone on February 19, 2024 from a number that she did not recognize. When she checked the message, it was from a law enforcement officer who was requesting Judge Cocroft's assistance in signing a warrant.

831.    In her fifteen years of service, Judge Cocroft has never given FCCP-Gen permission to provide her private cell phone number to any law enforcement personnel as a part of Duty Judge responsibilities.

832.    To find out how the officer obtained her number, Judge Cocroft returned the call from her FCCP-Gen office phone.

833.    When the officer answered, Judge Cocroft identified herself, apologized for missing the call and asked how the office obtained her private cell number.

834.    After pausing, the officer told Judge Cocroft that FCCP-Gen has a duty list that contains the private cell numbers of all FCCP-Gen Judges, and he got the number from that list.

835.    Judge Cocroft told the officer that no such list exists.

836. On February 22, 2024, Judge Cocroft sent an email to Worthington, Goodman, and K. Brown explaining the situation, asking if a list of private cell phone numbers was created, and requesting that her number be removed if such list existed. (Exhibit 85)

837. K. Brown responded and recited the text of the FCCP-Gen Local Rule regarding the hours of Duty Judge service and stating that, if a duty week begins on a holiday Monday, then "it would be up to the two judges as to how calls on the holiday are handled". K. Brown concluded by stating, "I will remind the judges at next week's meeting that they are not to share other judge's private numbers."

838. Judge Cocroft replied and noted that, in her fifteen years of service, there had never been a circumstance for which the Duty Judge who served during the week preceding a holiday did not manage duty calls and that no other accommodations needed to be made. (Exhibit 85)

839. Judge Cocroft also advised K. Brown that, when she served as Duty Judge in October 2023, she received a stack of garnishments that were left incomplete by the Duty Judge from the preceding week so "full compliance with the plain text of the Local Rule is not always accomplished."

840. In October 2023, K. Brown was the Duty Judge for the week preceding Judge Cocroft's service and had the incomplete garnishments delivered to Judge Cocroft's bailiff.

841. On February 23, 2024, Judge Cocroft sent a letter to the President of the Franklin County Board of Commissioners (the "FCBOC"), notifying them of her complaints of discrimination based on race and gender, hostile work environment, retaliation, and the filing of a bad faith complaint by Goodman. On May 19, 2020, the FCBOC passed a resolution asserting that "racism is a public health crisis affecting our entire county" and noting that "racism is a social system with multiple dimensions" including "systemic racism that is institutional or structural (* * *)." Further,

the resolution stated that "racism unfairly disadvantages specific individuals and communities, while unfairly giving advantages to other individuals and communities, and saps the strength of the whole society through the waste of human resources, and Franklin County's collective prosperity depends upon the equitable access to opportunity for every resident regarding of the color of their skin (* * *)".

842.    Judge Cocroft received a response, indicating that the FCBOC was requesting to be "advise[d] accordingly" regarding of any duties. Hummer was copied on the responsive communication.

843.    Under the Anti-Harassment Policy, FCCP-Gen was required to investigate once "the person" notified an outside agency of a complaint.

844.    For her entire life, Judge Cocroft has been a "person".

845.    On February 20, 2024, K. Brown sent an email to Judge Cocroft regarding her complaint of discrimination, based on race and gender, hostile work environment, and retaliation. (Exhibit 86)

846.    K. Brown wrote:

> In an effort to address your concerns, I intend to proceed with requesting the policy and procedures review at a Special Judges Meeting. I plan to formally recommend this review for the Judges' consideration. If the investigation uncovers information related to the specifics of your complaint, that information can potentially be addressed within the investigation. You will be permitted to make your own proposal at the Judges' meeting, should you wish to do so. I would like to get to work on scheduling the meeting, so please let me know if you have any bad dates in the next month.

847.    On March 8, 2024, K. Brown sent an email, indicating that she had scheduled a meeting for March 13, 2024. (Exhibit 87)

848.    On March 11, 2024, Judge Cocroft sent a follow-up email to K. Brown. (Exhibit 88)

849. Within that email, Judge Cocroft: a.) asked K. Brown whether she had conferred with Hummer and Dean regarding Judge Cocroft's concerns with their continued involvement and representation; b.) expressed concern regarding what would be accomplished during the Special Meeting because K. Brown stated there was only a *potential* that my complaint would be investigated; c.) reminded K. Brown that Sup. R. 4.01 gave her latitude to administer personnel policies, including those related to investigation of complaints under the Anti-Harassment Policy; and d.) inquired about any precedent for a complainant being required to go before FCCP-Gen Judges to explain their complaint and why an investigation should take place.

850. Judge Cocroft also advised K. Brown that, while K. Brown continued to vacillate on whether an investigation would occur, she and her staff continued to be subject to retaliatory behavior. Specifically, Goodman came to Judge Cocroft's suite toward Judge Cocroft's office before being stopped by Judge Cocroft's secretary, at which point Goodman said that she didn't realize she was on the wrong floor.

851. Goodman's office is located on the second floor; Judge Cocroft's office, with prominent signage, is on the fourth floor.

852. Judge Cocroft told K. Brown that she believed the goal was to leave her so exhausted by the process that she would withdraw her complaint and endure the discriminatory, hostile and retaliatory treatment.

853. K. Brown did not respond until 11:11am on March 13, 2024 – less than one hour before the Special Meeting she scheduled. (Exhibit 89)

854. In her response, K. Brown stated that FCCP-Gen "had not reached the point where the Court needs to hire independent or special counsel in this matter."

855. K. Brown also stated that she did not believe the Anti-Harassment Policy gave her unilateral authority to launch an investigation into a judge or the Court as a whole. Further K. Brown wrote that Judge Cocroft "was invited to provide specifics as to your complaints so that I could provide information to judges for review and determination as to whether and how to move forward" and that Judge Cocroft had never provided that information. (Emphasis added.)

856. K. Brown also said that because she had provided "a path forward for the Court's consideration" she did not "believe any additional in person meeting [with Judge Cocroft] would be beneficial at this time."

857. Because of K. Brown's March 13, 2024 reply, Judge Cocroft did not have an opportunity to respond and, instead, chose to attend the Special Judges' Meeting. (Exhibit 90, Recording 132)

858. Both Hummer and Dean attended the meeting.

859. During the meeting, K. Brown introduced the meeting and noted that Judge Cocroft requested that K. Brown launch an investigation into Judge Cocroft's complaint and indicated that she needed more specifics into the complaint (even though that information had been provided in the February 2024 communications with Hummer, Dean and K. Brown).

860. K. Brown then stated that her "interpretation" of the Anti-Harassment Policy and Sup. R. 4.01 did not allow her to launch an investigation and that, instead, she needed to get specifics on the complaint so that the FCCP-Gen Judges could decide if or how they would act on the complaint.

861. K. Brown then stated that she was recommending a review of policies and procedures to see how these issues were handled in the past.

862. K. Brown then noted that Judge Cocroft had "the right to speak" and disagreed with her plan of action.

863. While K. Brown said that Judge Cocroft had the right to speak, she did not give her an opportunity to speak as an initial matter.

864. Hummer then asked Judge Cocroft whether she agreed with K. Brown's overview and whether her statements were accurate.

865. Judge Cocroft then refuted all of what K. Brown articulated, noted that all complaints were to be confidential and that no other complainant was ever required to vet his/her complaint to the FCCP-Gen Judges.

866. Judge Cocroft also stated that she was saddened and disappointed by the way in which FCCP-Gen Judges were managing her complaint, when there was a level of intentionality when the Court managed Goodman's bad-faith complaint.

867. Despite this, Judge Cocroft called for the question on a vote regarding the implementation of a policies and procedures review.

868. Thereafter, Hummer and Dean explained why they were participating in the meeting and explained they were advising FCCP-Gen that there was value in undertaking a policies and procedures review.

