## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| KIMBERLY COCROFT,<br><br>        Plaintiff,<br><br>  v.<br><br>FRANKLIN COUNTY, *et al.*<br><br>        Defendants. | Case No. 2:24-cv-04208<br><br>Judge Michael J. Newman<br>Magistrate Judge Caroline H. Gentry<br><br>**Third Amended Complaint**<br><br>**(Jury Demand Endorsed Hereon)** |

### I. Introduction

1.     Since she was first elected to the Franklin County Court of Common Pleas in 2009, Judge Kimberly Cocroft has built a reputation as a hard-working judge committed to access to justice and equity. She was unanimously elected in July 2021 by her peers to serve as Administrative Judge for the court, becoming the first woman and first Black woman to hold that role. However, in electing Cocroft to Administrative Judge, her colleagues on the bench apparently expected her to preserve the status quo rather than significantly change how the court operated. So, when Judge Cocroft did not do so, and instead laid a substantive reform agenda aimed at increasing access to the courts, addressing structural injustices, and promoting diversity, Defendants in this case changed course and, with unjustified hostility, engaged in a campaign to undermine Cocroft's position and oust her from her office.

2.     As described herein, Defendants worked together to improperly remove Cocroft from the Administrative Judge role in retaliation for Cocroft's First-Amendment-protected speech and conduct and in violation of her rights to Due Process and Equal Protection under the law. This scheme involved the orchestration of a false "harassment" complaint against Cocroft, made in bad faith by Defendant Jennifer Goodman, which was used as a pretext by the court's other judges for

removing Cocroft as Administrative Judge. These proceedings, which Defendants implemented without question, contravened well-defined rules for how harassment complaints were to be addressed, deprived Cocroft of basic due process, and were otherwise marred by various irregularities.

3.  After this underhanded effort to remove her as Administrative Judge succeeded, Cocroft sought accountability from those responsible, but this too triggered Defendants' ire, who responded by mistreating and harassing her and other minority members of her staff, in violation of Cocroft's First Amendment and Equal Protection rights. In addition to suppressing Cocroft's grievances and denying her access to well-established internal procedures for resolving complaint, Defendants mistreated Cocroft and minority members of her staff by, *inter alia*, (a) denying them training and other resources customarily provided to judges and their staff members; (b) excluding Cocroft from meetings that she had the right to attend, including committee meetings; (c) modifying the Court's anti-harassment policy after receiving actual notice of Cocroft's claims to remove all provisions upon which her complaint was based; (d) denying Cocroft legal representation in a case where she was sued in her official capacity; (e) destroying internal correspondence between Cocroft, her staff, and court administrators; (f) informing crime victims that the Prosecutor's office was working on a plan to reassign Cocroft's entire criminal docket; and (g) subjecting Cocroft and her staff to an unprecedented degree of administrative scrutiny.

4.  All of this misconduct, as detailed below, has deprived Cocroft of her civil rights guaranteed by the First and Fourteenth Amendments to the U.S. Constitution and gives rise to various causes of action under 42 U.S.C. § 1983, which are asserted herein.

## II. Jurisdiction and Venue

5.  This Court has federal-question jurisdiction over this action pursuant to 28 U.S.C. § 1331 for the claims raised under 42 U.S.C. § 1983.

6.      This Court has jurisdiction over Defendants because they are residents or political subdivisions of the State of Ohio.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts upon which the claims in this litigation are based and the damages resulting therefrom occurred in Franklin County, Ohio.

### III. Parties

8.      Plaintiff Cocroft is a resident of Franklin County, Ohio and is a judge for the Franklin County Court of Common Pleas.

9.      Defendants Frye, O'Donnell, K. Brown, McIntosh, Holbrook, Lynch, Serrott, J. Brown, C. Brown, Young, Held Phipps, Hawkins, Aveni, and Munson are individuals residing in Franklin County, Ohio and are current or former judges for the Franklin County Court of Common Pleas.

10.     Defendant Goodman is a resident of Licking County, Ohio and was at all relevant times Court Administrator for the Franklin County Court of Common Pleas.

11.     Defendant Bedsole is a resident of Franklin County, Ohio and was at all relevant times Deputy Court Administrator for the Franklin County Court of Common Pleas.

12.     Defendant Davis is a resident of Franklin County, Ohio and was at all relevant times Director of Human Resources for the Franklin County Court of Common Pleas.

13.     Defendant Worthington is a resident of Franklin County, Ohio and was at all relevant times Director of Court Support Services for the Franklin County Court of Common Pleas.

14.     Defendant Hummer was at all relevant times First Assistant Prosecuting Attorney and Chief Counsel, Civil Division in the Franklin County Prosecutor's Office.

15.     Defendant Dean was at all relevant times Deputy Director of Labor and Employment, Civil Division, in the Franklin County Prosecutor's Office.