869. Instead of calling for a vote on Judge Cocroft's question, several of the FCCP-Gen Judges began to insult and denigrate Judge Cocroft:

- Lynch said "What's with the snowflake here? What's happening? If you don't like someone, that's tough."
- Lynch said that each FCCP-GEN Judge was the head of their own kingdom and she was "appalled by the whole thing."
- Serrott said that he thought a policies and procedures review was a bad idea.
- Lynch commented that the review was a "total bad idea".
- Holbrook wanted to know if anything that happened with the review would be made a public record request.
- Lynch said that, historically, if the judges don't like an AJ, they can vote them out but noted that she wasn't present in November 2022 when Judge Cocroft was voted out.

114

- Hawkins and Lynch asked how much "the person" conducting the review would be paid.
- Hummer then said that the judges were not at the meeting to vote, even though Judge Cocroft requested a vote and called for the question.
- Holbrook also asked who was going to pay and what the expenses would be.
- C. Brown said that if Judge Cocroft had a concern, then she should do what he did and call the Dispatch. J. Brown, Serrott, Lynch and several others laughed after C. Brown made that comment.
- Lynch said that she had never heard of such an issue related to race in all her years of service.
- Serrott continued to emphasize that he just didn't see any policy that would be workable.
- Lynch said that no vote on any issue would occur during the meeting.
- Aveni asked whether the inquiry itself could become a public record request.
- Lynch asked why the FCCP-Gen Judges would not pick its own investigator and Hummer said her office was trying to streamline the process.
- McIntosh noted that this policy would apply to a certain level of complaints and concerns and gave an example regarding what the internal process would be if a claim was raised between judges. He gave the example of a claim between himself and Lynch if Lynch asserted sexual harassment.
- Lynch responded that she would do what she did with a former judge and tell the person to "keep their fucking mouth shut".
- Young asked about multi-judge courts that have this kind of policy related to disputes between judges. As of the filing of this complaint, no such information has been obtained.
- Holbrook said that he did not want to pay someone $300/hour to investigate this issue.
- Serrott focused on not wanting a policy that dealt with a personality problem.
- Lynch said that in 20 years, the Court has never had a high-level issue.
- Lynch said that she thought the meeting was called for Judge Cocroft and that if it wasn't called for Judge Cocroft, then what was everyone doing there.
- Lynch asked whether the new policy would say that people had to be nice if an administrative judge was removed.
- Lynch said that they would not implement a policy that said you must be nice.
- Aveni said that the better argument against a policies and procedures review was what impact taking steps and doing a review would have in the future.
- Aveni focused on spending taxpayer money, rather than allegations of discriminatory and hostile behavior, and the filing of a bad faith complaint by Goodman.
- Serrott wanted to know what would happen if the FCCP-Gen Judges rejected a policy.
- Hawkins said that elected officials needed to grow up and act like adults.

870. The meeting concluded with no vote, a possible plan to get information on policies from other courts, no movement toward conducting a legally mandated internal investigation of Judge Cocroft's and her staff's complaints, and with Judge Cocroft being further humiliated.

871. Judge Cocroft sent an email to Hummer and Dean on March 13, 2024, expressing her: a.) disappointment and shock at the tone of the Special Judges' Meeting; b.) surprise that the K. Brown would write that additional in-person meetings with her would not be beneficial, c.) concern with Hummer's and Dean's continued involvement, representation of the court, and their clear conflict of interest; d.) shock that K. Brown would selectively exercise the authority granted under Sup R. 4.01; and e.) disappointment about the words and phrases spoken by FCCP-Gen Judges about her and her legitimate claims, including being referred to as a "Snowflake." (Exhibit 91)

872. In conclusion, Judge Cocroft restated her claims of discrimination based on race and gender, hostile work environment, and retaliation.

873. Hummer sent a response on March 15, 2024 (Exhibit 92) and acknowledged that "the meeting did not go in the direction that I had hoped." Judge Cocroft replied that she appreciated her attempt at optimism and that it was becoming increasingly clear that her concerns were not being taken seriously. In another meeting, Hummer called the March 13, 2024 meeting "horrific".

874. On March 18, 2024, Judge Cocroft sent a Preservation Letter to Hummer and Dean relating to her claims of discrimination based on race and gender, hostile work environment and retaliation, as well as her claim that Goodman's complaint against her was filed in bad faith in violation of the Court's Anti-Harassment Policy. (Exhibit 93)

875. On March 18, 2024, Judge Cocroft sent Davis a request for records related to the allocation of Court Support Specialist resources to FCCP-Gen employees who had no leave time available and the investigation of an employee complaint filed on or about October 20-October 21, 2014.

876.     On March 19, 2024, one day after Judge Cocroft sent the Preservation Letter, as well as the request to Davis, she received a calendar update from the account of Goodman's former Executive Assistant who had not worked for the Court since February 5, 2022.

877.     This calendar update was for an event that occurred 473 weeks prior in 2015.

878.     Judge Cocroft then sent an email to Hummer and Dean on March 20, 2022, expressing her concern about receiving the calendar update and expressing that it was illogical to receive an update for an event that occurred nine years prior unless someone was attempting to alter records that were associated with her public record requests submitted to Davis. (Exhibit 94)

879.     Dean responded and stated that she was unaware of any staff or elected officials not following the preservation letter and Judge Cocroft replied that the purpose of her communication was to provide notice that someone may not be complying.

880.     Judge Cocroft also informed Dean that, out of nowhere, both she and her bailiff were receiving error messages on their computer and could not use certain applications and inquired about whether the mirror clone imaging process outlined in the preservation letter had started.

881.     Dean stated she would make sure "IT" was aware of the concerns.

882.     On March 22, 2024, Judge Cocroft sent an email to Hummer and Dean with copies of two Advisory Opinions, 09-003 and 2019-09, from the Supreme Court of Ohio's Board of Professional Conduct. (Exhibit 95)

883.     Judge Cocroft wrote that each opinion seemed to indicate that, in order for Hummer, Dean, and their office to be in compliance with Rule 1.7 of the Ohio Rules of Professional Conduct, the appropriate course of action would be to provide Judge Cocroft with standalone counsel from another assistant prosecuting attorney within the civil division and requested a response to her request by 4:00pm on March 25, 2024.

884.   Dean responded, with a carbon copy to Hummer, stating that they did not believe that their office had a duty to appoint counsel, as they were unaware of their office ever representing an elected official making claims against the FCCP-Gen or the FCBOC (Exhibit 96).

885.   Dean further stated that, even if a conflict existed, her office could not unilaterally appoint outside counsel.

886.   Judge Cocroft responded and stated that Dean's email seemed to suggest that the acts about which she filed a complaint were made in good faith and in the scope and course of employment. Further, Judge Cocroft stated that the Advisory Opinions outlined an intractable responsibility to provide her with standalone counsel. Judge Cocroft also noted that Dean's and Hummer's unwillingness to fulfill their ethical obligations was a continuation of the pattern of retaliation to which Judge Cocroft had been subjected. (Exhibit 96)

887.   Thereafter, on March 25, 2024, Judge Cocroft contacted the Director of the Board of Professional Conduct as well as Chief Counsel for the Supreme Court of Ohio to discuss the conflict in Hummer's and Dean's continued representation. Neither was able to provide insight with the Chief Counsel suggesting that Judge Cocroft discuss the issue with the Administrative Judge, K. Brown, who had already informed Judge Cocroft that it would not be beneficial to have any in-person conversation with her.

888.   Later in the day on March 25, 2024, Dean again replied to Judge Cocroft and stated, "[W]e can reach out to the Board of Professional Conduct or Disciplinary Counsel if you want us to get an opinion on this matter." (Exhibit 96)

889.   As of the filing of this complaint, Judge Cocroft has never been advised by Hummer or Dean that they either contacted another agency and/or received guidance on a potential conflict of interest.

890. On March 25, 2024, Judge Cocroft received an email for Dean, notifying her that FCCP-Gen employees had filed complaints and that Judge Cocroft had been identified as a potential witness. (Exhibit 97)

891. The complaints were filed by Judge Cocroft's Black staff, her bailiff and secretary, for discrimination based on *inter alia* race and hostile work environment.

892. Dean's email also stated that the investigation was being handled by an investigator from a local Columbus law firm "at the request of the administrative judge [K. Brown]."

893. The investigator who was engaged was the same investigator that Hummer suggested regarding investigating Judge Cocroft's complaint and that K. Brown refused to engage.