## IV. Factual Background

**A.**     **In July of 2021, Judge Cocroft is elected as the first black female administrative judge in Franklin County history, with racism having been recognized as a public health crisis by County officials, and with mounting complaints of racial discrimination at the County Courthouse.**

16.     Plaintiff Kimberly Cocroft is an elected judge of the Franklin County Court of Common Pleas, General Division ("FCCP-Gen"), first elected in 2009 and repeatedly re-elected by large margins, reflecting sustained public confidence in her integrity and performance.

17.     Judge Cocroft has devoted her professional life to public service in Franklin County, where she was born, educated, and has long served as a mentor and role model for aspiring lawyers and judges from historically marginalized communities.

18.     In July of 2021, Judge Cocroft's colleagues unanimously elected her to serve as Administrative Judge of FCCP-Gen for the 2022 term, making her the first woman and first Black woman to hold that role in the court's history.

19.     In the years leading up to Cocroft's election to this position, the Court had received mounting complaints about its treatment of its staff (particularly its Black staff members), and the criminal defendants and probationers under the Court's supervision.

20.     For example, various employees of the Franklin County Adult Probation Department sent a letter to the Court, citing numerous specific examples of unequal and disproportionate treatment towards Black individuals, supported by personal testimonials. One Black officer described how white colleagues recommended prison for a young Black probationer with no serious record, whereas similarly situated white defendants routinely receive services. This same officer complained about management having ignored complaints about biased discipline and office assignments. Multiple testimonials recount supervisors making racist jokes or telling Black staff they were hired just for diversity. In another testimonial, a Black officer detailed how she was subject to daily time monitoring and denied any scheduling accommodation for childcare, in stark contrast to the leeway

4

routinely granted to white staff. And multiple complaints were made about the handling of an incident involving the display of a "Thin Blue Line" flag, which several employees found offensive and racially insensitive.

21.     Consistently and contemporaneously with these documented complaints by Courthouse staff, Franklin County, on May 19, 2020, issued a resolution declaring racism as a public-health crisis, supporting community efforts to amplify issues of racism, and encouraging racial equity training among all community partners.

22.     The Administrative Judge position carries substantial authority and responsibility for court administration, including supervision of the Court Administrator, oversight of personnel policies affecting staff assigned to the judges, and responsibility to the Chief Justice of the Ohio Supreme Court for compliance with rules of superintendence.

23.     By electing Judge Cocroft as Administrative Judge, the judges of FCCP-Gen recognized her leadership and entrusted her with responsibility for improving court operations, including addressing longstanding problems in staff management and the handling of internal complaints.

**B.      Cocroft receives minimal information and training in her transition to Administrative Judge, and is lectured by her White colleagues about the type of Black political leaders she needs to be "more like."**

24.     Almost immediately after her election, however, certain judicial colleagues and senior administrative staff began to undermine her authority and isolate her, in ways that departed from how prior, non-Black Administrative Judges had been treated.

25.     For example, then-Administrative Judge Stephen McIntosh and senior administrators, including Court Administrator Jennifer Goodman and Deputy Court Administrator Susan Bedsole, delayed and minimized the information and training they provided to Judge Cocroft about the Administrative Judge role.

26.     Where prior incoming Administrative Judges received timely orientation and updates about ongoing administrative issues, Judge Cocroft was left largely uninformed until late 2021, just weeks before she was to assume the role. The failure to provide a full and timely briefing was inconsistent with past practice and made it substantially more difficult for Judge Cocroft to succeed in her new leadership role.

27.     When a transition meeting was finally scheduled in November 2021, McIntosh began the meeting not by providing substantive guidance, but by telling Judge Cocroft that Goodman and Bedsole "would be [her] best friends," signaling that she was to rely on them and implicitly warning her about stepping outside their preferences.

28.     At the same time, some of her white judicial colleagues took it upon themselves to question and critique her personnel decisions in ways that were unprecedented and racially charged. In December 2021, Judges Jeffrey Brown and Mark Serrott came uninvited to Judge Cocroft's chambers and demanded an explanation for a staff termination she had made. In her years on the bench, Judge Cocroft had never observed white judges being required to justify their personnel decisions to other judges, and she viewed this interrogation as a departure from established norms and an intrusion on her autonomy.

29.     During this visit, J. Brown and Serrott told Judge Cocroft that "people" viewed her as unapproachable, unfriendly, and aggressive, and that as Administrative Judge she needed to be more "approachable." J. Brown then proceeded to name several prominent Black women—political and judicial figures—telling Judge Cocroft that she needed to be "more like" them. Serrott stood by and did nothing to correct or distance himself from Brown's comments, yet later added that he "would not want to be Black in America," underscoring the racial dimension of their criticism. Judge Cocroft responded that they had no right to present her with a list of Black women she should emulate, or to question her character and leadership style through the lens of racial stereotypes.

6

30.     Deeply upset by this, Cocroft went directly to McIntosh's office, where she reported the incident. McIntosh minimized the conduct, dismissing J. Brown's behavior as simply "how he is," and gave no indication that he would counsel J. Brown or Serrott or take any corrective action. No one ever apologized to Judge Cocroft for that incident, and she is not aware of any similar racialized criticism ever being directed at white judges regarding their demeanor or staffing choices.