894. In February 2024, both Hummer and Dean told Judge Cocroft that K. Brown's position was that she did not have the independent authority to request an outside investigator and would need the agreement of a majority of judges to do so.

895. To Judge Cocroft's knowledge, there was no FCCP-Gen Judges' meeting held to approve the engagement of an outside investigator regarding the claims asserted by Judge Cocroft's staff.

896. During the April 2024 FCCP-Gen Judges' meeting, K. Brown raised the issue of allowing all judges to have access to the documents created by other judges and their staffs. K. Brown stated that the goal was to give FCCP-Gen staff attorneys more access to documents that may be commonly used among all staff.

897. K. Brown asked that each FCCP-Gen Judge provide their position on this issue.

898. On April 16, 2024, Judge Cocroft sent an email to K. Brown, stating that she did not wish to participate in any courtwide effort to give unfettered access to any documents created and saved by her and/or her staff. K. Brown acknowledged receipt of her position. (Exhibit 98)

899.    The next day, K. Brown sent an email to all FCCP-Gen Judges regarding the issue of access to documents and noted specifically that she received an email from a "colleague" stating that they did not want to give access to their documents. (Exhibit 99)

900.    Judge Cocroft was the only FCCP-Gen judge who sent this specific communication. K. Brown did not discuss or disclose the positions of any other FCCP-Gen Judges, despite the fact that she asked each to provide their position.

901.    On April 16, 2024, Judge Cocroft received a second updated calendar invite from the email account of Goodman's former executive assistant who had not worked for FCCP-Gen since February 5, 2022.

902.    This updated invitation was for an event that occurred 486 weeks prior, in December 2014.

903.    On April 17, 2024, Judge Cocroft sent an email to Hummer, Dean and one other lawyer from their office regarding this situation. (Exhibit 100)

904.    Therein, Judge Cocroft noted that this second update came after she submitted a request for records that would have been created or finalized around the same time as the event in the 10-year-old calendar update.

905.    As such, Judge Cocroft requested that Hummer and Dean provide a second reminder to Goodman, Bedsole, Davis and Worthington that no documents should be altered as required by the March 18, 2024 preservation letter.

906.    On March 18, 2024, March 27, 2024, April 10, 2024, and April 22, 2024, Judge Cocroft sent a request for documents to Davis. The requests related to records that were created at the request of Judge Cocroft and/or had been provided to Judge Cocroft in her official capacity.

907.    On April 23, 2024, K. Brown sent an email to Judge Cocroft regarding her requests (Exhibit 101) and stated, "Your requests have become very time consuming and are interfering with the

other duties for which administration is responsible. The subject matters of your requests are also concerning <u>given your threatened litigation against the Court</u>. At this time, I have advised administration to hold on any further action on your requests, until I have reviewed the Court's obligations, if any, to respond. I will advise you accordingly." (Emphasis added.)

908.    At the time K. Brown sent the April 23, 2024 email, Judge Cocroft was presiding over a murder trial.

909.    Because K. Brown is responsible for assigning jury panels in her service as Administrative Judge, she would have known that Judge Cocroft was in trial.

910.    Judge Cocroft responded to K. Brown's email on April 24, 2024. (Exhibit 101)

911.    Judge Cocroft noted *inter alia* that: a.) she had not threatened litigation and was confused by K. Brown's assertion of the same; b.) she sent a preservation letter because Goodman, Bedsole, Davis, and Worthington had permanently deleted internal messages, which constituted pubic records, between them and Judge Cocroft and them and Judge Cocroft's staff; c.) she was receiving calendar updates for events that occurred nine or ten years prior; d.) she remained a duly elected member of FCCP-Gen, irrespective of any complaint that she filed; e.) K. Brown's claimed "interruption" actually constituted Davis's job responsibilities and position description; f.) K. Brown was treating her with a level of disrespect and contempt not shown to non-minority judges.

912.    Judge Cocroft also stated that it would be Hummer and Dean, as legal counsel for the Court, who would determine whether Judge Cocroft was entitled to the requested documents or whether there was legal justification for her not to receive the documents.

913.    K. Brown sent another reply and Judge Cocroft informed her that she had no intention to engage in an unconstructive back and forth conversation. (Exhibit 101)

914.    On April 25, 2024, Hummer contacted Judge Cocroft to inform her that her requests for documentation were being processed. (Exhibit 102)

915.    On May 6, 2024, K. Brown sent an email to all FCCP-Gen Judges regarding a request from Court employees to participate in an annual Summer parade. (Exhibit 103)

916.    Because neither FCCP-Gen nor its employees are permitted to sponsor an event or entity in order to maintain its neutrality and unbiased status, a "compromise" had been reached that would allow employees to wear t-shirts that did not contain the FCCP-Gen seal.

917.    K. Brown asked for feedback from all FCCP-Gen Judges regarding the compromise.

918.    K. Brown indicated that she was in support of the compromise but did not indicate that she played any role in creating it.

919.    In response, a few FCCP-Gen Judges said they were in favor of the compromise.

920.    Hawkins wrote that he would dissent from the compromise and stated, "I think this is highly inappropriate and unethical, especially given litigation that is pending in our Court and other similarly litigation that is reportedly headed our way." (Exhibit 103)

921.    For her response, Judge Cocroft asked K. Brown who proposed the compromise since the issue was not brought to all FCCP-Gen Judges before a compromise was developed. (Exhibit 103)

922.    Additionally, Judge Cocroft asked Hawkins for insight regarding what litigation was currently pending and reportedly headed to the Court that was implicated by the activity. (Exhibit 103)

923.    Shortly thereafter, C. Brown said that the conversation should be discontinued and should be discussed during a meeting. C. Brown made this statement after first writing, "I fully support the proposal." McIntosh and K. Brown agreed with C. Brown's new position and K. Brown advised FCCP-Gen Judges that the issue would be discussed during a Judges' Meeting. (Exhibit 104)

924.    Given K. Brown's past references to Judge Cocroft's "threatened litigation", she believes that Hawkins' reference was to a lawsuit thought to be filed by Judge Cocroft.

925.    Two weeks later, on May 20, 2024, Judge Cocroft received an email from Davis. (Exhibit 105)

926.    The email stated that FCCP-Gen had received a public records request from a reporter with the Columbus Dispatch on May 17, 2024, requesting a copy of the complaint filed by Goodman against her in November 2022, as well as any documents between Judge Cocroft, K. Brown, and McIntosh between April 1, 2024 and May 17, 2024 regarding "retention and/or potential litigation." Judge Cocroft found the timing of this request curious and suspicious, given Hawkins' reference to "threatened litigation" just two weeks prior, and given the fact that Goodman's bad-faith complaint had been provided to another Dispatch reporter two years prior.

927.    Davis noted, "We will be accessing your email to gather this information."

928.    Thereafter, Judge Cocroft replied to Davis and copied Hummer, noting that every other public record request included a carbon copy to the FCCP-Gen counsel. Hummer acknowledged and thanked Judge Cocroft for forwarding the communication and advised Davis that she should respond that the matter is under legal review, as the records may involve privileged communications. (Exhibit 105)

929.    On May 20, 2024, Judge Cocroft sent an email to Davis, Hummer and another lawyer in Hummer's office, requesting legal representation under the FCCP-Gen liability policy for judges. The foundation of Judge Cocroft's request was the fact that there was an additional inquiry regarding Goodman's two-year-old bad-faith complaint and Judge Cocroft was unclear about what issues might arise based on that request. (Exhibit 106)

930. Judge Cocroft reminded the email recipients that, in 2022, she was not advised of her right to representation through the FCCP-Gen liability policy and that, in an incident that occurred in 2014, counsel was contacted on behalf of a different FCCP-Gen Judge.

931. Davis stated that FCCP-Gen did not engage counsel on behalf of a FCCP-Gen Judge in 2014 and Judge Cocroft reminded her that she had documents provided by the Court that did not reflect this position.

932. On May 21, 2024, Hummer sent an email to Judge Cocroft, indicating that she would have to call liability counsel herself, unless it was a broader FCCP-Gen matter. (Exhibit 106)

933. Judge Cocroft responded that she believed the matter was a broader FCCP-Gen issue based on how circumstances had been managed and continued to be managed.