31.     From this point forward, Judge Cocroft understood that some of her colleagues were willing to question and undermine her in ways that were tied to her race and gender and that would not have been tolerated if directed at white judges.

**C.      Cocroft assumes the position of Administrative Judge in January of 2022 and begins to implement a reform agenda to her colleagues' disapproval.**

32.     On January 3, 2022, Judge Cocroft formally assumed the position of Administrative Judge of FCCP-Gen.

33.     As Administrative Judge, Judge Cocroft announced and began implementing a good-faith vision for reforming FCCP-Gen that focused on transparency, accountability, and fair treatment of court staff and litigants.

34.     Her reform efforts included insisting that senior administrators, including Court Administrator Jennifer Goodman, comply with court policies, state law, and ethical standards in areas such as handling staff complaints, preserving public records, and managing court resources.

35.     Almost immediately, several of her judicial colleagues, including Defendant Frye, and senior administrators, including Goodman, made clear through their words and actions that they disapproved of the direction she was taking the court.

36.     These defendants had grown accustomed to a more informal and insular style of administration in which court leadership did not welcome scrutiny of the Court Administrator's performance or serious discussion of systemic problems. By contrast, Judge Cocroft's approach

called for closer oversight of the Court Administrator, more rigorous documentation of decisions, and greater openness to complaints about discrimination and retaliation within the court.

37.     Goodman viewed this increased scrutiny and feedback from Judge Cocroft as a personal attack and a threat to her power and job security, rather than as appropriate supervision from the Administrative Judge. Several judges, including Frye, shared Goodman's hostility to Judge Cocroft's reform efforts.

38.     These judges and Goodman were also resistant to the fact that, as the first Black woman Administrative Judge, Cocroft's reform agenda included addressing racial inequities and disparate treatment in the court's internal operations.

39.     Over time, as Judge Cocroft continued to question Goodman's decisions and to demand improvements in areas such as staff management, complaint handling, and public-records compliance, Goodman and certain judges began to speak among themselves about her in negative and dismissive terms.

40.     Rather than engage openly with her policy disagreements, these defendants chose to treat her reform efforts as "aggressive," "unprofessional," or "difficult," in order to delegitimize her leadership and justify a campaign to remove her from the Administrative Judge role.

**D.     Defendants fabricate a bad-faith "harassment" complaint by Jennifer Goodman to use as a pretext to force Judge Cocroft out of her role as Administrative Judge, denying Cocroft recourse to the ordinary procedures for investigating such complaints.**

41.     The judicial defendants, including Frye, understood that they could not simply call a vote to remove the Administrative Judge they had just elected without articulating some purportedly serious misconduct. Removing her without allegations of misconduct would have been highly embarrassing to the other judges, would have exposed their disagreement with her reforms to public scrutiny, and

8

could have appeared retaliatory and discriminatory given her status as the first Black woman to be Administrative Judge.

42. Facing these difficulties, Defendants set out to manufacture a pretext that would make it appear that they were acting to protect court staff from "harassment," rather than to silence and punish Judge Cocroft for her reform agenda and protected speech.

43. This strategy centered on Goodman, whose position as Court Administrator allowed her to frame routine supervisory feedback as "harassment" and to recruit allies among the judges to support that narrative.

44. As part of her administrative duties, Judge Cocroft met with Goodman, reviewed Goodman's work, and, when necessary, pointed out deficiencies or concerns regarding court operations and staff management. These communications included direct but professional feedback regarding Goodman's performance in handling staff complaints, managing information systems, coordinating with outside agencies, and communicating with judges and staff. Much of the feedback that Cocroft provided to Goodman was based on information she or her staff had received directly from other Court staff-members about Goodman's deficiencies in various aspects of her job.

45. At no time did Judge Cocroft do anything that could be reasonably characterized as "harassing" Goodman, or anything that was not in fact well within Judge Cocroft's sound discretion pursuant to the very oversight responsibilities required of the Administrative Judge over the Court Administrator. Yet Goodman began privately characterizing these supervisory interactions as "harassing" or "hostile," to lay the groundwork for a future complaint. Goodman selectively documented or described interactions with Judge Cocroft in a manner that stripped away context and omitted the legitimate administrative reasons for Judge Cocroft's feedback.

46. On information and belief, Frye and other judges encouraged Goodman's recasting of these events, reassuring her that they would support her if she were to file a complaint accusing Judge

Cocroft of harassment. In discussions among themselves, these defendants framed the issue not as a disagreement over policy or reform, but as a "personality problem" or "conduct issue" with Judge Cocroft, which they believed would be more palatable as a basis for removing her from leadership.

47. As part of this plan, Frye and other judges led Goodman to understand that if she filed a formal "harassment" complaint, they would treat it as serious misconduct and would use the complaint to pressure Judge Cocroft to step down as Administrative Judge.