934. As of the filing of this complaint, Judge Cocroft has never been provided with counsel through the FCCP-Gen liability policy.

935. On May 23, 2024, Judge Cocroft received an email from McIntosh, with a carbon copy to K. Brown. (Exhibit 107)

936. The purpose of the email was to determine whether Judge Cocroft would be willing to participate in mediation through the Supreme Court of Ohio's Dispute Resolution Section.

937. McIntosh stated that the investigator who was not engaged to investigate Judge Cocroft's claims "had recommended some type of structured meeting or mediation to discuss pending issues."

937. K. Brown replied that she would be willing to participate as the representative of FCCP-Gen.

938. Judge Cocroft responded and asked a series of questions to better understand the process. (Exhibit 108)

939. When McIntosh responded almost a month later on June 20, 2024, he noted that the recommended mediators would be a retired Caucasian male magistrate judge from Defiance County and a retired Caucasian female judge from Henry County. (Exhibit 109)

940. The total Black population of Defiance County is 2.75%. The total Black population of Henry County is .54%.

941. Based on the information that McIntosh provided, as well as Hummer's and Dean's prior representation that the Supreme Court of Ohio is comprised mostly of "Caucasian men who tend conservative" and that a referral for resolution would become "too political," Judge Cocroft advised McIntosh that she was unwilling to engage in the proposed mediation. (Exhibit 109)

942. On May 23, 2024, Judge Cocroft filed a Charge with the Equal Employment Opportunity Commission, which Charge was accepted on the same date.

943. On May 23, 2024, Hummer sent an email to the reporter who submitted a public record request on May 17, 2024 and stated that the records were exempt from release under attorney-client privilege.

944. Thereafter, on May 29, 2024, Judge Cocroft sent an email to Hummer, asking for an explanation regarding the current position that records were exempt from disclosure based on attorney-client privilege, when Dean had been emphatic in her position that Judge Cocroft was not entitled to either legal representation or standalone counsel. (Exhibit 110)

945. Hummer stated that her office does not represent individual employees or elected officials in claims against FCCP-Gen (even though Judge Cocroft had not relinquished her position as a member of FCCP-Gen, thereby still making her Hummer's client).

946. Judge Cocroft responded and expressed her frustration with the evolving nature of FCCP-Gen's and Hummer's position.

947.    On May 31, 2024, Davis sent a calendar invitation to Judge Cocroft for an upcoming Personnel Committee meeting. Dissimilar from previous invitations, Davis did not provide any information regarding the focus of the meeting.

948.    When Judge Cocroft asked for an agenda, Davis informed her that the Committee would be discussing revisions to the Anti-Harassment Policy, as well as a review of the Employee Handbook. Davis also noted that the Handbook had been reviewed by Hummer and/or Dean. (Exhibit 111)

949.    When Judge Cocroft reviewed the Anti-Harassment Policy, which served as the basis for her claims of discrimination, hostile work environment, and retaliation, as well as those of her Black staff, Judge Cocroft noted that every provision upon which they had relied had been removed from the proposed Policy. (Exhibit 112)

950.    Moreover, Judge Cocroft noted that the proposed Policy vested Goodman with sole authority to decide on the appropriate action if there was a finding that the Policy had been violated.

951.    Noticeably absent from the revisions was any process or protocol that should be implemented when a FCCP-Gen Judge makes a claim against another judge or employee (e.g. Court Administrator).

952.    These proposed revisions were made after FCCP-Gen, Hummer, and Dean received actual notice of Judge Cocroft's EEOC Charge.

953.    On June 5, 2024, Judge Cocroft sent an email to Hummer, notifying her of the concerns. (Exhibit 113)

954.    Hummer was out of the office, so Judge Cocroft forwarded the communication to another lawyer in Hummer's office.

955.     On June 5, 2024, Dean responded to Judge Cocroft's email and stated that neither she nor Hummer were aware of the proposed changes to the Anti-Harassment Policy. Dean then said that she would be willing to attend the Personnel Committee meeting. (Exhibit 113)

956.     On June 6, 2024, Judge Cocroft responded and told Dean that, because she was neither the Chair of the Personnel Committee nor a member of the Committee, she could not proactively invite Dean to attend.

957.     On June 7, 2024, Dean sent another communication to Judge Cocroft, stating that she would advise the Personnel Committee that the changes to the Anti-Harassment Policy were premature. (Exhibit 113)

958.     On June 10, 2024, Judge Cocroft sent a duplicate email to Phipps regarding her concerns about the Anti-Harassment Policy proposed revisions.

959.     Phipps responded and stated:

> I began talking with [Davis], [Goodman], and [Bedsole] when I first became chair of the committee. I noticed a need for revisions as employees had difficulties with the chain of command when needing to file a complaint or address issues. This has been ongoing issue since I took the bench, as certain employees felt a need to ask [Judges] to assist them with their complaints.

960.     Judge Cocroft replied:

> [T]he timing of this effort and the edits in each document proposed to achieve this aim are troubling, at best. The irony of removing every provision upon which "a person" (language from the 2014 Anti-Harassment Policy) relied to assert the filing of a bad faith claim by the Court Administrator [Goodman] are legal, visual and public relations disasters waiting to happen, particularly given the fact that an EEOC Charge has been filed and accepted. However, should the Court choose to move forward with the meeting on tomorrow, I will restate my position.

(Exhibit 114)

961.    The scheduled June 11, 2024 Personnel Committee meeting went forward but the discussion regarding proposed revisions to the Anti-Harassment Policy was removed from the agenda.

962.    On June 11, 2024, Davis provided updates regarding the records that Judge Cocroft requested in March and April 2024.

963.    The "disclaimer" language in Davis's communications began to become increasingly expansive and included language not previously included in earlier communications.

964.    Judge Cocroft inquired about the change in a June 12, 2024 email to Dean, Hummer and another lawyer in their office and wrote:

> To be clear, the disclaimer that is at the bottom of the most recent communication from [Davis] has not been included in any other production provided to me. So, I have to presume that there was a genesis for the inclusion of this language and my belief is that the genesis was the filing of the Charge with EEOC.
> Moreover, I am confused by your [Dean's] statement that the Court may need to provide a different analysis based on the foundation of my request. I made the foundation clear when I sent the communication and my right to receive the documents was confirmed by Ms. Hummer. However, if I were to follow your initial position, then it appears that you provided the documents to me as a courtesy because I am a member of the Court, which would make me your client. If I am not considered a client, then it appears that the Court waived privilege to provide documents to a sitting judge who is a member of the Court but not your office's client.

(Exhibit 115)

965.    Dean responded on June 13, 2024, noting that Judge Cocroft was a client in her official capacity but that neither she nor her office could represent Judge Cocroft in a civil rights action against FCCP-Gen. (Exhibit 116)

966.    Because Davis revised the disclaimer language included in FCCP-Gen's production of documents, Judge Cocroft sent an email to Hummer on June 14, 2024, asking if Goodman, Bedsole, Davis, and Worthington were her clients, since one or all of them were managing how

they communicated with Judge Cocroft based on advice from Hummer, Dean or other lawyers in their office. (Exhibit 117) Hummer did not respond.

967.    On July 16, 2024, Judge Cocroft sent a communication to Worthington regarding a case that had been transferred from Munson's docket to her docket. (Exhibit 118)

968.    Counsel for the case appeared in Judge Cocroft's courtroom, expecting to have Judge Cocroft address the case. However, Judge Cocroft was not aware that the matter had been transferred to her.

969.    Upon further research, Judge Cocroft learned that Munson filed the recusal request on July 2, 2024 and it was transferred to Judge Cocroft's docket on July 12, 2024.

970.    Judge Cocroft reminded Worthington that, when a TRO case was transferred from her docket to Serrott, Worthington made a special trip to Serrott's office to advise him of the transfer.

971.    Judge Cocroft asked if or how she was supposed to receive notice of the transferred case, because neither she, Munson, nor Munson's staff advised Judge Cocroft of the same.