48. Goodman, acting in concert with Frye and these other judges, therefore filed a complaint accusing Judge Cocroft of "harassment" based on interactions that were, in truth, nothing more than firm, good-faith evaluations of Goodman's job performance.

49. Any responsible HR professional honestly evaluating Goodman's "harassment" complaint—let alone an experienced attorney or judge—would have recognized it as transparently baseless and reflective of nothing as much as Goodman's insubordination and hostility toward her supervisor.

50. Goodman's complaint was drafted and framed in a way that exaggerated tone and isolated individual comments, while omitting that Goodman was being held accountable for specific administrative failings and policy disagreements.

51. For example, although Goodman's complaint conceded that a new staff attorney's onboarding process ran into problems that required corrective work and additional training, Goodman characterized Cocroft's insistence that this be promptly fixed as "harassment" rather than routine accountability for an admitted failure. She likewise admitted that she and other administrators secretly re-engineered Plaintiff's DEI director proposal without telling Cocroft (Goodman's superior and the court's Administrative Judge), yet Goodman portrayed Plaintiff's anger and loss of trust about this undisclosed work around as evidence of "harassment," while downplaying the fact that she had undermined Cocroft's authority over this major policy initiative. Goodman also complained that Cocroft criticized her for not speaking first in an icebreaker, for

10

how she sat in her chair, and for facial expressions suggesting she wanted to speak but did not, even while acknowledging that the meeting was a leadership session called by the Administrative Judge and that Cocroft "did the vast majority of the talking" about leadership expectations. Goodman also characterized as "belittling" Cocroft's statements that, as Administrative Judge, she expected Goodman to be responsible for the performance of her subordinate directors and that "all happenings" in the executive team ultimately fell on Goodman, which is a textbook articulation of chain-of-command responsibility, not abusive conduct. In general, Goodman's complaint devoted substantial attention to subjective descriptions of Cocroft's tone, facial expressions, and body language and repeatedly asserted that Goodman "felt demeaned, belittled, criticized, and harassed" without acknowledging her own failures that would reasonably have led to her superior's frustration with her performance. Thus, Goodman's complaint reads, as a whole, as a senior manager bristling at criticism and consequences, and not reflective of any objectively unreasonable or abusive behavior by Cocroft.

52.    Goodman's complaint further ignored or downplayed the broader context in which Judge Cocroft had raised concerns about discrimination, retaliation, and irregularities in court operations, concerns that directly implicated Goodman's role.

53.    Once Goodman's complaint was filed, Frye and the other involved judges treated it as the long-sought vehicle for accomplishing what they could not do openly—removing the sitting Administrative Judge whose leadership they opposed. The defendant judges, including Frye and Colleen O'Donnell, therefore immediately began treating Goodman's complaint not as a matter requiring formal investigation or due process, but as a convenient tool to force Judge Cocroft out of the Administrative Judge position.

54. Normally, harassment complaints would trigger a structured process under FCCP-Gen's policies, including written notice of the allegations, an opportunity for the accused to respond with evidence, and involvement of multiple stakeholders to ensure fairness and documentation.

55. In stark contrast to the court's usual procedures for handling internal staff complaints—which typically involved review by the Human Resources Director, consultation with the Personnel Committee, and, if necessary, an impartial investigation by neutral parties—the handling of Goodman's complaint was shrouded in secrecy and expedited toward a predetermined outcome.

56. The defendant judges did not want an impartial probe into Goodman's complaint because it risked uncovering communications and context showing that Judge Cocroft's evaluation of Goodman were legitimate exercises of her administrative oversight duties, tied to her reform agenda and protected speech about court operations.

57. Frye, in particular, who had been a vocal supporter of Goodman's administration and opponent of Judge Cocroft's changes, made it clear in these discussions that the judges had no intention of allowing the complaint to proceed through standard channels that might vindicate Judge Cocroft.

58. Instead of following the proper process, Frye, in consultation with and approval from O'Donnell who was Chair of the FCCP-Gen Personnel Committee, approached Judge Cocroft privately, outside of any formal channels, and conveyed that they and the other judges had already agreed to vote Judge Cocroft out of her position based on Goodman's complaint unless Cocroft voluntarily resigned. They also told Judge Cocroft that if she voluntarily resigned as Administrative Judge, Goodman's complaint would simply "go away," with no further action taken against her and no public record of the matter.

59.     These representations were coercive and designed to pressure Judge Cocroft into resigning without a fight, as the Defendants knew that a formal removal vote would invite questions about the timing, the complaint's substance, and potential racial and retaliatory motives.

60.     The defendants' approach bypassed any neutral evaluation of the complaint's validity, such as interviewing witnesses, reviewing emails, or considering Judge Cocroft's written rebuttal, which would have been standard in comparable cases involving judicial or administrative personnel.

61.     Judge Cocroft, faced with this coordinated pressure from her colleagues and the implicit threat of a forced removal that would tarnish her reputation and career, saw no viable path forward to continue serving effectively as Administrative Judge.