972.    On July 16, 2024, Worthington sent a response to Judge Cocroft attempting to explain the entire transfer process for any FCCP-Gen case and then stated that notice of the case transfer "was then placed in your Judge's drawer on the 2nd floor" on July 16 (the same date the case was scheduled to be heard) "so that the bailiff is notified of the judge transfer." (Exhibit 118)

973.    Judge Cocroft replied that it was unreasonable to expect that her bailiff would be able to anticipate or discern that notification of the case transfer was placed in her judge drawer on the same date the case was set.

974.    Judge Cocroft also questioned how or why she was not notified of the transfer when it occurred on July 5.

975.    Judge Cocroft also reminded Worthington that many bailiffs do not use the case history card to receive notice of new case assignments. Judge Cocroft forwarded the initial communication to K. Brown, in her capacity as Administrative Judge, and received no response. (Exhibit 119)

976.    Beginning July 23, 2024, Davis sent Judge Cocroft emails regarding a series of public record requests.(Exhibit 120) Judge Cocroft forwarded K. Brown and McIntosh these series of requests but received no response.

977.    The first request was submitted by the same local reporter who filed a first public records request in May 2024.

978.    The request was related to a copy of a hearing with a lawyer against whom Judge Cocroft was compelled to file a notice to show cause regarding a finding of contempt.

979.    The reporter was not present in Judge Cocroft's courtroom when the events giving rise to the possible contempt occurred.

980.    Davis sent the second request to Judge Cocroft on July 26, 2024.

981.    The request was submitted anonymously for a copy of video for all hearings held on 7/18/24 for Judge Cocroft and a copy of docket for Judge Cocroft from 7/22/24 through 8/7/24.

982.    Judge Cocroft was scheduled to be out of the office from July 22, 2024 through August 7, 2024, as she was working remotely.

983.    Judge Cocroft stated that she would defer to the legal position of Hummer, whom Davis had not copied on her communications, regarding the release of information based on her role as counsel for the Court.

984.    Davis sent Judge Cocroft the third public record request on July 26, 2024.

985.   The request was submitted by a reporter with a local newspaper, requesting communications between Judge Cocroft and K. Brown and/or Judge Cocroft's bailiff and K. Brown regarding Judge Cocroft's "absence" between July 22, 2024 and August 5, 2024.

986.   Upon information and belief, the requests related to the belief that Judge Cocroft was out of the office because she was upset by how the lawyer addressed her on July 18, 2024.

987.   While the matter was both upsetting and embarrassing to Judge Cocroft, as the lawyer belittled her in front of two other lawyers, her staff and a Franklin County Deputy Sheriff, Judge Cocroft's time out of the office had been planned in advance.

988.   Judge Cocroft used the time to write myriad civil decisions, as she had been unable to hire a new staff attorney because of the ongoing mismanagement of her discrimination claims.

989.   On July 24 , 2024, Judge Cocroft sent a series of public records requests to Davis.

990.   On August 9, 2024 and August 12 2024, Hummer met with Judge Cocroft to propose the idea of a structured mediation to resolve her claims, wherein the Court and Judge Cocroft would each select a mediator and the parties would jointly select a third.

991.   Judge Cocroft stated that, if she were to consider participating in mediation then there would have to be findings that would be made public and an apology from the Court regarding the way in which she and her staff had been treated.

992.   Hummer indicated that the findings of mediation are never public and Judge Cocroft indicated that was a necessary pre-condition.

993.   Hummer said that pre-condition would not be possible and Judge Cocroft indicated that she would not participate in mediation.

994.   On September 10, 2024, Judge Cocroft sent an email to Davis inquiring about the status of her record requests. (Exhibit 121)

995. Davis stated that the requests were submitted to Hummer and Dean for legal review in August 2024.

996. On October 16, 2024, Judge Cocroft sent an email to Davis regarding the status of her July 24, 2024 record requests. (Exhibit 122)

997. On November 4, 2024 Judge Cocroft received a response to one of the public record requests related to any communications sent or received by FCCP-Gen Judges, Goodman, Bedsole, Goodman, Davis, or Worthington with a local reporter using the Court's Microsoft Outlook or Teams technology. (Emphasis added.)

998. Within that response, Judge Cocroft received a series of documents that were not sent to the local reporter using the FCCP-Gen Microsoft Outlook or Teams technology.

999. Rather, Davis responded with documents that Judge Cocroft sent to herself. The documents Judge Cocroft received did not even include a cover page email that would show the documents were sent to the local reporter using the FCCP-Gen Microsoft Outlook or Teams systems.

1000. Judge Cocroft hired a new Staff Attorney whose first day of employment was September 16, 2024.

1001. Davis and Bedsole were aware of the new Staff Attorney's start date in early August 2024.

1002. Unbeknownst to Judge Cocroft, her new Staff Attorney was not provided with a key to his office on the first day.

1003. Judge Cocroft did not learn of this until September 18, 2024, at which time she asked Davis about receiving a key. (Exhibit 123)

1004. In response to that request, Davis forwarded an email from January 2023 regarding the prior staff attorney's separation from employment to suggest that Judge Cocroft was still in possession of the key. (Exhibit 123)

1005. Judge Cocroft reminded Davis that another FCCP-Gen Director collected the key and other equipment and that the key had never been in her possession.

1006. Davis stated that a new key would be ordered and would be provided to the new Staff Attorney "as soon as possible." (Exhibit 123)

1007. To Judge Cocroft's knowledge, no other FCCP-Gen Judges' staff attorneys have had to wait to receive a key to their office.

1008. Judge Cocroft later learned that a member of Davis's staff provided her staff attorney with a temporary key, though Davis never shared that information with Judge Cocroft.

1009. On September 19, 2024, Davis came to Judge Cocroft's chambers and into the office of her staff attorney.

1010. Davis had to pass the door to Judge Cocroft's office to get her staff attorney's office.

1011. Davis never acknowledged Judge Cocroft's presence as she came into or left Judge Cocroft's suite. Judge Cocroft sent Davis an email, thanking her for providing the key and advising that she heard her greet her staff while bypassing her. (Exhibit 124)

1012. On September 19, 2024, Hummer met with Judge Cocroft to discuss a potential resolution to her claims.

1013. Hummer stated that K. Brown, McIntosh, and Phipps met with her and others to discuss FCCP-Gen's willingness to agree to and fund a policies and procedures review, the same effort that several FCCP-Gen Judges refused and rejected during the March 13, 2024 meeting.

1014. Hummer also stated that FCCP-Gen wanted to engage in mediation.

1015. Judge Cocroft restated many of her concerns but indicated that she would provide a formal answer to the offer on September 20, 2024.

1016.   Judge Cocroft submitted her formal response to Hummer's proposal on September 20, 2024 (Exhibit 125)

1017.   In it, Judge Cocroft listed several pre-conditions and conditions to which FCCP-Gen would have to agree in order for her to participate in mediation.

1018.   On October 2, 2024, Judge Cocroft received a notice of right to sue letter from EEOC and advised Hummer of the same. (Exhibit 126)

1019.   In response, Hummer said that she would "pass this on to the Client" and Judge Cocroft asked whom the client is, because Hummer had also referred to Judge Cocroft as "the client."

1020.   Hummer replied that her office represented FCCP-Gen, which is the entity that would be responsible for decision related to her claims. (Exhibit 126)

1021.   Judge Cocroft asked for clarification regarding whether notice went to K. Brown as Administrative Judge or whether notification would go to "every individual who is a part of and comprises the Client."

1022.   Judge Cocroft then restated her belief that Hummer, Dean and their office may be conflicted from continued representation. (Exhibit 126)

1023.   Hummer again restated that neither she nor her office represents any elected official pursuing a personal action.

1024.   Once again, Judge Cocroft stated that she has always been aware that neither she nor her office represents Judge Cocroft in a personal capacity but was struck by her statement of passing along the notice of right to sue to "the Client" because she had neither forfeited nor relinquished her role as a FCCP-Gen Judge.