62.     Her resignation was not voluntary but was extracted through duress, coercion, and the manipulation of irregular procedures that deprived her of due process and protected her from retaliation for her reform efforts and speech.

63.     Following her resignation, the defendant judges installed a successor—more aligned with their preferences—who promptly reversed or ignored key aspects of Judge Cocroft's reform agenda, confirming that the true motive was opposition to her vision, not any legitimate concern over Goodman's complaint.

64.     No formal investigation into Goodman's complaint ever occurred, and it was effectively buried after her resignation, further evidencing that it was a pretext for retaliation and discrimination against Cocroft and not a *bona fide* grievance warranting legitimate scrutiny pursuant to the Court's well-established rules for evaluating such complaints.

65.     These rules, which apply to all Judges, all other Court employees and staff, and "all individuals who may have contact with any employee of [the Court]," provide that when a harassment complaint is made, the Court will conduct an investigation in an expedited and professional manner and maintain the integrity of this process by keeping both the complaint and

investigation confidential. When the Administrative Judge is the subject of the complaint, Court

policy requires that the investigation shall be conducted by the Director of Human Resources,

Deputy Court Administrator and Chair of Personnel Committee. Further, the rules contemplate that

an investigation shall include interviews of all witnesses who have been identified specifically or who

may have any knowledge of the claims giving rise to the complaint. Further, the person who is the

subject of the complaint is given an opportunity to respond to the allegations in writing. Once all

information is compiled and reviewed, the investigative committee then makes its presentation to

the FCCP-Gen judges and, thereafter, the judges determine a course of action to resolve the

complaint. That resolution is then communicated both to the complainant and subject of the

complaint. Finally, if the investigative committee determines that a complaint or report has been

made in bad faith, then the complainant may be subject to disciplinary action, up to and including

termination.

**E.      As Cocroft persists in seeking to have Goodman's complaint adjudicated through the proper channels, Defendants continue to deny her due process, and subject Cocroft and her staff to a pattern of retaliatory actions.**

66.      After being coerced into resigning as Administrative Judge, Judge Cocroft did not simply

accept the wrongful loss of her leadership position. Rather, she repeatedly sought accountability for

what had happened, including by raising concerns with her judicial colleagues, court administrators,

county administrator and deputy county administrator, the then-president of the county's board of

commissioners, and county legal counsel about the coerced nature of her resignation and the falsity

of Goodman's harassment complaint.

67.      She requested that the court revisit the circumstances of her resignation, re-examine

Goodman's complaint under appropriate procedures, and take steps to ensure that similar abuses of

the complaint process would not be used against other judges or staff, pursuant to the Court's own

Anti-Harassment policy. However, rather than address these concerns in good faith, Defendants

responded with additional hostility and a pattern of retaliatory acts designed to isolate Judge Cocroft and her minority, female staff, diminish her effectiveness as a sitting judge, and punish her for challenging the wrongful treatment she had received.

68.     Following her resignation as Administrative Judge, Judge Cocroft and her minority, female staff were denied training opportunities and resources that had previously been routinely offered to judges and their chambers.

69.     For example, court-wide training sessions on new case-management systems and updated protocols were provided to other judges' staff, but Judge Cocroft's staff were either not invited, not informed, or added only after she specifically inquired about the sessions.

70.     When new administrative or technology tools were rolled out, other judges received individual assistance and materials, while her chambers were left to figure out the changes on their own, significantly increasing the workload and stress on her staff. Additionally, judges who had less seniority than Judge Cocroft received priority for technology upgrades, even though the priority for these upgrades was supposed to be based on seniority.

71.     Requests from her chambers for the same level of training and support afforded to other judges were ignored, delayed, or met with curt responses suggesting that her staff should "figure it out" without administrative assistance.

72.     This systematic deprivation of training and resources hindered the efficient operation of her courtroom and sent a clear message to both her and her staff that they were disfavored and unwelcome.

73.     Defendants also began excluding Judge Cocroft from meetings and committee activities in which she had a right to participate as an elected judge of FCCP-Gen. Cocroft was left off email lists for certain committee meetings, including committees on which she had previously served or to which she had been properly appointed. Agendas and materials for court-wide meetings were

15

circulated selectively, with other judges receiving background information and preparatory documents that were not shared with her. And she often learned about significant policy discussions and decisions only after the fact, when colleagues referenced meetings or votes from which she had been excluded.

74.    When Judge Cocroft questioned these omissions, Defendants offered pretextual explanations—such as "oversights" or "miscommunications"—but the repeated nature of the exclusions made clear that this was part of a deliberate, retaliatory, and discriminatory effort to marginalize her voice in court governance.

75.    The retaliation against Judge Cocroft intensified when, in at least one case, Judge Cocroft was sued in her official capacity as a judge of FCCP-Gen. In such cases, it is customary and expected that the county prosecutor's office or other designated counsel will provide legal representation to the judge, as the claims are directed at the judge's official actions on behalf of the court. However, when Judge Cocroft requested representation, she was told by Hummer and Dean that their office would not provide her counsel, even though they routinely defended other judges in similar suits. They took the position that they had no obligation to represent her and suggested that she would need to secure her own counsel, despite the official-capacity nature of the claims.