1025.   Judge Cocroft reminded Hummer that she had no obligation to advise either Hummer or FCCP-Gen of the notice of right to sue letter but was attempting to "partner" with the Court to resolve the matter, though she was continuing to be treated in a contemptuous way. (Exhibit 126)

1026.   Judge Cocroft did not receive a response to her September 20, 2024 letter until October 15, 2024. (Exhibit 127)

1027.   In response, Hummer stated, "The Court is willing to mediate through the Supreme Court's mediation program."

1028.   Judge Cocroft then replied, requesting answers to the questions generated by her September 20, 2024 letter and Hummer provided a reply to Judge Cocroft's first question only. Hummer then stated, "I look forward to hearing whether you are willing to utilize the Supreme Court's program."

1029.   Judge Cocroft then asked Hummer if it was correct to presume that she would not provide answers to the remaining questions so that Judge Cocroft could make an informed decision. (Exhibit 127)

1030.   Hummer did not reply.

1031.   Thereafter, on October 21, 2024, Judge Cocroft sent a letter to Hummer, with a carbon copy to K. Brown, McIntosh, and others, advising with great detail that she was rejecting the offer to mediate through the Supreme Court of Ohio's mediation program for the reasons Judge Cocroft had explained on myriad occasions. (Exhibit 128)

1031.   As of the filing of this complaint, FCCP-Gen, through Hummer and Dean, has not made any additional attempts to resolve this matter nor has any investigation into her claims been instituted.

1032. Beginning May 2024, Judge Cocroft's staff noticed that criminal continuance entries for matters set on her docket were being deleted from the FCCP-Gen hard drive.

1033. Judge Cocroft contacted Worthington on May 29, 2024, to alert her of the issue. (Exhibit 129)

1034. When Worthington responded, she blamed Judge Cocroft's bailiff for accidentally deleting the entries and stated there was a problem "on the front end".

1035. Judge Cocroft responded to Worthington and told her that Judge Cocroft's bailiff was especially vigilant in managing criminal documents and asked that the Director of Information Technology investigate the situation.

1036. When the Director of Information Technology responded, they advised Judge Cocroft that the continuance entries had been intentionally deleted and that it was not Judge Cocroft's staff who deleted them. (Exhibit 129)

1037. The Director also notified Judge Cocroft that they could not determine who deleted the entries but that they would implement safety procedures to allow "look backs" on who accessed files. The Director also noted that they were going to eliminate permissions given to various FCCP-Gen employees to access Judge Cocroft's continuance entries.

1038. Because of this issue, Judge Cocroft and her staff had to implement additional procedures to ensure there was record of everything signed. This process included taking screen shots of entries, printing extra copies and maintaining those copies in Judge Cocroft's chambers.

1039. Upon information and belief, no Caucasian FCCP-Gen Judge has had a problem with continuance entries being deleted and then having their staff be accused of deleting the files.

1040. All Administrative Judges received a 15% reduction in their caseloads due to handling administrative responsibilities.

1041. Judge Cocroft compared her monthly case assignments with those of her former suitemate (O'Donnell) and, with the exception of three months, it appeared that Judge Cocroft had as many, if not more, cases assigned to her docket than O'Donnell.

1042. For 12 ½ of the 15 years Judge Cocroft has served as a FCCP-Gen Judge, her staff was Caucasian.

1043. Judge Cocroft's first bailiff, a Caucasian woman, worked with her from 2009-2020. That bailiff left because she graduated from law school, passed the Ohio Bar and wanted to engage in the active practice of law.

1044. Prior to the hiring of her current staff attorney, the previous staff attorney was a Black woman who resigned after telling Judge Cocroft that she had never seen a judge treated the way Judge Cocroft had been treated and that it was taking a toll on her mental health.

1045. Before that, Judge Cocroft's staff attorney was a Caucasian woman who served from 2014-2023. That staff attorney resigned because she wanted to have a more traditional law practice.

1046. Prior to Judge Cocroft's current magistrate who is Greek Orthodox, her magistrate was a Caucasian woman who retired.

1047. Prior to Judge Cocroft's current Assistant, her former Assistant was a Caucasian woman. She resigned after being promoted to a new position with FCCP-Gen that had a higher level of pay.

1048. Upon information and belief, Judge Cocroft and her staff were referred to by other FCCP-Gen staff as the "Black courtroom" in 2022.

1049. FCCP-Gen Judges have questioned Judge Cocroft regarding why Caucasian employees left her staff.

1050.  To Judge Cocroft's knowledge, no Caucasian FCCP-Gen Judge has ever been asked to justify the race of employees they hire and/or to explain why former employees left their staff.

1051.  The race of most FCCP-Gen Judges' staff is Caucasian. The hiring practices of Caucasian FCCP-Gen Judges have not been questioned or challenged by other judges or Goodman.

1052.  Judge Cocroft experienced no sustained issues with a hostile work environment until she became Administrative Judge, tried to implement policies that created a more fair and equitable environment, advanced the plan to create a DEI Director position and hired a majority of Black staff. As recently as November 4, 2024 and November 12, 2024, K. Brown sent communications to Judge Cocroft that ignored her legitimate concerns regarding Worthington's and Davis's behavior toward Judge Cocroft and her staff. (Exhibit 130) Due to K. Brown's disregard for Judge Cocroft, her staff, and their concerns, Judge Cocroft resigned from her appointment to the Judicial Advisory Board on November 8, 2024. (Exhibit 131)

1053.  On December 3, 2024, Judge Cocroft was served with a Summons and Complaint for Writ of Mandamus filed against her in her official capacity.

1054.  Under Ohio Revised Code 309.09, the prosecuting attorney shall be the legal adviser of all county officers and shall prosecute and defend all suits and actions to which such officer is a party. (Emphasis added.)

1055.  Since April 6, 2009, Judge Cocroft has been a county officer.

1056.  On December 3, 2024, Judge Cocroft sent a communication to the Deputy Chief Counsel, Civil in the Franklin County Prosecuting Attorney's Office to provide notice of the summons and complaint and to request representation in the matter.

1057.  In response, Judge Cocroft was told, "Unfortunately, given the pending litigation against our office, ethics counsel has advised that we are unable to represent you in this matter. I believe

you could reach out to (* * *) [Ohio Department of Administrative Services] Risk Administrator to inquire about representation." (Exhibit 132)

1058. Judge Cocroft replied, emphasizing that she had not named the Franklin County Prosecuting Attorney's Office in the litigation and inquiring about whether she would be required to find her own counsel for any future matter in which she was sued while operating in her official capacity.

1059. Judge Cocroft recognized that the person who was tasked with providing this information to her (Deputy Chief Counsel, Civil) was not the person who made the ultimate decision but was simply the messenger. Upon information and belief, Judge Cocroft believes that Hummer, as Chief Counsel, instructed the Deputy Chief Counsel to communicate this message.

1060. The Deputy Chief Counsel emphasized that her office was relying upon the advice of ethics counsel. (Exhibit 132)

1061. Since January 2024, Hummer and Dean advised Judge Cocroft that they would need to contact ethics counsel or the Supreme Court of Ohio to determine whether they and/or their office were conflicted from providing continued representation or advice regarding Judge Cocroft's claims of discrimination based on race and gender, hostile work environment, and retaliation. As of the filing of this Amended Complaint, Judge Cocroft has never received an update from Hummer or Dean regarding whether there was a conflict that precluded their involvement. Yet, within forty minutes of Judge Cocroft requesting representation contemplated by statute, Hummer directed the Deputy Chief Counsel to advise that their office could not provide representation in a matter associated with Judge Cocroft's official capacity.

1062.   Judge Cocroft reminded the Deputy Chief Counsel that Ohio Revised Code 305.14 required the Franklin County Prosecuting Attorney to engage the services of special counsel in the event of a conflict. (Exhibit 132)

1063.   Judge Cocroft was once again told that she would be required to contact an Ohio state agency to inquire about representation. Additionally, Judge Cocroft was told, "It is my understanding that you need only call [the state agency] and indicate that the [Franklin County Prosecuting Attorney] has a conflict with representing you in a matter that was filed against you in your official capacity and [the state agency] will assign counsel to represent you." (Exhibit 132) (Emphasis added.)