76.    This denial of legal representation left her exposed to personal and professional risk and was a direct departure from standard practice, evidencing discriminatory and retaliatory animus.

77.    As Judge Cocroft continued to pursue accountability, she became increasingly concerned that court administrators were destroying or altering internal correspondence relevant to her complaints.

78.    She discovered that internal messaging between her chambers and the court administrators—communications that were public records under Ohio law—had been deleted from systems to which she previously had access.

79.     These deletions were not part of any neutral records-management policy; instead, they selectively affected communications involving her and her minority, female staff, especially those in which she raised concerns about discrimination, retaliation, or administrative irregularities.

80.     When she sent preservation letters and formal requests for these records, she received evasive responses and incomplete productions, further reinforcing that material had been destroyed or withheld.

81.     The destruction and concealment of this correspondence deprived her of critical evidence to substantiate her claims and amounted to an additional act of retaliation.

82.     Defendants also undermined Judge Cocroft's standing with litigants and the public by communicating with crime victims about plans to reassign her criminal docket.

83.     In at least one instance, representatives of the prosecutor's office informed crime victims that the office was working on a plan to move all cases off of Judge Cocroft's docket, implying that she was unfit or under scrutiny. These statements were made without any formal action from the Ohio Supreme Court or other authority to remove her from presiding over criminal cases, and without giving her any notice or opportunity to respond.

84.     This communication sowed confusion and distrust among victims and the public, damaged her reputation as a fair and competent judge, and signaled that court leadership and prosecutors were working together to sideline her.

85.     The targeting of her docket in this way was unprecedented and not applied to other judges whose performance or behavior had been questioned.

86.     Defendants also subjected Judge Cocroft and her minority, female staff to an unprecedented degree of administrative scrutiny in retaliation for her demands for accountability.

87.     Administrative staff closely monitored her use of court resources, her staff's schedules, and minor procedural details that had never before prompted intervention from administration. Routine

17

requests from her chambers for leave, schedule adjustments, or minor accommodations were treated as suspicious and were questioned or delayed in ways that did not occur for other judges.

88. Defendants also scrutinized her communications with staff and attorneys, sometimes forwarding or commenting on emails in a manner designed to cast her in a negative light.

89. This heightened monitoring created a climate of fear in her chambers, as all staff understood that anything they did could be seized upon and used as a pretext for further complaints against Judge Cocroft.

90. No other judge on FCCP-Gen was subjected to remotely comparable oversight or second-guessing of daily administrative matters.

91. Taken together, Defendants' actions after her forced resignation—from denial of resources and representation, to exclusion from meetings, destruction of records, dissemination of Goodman's unfounded complaint to the public, threats to reassign her docket, and intrusive administrative monitoring—constitute a sustained campaign of retaliation and discrimination.

92. This campaign was intended to punish Judge Cocroft for seeking accountability for the wrong done to her, to chill her from further protected speech and petitioning activity, and to send a clear message that a Black woman judge who challenges the status quo will face coordinated institutional backlash.

93. By late 2022 and into 2023, it had become clear to Judge Cocroft that the very individuals who were supposed to assist with and fairly evaluate her grievances—her fellow judges, the Court Administrator, the county administrator, and the county lawyers assigned to represent the court— were instead aligned against her.

94. Her repeated efforts to obtain internal accountability for being coerced into resigning as Administrative Judge, to challenge the pretextual nature of Goodman's "harassment" complaint, and to stop ongoing retaliation were met with indifference, hostility, or further retaliatory acts. Yet,

Defendants refused to revisit or correct the circumstances of her forced resignation, refused to provide a fair and transparent process for evaluating Goodman's complaint, and refused to take meaningful steps to stop the continuing discrimination and retaliation.

95.     Under these conditions, Judge Cocroft reasonably concluded that internal channels within the court and county government were hopelessly compromised and that no fair relief would be available from the same officials who had participated in or condoned the wrongdoing.

96.     Faced with ongoing harm to her reputation, working conditions, and ability to perform her judicial duties, and with no neutral forum inside the court willing to address her complaints, Judge Cocroft was left with no meaningful alternative but to seek relief through the courts for violations of her civil rights.

97.     Beginning in November 2022, shortly after receiving notice of Goodman's complaint, Judge Cocroft diligently tried to secure private counsel to help her pursue civil claims arising from the Court Defendants' conduct.

98.     She contacted multiple attorneys—at least six within approximately fifteen months—who advised her that she had meritorious claims but declined to represent her because of the politically sensitive nature of suing sitting Franklin County judges, court administrators, and assistant county prosecutors.

99.     Several of these attorneys told her, in substance, that representing a sitting common pleas judge against her own colleagues and court leadership would place them in conflict with their other cases in Franklin County and risk adverse consequences for their existing clients.