1064.   Judge Cocroft sent a communication to the state agency on December 6, 2024, advising of the conflict asserted by the Prosecutor's Office and requesting assistance regarding representation. (Exhibit 132)

1065.   In response, the state agency indicated that the request would need to be reviewed. (Exhibit 132)

1066.   Under the rules of the Court where the Complaint for Writ of Mandamus was filed, Judge Cocroft's responsive pleading was due by December 24, 2024.

1067.   Because Judge Cocroft was not receiving definitive information regarding legal representation required by Ohio law, she began preparing her own responsive pleading and notified the Deputy Chief Counsel of the same.

1068.   The Deputy Chief Counsel told Judge Cocroft that she would have representation, whether it was through the liability policy of the state agency or through another county prosecuting attorney's office. (Exhibit 132)

1069.   Judge Cocroft then asked if it was possible to preemptively contact another prosecuting attorney's office so that a responsive pleading could be filed in a timely manner. Judge Cocroft did not receive a response to that question.

1070.   Thereafter, Judge Cocroft contacted the Clerk of Courts where the Writ was filed and confirmed that she would be permitted to file a *pro se* pleading. Judge Cocroft's efforts were to ensure that her professional standing was protected.

1071.   On December 9, 2024, Judge Cocroft's secretary received a call from the Chief Counsel of the state agency that Judge Cocroft was told would provide representation based on the conflict asserted by the Franklin County Prosecuting Attorney's Office. At the time that the Chief Counsel called, Judge Cocroft was in open court managing her criminal docket.

1072.   Judge Cocroft returned the call of the Chief Counsel on December 10, 2024.

1073.   During that conversation, the Chief Counsel said that, normally, a letter would be sent regarding a representation/coverage decision but that she wanted to call to provide a little background.

1074.   The Chief Counsel then informed Judge Cocroft that the judicial liability coverage does not apply to writs because it would be "burdensome" for the State of Ohio to provide defense of every writ filed.

1075.   While the Chief Counsel stated that the liability policy excludes that kind of representation, she said that "unfortunately", the risk manager didn't understand that exclusion "nuance", such that representation for writs had been provided historically. The Chief Counsel further stated that since "Risk" was recently put under the department of legal services, Judge Cocroft's request was being denied.

1076.   The Chief Counsel further stated she contacted Hummer to tell her that their office should not advise judges to seek coverage and representation for writs. The Chief Counsel went on to explain that Hummer told her the reason she was confused and thought there would be coverage under the liability policy is because of how the state agency has misinterpreted its policy in the past and because Hummer found "some recent matter where [the state agency] did provide coverage."

1077.   The Chief Counsel then informed Judge Cocroft that another county prosecuting attorney's office was contacted to represent her and that the Chief Counsel was advised by Hummer that the representation was "in place" on December 9, 2024.

1078.   On December 9, 2024, Judge Cocroft was still communicating with the Deputy Chief Counsel in the Franklin County Prosecuting Attorney's Office and was never informed that representation with another county prosecuting attorney's office had been set, despite the fact that Judge Cocroft requested the same. What the Deputy Chief Counsel did tell Judge Cocroft, in response to a question about the incongruent decision to assert a conflict in a civil matter while still permitting assistant prosecuting attorneys for criminal matters to appear in her courtroom, was, "[The Prosecutor] has decided not to file affidavits of disqualification because we do not believe that is necessary at this time." (Exhibit 132) (Emphasis added.)

1079.   Judge Cocroft asked whether there had been conversations to disqualify her from doing the work she was elected to do and what action or event would lead the Prosecutor to make that decision regarding criminal matters. Judge Cocroft received no response.

1080.   The Chief Counsel at the state agency that had historically provided liability coverage and representation to judges concluded the call by informing Judge Cocroft that she would receive a

denial of coverage letter and that the Chief Counsel would let Hummer know when that letter was sent so that "whoever" would be working on the case could contact Judge Cocroft.

1081. After concluding the call with the Chief Counsel, Judge Cocroft received another communication from the Deputy Chief Counsel in Hummer's office, notifying Judge Cocroft that another prosecuting attorney's office would be representing her and advising her to call that office.

1082. Judge Cocroft told the Deputy Chief Counsel that the Chief Counsel at the state agency told her the denial of coverage letter would need to be sent before the representation could begin in earnest.

1083. Shortly thereafter, Judge Cocroft received an email from the Chief Counsel at the state agency, telling her that she could contact the county prosecuting attorney's office that would provide representation and that the coverage denial letter would be sent shortly.

1084. Judge Cocroft received the denial letter at 11:45am on December 10, 2024.

1085. While Judge Cocroft was engaged in these various communications, she was simultaneously managing her criminal docket and completing a draft of a responsive pleading.

1086. Once Judge Cocroft completed her criminal docket and the draft responsive pleading, she sent a communication to the Chief Counsel for the prosecuting attorney's office selected to provide representation.

1087. Beyond a recitation of the series of events that led to the engagement, Judge Cocroft provided the Summons and Complaint for Writ of Mandamus, the date by which the responsive pleading was due, the responsive pleading draft, and other documents that would assist in providing representation.

1088. Judge Cocroft receive a response from the Chief Counsel from the assigned prosecuting attorney's office, thanking her for the timeline, as that information had not been provided by

Hummer, and advising that representation could not begin officially because the office had not received the special designation from Hummer to represent Judge Cocroft.

1089. Despite not receiving the special designation, Judge Cocroft was assured that two assistant prosecuting attorneys in that office would be working on her matter and had experience with managing the kind of writ filed against Judge Cocroft in her official capacity.

1090. Based on representations from the Chief Counsel of the state agency that had provided representation to judges historically, the decision to deny coverage and representation to Judge Cocroft was a new protocol in Franklin County, as Hummer represented to the Chief Counsel that there had been a "recent" decision by the state agency to provide coverage in a matter similar to that involving Judge Cocroft.

<u>**Count One**</u>
**Discrimination and Retaliation Based on Race and Gender**
**Title VII of the Civil Rights Act of 1964**

1091. Plaintiff incorporates by reference Paragraphs 1 through 1090, as if fully rewritten herein.

1092. Judge Cocroft is Black, female and a member of a protected class and Defendant Franklin County is an employer as defined in the statute.

1093. Judge Cocroft was similarly situated in all relevant respects to Caucasian and male FCCP-Gen employees and Judges and was treated less favorably, and thus Judge Cocroft was subjected to race and gender discrimination and also subjected to a hostile work environment.

1094. Upon complaining internally about race and gender discrimination and after filing a complaint with EEOC, Judge Cocroft was subjected to the retaliatory actions outlined above, including but not limited to Defendant's failure and refusal to investigate Judge Cocroft's complaints or to take any remedial action to address them.

1095.   Defendant Franklin County, by and through its agents, representatives, and employees, discriminated and retaliated against Judge Cocroft on the basis of race and gender with respect to the terms, conditions and privileges of Judge Cocroft's employment including, but not limited to, subjecting her to the potential of an unfounded investigation, failing to follow their own Anti-Harassment Policy, breaching confidentiality regarding the complaint filed by Judge Cocroft, inhibiting her right to participate in all FCCP-Gen committee meetings, and interfering with the ability of her Black staff to do the work they were hired to do, all in violation of 42 U.S.C. 2000e, *et seq*.

1096.   Defendant's stated reasons for the adverse employment actions taken against Judge Cocroft are pretextual.

1097.   As a direct result of Defendants' unlawful discriminatory conduct as set forth above, Judge Cocroft has suffered harm and she is entitled to compensation for all economic loss, compensatory damages, including but not limited to mental anguish, physical and emotional distress, humiliation and embarrassment, loss of earning capacity and loss of professional reputation.

<u>**Count Two**</u>
**Violation of Reconstruction Era Civil Rights Act, 42 U.S.C. § 1981**

1098.   Plaintiff incorporates by reference Paragraphs 1 through 1097, as if fully rewritten herein.

1099.   By creating and failing to remedy a severe and/or pervasive hostile work environment based upon race and by denying Judge Cocroft equal opportunities and/or treatment for pretextual reasons because of her race, including denying her equal contractual rights, Defendants have intentionally and willfully violated Judge Cocroft's civil rights as stated in 42 U.S.C. 1981.