100.    One attorney agreed to explore informal discussions with representatives of the Court Defendants but withdrew within a few months due to conflicts of interest, leaving Judge Cocroft again without representation.

101.    In February 2024, she contacted at least two more attorneys, who likewise opined that she had valid claims but declined to represent her because they had matters pending before some of the same Court Defendants and did not want to jeopardize those cases.

102.    During the summer of 2024, Judge Cocroft also sought help from a local civil-rights organization, but she received no response and remained without institutional support.

103.    With no lawyer willing to represent her, she filed a discrimination charge with the EEOC on May 23, 2024, *pro se*, as a necessary step to preserve her employment-based federal rights against Franklin County and the Court Defendants.

104.    In September 2024, she requested a right-to-sue letter, and in October 2024 she received that notice, again while still unrepresented, confirming that she had exhausted her administrative remedies.

105.    Because she was still unable to retain counsel, she filed this lawsuit *pro se*, despite the substantial burden of litigating complex civil-rights claims while maintaining a full judicial docket and enduring ongoing retaliation.

106.    Even after filing suit, she continued to search for representation, consulting additional attorneys in early 2025, including lawyers outside Ohio, but concluded that they were not an appropriate fit, and she continued to represent herself.

107.    Only in September 2025—almost three years after she began seeking counsel—was she finally able to retain experienced civil-rights counsel willing to take on the case.

108.    Under these circumstances, Judge Cocroft alleges that she acted with reasonable diligence in attempting to vindicate her rights.

### V.  Causes of Action

### Count One
### First Amendment Retaliation, 42 U.S.C. § 1983

109.    Judge Cocroft incorporates the previous allegations by reference.

110. Judge Cocroft has a right under the First Amendment of the U.S. Constitution to be free from government retaliation for her speech.

111. At all relevant times, Defendants were acting under color of state law in their capacities as elected judges, court administrators, and county prosecutors.

112. Judge Cocroft engaged in conduct protected by the First Amendment, including specifically when, prior to and after her election as Administrative Judge, she advocated for and sought to implement reforms to the Franklin County Court of Common Pleas to address issues of equity and diversity. She also engaged in protected conduct when she demanded an investigation of Goodman's bad-faith complaint and sought accountability for her improper removal as Administrative Judge.

113. As retaliation for Judge Cocroft's protected activities, including criticism of the court's operations, Defendants maliciously engineered Judge Cocroft's removal as Administrative Judge by orchestrating a bad-faith harassment complaint against her, which threatened her good name and was used as a pretext to coerce Judge Cocroft's resignation. Following her resignation, as retaliation for her continued efforts to seek accountability for her prior mistreatment, Defendants continued to mistreat Judge Cocroft and her staff by, inter alia, (a) denying them training and other resources customarily provided to judges and their staff members; (b) excluding Cocroft from meetings that she had the right to attend, including committee meetings; (c) modifying the Court's anti-harassment policy after receiving actual notice of Cocroft's claims to remove all provisions upon which her complaint was based; (d) denying Cocroft legal representation in a case where she was sued in her official capacity; (e) destroying internal correspondence between Cocroft, her staff, and court administrators; (f) informing crime victims that the Prosecutor's office was working on a plan to reassign Cocroft's entire criminal docket; and (g) subjecting Cocroft and her staff to an unprecedented degree of administrative scrutiny.

114.    Defendants were motivated to take these adverse actions against Judge Cocroft in by part by Judge Cocroft's exercise of her First Amendment rights in criticizing the operations of the Franklin County Court of Common Pleas and advocating for various structural reforms to the court's operations.

115.    The actions taken by Defendants against Judge Cocroft, which among other things threatened her career and her reputation, would deter a person of ordinary firmness from continuing to engage in protected activity as Judge Cocroft had done.

116.    As a direct and proximate result of this unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wonton disregard for Judge Cocroft's rights, Judge Cocroft has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including but not limited to, mental, emotional, and physical pain and suffering. Judge Cocroft is also entitled to punitive damages based on Defendants' unlawful and unconstitutional conduct, as well as equitable and injunctive relief and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

**Count Two**
**Equal Protection Violation**
**Fourteenth Amendment and 42 U.S.C. § 1983**

117.    Judge Cocroft incorporates the previous allegations by reference.

118.    Judge Cocroft is a Black woman and an elected judge of the Franklin County Court of Common Pleas, General Division. Defendants are judges, court administrators, and county attorneys who at all relevant times acted under color of state law.

119.    Defendants intentionally treated Plaintiff differently than similarly situated white and/or male judges in the terms and conditions of her judicial service, court leadership opportunities, and access to court resources, because of her race and gender.

120.    Soon after her unanimous election as Administrative Judge, Plaintiff was uniquely subjected to racially charged criticism of her demeanor, intrusive questioning about her personnel decisions, and

comments about what kind of "Black woman" she should be—treatment not directed at white judges in comparable circumstances.