1100.   As a direct result of Defendants' unlawful discriminatory conduct as set forth above, Judge Cocroft has suffered harm and she is entitled to compensation for all economic loss, compensatory

damages, including but not limited to mental anguish, physical and emotional distress, humiliation and embarrassment, loss of earning capacity and loss of professional reputation.

### Count Three
### Violation of Civil Rights, 42 U.S.C. § 1983

1101.  Plaintiff incorporates by reference Paragraphs 1 through 1100, as if fully rewritten herein.

1102.  Plaintiff is a "citizen" within the meaning of 42 U.S.C. 1983 and Defendants at all times relevant to this matter were acting under the color of state law.

1103.  By creating and failing to remedy a severe and/or pervasive hostile work environment based upon race and gender and by denying Judge Cocroft equal opportunities and/or treatment for pretextual reasons because of her race, Defendants have deprived Judge Cocroft of clearly established property and liberty interests without procedural and substantive due process and equal protection of the laws in violation of the Fourteenth Amendment to the Constitution of the United States. Defendants' actions were taken with malice and/or reckless indifference to the rights of Judge Cocroft.

1104.  Defendants acted pursuant to a policy or custom of Defendant Franklin County of fostering and refusing to remedy severe race and gender discrimination and refusal to follow their own internal policies regarding complaints of discrimination, hostile work environment and retaliation.

1105.  Defendants further failed to adopt clear policies and failed to train their employees as to how not to create an environment which deprived Judge Cocroft of her rights under the constitution.

1106.  As a direct result of Defendants' unconstitutional conduct as set forth above, Judge Cocroft has suffered harm and she is entitled to compensation for all economic loss, compensatory damages, including but not limited to mental anguish, physical and emotional distress, humiliation and embarrassment, loss of earning capacity and loss of professional reputation.

### Count Four
### Racketeer Influenced and Corrupt Practices Act (RICO), 18 U.S.C. §§ 1961-1968

1107.  Plaintiff incorporates by reference Paragraphs 1 through 1106, as if fully rewritten herein.

1108.  At all times relevant hereto, Defendants were engaged in a fraudulent scheme and enterprise designed to violate the law and deprive Judge Cocroft of her legal and constitutional rights.

1109.  At all times relevant hereto, all Defendants participated in the illegal enterprise by engaging in a pattern of racketeering activity including but not limited to engaging in misrepresentation, fraud, mail fraud, electronic communication fraud and destruction of public records, all as outlined above, in violation of O.R.C. § 2921.12; O.R.C. § 2913.42; O.R.C. § 149.351; 18 U.S.C. § 1001; 18 U.S.C. § 1018; and 18 U.S.C. § 1030 all in an effort to advance the enterprise.

1110.  Defendants' illegal enterprise directly and proximately caused harm to Judge Cocroft by violating her lawful and constitutional rights, harming her professional reputation and causing her compensable harm.

### Count Five
### Unlawful Discrimination and Retaliation: Ohio Revised Code §§ 4112.02 and 4112.99

1111.  Plaintiff incorporates by reference Paragraphs 1 through 1110, as if fully rewritten herein.

1112.  At all times relevant hereto, all Defendants were subject to Ohio law codified in Ohio Revised Code §§ 4112.01 et seq.

1113.  Defendants' discriminatory treatment of Judge Cocroft and retaliation against her because of her race and gender violate Ohio Revised Code §§ 4112.02 and 4112.99. Further, the individual Defendants aided, abetted, incited, compelled, and coerced employment discrimination in violation of state law.

1114.   As a direct result of Defendants' unlawful conduct as set forth above, Judge Cocroft has suffered harm and she is entitled to compensation for all economic loss, compensatory damages, including but not limited to mental anguish, physical and emotional distress, humiliation and embarrassment, loss of earning capacity and loss of professional reputation.

<u>**Count Six**</u>
**Defamation against Goodman and Davis only**

1115.   Plaintiff incorporates by reference Paragraphs 1 through 1114, as if fully rewritten herein.

1116.   Goodman made a series of intentionally false, misleading and disparaging statements about Judge Cocroft in a complaint filed against Judge Cocroft and subsequent to the complaint, including but not limited to statements that were disseminated to all FCCP-Gen Judges, members of the local press, and other FCCP-Gen employees.

1117.   Within Goodman's bad-faith complaint, she included personnel information regarding Judge Cocroft's personal staff and stated that those staff left because they were fearful of Judge Cocroft.

1118.   Davis, as Director of Human Resources, is solely responsible for maintaining the records of FCCP-Gen Judges' personal staff.

1119.   Upon information and belief, Davis provided inaccurate information to Goodman for inclusion in her bad-faith complaint regarding the reason that former employees left Judge Cocroft's staff.

1120.   In her bad-faith complaint, Goodman asserted that Judge Cocroft called some FCCP-Gen Judges racist when Judge Cocroft never made any such statement to Goodman.

1121.   Goodman's and Davis's publications were without privilege or justification and constitute defamation per se.

1122.   The aforementioned acts were willful, wanton, malicious and oppressive, undertaken with the intent to harm Judge Cocroft and justify the award of exemplary and punitive damages.

1123.   Goodman's and Davis's defamatory statements proximately cause Judge Cocroft damages, including emotional distress and mental anguish, as well as loss of economic opportunity.

<u>**Count Seven**</u>
**Destruction of Public Records, O.R.C. § 149.351**

1124.   Plaintiff incorporates by reference Paragraphs 1 through 1123, as if fully rewritten herein.

1125.   As set forth above, upon information and belief, Defendants have permanently destroyed public records in an effort to cover up their unlawful conduct, including, but not limited to, destroying instant messages, calendar notations and other official documents after Judge Cocroft made multiple requests for public records to Defendants.

1126.   Judge Cocroft is a "person" who has been aggrieved by the removal, destruction, mutilation or transfer of the official public records.

1127.   Judge Cocroft is entitled to: a). an injunction prohibiting destruction of public records, b). civil forfeiture in the amount of $1,000 per violation, and c). compensatory and punitive damages.

**Wherefore,** Plaintiff, Judge Kimberly Cocroft, requests the Court grant the following relief:

A.   Declare that the acts and conduct of the Defendants constitute violations of Title VII, 42 U.S.C. §200e, the Civil Rights Act of 1991, 42 U.S.C. §1981a, the Ohio Civil Rights act, O.R.C. §4112.01, *et seq.*, 42 U.S.C. §1981, 42 U.S.C. §1983, federal common law and the common law of Ohio.

B.   Grant a permanent injunction enjoining Defendants and their officers, agents, employees and all persons in active participation from engaging in any employment practices which discriminate in any way, including discrimination on the basis of

gender and race and retaliation, and prohibiting continued violations of civil and constitutional rights.

C.  Order Defendants to not only institute policies, practices, and programs that provide equal opportunities for all employees and eradicate the effects of past and present unlawful employment practices, but to ensure that those policies, practices, and programs and carried out and adhered to by Defendants and their officers, agents, employees and all persons in active participation by implementing performance evaluations that monitor the efficacy and practical impact of those policies, programs and practices.

D.  Order Defendants to make Judge Cocroft whole by providing her with any affirmative relief necessary to eradicate the effects of unlawful employment practices and constitutional violations.

E.  Grant to Judge Cocroft appropriate compensatory and exemplary damages, in an amount in excess of Seventy-Five Thousand Dollars ($75,000), along with the costs of this action.

F.  Such other relief as the Court deems just, appropriate, and proper in the public interest.


Respectfully submitted,

**s/ Kimberly Cocroft**
Kimberly Cocroft
Plaintiff *Pro Se*
345 S. High Street, #4E
Columbus, OH  43215
Email: kimberlycocroft@gmail.com
Telephone:  (380) 260-3123

## JURY DEMAND

A trial by jury is demanded herein on all issues presented to the Court.

**s/ Kimberly Cocroft**
Kimberly Cocroft
Plaintiff *Pro Se*
345 S. High Street, #4E
Columbus, OH  43215
Email: kimberlycocroft@gmail.com
Telephone:  (380) 260-3123