121.    As Administrative Judge, Plaintiff and her predominantly Black staff were denied training, technology support, accommodations, and flexibility routinely afforded to white judges and their staff, and were instead subjected to heightened scrutiny of leave, access, and performance.

122.    When Plaintiff exercised her supervisory authority over Defendant Goodman and raised good-faith concerns about court operations and equity, judicial defendants, including at least Frye and O'Donnell, joined with Goodman to recharacterize her legitimate criticism as "harassment" and used a flimsy, pretextual complaint to coerce Judge Cocroft's resignation as Administrative Judge, though no white judge had ever been stripped of leadership on such a basis.

123.    After her coerced resignation, Defendants continued to single Plaintiff out for adverse treatment—including but not limited to exclusion from meetings, denial of official-capacity representation, destruction or non-preservation of her internal correspondence, interference with her internal document management system, including the unauthorized deletion of several orders she had entered, threats or plans to reassign her docket, and unprecedented administrative monitoring—while not subjecting similarly situated white judges to comparable measures.

124.    Defendants lacked any legitimate, non-discriminatory reason for these actions, which were motivated by discriminatory animus and stereotypes against Plaintiff as a Black woman judge and by hostility to her efforts to address racial inequities.

125.    As a direct and proximate result of this unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard for Judge Cocroft's rights, Judge Cocroft has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including but not limited to, mental, emotional, and physical pain and suffering. Judge Cocroft is also

entitled to punitive damages based on Defendants' unlawful and unconstitutional conduct, as well as equitable and injunctive relief and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

**Count Three**
**Procedural Due Process Violation**
**Fourteenth Amendment and 42 U.S.C. § 1983**

126.     Judge Cocroft incorporates the previous allegations by reference.

127.     Plaintiff had constitutionally protected liberty and property interests in, among other things, her leadership position of Administrative Judge, her professional reputation and good name, and her ability to perform her judicial duties free from arbitrary and stigmatizing official actions.

128.     Defendants, acting under color of state law, deprived Plaintiff of these protected interests by coercing her resignation as Administrative Judge and by subjecting her to stigmatizing accusations of "harassment" and related retaliatory measures, without providing her with constitutionally adequate notice, a fair opportunity to be heard, or an impartial decisionmaker.

129.     After Court Administrator Goodman filed a pretextual "harassment" complaint based on Plaintiff's legitimate supervisory criticism, judicial defendants including at least Frye, O'Donnell, and Serrott, deliberately bypassed the court's ordinary procedures for handling complaints and grievances, handled the matter in secret, and refused to initiate any neutral investigation or formal process through which Plaintiff could contest the allegations.

130.     Instead of affording Plaintiff written notice of specific charges, access to the evidence, an opportunity to present her own evidence and witnesses, and a decision by a neutral body, Frye and O'Donnell informed Plaintiff that the judges had already resolved among themselves that she must resign as Administrative Judge or they would remove her based solely on Goodman's complaint.

131.     Confronted with this ultimatum, and with no meaningful avenue to challenge the complaint in a fair forum, Plaintiff was coerced into resigning her position as Administrative Judge.

132.     The procedures (or lack thereof) employed by Defendants in processing and exploiting Goodman's complaint, in forcing Plaintiff's resignation, and in taking subsequent stigmatizing and retaliatory actions were fundamentally unfair, inconsistent with the court's own usual practices, and fell far short of the minimum requirements of procedural due process, including notice, a meaningful opportunity to be heard, and decision-making by an impartial tribunal.

133.     As a direct and proximate result of this unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wonton disregard for Judge Cocroft's rights, Judge Cocroft has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including but not limited to, mental, emotional, and physical pain and suffering. Judge Cocroft is also entitled to punitive damages based on Defendants' unlawful and unconstitutional conduct, as well as equitable and injunctive relief and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

## VI. Prayer for Relief

Wherefore, Plaintiff Kimberly Cocroft respectfully prays for judgment in her favor and against Defendants in an amount in excess of $75,000, together with punitive damages, attorneys' fees, costs, expenses, and any other relief to which Plaintiff may be entitled or that the Court deems equitable and just.

## VII.    Jury Demand

A trial by jury is demanded herein on all issues presented to the Court.

Respectfully submitted,

*/s/ Peter Pattakos*
Peter Pattakos (0082884)
    *peter@pattakoslaw.com*
Gregory Gipson (0104229)
    *ggipson@pattakoslaw.com*
Zoran Balac (0104229)
    *zbalac@pattakoslaw.com*

THE PATTAKOS LAW FIRM LLC
101 Ghent Road, Fairlawn, Ohio 44333
P: 330.836.8533 | F: 330.836.8536

*Attorneys for Kimberly Cocroft*

## Certificate of Service

I hereby certify that on December 1, 2025, the foregoing document was filed using the Court's electronic-filing system, which will serve the document upon counsel of record for all parties.

*/s/ Peter Pattakos*
*Attorney for Kimberly Cocroft*